# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal Credit Union,
Members United Corporate Federal Credit Union,
Southwest Corporate Federal Credit Union, and
Constitution Corporate Federal Credit Union,
in its own right, and on behalf of NCUA
GUARANTEED NOTES TRUST 2010-R1, NCUA
GUARANTEED NOTES TRUST 2010-R2, NCUA
GUARANTEED NOTES TRUST 2010-R3, NCUA
GUARANTEED NOTES TRUST 2011-R1, NCUA
GUARANTEED NOTES TRUST 2011-R2, NCUA
GUARANTEED NOTES TRUST 2011-R3, NCUA
GUARANTEED NOTES TRUST 2011-R4, NCUA
GUARANTEED NOTES TRUST 2011-R5, NCUA
GUARANTEED NOTES TRUST 2011-R6, NCUA
GUARANTEED NOTES TRUST 2011-M1,

                        Plaintiffs,

     -against-

DEUTSCHE BANK NATIONAL TRUST CO.

                     Defendant.

---------------------------------------------------------------------x

Case No. 14-cv-8919

Hon. Sidney H. Stein

**AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

TABLE OF CONTENTS

I.   NATURE OF THE ACTION .................................................................................1

II.  PARTIES ..........................................................................................................6

III. BNY MELLON AS INDENTURE TRUSTEE FOR THE NGN TRUSTS
     DECLINED TO TAKE ACTION ON BEHALF OF THE NGN TRUSTS
     AND, IN ANY EVENT, HAS DIRECT CONFLICTS IN PURSUING
     THESE CLAIMS .............................................................................................18

IV.  JURISDICTION AND VENUE .......................................................................19

V.   THE TRUSTS ................................................................................................20

VI.  BACKGROUND .............................................................................................21

     A.   RMBS Trusts ........................................................................................21

          Figure 1 ...............................................................................................23

     B.   The Trustees' General Duties ..............................................................25

     C.   The Trustees' Duties Under the Pooling and Servicing
          Agreements ..........................................................................................26

     D.   Duty Properly to Take Title to the Mortgage Loans Conveyed
          to the Trust ..........................................................................................27

     E.   Duty to Provide Notice of Incomplete or Defective Mortgage
          Files and Enforce Repurchase Rights with Respect to Mortgage
          Files that Cannot be Cured ..................................................................30

     F.   Duty to Provide Notice of Breaches and to Enforce Repurchase
          Rights with Respect to Defective Loans ..............................................31

     G.   Duties under the Transfer Agreements .................................................33

     H.   Duties Regarding the Servicers.............................................................35

     I.   The Trustee's Duties upon Knowledge of an Event of Default............36

     J.   The Trustee's Duties and Obligations under the TIA and the
          Streit Act, and the Common Law .........................................................37

i

VII.   **DEFENDANT SHOULD HAVE CAREFULLY INVESTIGATED THE
FACT THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS
IN THE FORM OF BREACHES OF REPRESENTATIONS AND
WARRANTIES AND TAKEN APPROPRIATE ACTION** ......................................39

A.     General Reports Concerning Originators' Systematic
Abandonment of their Underwriting Standards and Sponsors'
Disregard of Prudent Securitization Standards ......................................................40

B.     Specific Reports Concerning the Originators of Loans in the
Trusts Abandoning their Underwriting Standards and the
Sponsors Disregarding Prudent Securitization Practices ......................................46

1.     American Home ..............................................................................46

2.     Accredited Home Lenders, Inc. .....................................................48

3.     Ameriquest/Argent .........................................................................51

4.     Countrywide ....................................................................................58

5.     Decision One ...................................................................................64

6.     DLJ/Credit Suisse ...........................................................................65

7.     First Franklin ..................................................................................71

8.     Fremont ............................................................................................76

9.     GreenPoint .......................................................................................79

10.    Impac ...............................................................................................84

11.    IndyMac ...........................................................................................85

12.    Morgan Stanley Mortgage Capital .................................................90

13.    National City ....................................................................................95

14.    New Century .....................................................................................96

15.    Option One .....................................................................................106

16.    OwnIt ..............................................................................................110

17.    Paul Financial .................................................................................111

18.    Residential Funding .......................................................................113

ii

19.     RBS/Greenwich Capital ........................................................115

20.     Wells Fargo ..........................................................................117

21.     WMC Mortgage Corp. ...........................................................121

C.     A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards ................................................125

     1.     The Trusts Suffered from High Delinquency and Default Rates.......................................................................126

     2.     The Trusts Suffered Huge Losses .........................................127

D.     The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines .........................128

     Table 2 .............................................................................128

VIII.   ADDITIONAL EVIDENCE SHOWS THAT DEFENDANT KNEW OF DEFAULTS .................................................................................130

A.     Defendant's Affiliates Have Been Sued on Claims of Systematic, Widespread Shoddy Origination Practices.....................................130

B.     Defendant Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers...................................................................................132

C.     Global RMBS Repurchase Investigations and Settlements Alerted Defendant to Systematic, Widespread Breaches of Representations and Warranties.........................................................134

D.     Defendant Has Been Involved in Repurchase Litigation Against Responsible Parties................................................................135

IX.    DEFENDANT FAILED TO PRUDENTLY ADDRESS MASTER SERVICER AND/OR SERVICER DEFAULTS .......................................137

A.     Defendant Breached the Governing Agreements and Its Common Law and Statutory Obligations By Failing to Fulfill Its Duties After Defaults and Events of Default Triggered By Master Servicer and Servicer Misconduct .........................................137

B.     Specific Servicer Misconduct ................................................139

C.      The Master Servicers and Servicers Defaulted on their Duty to
        Notify the Trustee of Breaches of the Mortgage Loan
        Representations and Warranties..................................................151

D.      Defendant Knew That the Trusts Suffered from Widespread
        Master Servicer and/or Servicer Defaults ................................152

X.      **DEFENDANT FAILED TO ENSURE LOAN FILES WERE
        PROPERLY CONVEYED TO THE TRUSTS AND FAILED TO
        REMEDY ANY DEFECTS**..........................................................155

A.      Defendant Failed to Take Possession of Complete Mortgage
        Loan Files........................................................................................155

B.      Defendant Knew That the Loan Files Were Incomplete .....................158

C.      The Document Delivery Failures Were Events of Default ..................159

XI.     **DEFENDANT FAILED TO SATISFY ITS PRE-AND POST-DEFAULT
        DUTIES AND BREACHED THE GOVERNING AGREEMENTS** ......161

XII.    **THE "NO ACTION" CLAUSES DO NOT APPLY**....................................171

XIII.   **CLAIMS FOR RELIEF** ........................................................................171

COUNT ONE – BREACH OF CONTRACT.................................................171

COUNT TWO – BREACH OF FIDUCIARY DUTY ...................................174

COUNT THREE – NEGLIGENCE AND GROSS NEGLIGENCE.............176

COUNT FOUR – NEGLIGENT MISREPRESENTATION ..........................177

COUNT FIVE – BREACH OF THE COVENANT OF GOOD FAITH .......180

COUNT SIX – VIOLATION OF THE STREIT ACT...................................181

COUNT SEVEN – VIOLATION OF THE TRUST INDENTURE
ACT OF 1939 ...............................................................................................183

PRAYER FOR RELIEF ...............................................................................186

XIV.    **JURY DEMAND**...................................................................................187

The National Credit Union Administration Board ("NCUA Board"), acting in its capacity as liquidating agent for each of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union ("WesCorp"), Members United Corporate Federal Credit Union ("Members United"), Southwest Corporate Federal Credit Union ("Southwest"), and Constitution Corporate Federal Credit Union ("Constitution"), (collectively, the "CCUs"), and as the holder of the NGN Owner Trust Certificates (as defined below) brings this action against Deutsche Bank National Trust Co. ("DBNTC" or "Defendant"), individually and on behalf of and for the benefit of the NGN Trusts (as defined below, and collectively the "Plaintiffs") and alleges as follows:

## I.   NATURE OF THE ACTION

1.      Plaintiffs bring this action against Defendant to recover the damages they have suffered because of Defendant's violations of its statutory, contractual, and common law obligations.

2.      This action arises out of Defendant's role as trustees for 97 trusts identified on Exhibit A that issued residential mortgage-backed securities ("RMBS"). Each trust consists of hundreds of individual residential mortgage loans that were pooled together and securitized for sale to investors. Investors purchased certificates issued by the RMBS trust certificates that entitled the investors (or "certificateholders") to fixed principal and interest payments from the income stream generated as borrowers made monthly payments on the mortgage loans in the trusts.

3.      The CCUs purchased the certificates in the trusts identified on Exhibit A at an original face value of approximately $7.0 billion.

4.      The certificates' value was dependent on the quality and performance of the

mortgage loans in the trusts and swift correction of any problems with the loans. But, because of the structure of the securitizations, certificateholders do not have access to the mortgage loan files or the power to remedy or replace any defective loans. Instead, certificateholders must rely on the trustee to protect their interests.

5. Defendant, as the trustee for the trusts, had contractual, common law, and statutory duties to address and correct problems with the mortgage loans and to protect the trusts' and the certificateholders' interests. The trustee for each trust has three primary duties. First, the trustee must take possession and acknowledge receipt of the mortgage files, review the documents in the mortgage files, identify any mortgage files that lack a complete chain of title or that have missing documents, and then certify that the mortgage files are complete and accurate. If the trustee identifies defects in the mortgage files, it must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase any mortgage loans with defective mortgage files.

6. Second, if the trustee discovers a breach of the representations and warranties concerning the mortgage loans, including but not limited to representations concerning the characteristics of the mortgage borrowers, the collateral for the mortgage loans, and assurances that the mortgage loans were originated in accordance with applicable underwriting criteria, the trustee must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase the defective mortgage loans. If the trustee fails to exercise this duty, then the trusts and the certificateholders will suffer losses properly borne by the party responsible for the defective loans.

7. Third, the trustee must act to protect the interests of the trust and the certificateholders when it becomes aware of defaults concerning the trust. Thus, when the trustee

discovers a default, or is notified by other parties, such as servicers, of defaults like breaches of representations and warranties with respect to the underlying mortgage loans, the trustee must act prudently to investigate those defaults, notify certificateholders of the defaults, and take appropriate action to address the defaults.

8.      Here, Defendant failed to even perform the threshold duties of taking full possession of the original notes and mortgages and properly reviewing the mortgage loan files for irregularities. If Defendant had fulfilled its obligations, a significant percentage of the mortgage loans in the trusts would have been repurchased or substituted.

9.      Moreover, an overwhelming number of events alerted Defendant to the fact that the trusts suffered from numerous problems, yet it did nothing. First, the trusts suffered enormous losses due to the high number of mortgage defaults, delinquencies, and foreclosures caused by defective loan origination and underwriting. Second, highly publicized government investigations and enforcement actions, public and private litigation, and media reports highlighted the mortgage originators' systematic abandonment and disregard of underwriting guidelines and the deal sponsors' poor securitization standards in the years leading up to the financial crisis. As summarized below, these actions and reports detail the incredible volume of defective loans and notorious activities of the originators, sponsors, and other players in the RMBS industry. Yet Defendant failed to take steps to preserve its rights or hold the responsible parties accountable for the repurchase or substitution of defective mortgage loans in direct contravention of its obligations as trustee.

10.     Finally, Defendant failed to address servicer and/or master servicer defaults and events of default. Defendant knew that the master servicers and servicers were ignoring many of their duties, including their duty to notify other parties, including Defendant as trustee, upon the

3

master servicers' and servicers' discovery of breaches of the mortgage loan representations and warranties. Despite Defendant's knowledge of these ongoing defaults and events of default, Defendant failed to act prudently to protect the interests of the trusts and the certificateholders.

11.     Defendant's failures resulted in the trusts and certificateholders suffering losses rightfully borne by other parties. Had Defendant adequately performed its contractual, common law, and statutory obligations, breaching loans would have been removed from the loan pools underlying the certificates and returned to the responsible party. Defendant's improper conduct directly caused losses to certificateholders like the Plaintiffs.

12.     Even after ample evidence came to light that the trusts were riddled with defective loans, Defendant shut its eyes to such problems and failed to take the steps necessary to protect the trusts and certificateholders. Defendant failed to act in part because protecting the best interests of the trusts and the certificateholders would have conflicted with Defendant's interests. As a participant in many roles in the securitization process, Defendant was economically intertwined with the parties it was supposed to police.

13.     Because of the widespread misconduct in the securitization process, Defendant had incentives to ignore other parties' misconduct in order to avoid drawing attention to its own misconduct. Thus Defendant failed and unreasonably refused to take action to protect the trusts and certificateholders against responsible party breaches.

14.     Under the governing agreements and the common law, Defendant was required to exercise its rights and powers to protect the trusts.  Once Defendant became aware of the various failures discussed in this complaint, Defendant was required to use the same degree of care and skill that a prudent person would. But Defendant did not do so. Instead of protecting the trusts and the certificateholders, Defendant sat by as the trusts wasted away. Defendant failed to

4

exercise due care, failed to provide Plaintiffs and certificateholders with its undivided loyalty, failed to act in good faith, and negligently and with gross negligence breached its duties and made misrepresentations to Plaintiffs.

15.     Indeed, it is precisely this type of trustee complicity and inaction that led Congress to enact the Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa *et seq.*, to "meet the problems and eliminate the practices" that plagued Depression-era trustee arrangements and provide investors with a remedy for trustees that utterly neglect their obligations. *See, e.g.*, 15 U.S.C. § 77bbb(b) (explaining purposes of the TIA in light of problems identified in 15 U.S.C. § 77bbb(a)).[1]

16.     To that end, several sections of the TIA impose duties on trustees. First, TIA Section 315(a) provides that, prior to default (as that term is defined in the governing documents), the trustee is liable for any duties specifically set out in the governing documents. 15 U.S.C. § 77ooo(a)(1). Second, TIA Section 315(b) provides that the trustee must give holders of covered securities "notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b). Third, Section 315(c) requires a trustee to act prudently in the event of a default (as that term is defined in the governing documents). 15 U.S.C. § 77ooo(c). Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates

---

[1] In December 2014, the Second Circuit issued an order in *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. The Bank of New York Mellon*, Case No. 13-1776 (2d Cir. Dec. 23, 2014).  In its order, the Second Circuit held that residential mortgage-backed securities ("RMBS") certificates issued pursuant to pooling and servicing agreements ("PSAs") are not covered by the TIA because they fall under TIA § 304(a)(2), which exempts "any certificate of interest or participation in two or more securities having substantially different rights and privileges." 15 U.S.C. § 77ddd(a)(2). Plaintiffs have kept their TIA claims in this Amended Complaint to preserve their appellate rights.

expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b).

17.     In addition, New York Real Property Law § 124 *et seq.* (the "Streit Act") was enacted to ensure that trustees act with due care, facilitate the orderly administration of the trust, and to protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124. Like the TIA, following an event of default, the Streit Act provides that the trustee must exercise the same degree of skill and care in the performance of its duties as would a prudent person under the same circumstances. N.Y. Real Prop. Law § 126(1).

18.     Defendant's failure to perform its duties has damaged Plaintiffs. Accordingly, Plaintiffs now bring this action against Defendant for breaching the governing agreements, for failing in its common law duties, for violating the TIA, and, for the New York Trusts, for violating the Streit Act.

## II.     PARTIES

19.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") to stabilize corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The

NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA Board manages the NCUA. *See* Federal Credit Union Act ("FCU Act"), 12 U.S.C. §§ 1751, 1752a(a). Pursuant to 12 U.S.C. § 1787(a) and (b)(2)(A), the NCUA Board, in specified circumstances and in a distinct capacity, may close an insured credit union and appoint itself the Liquidating Agent for such credit union. As Liquidating Agent for a failed credit union, the NCUA Board succeeds to all rights, titles, powers, and privileges of the credit union, its members, accountholders, officers, and directors.

20.     U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas. As a corporate credit union, U.S. Central provided investment and financial services to other credit unions.

21.     WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California. As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

22.     Members United was a federally chartered corporate credit union with its offices and principal place of business in Warrenville, Illinois. Members United was created in mid-2006 by the merger of Empire and Mid-States Corporate Federal Credit Unions. As a corporate credit union, Members United provided investment and financial services to other credit unions.

23.     Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas. As a corporate credit union, Southwest provided investment and financial services to other credit unions.

24.     Constitution was a federally chartered corporate credit union with its offices and principal place of business in Wallingford, Connecticut. As a corporate credit union, Constitution provided investment and financial services to other credit unions.

25.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant its authority under the FCU Act, 12 U.S.C. § 1786(h). On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation pursuant to 12 U.S.C. § 1766(a) and 12 U.S.C. § 1787(a)(1)(A) and appointed itself Liquidating Agent. On September 24, 2010, the NCUA Board placed Members United, Southwest, and Constitution into conservatorship pursuant to the FCU Act. On October 31, 2010, the NCUA Board placed Members United, Southwest, and Constitution into involuntary liquidation, appointing itself Liquidating Agent.

26.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of the CCUs and of any member, account holder, officer or director of the CCUs, with respect to the CCUs and their assets, including the right to bring the claims asserted in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of the CCUs, and succeeds to all rights, titles, powers, and privileges of the CCUs. *See* 12 U.S.C. §1787(b)(2)(A). The NCUA Board may also sue on the CCUs' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2). In addition, the NCUA Board as Liquidating Agent may "exercise all powers and authorities specifically granted to conservators or liquidating agents, respectively, under this chapter and such incidental powers as shall be necessary to carry out such powers; and (ii) take any action authorized by this chapter, which the Board determines is in the best interests of the credit union, its account holders, or the Board." *See* 12 U.S.C. §1787(b)(2)(J).

27.     In 2010, the NCUA created the NCUA Guaranteed Note ("NGN") Program as a means of liquidating the distressed investment securities ("Legacy Assets") from the five failed corporate credit unions and thereby stabilizing funding for the credit union system. The Legacy

Assets consist of over 2,000 investment securities, secured by approximately 1.6 million residential mortgages, as well as commercial mortgages and other securitized assets. The NCUA transferred the Legacy Assets, including the CCU's investment in the trusts at issue in this Amended Complaint, to the NGN Trusts. The NGN Trusts then issued approximately $28.3 billion of NGNs, backed by the cash flows from the Legacy Assets. The timely repayment of principal and interest to the investors in the NGN Trusts is guaranteed by the NCUA and backed by the full faith and credit of the United States.

28.     As successor-in-interest to the CCUs, certain of the NCUA Board's interests in the majority of trusts at issue in this Amended Complaint were re-securitized in the NGN Program as part of: NCUA Guaranteed Notes Trust 2010-R1 ("NCUA 2010-R1 Trust"); NCUA Guaranteed Notes Trust 2010-R2 ("NCUA 2010-R2 Trust"); NCUA Guaranteed Notes Trust 2010-R3 ("NCUA 2010-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R1 ("NCUA 2011-R1 Trust"); NCUA Guaranteed Notes Trust 2011-R2 ("NCUA 2011-R2 Trust"); NCUA Guaranteed Notes Trust 2011-R3 ("NCUA 2011-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R4 ("NCUA 2011-R4 Trust"); NCUA Guaranteed Notes Trust 2011-R5 ("NCUA 2011-R5 Trust"); NCUA Guaranteed Notes Trust 2011-R6 ("NCUA 2011-R6 Trust"), and NCUA Guaranteed Notes Master Trust ("NCUA 2011-M1 Trust") (collectively the "NGN Trusts").  CUSIP 02660YAN2 in Trust AHM 2006-2, CUSIP 026935AD8 in Trust AHMA 2007-3, CUSIP 040104PY1 in Trust ARSI 2005-W4, CUSIP 41161PXB4 in Trust HVMLT 2005-14, CUSIP 45257BAE0 in Trust IMSA 2006-4, CUSIP 45667SAP2 in Trust INDX 2006-AR35, CUSIP 45661FAC5 in Trust INDYL 2006-L2, and CUSIP 61744CWJ1 in Trust MSAC 2005-HE7 were never resecuritized and have been held, and continue to be held, by the NCUA Board since the liquidation of the CCUs.

9

29.     Plaintiff NCUA Board is the holder of certain certificates that represent a beneficial ownership interest in the NGN Trusts (the "Owner Trust Certificates"). As the holder of the Owner Trust Certificates, the NCUA Board is entitled to payments from the NGN Trusts after the principal balance of the senior notes issued by the various NGN Trusts has been reduced to zero; all accrued and unpaid interest on the senior notes has been paid; all amounts owed to the Guarantor have been reimbursed; and the Indenture Trustee, in all of its related capacities, the Administrator and the Owner Trustee have been paid in full.

30.     The NCUA Board notified investors that it was actively investigating and pursuing certain legal claims in connection with the securities underlying the NGNs and any recovery on those claims would benefit the NCUA Board as Liquidating Agent for the CCUs (referred to as the "Sellers" under the NGN securitization agreements) exclusively. *See*, *e.g.*, NGN Trust 2011-R4 Offering Memorandum at 31 ("Beginning in September 2010, in connection with these investigations, the NCUA requested that various potential defendants, including potentially these Initial Purchasers, enter into separate tolling agreements to suspend for a period of time the running of any statutes of limitations that apply to potential claims, including claims under federal and state securities laws, with respect to specified asset-backed securities sold to the Corporate Credit Unions. It is not known at this time whether specific legal claims will be asserted by the NCUA in respect of the Underlying Securities, or whether litigation will ensue. Any damages or other amounts recovered by the NCUA in connection with any such claims will not be part of the Trust Estate and will not be used to make payments on the Offered Notes. Any such recoveries will benefit the Sellers exclusively.").

31.     Plaintiff, the NCUA Board, brings this action in its own right as the duly-appointed liquidating agent for each of the CCUs with respect to CUSIPs that were not re-

securitized as part of the NGN Program, and in the right of, and on behalf of, and for the benefit

of the NGN Trusts with respect to CUSIPs that were re-securitized as part of the NGN Program.[2]

32.     NCUA Guaranteed Notes Trust 2010-R1 is a Delaware statutory trust formed

pursuant to, *inter alia*, the associated (i) Indenture dated as of October 27, 2010 (the "NGN

2010-R1 Indenture"), by and between the NCUA 2010-R1 Trust, as issuer, and The Bank of

New York Mellon ("BNY Mellon"), as Indenture Trustee, (ii) Trust Agreement dated as of

October 27, 2010, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells

Fargo Delaware Trust Company, N.A. ("Wells Fargo"), in its capacity as Owner Trustee, and

BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty

Agreement dated as of October 27, 2010, by and among NCUA in its capacity as an Agency of

the Executive Branch of the United States, as Guarantor, the NCUA 2010-R1 Trust, as issuer,

and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture

trustee under the NGN 2010-R1 Indenture for the benefit of the holders from time to time of the

senior notes issued by the issuer pursuant to the NGN 2010-R1 Indenture and of the Guarantor

(collectively, the "NGN 2010-R1 Agreements").

33.     NCUA Guaranteed Notes Trust 2010-R2 is a Delaware statutory trust formed

pursuant to, *inter alia*, the associated (i) Indenture dated as of November 17, 2010 (the "NGN

201-R2 Indenture"), by and between the NCUA 2010-R2 Trust, as issuer, and BNY Mellon, as

Indenture Trustee, (ii) Trust Agreement dated as of November 17, 2010, by and among the

NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner

Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii)

---

[2] The NCUA, as Guarantor, has assigned legal title and any rights it may have had to pursue the claims set forth in this Amended Complaint to the NCUA  Board, as Liquidating Agent for the CCUs.

Guaranty Agreement dated as of November 17, 2010, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2010-R2 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2010-R2 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2010-R2 Indenture and of the Guarantor (collectively, the "NGN 2010-R2 Agreements").

34.     NCUA Guaranteed Notes Trust 2010-R3 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of December 9, 2010 (the "NGN 2010-R3 Indenture"), by and between the NCUA 2010-R3 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of December 9, 2010, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of December 9, 2010, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2010-R3 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2010-R3 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2010-R3 Indenture and of the Guarantor (collectively, the "NGN 2010-R3 Agreements").

35.     NCUA Guaranteed Notes Trust 2011-R1  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of January 27, 2011 (the "NGN 2011-R1 Indenture"), by and between the NCUA 2011-R1 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of January 27, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and

BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of January 27, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R1 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R1 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R1 Indenture and of the Guarantor (collectively, the "NGN 2011-R1 Agreements").

36.     NCUA Guaranteed Notes Trust 2011-R2  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of February 11, 2011 (the "NGN 2011-R2 Indenture"), by and between the NCUA 2011-R2 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of February 11, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of February 11, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R2 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R2 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R2 Indenture and of the Guarantor (collectively, the "NGN 2011-R2 Agreements").

37.     NCUA Guaranteed Notes Trust 2011-R3  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of March 1, 2011 (the "NGN 2011-R3 Indenture"), by and between the NCUA 2011-R3 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of March 1, 2011, by and among the NCUA

Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of March 1, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R3 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R3 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R3 Indenture and of the Guarantor (collectively, the "NGN 2011-R3 Agreements").

38.    NCUA Guaranteed Notes Trust 2011-R4  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of March 31, 2011 (the "NGN 2011-R4 Indenture"), by and between the NCUA 2011-R4 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of March 31, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of March 31, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R4 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R4 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R4 Indenture and of the Guarantor (collectively, the "NGN 2011-R4 Agreements").

39.    NCUA Guaranteed Notes Trust 2011-R5  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of April 14, 2011 (the "NGN 2011-R5 Indenture"), by and between the NCUA 2011-R5 Trust, as issuer, and BNY Mellon, as

Indenture Trustee, (ii) Trust Agreement dated as of April 14, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of April 14, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R5 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R5 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R5 Indenture and of the Guarantor (collectively, the "NGN 2011-R5 Agreements").

40.    NCUA Guaranteed Notes Trust 2011-R6  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of May 5, 2011 (the "NGN 2011-R6 Indenture"), by and between the NCUA 2011-R6 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of May 5, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of May 5, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R6 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R6 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R6 Indenture and of the Guarantor (collectively, the "NGN 2011-R6 Agreements").

41.    NCUA Guaranteed Notes Master Trust is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Master Indenture dated as of June 16, 2011 (the "NGN

2011-M1 Indenture"), by and between the NCUA 2011-M1 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Indenture Supplement dated as of June 16, 2011, by and between the NCUA 2011-M1 Trust, as issuer, and BNY Mellon, (iii) Master Trust Agreement dated as of June 16, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iv) Guaranty Agreement dated as of June 16, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-M1 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, (collectively, the "NGN 2011-M1 Agreements").

42.     NCUA, in its capacity as an agency in the Executive Branch of the U.S. Government, has issued a guarantee in connection with the NGNs. Plaintiff NCUA Board, as liquidating agent for each of the CCUs, is the holder of the Owner Trust Certificates in connection with the NGNs.  Any recovery the NGN Trusts receive as a result of the claims for relief in this complaint directly increases the value of the Owner Trust Certificates. The value of the Owner Trust Certificates will become available to pay claims against the liquidated CCUs, including those of the NCUSIF and TCCUSF.  Thus any recovery on behalf of the NGN Trusts in this action will benefit the NGN Trusts and the NCUA Board and lessen the financial burden on the government and federally insured credit unions resulting from the failure of the CCUs.

43.     Plaintiff NCUA Board brings the claims on behalf of and for the benefit of the NGN Trusts as the holder of the NGN Owner Trust Certificates, as an express third-party beneficiary of the NGN Trust Indentures, and pursuant to its authority under 12 U.S.C. § 1787.

44.     DBNTC is a national banking association organized under the laws of the United States to carry out the business of a limited purpose trust company. DBNTC's main office is

located in Los Angeles, California, and its principal place of trust administration is located in Santa Ana, California. DBNTC is a nondepository trust company regulated by the Office of the Comptroller of the Currency ("OCC"). As of December 31, 2013, DBNTC had assets valued at over $188 billion, making it the eighth largest nondepository trust company in the United States. As a nondepository trust company, DBNTC operates for profit, accepting and executing trusts, including the trusts at issue here.

45.     DBNTC is an indirect wholly owned subsidiary of Deutsche Bank AG ("DBAG"), which maintains its corporate headquarters in Frankfurt, Germany. Deutsche Bank Trust Corporation ("DBTC") is a wholly owned subsidiary of DBAG. DBNTC is a wholly owned subsidiary of Deutsche Bank Holdings, Inc. ("DBHI"), which is a wholly owned subsidiary of DBTC.

46.     DBNTC, together with its affiliates, is involved in many aspects of the private-label RMBS market. As of April 2014, DBNTC administered as trustee more than $1.15 trillion in original face value of non-agency RMBS issued between 2004 and 2008 (*i.e.*, private-label residential mortgage backed securities not guaranteed by an agency of the United States Government), with a total current balance of $157.1 billion, representing nearly 21% of all non-agency RMBS during that period based on current balances.

47.     Additionally, Deutsche Bank AG through its subsidiaries and affiliates, MortgageIT, Inc. and Chapel Funding LLC originated tens of billions of dollars in loans leading up to the financial crisis.

III.   **BNY MELLON AS INDENTURE TRUSTEE FOR THE NGN TRUSTS DECLINED TO TAKE ACTION ON BEHALF OF THE NGN TRUSTS AND, IN ANY EVENT, HAS DIRECT CONFLICTS IN PURSUING THESE CLAIMS**

48.     BNY Mellon is the indenture trustee of the NGN Trusts.

49.     Pursuant to the indentures of each of the NGN Trusts, on February 24, 2015, NCUA, acting in its capacity as Guarantor with respect to the NCUA Guaranteed Notes, issued a written demand to BNY Mellon, not in its individual capacity, but solely as the indenture trustee of the NGN Trusts, to take action to assert the claims on behalf of the NGN Trusts. On February 25, 2015, BNY Mellon indicated that it does not intend to pursue claims on behalf of the NGN Trusts, and acknowledged and agreed that NCUA has the right to pursue claims on behalf of the NGN Trusts because BNY Mellon failed to do so after receiving notice.

50.     Additionally, BNY Mellon has irreconcilable direct and positional conflicts of interest in pursuing Plaintiffs' claims against Defendant such that any demand for BNY Mellon would be futile.

51.     Most importantly, BNY Mellon is itself an RMBS trustee. While proceeding as plaintiff on behalf of the NGN Trusts, BNY Mellon would be in the untenable position of advocating against its own interests as an RMBS trustee and positions it has taken in separate litigation.

52.     In particular, BNY Mellon is already a defendant in several lawsuits asserting the very same claims against BNY Mellon as those asserted in this Amended Complaint. *See, e.g., Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, Case No. 11-cv-5459 (S.D.N.Y. 2011); *Am. Fid  Assur. Co. v. Bank of New York Mellon*, Case No. 11-1284 (W.D. Okla. 2011); *Blackrock Allocation Target Shares: Series S Portfolio, et al. v. Bank of New York Mellon, as Trustee, et al.*, Case No. 14-cv-9372 (S.D.N.Y. 2014); *Phoenix Light SF*

*v. Bank of New York Mellon*, Case No. 14-cv-10104 (S.D.N.Y. 2014); *Royal Park Investments SA/NV v. The Bank of New York Mellon*, Case No. 14-cv-6502 (S.D.N.Y. 2014); *Western and Southern Life Ins. Co., et al. v. Bank of New York Mellon, as Trustee*, No. A1302490 (Ohio Ct. Comm. Pl. 2013).

53.     In those lawsuits, BNY Mellon has taken or will take positions directly at odds with Plaintiffs' claims against the Defendant. For example, BNY Mellon has asserted or almost certainly will assert that: (a) the Streit Act does not apply to RMBS trusts; (b) RMBS trustees have no duty of care prior to the occurrence of an Event of Default; (c) there is no independent cause of action against RMBS trustees for breach of fiduciary duty; and (d) that no Events of Default occurred with respect to certain RMBS trusts.

54.     BNY Mellon cannot fully and forcefully safeguard Plaintiffs' interests in light of this irreconcilable conflict.

55.     Because of the foregoing, the NCUA Board brings this action on behalf of itself, as Liquidating Agent for each of the CCUs, and pursuant to its authority under 12 U.S.C. § 1787, and on behalf of and for the benefit of the NGN Trusts, as holder of the NGN Trust Owner Trust Certificates and as an express third-party beneficiary of the NGN Indenture Agreements.

## IV.   JURISDICTION AND VENUE

56.     This Court has subject matter jurisdiction pursuant to the following statutes: (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced

by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress"; (c) 15 U.S.C. § 77v, providing for jurisdiction for claims under the TIA ; (d) 15 U.S.C. § 1331, providing for "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"; (e) 28 U.S.C. § 1332 because there is compete diversity of citizenship of the parties and the amount in controversy, without interest and costs, exceeds $75,000; and (f) 15 U.S.C. § 1367, providing for "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." This Court also has jurisdiction over the claims asserted under the Streit Act because this case involves New York common law trusts.

57.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a), and/or 28 U.S.C. § 1391(b)(1), because Defendant is a resident of and/or conducts business in this District. This Court has personal jurisdiction over Defendant because it is a resident of and/or conducts business in this District and under N.Y. C.P.L.R. 301, New York's long arm statute.  The claims relate to Defendant's role as trustee over trusts created under New York law and/or administered at least in part in New York.  In addition, Defendant has filed foreclosure cases on behalf of the trusts in New York and in the course of such proceedings either discovered or should have discovered multiple defaults and representation warranty breaches.

## V.     THE TRUSTS

58.     The trusts identified on Exhibit A are 97 New York common law trusts or Delaware statutory trusts created in connection with residential mortgage-backed securitizations between 2004 and 2008.

59.     The trusts have a high concentration of loans originated or contributed by the

following lenders and their affiliates: American Home Mortgage Corp. and American Home Mortgage Investment Corp.; Accredited Home Lenders, Inc.; Ameriquest Mortgage Co. and Argent Mortgage Co. LLC; Countrywide Home Loans, Inc. and Countrywide Mortgage Funding, Inc.; Decision One Mortgage Company, LLC and Decision One Mortgage Corp.; Fremont Investment and Loan; GreenPoint Mortgage Funding, Inc.; Impac Funding Corporation; IndyMac Bank, F.S.B; National City Mortgage Co.; NC Capital Corp. and New Century Mortgage Corp.; Option One Mortgage Corp.; OwnIt Mortgage Solutions, Inc.; Paul Financial, LLC; Residential Funding Co., LLC; First Franklin Financial Corp.; Wells Fargo Bank, N.A.; and WMC Mortgage Corp. (collectively, the "originators").

60. A significant portion of the trusts were sponsored by the following sponsors and their affiliates: American Home Mortgage Acceptance, Inc. and American Home Mortgage Corp.; Ameriquest Mortgage Co.; DLJ Mortgage Capital, Inc.; Greenwich Capital Financial Products, Inc.; Impac Funding Corp. and Impac Mortgage Holdings, Inc.; IndyMac Bank, F.S.B.; Morgan Stanley Mortgage Capital, Inc. and Morgan Stanley Mortgage Capital Holdings, LLC; NC Capital Corp.; and Option One Mortgage Corp (collectively, the "sponsors").

## VI.  BACKGROUND

### A.  RMBS Trusts

61. RMBS certificates are debt instruments issued to investors by an issuing trust that holds one or more mortgage pools. The corpus of the trust – like the trusts at issue here – consists almost exclusively of the underlying mortgage loans. Certificateholders receive a portion of the income stream generated by the trust as borrowers make payments on their mortgage loans.

62. Because residential mortgage loans are the assets underlying the RMBS, the origination of mortgages starts the process that leads to the creation of RMBS. Originators

decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting. The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.

63.     The securitization process begins with a sponsor who purchases loans in bulk from one or more originators. The sponsor transfers title of the loans to an entity called a depositor.

64.     The depositor transfers the loans to a trust called the issuing entity.

65.     The issuing entity then issues notes and/or certificates, providing certificateholders scheduled principal and interest payments derived from the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

66.     The depositor files required documents (such as registration statements and prospectuses) with the U.S. Securities and Exchange Commission ("SEC") so the certificates can be offered to the public.

67.     One or more underwriters then sell the notes or certificates to investors.

68.     Figure 1 (*infra*) depicts a typical securitization process.

**Figure 1**
*Illustration of the Securitization Process*



69.    The establishment and administration of each trust is governed by an agreement called a Pooling and Servicing Agreement ("PSA") and certain related agreements that the PSA references and incorporates (the "governing agreements"). All of the governing agreements are substantially similar, and impose the same duties on Defendant. *See* Exhibit F §§ I – IX. Accordingly, this Amended Complaint refers to the PSAs or the governing agreements when discussing the trustee's contractual obligations.

70.    Once the loans are deposited into a trust, borrowers begin making payments to the trust through a master servicer. The master servicer is ultimately responsible for servicing the loans, but may use a designee, typically called a servicer or sub-servicer, to perform some or all

of the mortgage servicing functions. The master servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties, and overseeing any sub-servicers.

71.     When the master servicer collects loan payments from borrowers, it then transfers those payments, less allowable deductions, to the trustee. The trustee uses the payments, less allowable fees and expenses, to make scheduled principal and interest payments to certificateholders. The trustee also delivers monthly remittance reports to certificateholders describing the performance of underlying loans and compliance with the governing agreements. The contents of those reports are specified in the governing agreements and in Item 1121 of SEC Regulation AB. *See* 17 C.F.R. § 229.1121. The servicer provides data to the trustee to include in these remittance reports.

72.     Thus, each trust is administered primarily by two entities – the trustee and the master servicer, under the oversight of the trustee. The trustee owes certificateholders certain duties set forth in the governing agreements, as well as those duties imposed by the common law, TIA and the Streit Act.

73.     The purpose of having a trustee in an RMBS securitization is to ensure there is at least one independent party to the governing agreements who, unlike the RMBS certificateholders, does not face collective action, informational, or other limitations, and as a result can protect the trusts and the interests of RMBS certificateholders. The governing agreements, the common law, the TIA, and the Streit Act impose critical duties on trustees, and the trustees' adherence to those duties affects the value of the RMBS.

74.     Defendant earned fees in connection with its role as trustee, typically an annual

fee based on the percentage of principal outstanding on the loans underlying the RMBS.

Defendant also received significant benefits from the interest-free deposits maintained in its

accounts when the servicing payments were remitted to its accounts.  Defendant maintained

accounts for thousands of trusts and earned enormous sums from the aggregate balances on these

accounts.  The RMBS trustee engagements further deepened Defendant's business relationships

with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

### B.     The Trustee's General Duties

75.     The terms of the governing agreements are substantially similar, if not identical,

and impose substantially the same, if not identical, duties and obligations on the trustee. *See* Ex.

F §§ I – IX. Further, upon information and belief, Defendant employed the same general set of

policies and procedures to oversee and manage the trusts regardless of any individual variations

contained within the governing agreements.

76.     Most importantly, Defendant has an absolute duty under the governing

agreements, the common law, the TIA, and the Streit Act to acquire and protect the trust corpus

for the benefit of certificateholders. "The Trustee or the Custodian, on behalf of the Trustee . . .

declares that it or the Custodian holds and will hold such documents and the other documents

delivered to it constituting the Mortgage Files, and that it or the Custodian holds or will hold

such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all

present and future Certificateholders." PSA Section 2.2; *see also* Exhibit F § II.[3]

---

[3] All cites to "PSA Section ___" or any related agreements are to the PSA and related
agreements specific to the Saxon Asset Securities Trust 2007-2 ("SAST 2007-2") offering,
which, as alleged above, is substantially similar to the governing agreements for all of the trusts.
A copy of the SAST 2007-2 PSA is attached as Exhibit B.

**C.    The Trustee's Duties Under the Pooling and Servicing Agreements**

77.    The PSAs are contracts between, in addition to others, the depositor, the master servicer or servicer, and the trustee, which govern the trusts that issued the certificates. The PSAs for each of the trusts are substantially similar and memorialize the following events and conditions: (i) the transfer and conveyance of the mortgage loans from the depositor to the trust; (ii) the trust's issuance of beneficial certificates of interests in the trust to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates. *See* Exhibit F §§ I – IX.[4]

78.    The PSAs also set forth Defendant's contractual duties and obligations, which are identical or substantially identical for each trust. *See* Exhibit F §§ I – IX. Specifically, each PSA requires Defendant to oversee and enforce the depositors' and the servicers' obligations. In performing these contractual obligations, Defendant must act in the best interests of and for the protection of the trusts and the certificateholders. Certificateholders, unlike the trustee, have no direct contact with the depositors and servicers. Moreover, under the PSAs, certificateholders do not have the right to compel the trustee to enforce the responsible party's representations and warranties,[5] absent satisfaction of the collective action provisions. Certificateholders must rely

---

[4] Some of the trusts have a different structure—they issued notes pursuant to an indenture (collectively, the "Indentures") on which the Defendant serves as indenture trustee. A separate agreement, such as a Sale and Servicing Agreement ("SSA"), governs other terms of these transactions. Although there are some differences between the PSA and Indenture structures, with regard to this Complaint, both the nature of the claims asserted and Defendant's duties and obligations are similar under the two structures.

[5] The governing agreements specify the party that is responsible for repurchasing any defective loan. Generally, they provide that, upon discovery and/or notice of a breach of a representation and warranty with respect to a mortgage loan that materially and adversely affects the interests of the certificateholders, the responsible party shall cure the breach or repurchase the affected mortgage loan at its purchase price, which is equal to the then-outstanding amount due on the mortgage loan. The responsible party is generally either the originator of the loans, the seller of the loans, or the sponsor of the securitization. These roles are frequently undertaken by the same

on the Defendant to protect their interests.

**D.    Duty Properly to Take Title to the Mortgage Loans Conveyed to the Trust**

79.    The trusts must take title to the mortgages conveyed to them for due consideration for the RMBS properly to be backed by mortgage loans. The PSAs establish the conveyance terms of the mortgage loans to the trustee, on behalf of the trust and the RMBS certificateholders, and those terms are intended to ensure that the trustee, on behalf of the trusts, takes full title to the mortgage loans. *See* Exhibit F § I – III.

80.    The first part of this conveyance involves the depositor assigning to the trustee, among other things, its rights, title, and interest in the mortgage loans and the depositor's rights under the transfer agreement whereby the depositor acquired the mortgage loans. PSA Section 2.1 ("Conveyance of the Mortgage Loans") provides in relevant part:

> [T]he Depositor hereby bargains, sells, conveys, assigns and transfers to the Trustee, in trust, without recourse and for the exclusive benefit of the Certificateholders as their interests may appear, all the Depositor's right, title and interest in and to any and all benefits accruing to the Depositor from: (i) the Mortgage Loans, which the Depositor is causing to be delivered to the Trustee (or the Custodian) herewith (and all Substitute Mortgage Loans substituted therefor), together in each case with the related Mortgage Files and the Depositor's interest in any collateral that secured a Mortgage Loan but that is acquired by foreclosure or deed-in-lieu of foreclosure after the Closing Date, and all Scheduled Payments due after the Cut-off Date and all principal prepayments received with respect to the Mortgage Loans paid by the borrower after the Cut-off Date and proceeds of the conversion, voluntary or involuntary, of the foregoing; (ii) the Sales Agreement; (iii) the Swap Agreement, (iv) the Cap Agreement; and (v) all proceeds of any of the foregoing (including, but not limited to, all proceeds of any mortgage insurance, hazard insurance, or title insurance policy relating to the Mortgage Loans, cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, rights to payment of any and every kind, and other forms of obligations and receivables, which at any time constitute all or part or are included in the proceeds of any of the foregoing) to pay the Certificates as specified herein (items (i) through (v) above collectively, the "Trust Fund").

The other PSAs contain substantially similar provisions. *See* Exhibit F § I.

---

or affiliated entities. For simplicity's sake, this complaint uses "responsible party" to refer to the entity responsible for the repurchase of any defective loans.

81.     Furthermore, the PSAs require Defendant, or its agents acting as custodians, to

acknowledge receipt of the mortgage loans on behalf of the trust and to acknowledge that all

mortgage pool assets—including the mortgage files and related documents and property—are

held by it as trustee. Significantly, Defendant, or its agents, must take physical possession of the

mortgage files, including the mortgage note and the mortgage, properly endorsed and assigned to

the trustee. As set forth in PSA Section 2.2:

> The Trustee or the Custodian, on behalf of the Trustee acknowledges receipt of the
> documents identified in the initial certification in the form annexed hereto as Exhibit C
> (the "Initial Certification") and declares that it or the Custodian holds and will hold such
> documents and the other documents delivered to it constituting the Mortgage Files, and
> that it or the Custodian holds or will hold such other assets as are included in the Trust
> Fund, in trust for the exclusive use and benefit of all present and future
> Certificateholders.

The other PSAs contain substantially similar provisions. *See* Exhibit F §§ II, IV.

82.     Section 2.1 of the PSA also specifically sets forth the operative documents that

must be contained in the mortgage file:

> (i) (A) the original Mortgage Note endorsed by manual or facsimile signature to the
> Trustee or the Custodian or in blank, without recourse, with all intervening endorsements
> showing a complete chain of endorsement from the originator to the Person endorsing the
> Mortgage Note (the "Last Endorsee") (each such endorsement being sufficient to transfer
> all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in
> and to that Mortgage Note); or (B) with respect to any Lost Mortgage Note, a lost note
> affidavit from the Depositor stating that the original Mortgage Note was lost or
> destroyed, together with a copy of such Mortgage Note;
>
> (ii) except with respect to any Cooperative Loan, the original recorded Mortgage or a
> copy of such Mortgage certified by the Depositor, the originating lender, settlement
> agent, or escrow company as being a true and complete copy of the Mortgage;
>
> (iii) except with respect to any Mortgage Loan for which the related Mortgage names the
> Custodian as nominee for the originating lender (or similar designation satisfactory to the
> Custodian), as beneficiary or mortgagee, either (A) a duly executed assignment of the
> Mortgage in blank, or (B) an original recorded assignment of the Mortgage from the Last
> Endorsee to the Custodian or a copy of such assignment of Mortgage certified by the
> Depositor, the originating lender, settlement agent, or escrow company as being a true

and complete copy thereof which in either case may be included in a blanket assignment or assignments;

(iv) each interim recorded assignment of such Mortgage, or a copy of each such interim recorded assignment of Mortgage certified by the Depositor, the originating lender, settlement agent, or escrow company as being a true and complete copy thereof;

(v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any;

(vi) except as to any second lien Mortgage Loan in the original principal amount of $50,000.00 or less, either the original or duplicate original title policy (including all riders thereto) with respect to the related Mortgaged Property, if available, provided that the title policy (including all riders thereto) will be delivered as soon as it becomes available, and if the title policy is not available, and to the extent required pursuant to the second paragraph below or otherwise in connection with the rating of the Certificates, a written commitment or interim binder or preliminary report of the title issued by the title insurance or escrow company with respect to the Mortgaged Property; and

(vii) in the case of a Cooperative Loan, the originals of the following documents or instruments:

> (a)      The Coop Shares, together with a stock power in blank;
>
> (b)      The executed Security Agreement;
>
> (c)      The executed Proprietary Lease;
>
> (d)      The executed Recognition Agreement;
>
> (e)      The executed UCC1 financing statement with evidence of recording thereon which have been filed in all places required to perfect the Depositor's interest in the Coop Shares and the Proprietary Lease; and
>
> (f)      Executed UCC3 financing statements or other appropriate UCC financing statements required by state law, evidencing a complete and unbroken line from the mortgagee to the Trustee with evidence of recording thereon (or in a form suitable for recordation).

(viii) the original Primary Mortgage Insurance Policy or certificate or, an electronic certification evidencing the existence of the Primary Mortgage Insurance Policy or certificate, if private mortgage guaranty insurance is required;

83.      Once the mortgage files are in Defendant's or its custodians' possession,

Defendant, or the custodian on Defendant's behalf, is required to ensure that the underlying

mortgage loans were properly conveyed to the trusts, and that the trusts have perfected

enforceable title to the mortgage loans by reviewing the mortgage files for each mortgage loan.

Defendant, or the custodian on the Defendant's behalf, is required to review each mortgage file

within a certain period after the "closing date" of the securitization and deliver to the depositor a

certification that all documents required have been executed and received. This duty overlaps

with and forms part of the requirements that the trustee must satisfy to properly take title to the

mortgage loans. As set forth in PSA Section 2.2:

> The Trustee agrees to execute and deliver or to cause the Custodian to execute and deliver on the Closing Date to the Depositor and the Servicer an Initial Certification in the form annexed hereto as Exhibit C. Based on its or the Custodian's review and examination, and only as to the documents identified in such Initial Certification, the Custodian, on behalf of the Trustee acknowledges that such documents appear regular on their face and relate to such Mortgage Loan.

The other PSAs contain substantially similar provisions. *See* Exhibit F § III.

84. Defendant breached these contractual obligations by: 1) failing to take proper title

to the mortgage loans; 2) failing to adequately review the mortgage loan files and certify their

completeness; 3) failing to properly oversee the custodian or its agents. *See* Exhibit E § III.

**E. Duty to Provide Notice of Incomplete or Defective Mortgage Files and Enforce Repurchase Rights with Respect to Mortgage Files that Cannot be Cured**

85. If Defendant or the custodian identifies any defect in a mortgage loan file for an

underlying mortgage loan contained in a trust, Defendant must identify such defect and promptly

provide notice to the relevant parties. As set forth in PSA Section 2.2:

> If, in the course of such review, the Trustee or the Custodian, on behalf of the Trustee finds any document constituting a part of a Mortgage File which does not meet the requirements of Section 2.1 hereof (the "Mortgage Loan Document Requirements"), the Trustee shall list or shall cause the Custodian to list such as an exception in the Final Certification . . . .

86.     Once incomplete mortgage files or loans with defective transfer documentation

are identified, the parties to the governing agreements must work to remedy these deficiencies.

As set forth in PSA Section 2.2:

> SFM [the responsible party] shall promptly correct or cure such defect within 90 days
> from the date it was so notified of such defect and, if SFM does not correct or cure such
> defect within such period, SFM shall either (a) substitute for the related Mortgage Loan a
> Substitute Mortgage Loan, which substitution shall be accomplished in the manner and
> subject to the conditions set forth in Section 2.3 hereof, or (b) purchase such Mortgage
> Loan from the Trustee within 90 days from the date SFM was notified of such defect in
> writing at the Purchase Price of such Mortgage Loan . . . .

The other PSAs contain substantially similar provisions. *See* Exhibit F § V.

87.     The trustee's sole remedy to protect the trust from such defective loans is to

enforce the obligation of the responsible party to repurchase such loans. As set forth in PSA

Section 2.2:

> It is understood and agreed that the obligation of SFM to substitute for or to purchase any
> Mortgage Loan which does not meet the requirements of Section 2.1 hereof shall
> constitute the sole remedy respecting such defect available to the Trustee and any
> Certificateholder against the Depositor or SFM.

88.     Defendant breached these contractual obligations by: 1) failing to provide notice

of incomplete or defective mortgage files; and 2) failing to enforce repurchase rights with respect

to mortgage files that could not be cured. *See* Exhibit F § V.

**F.      Duty to Provide Notice of Breaches and to Enforce Repurchase Rights with
Respect to Defective Loans**

89.     The quality of the mortgage loans to which the trusts purportedly receive title is

also critical to an RMBS securitization. For that reason, the governing agreements contain

"representations and warranties" by the responsible party attesting to the characteristics of the

borrower and collateral for the mortgage loans conveyed to the trusts, and that the loans were

made in accordance with applicable underwriting guidelines.

90.     As in instances of missing documents or where the transfer of the mortgage was incomplete, the governing agreements also require the responsible party to cure, substitute, or repurchase any mortgage loans that materially breach the responsible party's representations and warranties concerning the quality of the mortgage loans conveyed to the trusts. Specifically, the governing agreements require the trustee, among others, to provide notice of the breaches and enforce the responsible party's repurchase obligations:

> Upon discovery by any of the parties hereto of a breach of a representation or warranty made by the Seller in respect of the Mortgage Loans that (i) materially and adversely affects the interests of the Certificateholders in any such Mortgage Loan or (ii) is set forth in subsections (B) or (C) of Exhibit B to the Sales Agreement between the Depositor and SFM, the party discovering such breach shall give prompt notice thereof to the other parties. SFM hereby covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach such of any representation or warranty which (x) materially and adversely affects the interests of the Certificateholders in any Mortgage Loan (it being understood that any such breach shall be deemed to materially and adversely affect the value of such Mortgage Loan or the interest of the Trust Fund therein, if the Trust Fund incurs a loss as the result of such breach) or (y) is set forth in subsections (B) or (C) of Exhibit B to the Sales Agreement between the Depositor and SFM, it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below . . . .

PSA Section 2.3. *see also* Exhibit F § V. Even in instances where enforcement by the trustee of the repurchase obligation is not explicit, trustees still have a right and duty to protect the trusts by ensuring all parties to the governing agreements comply with their respective obligations.

91.     Consequently, under the governing agreements, Defendant is entrusted to ensure that the mortgage loans in the trusts were properly underwritten, were of a certain risk profile, and had characteristics of a certain quality as represented by the responsible party.

92.     To protect the trusts and all certificateholders, the governing agreements require

Defendant to give prompt written notice to all parties to the governing agreements upon its knowledge of a breach of a representation or warranty made by the responsible party about the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the trusts regarding the breach.

93.    Defendant breached these contractual obligations by: 1) failing to provide notice of defective mortgage loans; 2) failing to enforce repurchase rights with respect to defective mortgage loans; and 3) failing to ensure the responsible party abided by their contractual obligations. *See* Exhibit F § V.

### G.    Duties under the Transfer Agreements

94.    Depending on the parties, there are several methods whereby the depositor acquires the loans for securitization. These include Mortgage Loan Purchase Agreements ("MLPAs"), Sale and Servicing Agreements ("SSAs"), Sale Agreements ("SAs"), and Assignment and Recognition Agreements (collectively, "transfer agreements"). These agreements are all substantially similar and govern the terms for transferring mortgage loans acquired for securitization from the originator to the depositor. These transfer agreements are generally between either the originator and the depositor, or the sponsor and the depositor.

95.    One of the parties to the transfer agreement—typically an originator or sponsor— makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans in either the PSA or the associated transfer agreement.[6] For simplicity's sake, this Amended Complaint refers to that party as the "responsible party."

---

[6] The governing agreements frequently refer to the same entity by different titles depending upon the role being played. The role of seller or transferor generally overlaps with that of the sponsor.

96.     The responsible party's typical representations and warranties in the transfer

agreements include, *inter alia*, the following: (i) the information in the mortgage loan schedule is

true and correct in all material respects; (ii) each loan complies in all material respects with all

applicable local, state and federal laws and regulations at the time it was made; (iii) the

mortgaged properties are lawfully occupied as the principal residences of the borrowers unless

specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in

default; (v) no loan has a loan-to-value ("LTV") ratio of more than 100%; (vi) each mortgaged

property was the subject of a valid appraisal; and (vii) each loan was originated in accordance

with the underwriting guidelines of the related originator. *See, e.g.*, SA Section 3.02.[7] To the

extent mortgages breach the responsible party's representations and warranties, the mortgage

loans are worth less and are much riskier than represented. *See, e.g.*, Exhibit F§ IX.

97.     Under the transfer agreements, upon discovery or receipt of notice of any breach

of the responsible party's representations and warranties that has a material and adverse effect on

the value of the mortgage loans in the trusts or the interests of the certificateholders therein, the

responsible party is obligated to cure the breach in all material respects. SA Section 7.

98.     If a breach is not cured within a specified period, the responsible party is

obligated either to substitute the defective loan with a loan of adequate credit quality, or to

repurchase the defective loan.

99.     The repurchase provisions ensure that the trust need not continue to hold

mortgage loans for which the responsible party breached its representations and warranties.

Thus, the repurchase provisions are designed to transfer the risk of any decline, or further

---

[7] All cites to "SA Section ___" are to the Sale Agreement and related documents specific to the
Saxon Asset Securities Trust 2007-2 ("SAST 2007-2") offering, which, as alleged above, is
substantially similar to the transfer agreement for all of the trusts. A copy of the SAST 2007-2
SA is attached as Exhibit C.

decline, in the value of defective mortgage loans that results from a breach from the trusts to the responsible party.

100.     Under the transfer agreements, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the trusts or the certificateholders' interests in the loans. The responsible party's cure, substitute, and repurchase obligations do not require any showing that the responsible party's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or require that the demanding party prove reliance on servicing and origination documents.

101.     Upon the sale of the mortgage loans to the trust, the rights under the transfer agreements, including the responsible party's representations and warranties concerning the mortgage loans, are generally assigned to the Defendant, as trustee, for the benefit of the trusts and all certificateholders, in accordance with the governing agreements.

102.     Defendant breached these contractual obligations by: 1) failing to enforce its contractual rights under the transfer agreement; 2) failing to enforce repurchase rights with respect to defective mortgage loans; and 3) failing to ensure the responsible party abided by their contractual obligations.

## H.     Duties Regarding the Servicers

103.     Each PSA requires the master servicer or servicer to prudently service the loans underlying the trusts.

104.     Section 3.1 of the PSA states:

> For and on behalf of the Certificateholders, the Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and customary and usual standards of practice of prudent mortgage loan servicers.

The other PSAs contain substantially similar provisions. *See* Exhibit F § VII.

105.     Under the PSAs, Defendant, as trustee, has certain duties and obligations regarding monitoring the master servicers and/or servicers. In particular, the PSAs set forth Defendant's obligations upon occurrence of an "event of default" which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time.[8] Section 7.1 of the PSAs identifies several types of failures by the servicer that may give rise to such an event. The other PSAs contain substantially similar provisions. *See* Exhibit F § VIII. Such failures include a breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied after written notice of such failure shall have been given to the servicer by the trustee.

106.     The remedies for uncured servicer events of default include, among other things, termination of the master servicers and/or servicers. *See* Exhibit F § VIII.

107.     Defendant breached these contractual obligations by failing to properly monitor the servicers and master servicers.

**I.      The Trustee's Duties upon Knowledge of an Event of Default**

108.     The PSAs impose additional obligations upon Defendant once one of its responsible officers knows a default or a servicer event of termination has occurred. First, under Section 7.01 of the PSAs, Defendant must give written notice to the servicer of the occurrence of such an event within the specified period after Defendant obtains knowledge of the occurrence.

_____

[8] Similarly, for those trusts structured with an indenture instead of a PSA, events of default is defined as a specified failure of the issuer to perform some similar duty.

109.     Second, within sixty to ninety days after a default has occurred, Defendant must provide written notice to all certificateholders about that event, unless the default has been cured or waived. As set forth in PSA Section 7.2(b):

> Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Certificateholders notice of each such Event of Default hereunder known to the Trustee, unless such Event of Default shall have been cured or waived.

The other PSAs contain substantially similar provisions. *See* Exhibit F § VIII.

110.     Third, and most importantly, Section 8.1 of the PSAs requires Defendant to exercise the rights and powers vested in it by the PSA using "the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." The other PSAs contain substantially similar provisions. *See* Exhibit F § VI.

111.     Defendant breached these contractual obligations by: 1) failing to provide notice of defaults and events of default; 2) failing act as a prudent person following defaults and events of default; and 3) failing to act with due care and without negligence prior to an Event of Default. *See* Exhibit F §§ VI, VIII.

**J.      The Trustee's Duties and Obligations under the TIA and the Streit Act, and the Common Law**

112.      Each of the PSAs (or indentures) is substantially similar and imposes substantially the same duties on Defendant as trustee. Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs (or indentures) and the related trusts. 15 U.S.C. § 77ddd(a)(1).

113.     The TIA imposes two sets of duties and obligations on Defendant as trustee of the trusts – one set "prior to default" and the other set "in case of default."

114.    Prior to default, a trustee must perform "such duties as are specifically set out in [the] indenture," *i.e.*, the instrument governing the trust. 15 U.S.C. § 77ooo(a)(1). Under that provision, Defendant had to perform the duties specifically assigned to it under the governing agreements, including those duties described above.

115.    Also, prior to default, a trustee must "examine the evidence furnished to it [by obligors of the indenture] to determine whether or not such evidence conforms to the requirements of the indenture." 15 U.S.C. § 77ooo(a) (citing 15 U.S.C. § 77nnn). Thus, Defendant was required to examine the evidence the master servicer or custodian provided to the trusts, certifying their compliance with the covenants it made under the governing agreements, and Defendant also had to determine whether that evidence conformed to the governing agreements' requirements.

116.    In addition, a trustee must "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). Defendant consequently had to inform RMBS certificateholders of defaults and breaches of the governing agreements within ninety days after their occurrence.

117.    In case of a default (as defined in the PSA or indenture), a trustee must exercise "such of the rights and powers vested in it by such indenture, and [ ] use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c).

118.    The Streit Act imposes a duty upon the trustee to discharge its duties under the applicable indenture with due care to ensure the orderly administration of the trust and to protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124. Like the TIA, following an event of

default, the Streit Act provides that the trustee must exercise the same degree of skill and care in performing its duties as a prudent person would under the same circumstances. N.Y. Real Prop. Law § 126(1).

119.    The duty to act as a prudent person is also implicated under the common law when the trustee substantially breaches its obligations under a contract or an indenture.  Under such circumstances, the trustee cannot rely on provisions of the contract or indenture providing the trustee with the protections afforded to an indenture trustee.

120.    The common law also imposes fiduciary duties upon the trustee and requirements to act with due care, with undivided loyalties and in good faith, and to refrain from negligent conduct and negligent misrepresentations. Defendant's negligence, willful misconduct, and failure to act resulted in breaches of the governing agreements.

121.    As set forth below, Defendant is liable to Plaintiffs under the TIA, the Streit Act, and the common law for failing to exercise the necessary degree of skill and in failing to enforce its rights and powers under the governing agreements.

## VII.    DEFENDANT SHOULD HAVE CAREFULLY INVESTIGATED THE FACT THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS IN THE FORM OF BREACHES OF REPRESENTATIONS AND WARRANTIES AND TAKEN APPROPRIATE ACTION

122.    The trusts' loan pools contained large numbers of loans that materially breached the responsible parties' representations and warranties concerning the originators' compliance with underwriting guidelines, owner occupancy statistics, appraisal procedures, and other associated standards. By 2009, Defendant had a duty to carefully investigate the evidence, public evidence or evidence otherwise available to trustees, demonstrating the widespread breaches of representations and warranties in the trusts, including: 1) general reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the sponsors'

pervasive disregard of prudent securitization standards; 2) specific reports concerning the

originators of loans in the trusts abandoning their underwriting standards and sponsors of the

securitizations failing to follow prudent practices; 3) the high number of borrower delinquencies

and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts; 4) the

collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to

much lower ratings, including numerous "junk" ratings; and 5) the numerous lawsuits brought

against Defendant and its affiliates alleging the systematic abandonment of originator

underwriting guidelines.

> **A.** **General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards**

123.    By 2009, government reports, public and private investigations, and media reports

had surfaced concerning the collapse of the RMBS market and revealed the potential for massive

problems in the trusts such that a reasonable and prudent trustee would have taken upon itself the

duty to carefully investigate these issues and to take action as necessary. These reports and

investigations identified the originators' pervasive abandonment of underwriting standards and

sponsors' disregard of prudent securitization standards as the cause of the crisis.

124.    For example, the Office of the Comptroller of the Currency (the "OCC"),

published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest

rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in

those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report the OCC emphasized

the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the
> borrower and market conditions that a borrower is highly likely to be able to repay the
> loan as promised—is a major determinant of subsequent loan performance. The quality of

underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

125.    Despite the importance of sticking to underwriting standards, it was clear that originators were not following them. Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008, *available at* http://www.federalreserve.gov/newsevents/speech/bernanke20080410a.htm.

126.    In November 2010, the Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a report entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation." The report recounts widespread foreclosure abuses in connection with mortgages that have been securitized and the numerous federal and state investigations that have detailed this problem. The abuses identified in the report—including forged or back-dated mortgage assignments and "robo-signing" of false affidavits used in foreclosure actions—arise from failures in the documentation

and transfer of mortgage loans from the originators to other entities in the securitization process, and ultimately into the trusts. As the report explains, irregularities in the chain of title between the originator and the trust can have significant legal consequences that damage the trusts and certificateholders. Cong. Oversight Panel, *Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation*, Pub. L. No. 110-343 (2010)*, available at* http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

127.    Other reports reached similar conclusions. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") issued a report detailing the causes of the financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

Staff of S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* 50 (Subcomm. Print 2011).

128.    The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and the subsequent collapse of the mortgage market and wider economy. *See* Fin. Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").

129.    The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately—as has been the case in past speculative booms and

busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the

financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and
> available credit, scant regulation, and toxic mortgages—that was the spark that ignited a
> string of events, which led to a full-blown crisis in the fall of 2008. Trillions of dollars in
> risky mortgages had become embedded throughout the financial system, as mortgage-
> related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

130.    The FCIC Report also noted that during the housing boom, mortgage lenders

focused on quantity rather than quality, originating loans for borrowers who had no realistic

capacity to repay the loan, and noted "that the percentage of borrowers who defaulted on their

mortgages within just a matter of months after taking a loan nearly doubled from the summer of

2006 to late 2007." *Id*. at xxii. A default in the first few months of a mortgage, known as an early

payment default, is known in the mortgage industry as a significant indicator of pervasive

disregard for underwriting standards. Not surprisingly, the FCIC Report noted that mortgage

fraud "flourished in an environment of collapsing lending standards." *Id*.

131.    In this lax lending environment, mortgage lenders went unchecked, originating

mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause
> massive losses to investors in mortgage securities. As early as September 2004,
> Countrywide executives recognized that many of the loans they were originating could
> result in "catastrophic consequences." Less than a year later, they noted that certain high-
> risk loans they were making could result not only in foreclosures but also in "financial
> and reputational catastrophe" for the firm. But they did not stop.

*Id*.

132.    Lenders and borrowers took advantage of this climate, with borrowers willing to

take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened

underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low

that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id*. at xxiii.

133.    In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id*. at 12-13 (internal quotation marks omitted).

134.    The predominant RMBS securitization method involved an originate-to-distribute ("OTD") model where the originators of the loans do not hold the loans, but instead repackage and securitize them. The OTD model created a situation where the origination of low quality mortgages through poor underwriting thrived. The Financial Stability Oversight Council ("FSOC") found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully. Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold. By lower underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

Fin. Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements (2011) ("FSOC Report") at 11 (footnote omitted).

135.    The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry. The FSOC Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans." *Id*. Similarly, the sponsors responsible for securitizing residential mortgages for trusts between 2004-2008 failed

44

to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the represented quality and also failed to ensure that the purported mortgaged property's appraised value was accurate.

136.    As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

137.    Additionally, the evidence shows that sponsors, and the third party due diligence providers they hired, failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools. More importantly, when the sponsors and their due diligence firms identified high percentages of mortgage loans in their sample reviews as defective, the sponsors often "waived in" mortgage loans in the interest of preserving their business relationships and their own profits.

138.    In sum, reports regarding the disregard of underwriting standards and poor securitization practices became common by 2009. Even prior to 2009, Defendant had exclusive access to proprietary information and data demonstrating the systematic failure of underwriting standards that was not available to the public. If validated, those practices would have directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools underlying RMBS, resulting in steep losses. By at least 2009, it was apparent to trustees that the originators and sponsors involved in the securitization of the trusts had engaged in problematic practices such that a reasonable and prudent trustee would have taken upon itself the duty to carefully investigate these issues fully in connection with the trusts entrusted to its care.

**B.      Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices**

139.     The governing agreements for each of the trusts incorporated representations and warranties concerning title to the mortgage loans, the characteristics of the borrowers and the collateral for the mortgage loans, and the credit criteria and underwriting practices for the origination of loans.

140.     However, as discussed below, Defendant had reason to suspect that those representations and warranties were false and carefully investigate whether the mortgage files for the underlying mortgage loans in their trusts were defective. Numerous investigations, lawsuits, and media reports have demonstrated that nearly all of the largest mortgage loan originators in the RMBS market between 2000 and 2008 systematically disregarded their stated underwriting guidelines while pursuing profit by recklessly originating loans without regard for the borrowers' ability to repay. In addition, investigations, lawsuits, and media reports have shown that the primary sponsors in the RMBS market ignored prudent securitization standards.

141.     The information below provided ample reason for Defendant to suspect, as trustee for the trusts, that the loans underlying the trusts did not comply with the representations and warranties in the governing agreements. As a result, Defendant should have carefully investigated those issues in the context of the trusts entrusted to its care, provided notice to certificateholders, and taken appropriate action to protect the trusts.

**1.      American Home**

142.     American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated, aggregated, and serviced by its subsidiaries. It was the parent of American Home Mortgage Acceptance, Inc. and American

Home Mortgage Holdings, Inc., which was the parent of American Home Mortgage Corp., a retail lender of mortgage loans. Collectively, these entities are referred to as "American Home." American Home originated or contributed a material portion of the loans in the mortgage pools underlying the trusts and sponsored some of the trusts.

143.    American Home's lack of adherence to underwriting guidelines was detailed in a 165-page amended class action complaint filed in June 2008. *See* Am. Complaint, *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. June 4, 2008) ("American Home Am. Compl."). Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from over 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. *See generally* American Home Am. Compl.

144.    According to the American Home Am. Compl., former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied without compensating factors. *See id*. ¶¶ 120-21.

145.    Witnesses reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud. *See id*.

146.    Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American

47

Home headquarters to get approval for exceptions. It was commonplace to overrule mortgage underwriters' objections to facilitate loan approval. *See id.* ¶ 123.

147.     A former American Home auditor confirmed that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id.* ¶ 124.

148.     The parties settled the litigation on January 14, 2010, for $37.25 million.

149.     Like other originators from this period, American Home's poor lending practices resulted in numerous other civil lawsuits. Those lawsuits contain firsthand accounts from former employees and allegations that reunderwriting revealed that many loans originated by American Home were found to be breaching the associated representations and warranties. *See, e.g.*, Complaint, *Royal Park Invs. SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012); First Consolidated and Am. Complaint, *New Jersey Carpenters Health Fund v. Structured Asset Mortgage Invs. II, et al.*, No. 08-cv-8093 (S.D.N.Y. May 15, 2009).

### 2.     Accredited Home Lenders, Inc.

150.     In October 2006, Accredited Home Lenders, Inc. ("Accredited") acquired a smaller sub-prime lender, Aames. Accredited and Aames originated or contributed a material portion of the loans to the trusts.

151.     A complaint filed by Allstate Insurance Company contains allegations based on confidential witness statements in which former Accredited employees confirm that Accredited blatantly disregarded its underwriting standards. *See* Compl., *Allstate Insurance Company v. Morgan Stanley*, No. 651840/2011 (N.Y. Sup Ct. July 5, 2011) ("Allstate Complaint").

152.     One confidential witness, who served as a corporate underwriter for Accredited in San Diego, California between May 2002 and November 2006, reported that "underwriters were

consistently pressured by upper management to approve loans where there was no mitigating value except to get the loan on the books." Allstate Complaint at ¶ 125. That same former Accredited employee "explained that certain underwriters with problem loan ratios above 45% 'were favored [by upper-level management] because they produced more loans.'" *Id.*

153.    Another confidential witness, who served as a corporate underwriter at Accredited between August 2003 and February 2006 in Tampa, Florida reported that "[t]he problem with the whole system was the overrides. The overrides were rampant. . . . If the borrower breathed, he got the loan." *Id.* ¶ 126.

154.    Similarly, a former chief appraiser at Accredited between 2002 and June 2007 in San Diego, California explained that Accredited's misconduct extended to artificial inflation of property appraisal values. According to the former appraiser, "Accredited established a policy whereby sales managers had the authority to manipulate a professional appraiser's final opinion of market value by utilizing the values of properties that were not comparable to the property serving as collateral for the loan . . . . '[a]s of June 2006, between 12% and 15% of [Accredited's] business was being done through management overrides.'" *Id.* ¶ 127.

155.    Additionally, the complaint in *Bayerische Landesbank v. Goldman Sachs Group, Inc.*, No. 653111/2012 (N.Y. Sup. Ct. Sept. 5, 2012) ("Bayerische Complaint") cited confidential sources formerly employed by Accredited.

156.    According to a former corporate underwriter at Accredited in San Diego, California and Austin, Texas from June 2000 through March 2007, "inflated income on stated income loans was a most common problem and it was not unusual to see housekeepers who claimed to make $8,000 per month or landscapers who claimed to make $10,000 or $12,000 per month." *Id.* ¶ 177.

157.   A former Accredited employee from 1998 until December 2006 in loan underwriting and sales explained that underwriters were "strongly encouraged to push loans through regardless of quality."  *Id.* ¶ 176.

158.   The Amended Class Action Complaint filed in *Public Employees' Retirement System of Mississippi v. Merrill Lynch*, No. 1:08-cv-10841-JSR-JLC (S.D.N.Y. July 6, 2010) cited the following based on additional information provided by confidential sources:

- According to CW16, the number of overrides grew so large that Accredited was forced to institute a system to track such overrides. The system included a box on the loan file that an underwriter needed to check if a higher-level manager approved the loan "as a business decision" over the recommendation of the underwriter.

- According to CW17, a Corporate Underwriter at Accredited between June 2000 and March 2007 in both the San Diego, California, and Austin, Texas, offices, 'At the end of the month, we were handed loan files and told to just sign them with no audit.'

*Id.* ¶¶ 158–59.

159.   Additionally, the Class Action Complaint filed in *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-cv-488 H (RBB) (S.D. Cal. Aug. 24, 2007) provides testimony by former Aames and Accredited employees, as follows:

- According to CW11, the Western Retail Operations Manager at Accredited from October 2006 until March 2007, "Accredited got very loosey goosey on credit. It was common to see four, five or six exceptions on a loan. . . . At Accredited, they actually pushed making the exceptions. . . ."

- Further, according to CW11, "I was frequently overridden on loans that I thought were pieces of crap. They wanted units and dollar volume and didn't care how they got there."

- CW12, a Senior Underwriter at Accredited from October 2006 through March 2007 in its Irvine office, reported that "[a]t Accredited, we were told to make exceptions on everything." According to CW12, it wasn't until February 2007 that

> Accredited finally tightened its lending guidelines. According
> to CW12, "it was too late by then."

*Id.* ¶¶ 83–88.

160.    The Court in *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-cv-488 H

(RBB) (S.D. Cal. Jan. 4, 2008) sustained allegations that "[d]efendants' statements regarding

Accredited's underwriting practices were allegedly false and misleading because defendants had

caused Accredited to deviate from its publicly professed standards."

### 3.    Ameriquest/Argent

161.    ACC Capital Holdings ("ACC Capital"), based in Orange, California, was the

nation's largest privately-owned subprime lender. Ameriquest Mortgage Company

("Ameriquest") was ACC Capital's retail mortgage lending unit. Argent Mortgage Company,

LLC ("Argent") was ACC Capital's wholly-owned wholesale lending unit that made loans

through independent brokers. On September 1, 2007, Citigroup purchased Argent from ACC

Capital, and Ameriquest announced that it was shutting down lending operations.

162.    Ameriquest and Argent originated or contributed a substantial portion of the loans

in the mortgage pools underlying the trusts and also sponsored many of the trusts.

163.    Argent appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report.

Argent was ranked as the worst lender in Cleveland, Ohio, and Detroit, Michigan; the second

worst in Las Vegas, Nevada, and Miami, Florida; the third worst in Denver, Colorado; the fourth

worst in Stockton, California; the fifth worst in Bakersfield, California; the sixth worst in

Riverside and Sacramento, California; and the eighth worst in Memphis, Tennessee.

164.    In the 2009 OCC Report, Argent was fourth in Las Vegas, Nevada; sixth in Fort

Pierce-Port St. Lucie, Florida and Reno, Nevada; seventh in Bakersfield, California and

Stockton-Lodi, California; eighth in Riverside-San Bernardino, California; ninth in Merced,

California, Modesto, California and Fort Myers-Cape Coral, Florida; and tenth in Vallejo-Fairfield-Napa, California.

165.     According to a May 11, 2008, Cleveland Plain Dealer article titled *The Subprime House of Cards*, Jacquelyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, reported that "some Argent employees played fast and loose with the rules" and stated: "I personally saw some stuff I didn't agree with." Ms. Fishwick "saw [Argent] account managers remove documents from files and create documents by cutting and pasting them." Mark Gillispie, *The Subprime House of Cards*, The Plain Dealer, May 11, 2008, *available at* http://blog.cleveland.com/metro/2008/05/the_subprime_house_of_cards.html.

166.     According to a January 29, 2009, article in the Miami Herald, Orson Benn, a former vice president of Argent who was convicted and sentenced to prison for racketeering relating to mortgage fraud, spent three years during the height of the housing boom teaching brokers "how to doctor credit reports, coached them to inflate [borrower] income on loan applications, and helped them invent phantom jobs for borrowers" so that loans could be approved. Jack Dolan *et al.*, *Home Loan Racket Flourished In Florida*, Miami Herald, Jan. 29, 2009, *available at* http://www.miamiherald.com/2008/12/07/v-fullstory/878194/home-loan-racket-flourished-in.html.

167.     According to Mr. Benn himself, "the accuracy of loan applications was not a priority." *Id.* The article reports: "The simplest way for a bank to confirm someone's income is to call the employer. But in at least two dozen cases, the applications show bogus telephone numbers for work references." *Id.* The article notes that one Argent broker generated at least 100 loans worth $22 million in Miami and nearly all of them were based on false and misleading

financial information. *See id.* For instance, "one borrower claimed to work for a company that didn't exist—and got a $170,000 loan. Another borrower claimed to work a job that didn't exist—and got enough money to buy four houses." *Id.* The Miami Herald obtained applications for 129 loans funded by Argent and found that "103 contained red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth." *Id.*

168.     The New York Times reported that Ameriquest refused to sign up for a tax verification service for verifying the reported taxes of borrowers as part of its underwriting process. Gretchen Mortgenson, *A Road Not Taken By Lenders*, N.Y. Times, Apr. 6, 2010, *available at* http://www.nytimes.com/2008/04/06/business/06gret.html.

169.     Richard Bowen, the former Business Chief Underwriter at Citibank, was involved in the due diligence process for Citibank's acquisition of Argent. In his April 7, 2010 appearance before the FCIC, Mr. Bowen testified that he advised against the acquisition because "we sampled loans that were originated by Argent, and we found large numbers that did not—that were not underwritten according to the representations that were there." Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Richard M. Bowen, III) ("Bowen Testimony") at 239.

170.     In a video released by the American News Project on May 11, 2009, reporters Lagan Sebert and Mike Fritz interviewed several former employees of Argent and Ameriquest regarding their lending practices. American News Project, *Fraud by Mortgage Companies Key Cause of Foreclosures* (May 11, 2009), *available at* http://www.youtube.com/watch?v=MFPi6mcNubo.

171.     Tamara Loatman-Clark, a former loan closer for Argent, stated "I mean you did what you had to do and again if that meant manipulating documents so that you can get them out

so that they could conform, that's what you did…. [T]here were incentives to get as many done as possible. So on a typical Thursday, I may have 15 or 20 files that I need to get funded somehow and you know you need to work very hard to get 20 files funded. Whatever hit your desk for the day is what you wanted to get out." *Id*.

172.    According to the video, "It was the Wall Street business that drove the frantic pace. Even before proper papers were signed, Ameriquest was bundling the loans and passing them on." Loatman-Clark said, "And so sometimes when they came back and you're talking about, you know, names not properly on mortgage documents… you're talking about missing documents, like internally the incentive was to do whatever you needed to do to get them out and that sometimes meant that you manipulated documents to get them out." *Id*.

173.    The video report contained the following exchange:

Reporter: "So you are saying the goal was to make these loans and then get them off your books as quick as possible?"

Loatman-Clark: "Exactly. That was the pressure."

Reporter: "But who were the people who were buying, who were like the most hungry for these loans?"

Loatman-Clark: "Bear Stearns… Citigroup was another one. Basically the ones that were/are hardest hit were the people who invested. And these were the people we were shuffling these documents out to by any means necessary."

*Id.*

174.    Omar Kahn, a former Ameriquest Loan Officer, also told the reporters, "Every closing we had was a bait and switch, because you could never get them to the table if you were honest." "There were instances where the borrower felt uncomfortable about signing the stated income letter, because they didn't want to lie, and the stated income letter would be filled out later on by the processing staff." *Id*.

175.    Another former Ameriquest Loan Officer named Tyson Russum said, "The entire system is built to do whatever you can to close as many loans at the highest fee amount as possible." *Id*.

176.    In testimony before the FCIC on Jan. 14, 2010, Illinois Attorney General Lisa Madigan explained that a multistate investigation of Ameriquest "revealed that the company engaged in the kinds of fraudulent practices that other predatory lenders subsequently emulated on a wide scale ... includ[ing]: inflating home appraisals." FCIC Report at 12.

177.    On June 23, 2011, the Cleveland Plain-Dealer reported that a Cleveland grand jury indicted nine former Argent employees for their suspected roles in approving fraudulent home loans. Mark Gillespie, *Former Employees of Subprime Mortgage Lender Indicted by Cuyahoga County Grand Jury*, The Plain Dealer, June 23, 2011, *available at* http://blog.cleveland.com/metro/2011/06/former_employees_of_subprime_m.html.

178.    The indictment alleged that Argent employees "helped coach mortgage brokers about how to falsify loan documents so that they misstated the source or existence of down payments as well as borrower's income and assets." *Id*. The article noted that "[e]mployees at an Argent loan processing center in Illinois ultimately approved the loans knowing that the company's own lending rules had not been satisfied." *Id*. A spokesman for the prosecutor's office said that "Argent employees bent the rules to get loans approved in order to inflate their wages and bonuses." *Id*.

179.    Later, the Plain Dealer reported that additional criminal charges had been brought against one of the former Argent employees indicted in June—a woman named Angela Pasternak. Mark Gillespie, *Argent Mortgage Worker Gets Indicted Again in Suspected Mortgage Fraud Case*, The Plain Dealer, Nov. 15, 2011, *available at*

http://blog.cleveland.com/metro/2011/11/argent_mortgage_worker_gets_in.html.

180.    According to the article, prosecutors said that Ms. Pasternak, "approved

exceptions knowing that loan applications contained false income information and bogus credit

scores." *Id*. The article also reported, "Plain Dealer investigations found numerous instances in

which Argent approved mortgages that contained blatant misrepresentations of borrowers'

income, assets and ability to pay." *Id*.

181.    According to another article, Steve Jernigan, a fraud investigator at Argent, said

that when he sent an appraiser to check on a subdivision for which Argent had made loans, the

address on the loans was clearly fictitious because the appraiser was standing in the middle of a

cornfield. Michael W. Hudson, *Silencing the Whistle-blowers*, The Investigative Fund, May 10,

2010, *available at*

http://www.theinvestigativefund.org/investigations/economiccrisis/1308/silencing_the_whistle-

blowers/.

182.    When Jernigan reviewed the loan files, he determined that the houses did not exist

and that each of the loan files contained the picture of the same house. *See id.* The article also

reported that Argent had been ripped off by a con man named Robert Andrew Penn, who later

admitted that he had appropriated victims' names and credit histories to obtain loans and buy

properties for inflated prices around Indianapolis. *See id*. Although Argent was warned about the

man in 2004, Jernigan said the company did not "conduct a serious investigation" into the fraud

until mid-2006 when it learned the scheme was about to be made public by another duped lender.

*Id*.

183.    The article stated that the reluctance to investigate fraud was deliberate because

management did not want to "crimp loan sales." *Id*. The article quoted Kelly Dragna, a fraud

investigator at Ameriquest who said, "You're like a dog on a leash. You're allowed to go as far

as a company allows you to go." "At Ameriquest, we were on pretty short leash. We were there

for show. We were there to show people that they had a lot of investigators on staff." *Id.*

184.    The article outlined the story of one fraud investigator's career at Ameriquest to

demonstrate the extent to which Ameriquest turned a blind eye to fraud:

> Ed Parker signed on as Ameriquest's head of mortgage fraud investigation in early 2003,
> as the company was on the verge of becoming the nation's largest subprime lender. The
> first case he took on involved allegations that employees at the company's Grand Rapids,
> Mich., branch were pushing real-estate appraisers to inflate loan applicants' home values.
> Workers admitted to the scheme, Parker said, and the company shut down the branch and
> repurchased hundreds of loans from the investors who'd bought them.
>
> Parker saw the investigation as a success. He thought he'd helped set a precedent that
> fraud wouldn't be tolerated. But he discovered that his actions didn't endear him to many
> of his co-workers. One executive told him the sales force looked on him as "Darth
> Vader." On another occasion, when a suspicious loan file was brought up during a staff
> meeting, a senior executive said: "Don't give it to Ed. If you give it to him, that one file
> will multiply and become hundreds of files."
>
> Parker said higher-ups began pushing him to limit the scope of his inquiries and focus on
> smaller cases rather than big-impact ones like Grand Rapids. This message was driven
> home after Ameriquest learned that a TV reporter was digging into problems at a branch
> in Mission Valley, Calif. Two loans raised questions about whether branch employees
> were falsifying not only borrowers' incomes but also their ages, so that the inflated
> incomes would seem plausible. One borrower was 67, but the loan application prepared
> in her name said she was 41. Another was 74, but the loan application indicated the
> borrower was 44. The company, Parker said, wanted to limit its exposure and portray the
> problem as a couple of isolated cases. The company had all of the branch's loan files
> boxed up and transported to the fraud investigation team in Orange County. Management
> sent word, however, that Parker's team shouldn't open the boxes. His investigators
> looked anyway. As they cracked open the files, they saw that falsified incomes and ages
> were a problem that went beyond two borrowers' loans. When senior managers
> discovered what the team was doing, Parker said, they weren't happy. "They said: 'Don't
> look anymore,'" he recalled. "They didn't want to know."

*Id.*

185.    In January 2010, Ameriquest and Argent agreed to pay $22 million to settle 29

class action lawsuits against them that had been consolidated in the Northern District of Illinois,

alleging that Argent and Ameriquest inflated appraisal values and borrower income or asset statements and aggressively employed misleading marketing/sales techniques as part of a business strategy to force potential borrowers to close loans. *See In re Ameriquest Mortgage Co. Mortgage Lending Pracs. Litig.*, MDL No. 1715 (N.D. Ill)

### 4. Countrywide

186.   Countrywide Financial, Countrywide Home Loans, Inc., Countrywide Mortgage Funding, Inc. and Countrywide Home Loans Servicing LP ("Countrywide") was one of the largest originators of residential mortgages in the United States during the period leading up to the financial crisis. Countrywide originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

187.   In a television special titled, "*If You Had a Pulse, We Gave You a Loan*," Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."
>
> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.
>
> He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."
>
> He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."
>
> But it turned out to be no laughing matter for Partow. Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.
>
> In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."
>
> . . .

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *If You Had a Pulse, We Gave You a Loan,* NBC Dateline (Mar. 22, 2009),

*available at* http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-

the_hansen_files_with_chris_hansen.

188.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled

investors about the credit risks that Countrywide created with its mortgage origination business,

telling investors that Countrywide was primarily involved in prime mortgage lending, when it

was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines.

*See* Complaint, *SEC v. Mozilo*, No. 09-cv-3994 (C.D. Cal. June 4, 2009). Mozilo and the other

executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter

Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud

Charges*, L.A. Times, Oct. 16, 2010, at A1.

189.    Internal Countrywide e-mails released in connection with the SEC lawsuit and

publicly available show the extent to which Countrywide systematically deviated from its

underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top

Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

190.     Indeed, in a September 1, 2004 email, Mozilo voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."

191.     In 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract. In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate." Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic] It's not only subordinated to the first, but the first is subprime. In addition, the [FICOs] are below 600, below 500 and some below 400 . . . . With real estate values coming down . . . the product will become increasingly worse. There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

192.     Countrywide sold a product called the "Pay Option ARM." This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 e-mail, Mozilo noted that

most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."

193.    An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.

194.    Mozilo admitted in a September 26, 2006 email that Countrywide did not know how Pay Option ARM loans would perform and had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet." Yet such loans were securitized and passed on to unsuspecting investors such as the CCUs.

195.    With growing concern over the performance of Pay Option ARM loans, Mozilo advised in a November 3, 2007 email that he "d[id]n't want any more Pay Options originated for the Bank." In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans. Mozilo's concerns about Pay Option ARM loans expressed in the same email were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."

196.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted

irrespective of the circumstances."

197.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines." Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry.

198.    Aguilera confirmed in a June 12, 2006 email that internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.

199.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate. In a February 21, 2007 email, Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."

200.    John McMurray, a former Countrywide managing director, expressed his opinion in a September 7, 2007 e-mail that "the exception process has never worked properly."

201.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors. After reviewing many of the loans that went bad, Countrywide executive Russ Smith stated in an April 11, 2007 email that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."

202.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

203.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

204.    According to Zachary, Countrywide pressured employees to approve unqualified borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there." NBC Nightly News, *Countrywide Whistleblower Reports "Liar Loans,"* July 1, 2008. Zachary also stated that the practices were not the work of a few bad apples, but rather: "It comes down, I think from the very top that you get a loan done at any cost." *Id.*

205.    Zachary also told of a pattern of: 1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income to qualify for loans. *Id.*

206.    NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices. Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans. NBC News quoted a former loan officer: "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'" *Id.*

207.    Countrywide's complete disregard for proper loan underwriting has spawned numerous lawsuits. As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files. Public disclosure of the staggering number of loans breaching the associated representations and warranties discovered in these cases should have alerted the trustee that Countrywide loans were highly likely to have breached the associated representations and warranties.

### 5.    Decision One

208.    Decision One Mortgage Co., LLC and Decision One Mortgage Corp. ("Decision One") was a major lender specializing in mortgage loans that are commonly referred to as Alt-A lending options, and non-conforming or sub-prime loans. In 2006, Decision One ranked as the 14th largest subprime lender in the nation. Decision One originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

209.    A 2011 complaint filed by Allstate Insurance Company contains allegations based on confidential witness statements in which former Decision One employees "described Decision One's lax attitude towards its own origination and underwriting standards and explained that Decision One had been approving loans that should have never been issued." Complaint, *Allstate Ins. Co. v. Morgan Stanley*, No. 651840/2011, ¶ 95 (N.Y. Sup. Ct. July 5,

2011). On March 15, 2013, the Court granted Morgan Stanley's Motion to Dismiss with respect to a negligent misrepresentation claim, but denied the Motion in all other respects.

210.    According to testimony and documents submitted to the FCIC by a Clayton executive, during 2006 and the first half of 2007, Clayton reviewed 911,039 loans issued by originators, including Decision One, for securitization. Clayton determined over 10% of Decision One's loans did not comply with its underwriting guidelines and had no compensating factors. *See* Clayton All Trending Report at 10, available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

211.    Decision One's reckless lending practices earned it a spot on the OCC's 2009 "Worst Ten in the Worst Ten" list.

### 6.      DLJ / Credit Suisse

212.    DLJ Mortgage Capital, Inc. ("DLJ"), is a Delaware corporation and subsidiary of Credit Suisse Securities, an affiliate of Credit Suisse Financial Corp. (collectively, "Credit Suisse") with its headquarters at Credit Suisse's office in New York. DLJ sponsored at least one of the trusts.

213.    Lawsuits brought against Credit Suisse have revealed that Credit Suisse understood that loan originators were purposely and wrongfully overstating borrower income. On June 28, 2006, Credit Suisse internally circulated to Robert Sacco (Credit Suisse's Head of Underwriting) a take on the final courtroom scene in *A Few Good Men* between a loan officer (the Jack Nicholson role) and an underwriter (the Tom Cruise role) in which the loan officer says that loans "must be brought in by people . . . who thrive on cold-calling, rejection, and false promises," and that his "very existence, while grotesque and incomprehensible to you, drive REVENUE!" When the underwriter asks "Did you overstate the income?" then loan officer yells

back "You're damn right I did!!!!!" *See* Complaint, *CMFG Ins. Co. et al. v. Credit Suisse (USA),* *LLC*, No. 14-cv-249, Exh. 1 (W.D. Wis. April 3, 2014) (6/28/2006 email from K. Jones to R. Sacco).

214.    About two months later, when presented with an article stating that Massachusetts shut down two mortgage brokers after regulators documented several cases of brokers inflating the incomes of borrowers on mortgage applications to help buyers qualify for loans, Mr. Sacco internally remarked, "Isn't that what stated income loans are supposed to do – inflate the income to qualify borrowers for loans?" *Id.* Exh. 2 (8/30/2006 email from R. Sacco to B. Kaiserman).

215.    Others in managerial positions with Credit Suisse were willing to take actions regarding RMBS that even Mr. Sacco had trouble stomaching. According to Michael Daniel (Managing Director of Credit Suisse), Mr. Sacco "claims he regularly has to respond to pressure from [Mike] Fallacara [head of Credit Suisse's residential mortgage conduit and Mr. Sacco's boss] and salespeople to approve loans that he thinks are unworthy (and he showed me plenty of emails to prove it–undeniably)." *Id.* Exh. 3 (11/22/2006 email from M. Daniel to M. Marriott). According to Mr. Daniel, Mr. Fallacara pressured Mr. Sacco to approve loans with "unreasonable income and a huge DTI," and "iffy" appraisals. *Id.*

216.    Mr. Daniel wrote, "I really don't believe that Fallacara or anyone else in the conduit can make credit decisions objectively. Mike wants volume, and is all to [sic] willing to look the other way when volume is at stake." *Id.*

217.    Several months later, Mr. Daniel told Mr. Vibert and Peter Sack of Credit Suisse that Mr. Fallacara "has subverted sound underwriting." *Id.* Exh. 4 (1/9/2007 email from M. Daniel to J. Vibert & P. Sack).

218.    Mr. Vibert wrote shortly thereafter that Mr. Fallacara "is an impediment to best practices." *Id.* Exh. 5 (1/18/2007 email from J. Vibert to M. Daniel).

219.    Mr. Fallacara's willingness to funnel through inappropriate loans to RMBS investors was well known to Credit Suisse even before 2007. On June 6, 2006, Mr. Vibert wrote, "Instead of trying to sell bonds, I spend my time playing defense from a guy supposedly on my team who won't stop waiving credit guidelines until we've taken on so much water the firm will pull the plug. Trust me, when this Titanic goes down, fallacara will be the guy on the bow proclaiming 'I'm the king of the world!!!!!'" *Id.* Exh. 6 (6/6/2006 email from J. Vibert to M. Marriott).

220.    Problems with Credit Suisse's residential mortgage conduit were long-standing. In September 2004, Credit Suisse's Internal Audit Department gave its residential mortgage conduit and wholesale business the second-to-worst possible rating. *Id.* Exh. 7 (9/20/2004 Executive Summary of Residential Mortgage Conduit and Wholesale (Americas)).

221.    The Credit Suisse Internal Audit Department found that "controls need improvement in certain areas, including . . . approval of underwriting exceptions," and that "underwriting exceptions identified during the due diligence process are not always reviewed and approved by the Front Office as required by policy." *Id*. Exh. 7 p. 1. It also concluded that "[t]here is no formal process for documenting certain decisions made during the underwriting process nor were these exceptions raised to New York for approval. Specific instances noted include: loan appraisals not being compared to external sources for reasonableness as required; and approval of loans that did not have all of the required documentation (second appraisal/AVM), as prescribed in the Underwriting Guidelines." *Id*. Exh. 7 p. 2.

222.    To remedy the deficiencies identified in its September 20, 2004 internal audit, the Credit Suisse Internal Audit Department recommended that Credit Suisse "implement procedures to ensure decisions made during the due diligence process are documented and that required exceptions are approved in writing." *Id.*

223.    Mr. Fallacara commented that this recommendation was "Agreed and completed. Supervisory procedures have been enhanced to ensure all decisions made during the underwriting process are documented and that all material exceptions are sent to New York for review and approval." *Id.*

224.    A few months later, Credit Suisse's Internal Audit Department gave its RMBS business the worst possible rating. *Id.* Exh. 8 (12/23/2004 Executive Summary of Credit Suisse First Boston Residential Mortgage Backed Securities Trading and Sales (Americas)).

225.    The Internal Audit Department found that "there was also an issue from our prior report related to the lack of documentation for loan acquisition and due diligence procedures for sub performing loans that was improperly reported as 'fully implemented' by management who has subsequently left the Firm." *Id.* Exh. 8 p. 2.

226.    Additionally, on June 28, 2013, U.S. Bank, acting as trustee, filed an amended complaint against DLJ seeking repurchase of defective loans in a pool of over 5,000 mortgages. *See* Am. Complaint, *Home Equity Asset Trust 2007-1 v. DLJ Mortgage Capital Inc.*, No. 650369/2013 (N.Y. Sup. Ct. June 28, 2013).

227.    After suffering severe losses, U.S. Bank conducted a forensic review of more than 1,500 loans. It found that nearly 80% of the loans breached DLJ's representations and warranties. *Id.* ¶ 5. A loan-level review of approximately 1,000 more loans confirmed that "the principal originators of the Mortgage Loans failed to adhere to industry-standard and reasonable

underwriting guidelines in an extremely high percentage of cases." *Id.*

228.     On December 18, 2013, the Attorney General of New Jersey announced that the

State had filed a lawsuit against Credit Suisse, DLJ, and Credit Suisse First Boston Mortgage

Securities. The complaint includes allegations that the defendants offered over $10 billion in

RMBS for sale to investors, but failed to disclose that "there had been a wholesale abandonment

of underwriting guidelines" and numerous originators had high delinquency and default rates.

Press Release, *Acting Attorney General Announces Lawsuit Against Credit Suisse Arising From

Sale of Over $10 Billion in Troubled Mortgage Backed Securities* (Dec. 18, 2013), *available at*

http://nj.gov/oag/newsreleases13/pr20131218a.html.

229.     Credit Suisse and DLJ have also been the target of other significant RMBS

investigations and lawsuits. A review of loan files by MBIA, which wrote insurance on DLJ

Mortgage certificates, demonstrates that DLJ Mortgage routinely misrepresented the quality of

loans included in the securitizations. Complaint, *MBIA Ins. Corp. v. Credit Suisse Securities

(USA) LLC, et al.*, No. 603751/2009 (N.Y. Sup. Ct. Dec. 14, 2009). In carrying out its review of

the approximately 1,386 DLJ defaulted loan files, MBIA found that 87% of the defaulted or

delinquent loans in those securitizations contained breaches of DLJ Mortgage's representations

and warranties. *Id.* ¶ 68. These findings demonstrated "a complete abandonment of applicable

guidelines and prudent practices such that the loans were (i) made to numerous borrowers who

were not eligible for the reduced documentation loan programs through which their loans were

made, and (ii) originated in a manner that systematically ignored the borrowers' inability to

repay the loans." *Id.* ¶ 11. Moreover, "[t]he rampant and obvious nature of the breaches confirms

that Credit Suisse made intentional misrepresentations concerning its mortgage loans and the due

diligence that Credit Suisse purported to perform regarding the quality of those loans." *Id.*

230.    Investors have reached similar conclusions regarding the defective loan collateral underlying Credit Suisse securitizations in their review of loans from Credit Suisee-label trusts. For example, FHFA conducted a forensic review of numerous loans in Credit Suisse securitizations. Complaint, *FHFA v. Credit Suisse Holdings (USA), Inc*., No. 11-cv-06200 (S.D.N.Y. Sept. 2, 2011). The forensic review "revealed that for a majority of the loans reviewed in those Securitizations, there were numerous breaches of the originators' underwriting guidelines, such as failure to evaluate the reasonableness of the borrower's stated income or to correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan." *Id*. ¶ 6.

231.    In November 2011, Allstate Insurance Company ("Allstate") filed an amended complaint alleging fraud against Credit Suisse, DLJ Mortgage and other affiliates in connection with the sale of approximately $232 million in "highly-rated certificates." Am. Complaint, *Allstate Insurance Co. et al. v. Credit Suisse Secs. (USA) LLC et al.*, No. 650547/2011 (N.Y. Sup. Ct. Nov. 16, 2011). Allstate performed a forensic review of sampling of loans from the loan pools, which showed that the loans were riddled with defects constituting pervasive breaches of representations and warranties. For example, Allstate found that Credit Suisse systematically and significantly overstated the number of owner-occupied properties and understated the loans' LTV and CLTV ratios, and "routinely included" loans that "failed to conform to the originator's stated underwriting standards." *Id*. ¶¶ 126-61. Moreover, Allstate's forensic analysis found that Credit Suisse loan originators "systematically abandoned underwriting standards." *Id*. ¶¶ 162-199.

232.    In another case, Prudential's loan-level "analysis revealed systematic failures in Defendants' loan underwriting and assignment practices." Complaint, *Prudential Ins. Co. of*

*America v. Credit Suisse Secs. (USA) LLC et al.*, No. 12-cv-07242, at ¶ 1 (D.N.J. Nov. 21, 2012).

Specifically, Prudential found that across the twenty-three Credit Suisse securitizations that it

tested, a staggering 48.67% of the mortgage loans contained at least one material defect. *Id.* ¶ 18.

233.   In other cases, monoline insurers and investors have reached similar findings

regarding Credit Suisse's widespread breach of representations and warranties concerning the

loans securitized in Credit Suisse-label trusts. *See, e.g.*, Complaint, *Assured Guaranty Municipal

Corp. v. DLJ Mortgage Capital Inc.*, No. 652837/2011 (N.Y. Sup. Ct. Oct. 17, 2011) (forensic

review confirmed that DLJ breached representations about the loans and that a huge number of

defective mortgages were packaged into securities); Complaint, *FGIC v. Credit Suisse Secs.

(USA) LLC*, No. 651178/2013, at ¶ 9 (N.Y. Sup. Ct. Apr. 2, 2013) (forensic review confirmed

that "Credit Suisse's pre-closing representations were fraudulent, the warranties it made in the

Insurance Agreement were false, and it willfully disregarded and frustrated its contractual

covenants"); Complaint, *Mass. Mut. Life Ins. Co. v. DLJ Mortgage Capital, Inc.*, No. 11-cv-

30047, at ¶ 6 (D. Mass. Feb. 25, 2011) (analysis confirmed "Credit Suisse Defendants abandoned

or disregarded disclosed underwriting guidelines, often originating or acquiring loans issued to

borrowers regardless of the borrowers' ability to repay").

### 7.    First Franklin

234.   First Franklin Financial Corporation ("First Franklin") originated or contributed a

material portion of the loans in the mortgage pools underlying the trusts.

235.   Starting in 2009, First Franklin was named in numerous lawsuits alleging that it

systematically abandoned its underwriting guidelines in the pursuit of profits. These lawsuits

contain ample evidence that mortgage loans originated by First Franklin breached the associated

representations and warranties. Not only do these lawsuits contain eye-witness accounts from

confidential witnesses and former employees of First Franklin, but many complaints also contain detailed information based on forensic reviews of individual loans.

236.    One of the earliest lawsuits naming First Franklin was filed on February 17, 2009. Complaint, *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. et al.*, No. 09-cv-1392 (S.D.N.Y. Feb. 17, 2009). The complaint alleged that First Franklin "systematically ignored, or abandoned their stated and pre-established underwriting and appraisal standards." *Id.* at ¶ 11. The litigation was eventually settled.

237.    First Franklin was also named in a 2010 class action suit that alleged it systemically disregarded its underwriting guidelines when originating mortgages that were subsequently securitized into RMBS. *See* Corrected Am. Compl. For Rescission and Damages, *Federal Home Loan Bank of Chicago v. Banc of America Funding Corp et al.*, No. 10-ch-45003 (Ill. Cir. Ct. Apr. 8, 2011) ("FHLB Chicago Am. Compl.").

238.    Statements from confidential witnesses in the FHLB Chicago Am. Complaint represented that First Franklin originated mortgage loans in violation of its stated underwriting standards.

239.    According to one confidential witness who was an underwriter at a First Franklin branch in Georgia from March 2004 to November 2007, account executives at First Franklin were making "$100,000 a month in commissions," which was based on the number and dollar amount of loans processed. Due to this incentive structure, account executives would often pressure underwriters to approve loans that should not have been approved. The executives would simply override the underwriter's decision so that, according to this confidential witness, "Nine out of ten times, the loan went through." *Id.* ¶¶ 387-88.

240.    That same confidential witness explained that First Franklin used contract appraisers who inflated property values. There "were homes with busted out windows and the meter boxes [] missing" that appraised for $300,000. He also knew that many fake W-2s had been attached to loan applications because the tax withholdings did not match the income. Further, he knew that mortgage brokers who referred loan applications to First Franklin were "whiting out or faxing over" the actual numbers and writing in new numbers so that the loans would work. *Id*. ¶¶ 400, 402.

241.    Another confidential witness was an underwriter and account executive at a First Franklin branch in Ohio from 2000 until 2007. Account executives were responsible for maintaining relationships with mortgage brokers that referred loan applications to the originating banks. This confidential witness stated that "account executives paid processors cash under the table to help them get loans closed," and went on to describe how one loan processor was caught manipulating the loan documents in order to close more loans. *Id*. ¶ 389.

242.    One confidential witness, who was an underwriter at a First Franklin branch in Washington from 2005 until November 2007, described how the systematic disregard for underwriting standards grew worse after First Franklin purchased OwnIt Mortgage and OwnIt employees began working with the confidential witness. She stated that OwnIt employees "were used to approving anything. They'd say, 'If we don't approve it, somebody else will. So why lose the money?'" This witness's manager was a former OwnIt employee who would often override her employees' decisions to decline loans in order to meet performance goals. The witness also noted that First Franklin employees manipulated applications so that they would be approved. *Id*. ¶¶ 390, 406.

243. The confidential witness who worked at the Ohio branch represented that there was enormous pressure from management to close loans at any cost. "[P]eople were working until 8 p.m. on Saturdays and Sundays" in order to close the loans, stated the witness. As a result, "a lot of loans slipped through. People were tired of being beat up. With the rush of loans, stuff could have been overlooked. Maybe the conditions didn't exactly meet the guidelines." During the last few days of the month, some employees would go to the branch manager "begging for exceptions to close their loans." *Id.* ¶ 395.

244. Another confidential witness, who was, among other things, an account executive and underwriter at a First Franklin branch in Utah from 1996 until 2008, noted that account executives would often approach branch managers about overturning an underwriter's decision to reject a loan, and said that "some loans were approved that were not compliant with guidelines." *Id.* ¶ 396.

245. That same confidential witness also encountered the "blatant fraud" first hand. She recalled a $500,000 loan application for a home that was supposed to be owner occupied even though the same borrower and purchased a $1,000,000 home in the same neighborhood a month earlier and also claimed that it would be owner occupied. Although the underwriter was successful in blocking that particular application, her manager was mad at her for catching it. Other similar loans were approved. *See id.* ¶ 404.

246. When First Franklin began downsizing its mortgage operation in late 2007, it ordered all of its remaining underwriters to assist in loss mitigation. The confidential witness from the Utah branch was one of them. She reported that the loss mitigation group was tasked with reviewing the quality of a number of First Franklin's loans: she reported that among the loans she reviewed, fifty percent were not compliant with First Franklin's guidelines, citing

problems such as inflated appraisal values, insufficient employment verification, and disqualifying credit scores. *See id.* ¶ 398.

247.    According to another confidential witness, who was an underwriter at a First Franklin branch in Florida from 1999 until 2007, loan document manipulation at First Franklin grew to disconcerting levels. The witness stated that "a lot of fraudulent loans were going through. There was tons of fraud going on." *Id.* ¶ 401.

248.    FHLB's complaint survived the defendants' motion to dismiss, with the court stating "the Bank has provided evidentiary facts, such as testimony, AVM analysis of appraisal values, delinquency and foreclosure rates, and pleadings from other civil actions involving the defendants, which demonstrate the strength of the Bank's case" that the originators systematically disregarded their underwriting standards. Order, No. 10-45033 (Ill. Cir. Ct. Sept. 19, 2012).

249.    First Franklin has also been sued by Ambac Assurance Corporation, a company that provided monoline insurance, a form of credit enhancement for certain certificates in a RMBS. After paying hundreds of millions of dollars to certificateholders as a result of the many defaults and delinquencies on First Franklin-originated loans, Ambac reviewed 1,750 First Franklin loans. It found that 94% had material defects, including:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated appraisals; and

- Pervasive violations of the loan originator's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with debt-to-income and loan-to-value ratios above the allowed maximums, or (iii) with relationships to the applicable

originator or other non-arm's-length relationships. Complaint, *Ambac Assurance Corp. v. First Franklin Fin. Corp.*, No. 651217/2012, at ¶¶ 82-83 (N.Y. Sup. Ct. April 16, 2012).

### 8. Fremont

250. Fremont Investment and Loan ("Fremont") originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

251. Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a lender "'known for poor quality loans.'" Opening Statement of Sen. Carl Levin, Chairman, *Wall Street and the Financial Crisis: The Role of High Risk Home Loans*, Hearing Before S. Permanent Subcomm. on Investigations (Apr. 23, 2010). Senator Levin recounted how an analyst with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, a subprime lender known for loans with high rates of delinquency. On January 24, 2007, an analyst wrote seeking advice from two senior analysts: "I have a Goldman deal with subprime Fremont collateral. Since Fremont collateral has been performing not so good, is there anything special I should be aware of?" One analyst responded: "No, we don't treat their collateral any differently." The other asked: "are the FICO scores current?" "Yup," came the reply. Then "You are good to go." In other words, the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry. In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages. By October, both companies began downgrading the CDO. Today all five AAA tranches have been downgraded to junk status.

*Id.*

252. Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc., which is mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.

76

> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.
>
> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*,

Myrtle Beach Sun-News, Aug. 15, 2010, at A, *available at*

http://www.myrtlebeachonline.com/2010/08/15/1637463/investors-paying-for-risky-loans.html.

On September 28, 2012, the court denied in principal part the defendants' Joint Motion to

Dismiss For Failure to State a Claim. *See Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley &*

*Co., Inc., et al.*, No. 10-2741 (Mass. Super. Ct.).

253.    On December 21, 2011, the FHFA filed an amended complaint against UBS

Americas, Inc., alleging securities laws violations concerning RMBS purchases made by Freddie

Mac and Fannie Mae. In the complaint, the FHFA alleged:

> A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans. He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this." The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved. The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams. He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

*See* Second Am. Complaint, *FHFA v. UBS Americas, Inc.*, No. 11-cv-05201 (S.D.N.Y.) (Dec.

21, 2011). The court denied a motion to dismiss the complaint in May 2012. *See FHFA v. UBS*

*Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012). On July 25, 2013, the FHFA announced

that it had reached an agreement to settle the case for $885 million.

254.    Fremont's origination practices have also been addressed in numerous governmental investigations and reports. For example, the FCIC Report discusses that Moody's created an independent surveillance team in 2004 in order to monitor previously rated deals. The Moody's surveillance team saw a rise in early payment defaults in mortgages originated by Fremont in 2006, and downgraded several securities with underlying Fremont loans or put them on watch for future downgrades. Moody's chief credit officer stated that Moody's had never had to put on watch deals rated in the same calendar year. In 2007, Moody's downgraded 399 subprime mortgage-backed securities that had been issued in 2006 and put an additional 32 securities on watch. Moody's noted that about 60% of the securities affected contained mortgages from one of four originators, one of which was Fremont. FCIC Report at 221-222.

255.    According to the FCIC Report, when sponsors kicked loans out of securitization pools, some originators simply put those loans into new pools. Roger Ehrnman, Fremont's former regulatory compliance and risk manager, told the FCIC that Fremont had a policy of putting loans into subsequent pools until they were kicked out three times. FCIC Report at 168.

256.    Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee. *See* 2008 "Worst Ten in the Worst Ten" Report. In the 2009 "Worst Ten of the Worst Ten" Report, Fremont held the following positions: 2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th

in Bakersfield, California and Merced, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 9. GreenPoint

257.    GreenPoint Mortgage Funding, Inc. ("GreenPoint"), based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One"). Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year later on August 21, 2007. Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business. GreenPoint originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

258.    When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5%. A September 12, 2008, article on Bloomberg reports on GreenPoint's underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay stubs or tax returns to document their earnings, were offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found it difficult to verify their salaries.
> . . .
> "To grow, the market had to embrace more borrowers, and the obvious way to do that was to move down the credit scale," said Guy Cecala, publisher of Inside Mortgage Finance. "Once the door was opened, it was abused."
> . . .
> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent, according to a study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*,

Bloomberg, Sept. 12, 2008, *available at*

http://www.bloomberg.com/apps/news?pid=newsarchive&sid=arb3xM3SHBVk.

259.    Syncora Guarantee, a monoline insurer, sued J.P. Morgan Securities, LLC, as

successor to Bear Stearns & Co., Inc., in 2011 in connection with an RMBS underwritten by

Bear Stearns and exclusively collateralized by GreenPoint-originated loans. After sustaining

large losses due to the poor performance of GreenPoint loans, Syncora hired an independent

consultant to "reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly selected

without regard to payment status. Over 92% of the 1,431 loans contained misrepresentations, and

over 85% of the randomly selected 400 loans contained misrepresentations. The

misrepresentations uncovered included the following:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

*See* Complaint, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, No. 651566/2011 (N.Y. Sup. Ct.

June 6, 2011). Syncora's lawsuit survived a combined motion to dismiss and motion for

summary judgment. *See* Decision and Order, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, Doc. 50, No. 651566/2011 (N.Y. Sup. Ct. May 2, 2012).

260.    GreenPoint's own employees have corroborated the findings of Syncora. A confidential witness in *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities, Inc.*, stated that (1) GreenPoint employees faced intense pressure to close loans at any cost; (2) GreenPoint managers overrode employees' decisions to reject loans and approved loans based upon inflated incomes; (3) GreenPoint approved loans that contained exceptions for which there were no reasonable compensating factors; and (4) GreenPoint failed to adhere to sound underwriting guidelines. This confidential witness was a senior loan underwriter at GreenPoint from October 1997 through August 2007. *See* Complaint, *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortgage Secs., Inc.*, No. 49D051010PL045071 (Ind. Sup. Ct. Oct. 15, 2010) ("FHLB Indianapolis").

261.    According to that confidential witness, sales staff and managers at GreenPoint received bonuses based on the number of loans closed. As she said, "sales had tremendous authority" at GreenPoint, and "[t]hey were in business to make more money. They would try to find any way to close a loan." *Id.* ¶ 266.

262.    Between 2005 and 2007, the confidential witness said that stated income loans became increasingly popular and GreenPoint managers approved loans based upon inflated incomes she believed should not have been approved. She saw a lot of loans with stated "income that was more than could be justified by the borrower's employment." When she denied loans because she believed the income was inflated, sometimes the underwriting managers, operations managers, and the regional operations manager overrode her decisions. *Id.* ¶ 267.

263.     More often than not, the confidential witness believed that her managers overrode her denials due to the incentives they received based upon loan volume. As she said, "They were making the decision because they had to hit certain sales numbers." She knew of such targets because of comments made in operations meetings about the company needing to meet certain goals. *Id.* ¶ 268.

264.     In *Allstate Bank v. J.P. Morgan Chase, N.A.*, Allstate, an RMBS investor, sued J.P. Morgan, the RMBS underwriter, for misrepresentations in RMBS offering documents. Allstate's complaint relied on several confidential witnesses. One confidential witness, who was an underwriting analyst at GreenPoint from 2003 to 2007, stated that GreenPoint reviewed only 10% of the loans it originated for fraud. He thought this was a "mistake" because the fraud and misrepresentations uncovered in the 10% sample indicated that many more loans likely contained fraud. But the remaining 90% of the loans were not reviewed. Am. Complaint, *Allstate Bank v. J.P. Morgan Chase, N.A.*, No. 11-cv-1869, at ¶ 485 (S.D.N.Y. May 10, 2012).

265.     That confidential witness also stated that sales personnel ran GreenPoint, and senior management was comprised of people from sales who were incentivized to push the volume of mortgage loans, not adherence to the underwriting guidelines or due diligence. Managers' bonuses were tied to production volume, and they were not penalized if loans were later found to be fraudulent or if the borrower defaulted on the first payment. He stated that GreenPoint's management deliberately overlooked misrepresentations from mortgage loan brokers, particularly if the broker brought in a high volume of loans. Problem brokers were rarely suspended, and even when they were, there was never a review of the loans they originated that were already in the pipeline. *Id.* ¶ 486.

266.     Another confidential witness was a Wholesale Account Manager at GreenPoint from 2004 to 2006. That confidential witness stated that GreenPoint employees understood that if a mortgage loan could eventually be sold to Wall Street, GreenPoint was to approve and fund the mortgage loan. The majority of the loan products originated in the confidential witness's office were stated income and asset loans and pay-option ARMs. Despite the risk inherent in these products, the sales force "never learned of negative loan performance" and their compensation was not tied to loan performance. *Id.* ¶ 487.

267.     Another confidential witness was an Underwriting Supervisor at GreenPoint from 2005 to 2006 who supervised five Underwriters and three Conditions Specialists. That confidential witness stated that GreenPoint management authorized exceptions to loan underwriting guidelines to approve applications, even when there were no compensating factors justifying the exceptions. The confidential witness knew that management overrode decisions to refuse funding in locations known for fraud and property flipping, even when evidence of fraud was found. According to the confidential witness, "if the borrower is breathing and could sign loan documents, they could get a loan" from GreenPoint. *Id.* ¶ 488.

268.     Allstate's complaint also alleged that many of GreenPoint's loans were granted by the over 18,000 brokers approved to transact with GreenPoint – a large enough number that GreenPoint could exercise no realistic degree of control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. *Id.* ¶ 490.

269.     GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento,

California, and Las Vegas, Nevada. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; and 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California.

### 10. Impac

270.    Impac Funding Corp. and Impac Mortgage Holdings, Inc. ("Impac") is a mortgage company that acquires, purchases, and sells mortgage loans. It is a California corporation headquartered in Irvine, California. Impac originated or contributed a material portion of the loans in the mortgage pools underlying the trusts and sponsored many of the trusts.

271.    Massachusetts Mutual Life Ins. Co. ("Mass Mutual"), an RMBS investor like the CCUs, sued Impac regarding RMBS that Impac sponsored. Mass Mutual conducted a forensic analysis of loans underlying an RMBS it had purchased. The analysis revealed that 48% of the loans tested had appraisals inflated by 10% or more, and 34% of the loans tested had LTVs that were 10 or more points more than represented. Additionally, 15.45% of the loans that had been represented to be owner occupied were determined not to be owner occupied. *See* Complaint, *Massachusetts Mut. Life Ins. Co. v. Impac Funding Corp.*, No. 11-cv-30127, at ¶¶ 87-88, 95 (D. Mass. May 6, 2011).

272.    As conservator for Fannie Mae and Freddie Mac, the Federal Housing Finance Agency ("FHFA") sued Bear Stearns for alleged material misstatements and omissions in certain RMBS offering documents concerning RMBS purchased by Fannie Mae and Freddie Mac. *See* Am. Complaint, *FHFA v. JP Morgan*, No. 11-cv-6188 (S.D.N.Y. June 13, 2012).

273.    In connection with this lawsuit, the FHFA conducted a forensic review of loans backing an RMBS that contained a significant number of loans from Impac. This review consisted of an analysis of the loan origination file for each loan, including the documents

submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as the borrower's motor vehicle registration documentation with pertinent information indicating a borrower's assets or residence, and other information that was available at the time of the loan application, as well as the borrower's filings in bankruptcy proceedings and other sources of information. *Id.* ¶ 362.

274.    The FHFA reviewed 535 loan files from the group of loans. Impac originated 13.56% of the loans in that group. The FHFA's review revealed that 98% of the loans (523 out of 535) were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents. Of the 523 loans that did not comply with the underwriting guidelines, none had sufficient compensating factors to warrant an exception. *Id.* ¶¶ 359, 367.

275.    Of the 535 loans reviewed, 89 loans (or 25.2 percent) revealed an incorrect calculation of the borrower's debts which, when corrected, caused the debt-to-income ratio to exceed the applicable underwriting guidelines for the product type. *Id.* ¶ 386.

### 11.    IndyMac

276.    By 2007, IndyMac Bank, F.S.B. ("IndyMac") was the largest savings and loan association in the Los Angeles area and the seventh largest mortgage originator in the United States. IndyMac originated or contributed a material portion of the loans in the mortgage pools underlying the trusts and sponsored many of the trusts.

277.    On July 11, 2008, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac's parent, IndyMac Bancorp, Inc., filed for bankruptcy on July 31, 2008.

278.    IndyMac has been the subject of numerous investigations and lawsuits alleging that IndyMac systematically abandoned its underwriting guidelines in pursuing profits. These investigations and lawsuits contain ample evidence that mortgage loans originated by IndyMac breached the associated representations and warranties. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. These lawsuits, investigations, and reports, in conjunction with the poor performance of the underlying loans and the public information concerning wide-spread issues among all originators was more than sufficient to provide Defendant with notice that large numbers of loans originated by IndyMac, including loans in the trusts, breached the associated representations and warranties.

279.    For example, in June 2008, the Center for Responsible Lending ("CRL") published a report entitled IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending (June 30, 2008) ("CRL Report"), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/indymac_what_went_wrong.pdf. The CRL Report detailed the results of CRL's investigation into IndyMac's lending practices. CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac. The CRL Report summarized the results of its investigation:

> IndyMac's story offers a body of evidence that discredits the notion that the mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll the purchase of bigger homes or investment properties. CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

280.     CRL reported that its investigation "uncovered substantial evidence that [IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id*. at 2.

281.     The CRL Report stated that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id*.

282.     The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id*. at 3.

283.     Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id*. at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id*. at 3.

284.     The CRL also found the following evidence: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it."

The refrain from managers, Miller recalls, was simple: "Find a way to make this work." *Id*. at 9

(footnote omitted).

285.    Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated: "I would reject a loan and the insanity would begin . . . . It would go to upper management and the next thing you know it's going to closing." *Id.* at 1, 3. Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

286.    Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time. *See id.* at 9. According to Montilla:

> "I would tell them: 'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says. "There were some loans that were just blatantly overstated. . . . Some of these loans are very questionable. They're not going to perform."

*Id.* at 10.

287.    Montilla and another IndyMac mortgage underwriter told the CRL that borrowers did not know their stated incomes were being inflated as part of the application process. *See id.* at 14.

288.    On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac. The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying loan pool.

289.     According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale." IndyMac OIG Report at 2. The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well." *Id*.

290.     IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id*. at 11, 21. The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id*. at 11.

291.     IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id*. at 2-3.

292.     IndyMac's "risk from its loan products. . .was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id*. at 31.

293.     Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market." *Id*. at 3. This proved to be a weight it could not bear, and IndyMac ultimately failed. *See id*.

294.     On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division, alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with

insufficient collateral. *See FDIC v. Van Dellen*, No. 10-cv-04915 (C.D. Cal. July 2, 2010). The case was tried in late 2012, and the jury entered a verdict in favor of the FDIC.

295. IndyMac currently faces or has faced additional litigation alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS. *See, e.g.*, *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-cv-4583 (S.D.N.Y. May 14, 2009); *Federal Home Loan Bank of Boston v. Ally Financial, Inc., et al.*, No. 11-cv-10952 (D. Mass. May 26, 2011); *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. July 27, 2012).

296. IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities. As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's "Worst Ten in the Worst Ten" Report. IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009.

### 12. Morgan Stanley Mortgage Capital

297. Morgan Stanley Mortgage Capital, Inc. ("MSMC"), now known as Morgan Stanley Mortgage Capital Holdings, LLC ("MSCH"), did not originate residential mortgages itself. Rather it purchased closed, first-lien and subordinate-lien residential mortgage loans for securitization or for its own investment from other lenders. MSMC acquired residential mortgage loans through bulk purchases and through purchases of single loans through its conduit loan purchase program.

298. MSMC and MSCH contributed loans to the mortgage pools underlying the trusts and sponsored a significant number of the trusts.

299.    MSMC has been the subject of numerous investigations and lawsuits alleging that MSMC systematically abandoned originator underwriting guidelines in pursuing profits. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. These lawsuits in conjunction with the poor performance of the underlying loans and the public information concerning wide-spread issues among all originators was more than sufficient to provide Defendant with notice that large numbers of loans contributed by MSMC, including loans in the trusts, breached the associated representations and warranties.

300.    On June 24, 2010, the Attorney General of the State of Massachusetts entered into an Assurance of Discontinuance with "Morgan Stanley & Co. Incorporated together with its affiliates involved in the mortgage financing and securitization business" concerning its practices of buying and securitizing loans, primarily from New Century Financial Corp. and its subsidiaries. Press Release, *Morgan Stanley to Pay $102 Million for Role in Massachusets Subprime Mortgage Meltdown Under Settlement with AG Coakley's Office*, Attorney General of Massachusetts, (June 24, 2010) *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2010/attorney-general-martha-coakley-reaches-102.html. The Attorney General found:

- As part of its process for "purchasing and securitizing subprime loans, [Morgan Stanley] engaged in a number of reviews of the quality of the originators' lending practices and loans. These included, inter alia, determining whether the subprime loans were originated in accordance with the originators' underwriting guidelines and assessing compliance with applicable laws ('credit and compliance diligence'), and examining property values ('valuation diligence'). These reviews increasingly demonstrated shortcomings in some of New Century's lending practices and problems with a large number of individual subprime loans."

- Based on an internal analysis run by Morgan Stanley, New Century qualified borrowers based on a teaser interest rate, but when the fully indexed rate was taken into consideration, 45% of the borrowers in Massachusetts would not have qualified for the loan.

91

- Morgan Stanley hired the underwriting firm Clayton to analyze a sample of loans to be purchased to determine whether they were originated in accordance with underwriting guidelines. Although Clayton's analysis showed that New Century increasingly stretched "underwriting guidelines to encompass or approve loans not written in accordance with the guidelines," Morgan Stanley continued to buy such loans under pressure from New Century to avoid losing New Century's business to another loan buyer.

- During the period from 2006-2007, only 9% of those loans that were granted pursuant to exceptions had adequate compensating factors to offset the exception. Further, Morgan Stanley waived exceptions on a large number of loans Clayton found to be generated in violation of guidelines without adequate compensating factors.

- Although Morgan Stanley had a stated policy not to purchase or securitize loans with a combined LTV ratio of greater than 100%, the reality was about a third of the loans securitized by Morgan Stanley in 2006-2007 had a CLTV greater than 100%.

- Morgan Stanley determined that New Century did not adequately evaluate the borrower's income on "stated income" loans.

- Despite Morgan Stanley's awareness of problems at New Century, it continued to fund, purchase, and securitize New Century loans.

301.    Under the Assurance of Discontinuance, Morgan Stanley agreed to institute procedures to ensure that loans it securitized conformed to underwriting guidelines and to pay $102 million to settle the charges against it. *Id.*

302.    In September 2011, MSCH entered into a similar Assurance of Discontinuance with the Attorney General of the State of Nevada following an investigation into the origination practices of originators (primarily New Century) who originated loans that MSCH purchased and sold via securitizations, including whether the originators misrepresented interest rates to borrowers, inflated appraisals, and failed to disclose payment shock to borrowers following expiration of the initial teaser interest rate. Under the agreement, Morgan Stanley agreed to provide relief to consumers valued between $21 million and $40 million and to institute a process to review loans purchased for securitization to ensure compliance with the law. *Available*

*at* media.lasvegassun.com/media/pdfs/blogs/documents/2011/09/27/morgandoc092711.pdf.

303.   MSMC/MSCH has also been the subject of numerous civil lawsuits alleging it did

not adequately conduct due diligence on loans it purchased and securitized.

304.   For instance, in *Central Mortgage Co. v. Morgan Stanley Mortgage Capital*

*Holdings, LLC*, No. 5140 (Del. Chanc. Jan. 29, 2010), a servicer of loans sued MSCH (as

successor in interest to MSMC) on several contract and fraud theories regarding the plaintiff's

purchase of the servicing rights to thousands of loans from MSCH. The complaint alleged that

plaintiff paid a premium for the right to service the loans, because MSCH had represented that

they were "agency" loans, or loans originated under Fannie Mae and/or Freddie Mac guidelines.

The complaint alleged that the loans experienced high rates of delinquency. According to the

complaint, a representative of Morgan Stanley admitted the loans had not been screened at

Morgan Stanley's internal due diligence facility and were of poorer quality than originally

represented. Fannie Mae and Freddie Mac made repurchase requests regarding the loans. After

initially honoring the repurchase requests, MSCH eventually stopped doing so notwithstanding

its contractual obligations. The complaint alleged that the plaintiff reviewed the loans and found

numerous fields in the mortgage loan schedules that were inaccurate.

305.   In *FHFA v. Morgan Stanley, et al.*, No. 11-cv-06739 (S.D.N.Y. Sep. 2, 2011), the

FHFA, as conservator of Fannie Mae and Freddie Mac, sued Morgan Stanley & Co., Inc., several

of its subsidiaries, including Morgan Stanley Mortgage Capital Holdings LLC d/b/a Morgan

Stanley Mortgage Capital, Inc., and others alleging that the defendants falsely represented that

the mortgages collateralizing certain RMBS sold to Fannie Mae and Freddie Mac "complied

with certain underwriting guidelines and standards, and presented a false picture of the

characteristics and riskiness of those loans." FHFA alleged that its analysis of a sampling of the

loans revealed that a statistically significant rate of owner occupancy and LTV ratios were false. The case was settled in 2014 for $1.25b. Press Release, *FHFA Announces $1.25 Billion Settlement with Morgan Stanley* (Feb. 7, 2014) *available at* http://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Announces-$1-25-Billion-Settlement-With-Morgan-Stanley.aspx.

306.    Likewise, in *MBIA Ins. Co. v. Morgan Stanley, et al.*, No. 29951/2010 (N.Y. Sup. Ct. Dec. 6, 2010), the monoline insurer MBIA sued Morgan Stanley, Morgan Stanley Mortgage Capital Holdings, LLC, and Saxon Mortgage Services, Inc., alleging that its review of loan files securitized by the defendants revealed breaches of representations and warranties including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed. The parties settled the case in December 2011.

307.    According to the FCIC Report, Morgan Stanley devoted minimal resources to due diligence on the loans it securitized. For instance, the head of due diligence was based not in New York but rather in Boca Raton, Florida, and he had, at any one time, only two to five individuals reporting to him directly—and they were actually employees of a personnel consultant, Equinox. FCIC Report at 168.

308.    According to the report, internal Clayton documents show that a startlingly high percentage of loans reviewed by Clayton for Morgan Stanley were defective, but were nonetheless included by Morgan Stanley in loan pools. According to Clayton's data 37% (or 23,154) of the 62,940 loans it reviewed for Morgan Stanley failed to conform to Morgan Stanley's stated underwriting standards. Of the 37% of loans identified by Clayton as non-compliant, Morgan Stanley "waived in" 56% (or 20% of the total pool).

### 13.     National City

309.    National City Mortgage Co. was a division of National City Bank which was a wholly owned subsidary of National City Corporation. Collectively these entities are referred to as "National City." National City originated or contributed a material number of loans the mortgage pools underlying the trusts.

310.    In 2008, investors brought a securities fraud class action lawsuit against National City alleging that National City misrepresented the quality of its mortgage loans. *See* Am. Class Action Complaint, *In Re National City Corp. Sec., Derivative & ERISA Litig.*, No. 08-nc-70004 (N.D. Ohio June 13, 2008). On August 8, 2011, it was announced that the case had settled for $168 million.

311.    National City faced another class action lawsuit in 2010 alleging, among other things, that National City did not adhere to its underwriting standards. *See* Second Am. Class Action Complaint, *Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd. and Argent Classic Convertible Arbitrage Fund L.P. v. National City Corp.*, No. 08-nc-70016 (N.D. Ohio Feb. 19, 2010). On November 30, 2010, the case settled for $22.5 million.

312.    Evidence of misconduct on the part of National City employees can also be found in the complaint filed in *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012). For example, in October 2011, in Providence, Rhode Island, National City Loan Officer Juan Hernandez pled guilty to participating in a fraudulent lending scheme. Hernandez pled guilty to fraudulently obtaining loans from National City and other lenders by using "straw purchasers" and providing false information to qualify borrowers for loans they would not have otherwise qualified for. From October 2006 through August 2007, Hernandez prepared false loan applications for phony

borrowers containing falsified borrower incomes and debts, and misrepresenting that the properties would be owner occupied when they were not. *Id.* ¶ 361.

313.    Hernandez was joined in the fraud by Miguel Valerio, a National City Loan Processor. Valerio also pled guilty to the fraudulent scheme in December 2011. *Id.* ¶ 362.

314.    Similarly, in the Cleveland, Ohio area, in February 2011, at least two National City employees were indicted for lending fraud, along with 15 other co-conspirators. Loren Segal and Krystal Hill, both National City employees, were indicted for assisting in a fraudulent lending scheme that spanned from March 2005 through November 2007. The scheme included using straw purchasers, inflated appraisals, falsified borrower incomes, fake bank statements, and false verifications of borrowers' funds. Both Segal and Hill pled guilty to participating in the scheme. *Id*. ¶ 363.

315.    National City's systemic failure to follow its underwriting guidelines and evaluate its borrowers' true repayment abilities, and the fraudulent loans that followed, required the parent company, National City Corporation, to take a charge of $4.2 billion in the first quarter of 2008 for its defective loans. Moreover, National City's abject failure to follow its underwriting guidelines led to the SEC investigating National City's underwriting standards in 2008. In addition, in mid-2008, National City Corporation entered into a confidential agreement with the OCC, "effectively putting the bank on probation," according to a Wall Street Journal article published on June 6, 2008. Damian Paletta *et al.*, *National City is Under Scrutiny*, Wall Street Journal, June 6, 2008, *available at* http://online.wsj.com/articles/SB121271764588650947.

### 14.    New Century

316.    New Century Mortgage Corporation and NC Capital Corporation were subsidiaries of New Century Financial Corp. (collectively "New Century"). New Century was

founded in 1995 in Irvine, California, and grew to be one of the nation's largest subprime

lenders—originating $60 billion in loans in 2006 alone. New Century originated or contributed a

material portion of the loans in the mortgage pools underlying the trusts and sponsored at least

one of the trusts.

317.    New Century failed amid revelations that its books contained numerous

accounting errors, government investigations and a liquidity crisis when its Wall Street backers

pulled the financial plug on loan funding. The circumstances leading to its collapse tell the story

of a company that was far more concerned with originating mortgages to fuel the securitization

machine than in the quality of those mortgages.

318.    A June 2, 2008 article in the Columbus Dispatch summarized New Century's

reputation in the industry:

> The California-based mortgage company catered to the riskiest borrowers, even those
> with credit scores as low as 500. Its brokers cut deals by asking few questions and
> reviewing even fewer documents, investigators say.

> Homeowners struggling to pay their existing mortgages signed up for what they believed
> to be redemption: a new loan. They were unaware of the warnings from lending and legal
> experts that New Century loaned money with a devil-may-care-attitude.

> New Century typified the book-'em-at-any-cost mentality that fueled the national mania
> for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, Columbus

Dispatch, June 2, 2008, at 1A.

319.    The article continued:

> Lending experts and consumer advocates say New Century was the poster child for the
> subprime tsunami – a company that relaxed lending standards so much that even
> borrowers with fresh bankruptcies and foreclosures could get a mortgage.

*Id*.

97

320.    New Century's foreclosure rates reflected its inattention to underwriting standards. Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report in every housing market highlighted. Incredibly, New Century appeared in the top five in every market—1st in Las Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton, California; 3rd in Bakersfield, California and Detroit, Michigan; and 5th in Miami, Florida and Memphis, Tennessee.

321.    When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, New Century rose to the top three in every one of the ten worst markets, holding 1st place in Reno, Nevada; Bakersfield, California; Riverside-San Bernardino, California; and Fort Myers-Cape Coral, Florida; 2nd place in Modesto, California; Las Vegas, Nevada; Merced, California; Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida; and Vallejo-Fairfield-Napa, California.

322.    The U.S. Bankruptcy Court for the District of Delaware presiding over New Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and all accounting and financial statement irregularities, errors and misstatements" in connection with New Century's practices and procedures. The Examiner engaged a law firm, forensic accountants, and financial advisors to assist in his investigation and reporting. Final Report of Michael J. Missal, *In re: New Century TRS Holdings, Inc.*, No. 07-bk-10416 (D. Del. Feb. 29, 2008) (the "Examiner's Report") *available at* http://www.klgates.com/files/upload/Final_Report_New_Century.PDF.

323.    The Examiner concluded that New Century "engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes." Examiner's Report at 2. The Examiner summarized the findings:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.' Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." *Id*. at 3.

- "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id*.

- "More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as 'liars' loans' because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that 'we are unable to actually determine the borrowers' ability to afford a loan.'" *Id*.

- "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies." *Id*. at 3-4.

- "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality. Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market." *Id*. at 4.

- "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this

wave turned into a tsunami of impaired and defaulted mortgages. New Century was not able to survive and investor suffered mammoth losses." *Id*.

324.    Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" *i.e.*, a rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id*. at 61-62.

325.    From 2003 to 2006, New Century peddled riskier and riskier products, yet failed to employ underwriting safeguards that might have mitigated the inherent risk associated with such products. For instance, from March 2003 to June 2005, the percentage of interest-only loans New Century originated leapt from 0% to 38.49%. And from 2004 to 2005, the percentage of interest-only adjustable-rate loans rose from 19.3% to 29.6% of the total volume of New Century's originations and purchases. New Century qualified borrowers based on their ability to pay the initial interest rate rather than the interest plus principal amortization, which was added after the first several years. *Id*. at 57, 125-26.

326.    Likewise, from 2004 through 2006, New Century increasingly sold "stated income" loans—with such loans representing at least 42% of New Century's total loan volume. "Stated income" loans involve no documentation regarding a borrower's income; instead, the loan is made based on the borrower's statement as to the amount of his or her income. Stated income loans are often referred to in the industry as "liars' loans," because of the ease with which unscrupulous borrowers or mortgage brokers can overstate income. *Id*. at 58. New Century actively discouraged its employees from even seeking to verify whether a prospective borrower's stated income was reasonable. *Id*. at 127 n.314.

327.    The Examiner identified several "red flags" that indicated the poor quality of New Century's loans and that New Century was not adhering to its underwriting guidelines.

Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all of which "suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines." *Id*. at 109.

328.    The Examiner found:

New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004. For example, in April 2004, New Century's Chief Credit Officer reported that 'the QA [quality assurance] results [pertaining to the loan origination processes] are still at unacceptable levels' and that 'Investor Rejects [kickouts] are at an incline as well.' Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that 'we have so many issues pertaining to quality and process!'"

*Id*. at 110.

329.    In 2005, New Century began internal audits of its loan origination and production processes. An audit of the Sacramento wholesale fulfillment center revealed several "high risk" problems, including that 45% of the loans reviewed had improper RESPA disclosures, 42% did not have approval stipulations fully satisfied, 39% had noted exceptions regarding the calculation or verification of income, and 23% had appraisal exceptions or problems. *See id*. at 152.

330.    Further adding to the problem was that exceptions were frequently granted to underwriting guidelines, but "New Century had no formal exceptions policy." *Id*. at 174.

331.    With no policy in place, granting exceptions was arbitrary. Despite upper management's awareness of the tremendous problems regarding loan quality, the Examiner concluded that "New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." *Id*. at 111.

332.    The Examiner reported:

New Century's loan originations grew at an enormous rate from 2000 through 2006, becoming the second largest subprime lender by the end of 2004 and remaining one of the largest in 2005. The Production Department was highly motivated and effective in originating such loans and apparently resisted changes that might have limited loan production volume. While both the Quality Assurance and Internal Audit Departments identified loan quality problems, and kick-out and EPD rates confirmed many of these problems, the Production Department devoted its resources to generating high volumes of loans, with relatively little attention to loan quality.

*Id.* at 113.

333.    New Century consistently prioritized the origination of new loans over virtually all other concerns, including loan quality. Despite after-the-fact assertions by some company spokespeople that such disregard was anomalous, New Century leaders articulated priorities demonstrating that the disregard was systematic. For example, Patrick Flanagan, who until 2006 was New Century's Head of Loan Production and Secondary Marketing, "emphasized maintaining New Century's loan production even when field audits revealed loan quality problems." *Id.* at 89. Even after Flanagan left the company, New Century's prioritization of volume, rather than quality, continued.

334.    The Examiner noted that New Century's Quality Assurance Department would run audit reports after loans were funded to determine if the loan file evidenced compliance with New Century's underwriting guidelines. "The Quality Assurance audit results tended to identify the same sorts of problems as identified in the kickout reports, such as faulty appraisals, undocumented exceptions to underwriting guidelines and missing documentation from loan files." Despite this, "since such post-funding audits did not directly affect profitability, some in Management discounted their importance." *Id.* at 137.

335.    The Examiner's Report contained pages of findings that management ignored the loan quality issue and resisted efforts to implement strategies that would improve the quality of

loans. For instance, the Examiner reported that management had determined a way to identify underwriters whose actions led to a high number of defective loans in October 2005, but failed to implement the effort until much later. *See id*. at 169 n.337.

336.    The Examiner's Report found that loan quality trends "worsened dramatically" at New Century in 2006 and early 2007. Although New Century belatedly tried to improve loan quality late in 2006, it was "too little too late" and even as late as December 2006, "the same sorts of problems, including defective appraisals and missing documentation continued to be the main reasons for investors kicking out increasing quantities of New Century loans." *Id*. at 157-58.

337.    The Examiner concluded, "New Century knew from multiple data sources that its loan quality was problematic, starting no later than 2004. Yet . . . the Board of Directors and Senior Management before 2006 took few steps to address the troubling loan quality trends." *Id.* at 175.

338.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at New Century, who worked for the company from 1997 through December 2007, corroborated the Examiner's findings in her testimony before the FCIC. She testified that at New Century, risk managers were often viewed as a roadblock rather than a resource and that:

> Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . . Many of the sales managers and account executives lacked any real estate or mortgage experience. They were missing the depth of experience necessary to make an informed lending decision. These same sales mangers [sic] had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. Some of the best sales managers had underwriting backgrounds and were more closely aligned with risk management and better at understanding potential problems, but this was the exception and not the rule.

Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the

Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice

President of Corporate Risk, New Century).

339.    She also testified to systematic problems in the appraisal process:

> In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value," fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id*.

340.    Ms. Lindsay noted that at the end, New Century's approach to lending lacked

"common sense"—that the business became "volume driven and automated" with a broker being

able to get a loan pre-approved in "12 seconds or less." *Id*.

341.    The FCIC found that New Century "ignored early warnings that its own loan

quality was deteriorating and stripped power from two risk-control departments that had noted

the evidence." FCIC Report at 157. The FCIC reported that New Century's Quality Assurance

staff "had found severe underwriting errors," while New Century's Internal Audit department

"identified numerous deficiencies in loan files," with seven out of nine reviews of the company's

loan production department resulting in "'unsatisfactory'" ratings. *Id*. Instead of making efforts

designed to bring the company into compliance with its underwriting guidelines, New Century's

management directed that the negative results be removed from the company's loan performance

tracking system, that the Quality Assurance department be dissolved, and that the Internal Audit

department's budget be cut. *Id*.

342.    In December 2009, the SEC filed a complaint charging three former New Century

executives with securities fraud. *See SEC v. Morrice, et al*., No. 09-cv-01426 (C.D. Cal. Dec. 7,

2009). The SEC's complaint alleges that the New Century executives misled investors as to the
deterioration of New Century's loan portfolio, including dramatic increases in early default rates
and loan repurchases/repurchase requests. On July 30, 2010, the SEC announced it had accepted
offers to settle the case, subject to court approval, with defendants agreeing to (1) pay over $1.5
million in disgorgement and civil penalties; (2) be permanently enjoined from further securities
law violations; and (3) a five-year ban on serving as an officer or director of a public company.

343. The Attorney General for the Commonwealth of Massachusetts also investigated
New Century's faulty origination practices with the following findings:

- New Century unlawfully qualified borrowers for adjustable rate mortgages by
using "teaser" rates instead of using the "fully indexed rates" as required by law.
Assurance of Discontinuance at 13, *In re: Morgan Stanley & Co. Incorporated*,
No. 10-2538 (Mass. Super. Ct. June 24, 2010), *available at*
http://www.mass.gov/ago/docs/press/2010/2010-06-24-ms-settlement-
attachment3.pdf.

- New Century engaged in "sloppy underwriting for many loans and stretching of
underwriting guidelines to encompass or approve loans not written in accordance
with the guidelines." *Id*. at 9.

- New Century successfully pressured Morgan Stanley into buying loans which
both parties knew did not comply with the underwriting guidelines. *Id*. at 10.

- "31% of the New Century loans on properties checked via BPOs . . . and
securitized by Morgan Stanley in 2006 and 2007 had []LTV ratios . . . that were
greater than 100%." *Id*. at 13.

- "As early as October 2005, Morgan Stanley's diligence team determined . . . that
the stated income on a number of New Century loans was unreasonable. In early
2006, a Morgan Stanley employee commented that stated income credit was not
adequately evaluated by New Century. . . . On average, the stated income of these
borrowers was approximately 42% higher than the income of fully documented
borrowers." *Id*. at 13-14.

344. Private litigation has also illustrated the fact that New Century failed to comply
with its stated underwriting guidelines. In *Cambridge Place Investment Management Inc. v.
Morgan Stanley & Co., Inc.*, No. 10-2741 (Mass. Super. Ct. July 9, 2010), confidential witnesses

stated that: the company abandoned underwriting guidelines to approve more loans; employees were told to do whatever they had to in order to increase volume; and loans that were not initially approved by underwriters were often later approved by superiors.

### 15.   Option One

345.    Option One Mortgage Corp. ("Option One") was a national mortgage lender formerly owned by H&R Block, Inc., until its assets were sold to American Home Mortgage Servicing, Inc. in April 2008. Option One originated or contributed a material portion of the loans in the mortgage pools underlying the trusts and also sponsored one trust.

346.    In November 2008, the OCC issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations. Option One was ranked as the sixth-worst mortgage originator by number of foreclosures in the worst-affected metropolitan areas.

347.    Reflecting the terrible quality of its loans, Option One has since been named as a defendant in a wave of lawsuits alleging that it engaged in a pattern of fraudulent and otherwise improper lending practices. Cambridge Place, a RMBS investor, sued Morgan Stanley and other Wall Street banks alleging violations of the Massachusetts Securities Act arising from the Wall Street banks' offers and sales of RMBS. Cambridge Place's complaint relied on several confidential witnesses. These former employees with first-hand knowledge confirmed that Option One violated its stated standards for underwriting and appraisals. *See* Am. Complaint, *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Super. Oct. 14, 2011).

348.    For example, a former underwriter at Option One in Atlanta, Georgia from 2005

to 2006, referred to as CW 52, said that if an underwriter denied a loan and an account executive complained, the loan was escalated to the branch manager, who then got in touch with the underwriter. With account executives, "the biggest screamer and shaker of trees gets the most fruit." For a "top-producing" account executive, any red flags that may have been present in the loan file being considered would be "overlooked" and the loan file would invariably be pushed through successfully. CW 52 estimated that at least 50% of the total loan volume in Option One's Atlanta branch was approved in this manner. CW 52 also stated that a loan applicant could tell "a straight up lie" about his or her income, but the false information would be overlooked and the loan would be approved, despite CW 52's initial rejection of the application. *Id*. ¶ 242.

349.   Similarly, CW 53, an underwriter at Option One's Marietta, Georgia office in 2005, reported that Option One approved stated income loans "knowing good and well that those people did not make that much money in the position they were in." Likewise, CW 54, an underwriter for Option One in Hawaii from November 2004 to January 2006, stated that "the overwhelming majority of stated income loans were crafted," meaning that the borrowers were not making "anywhere near" what they claimed. However, CW 54 stated that he felt pressured to push loans through because every loan generated income and because, "[i]f you applied any level of rational thought, you were frowned upon." *Id*. ¶ 243.

350.   Former employees also revealed that falsified mortgage appraisals were another ubiquitous facet of Option One's questionable origination practices. With respect to artificially inflated appraisals, CW 52 stated that "[o]f course [loan appraisers] inflated values" and that if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file. Similarly, CW 55 stated that the appraisals "were all bad." He considered the appraisals borderline fraudulent, not

merely incompetent, but was unable to prevent loans based on the flawed appraisals. He explained, "Our job is supposed to be stopping bad loans, but no one stopped them." When CW 55 objected to loans because of flawed appraisals, the loan officer would complain to the branch manager, who would complain to the Appraisals Department at headquarters in Irvine, California, and on up the chain until someone high enough in the Underwriting and Sales Department would ultimately approve the loan. *Id*. ¶ 244.

351.    Option One was motivated to violate its underwriting and appraisal standards in order to increase the volume of loans it could sell to Wall Street banks to be securitized. CW 56, an Assistant Vice President of Option One from 2005 to 2007, worked in the Correspondent Lending department, which purchased loans from small mortgage companies. CW 56 stated that Option One purchased loans that raised concerns under the stated guidelines and that when he raised such concerns he was essentially told, "Shut up. Wall Street will buy it: don't worry about it." *Id*. ¶ 245.

352.    Similarly, CW 57, who was an underwriter at Option One in Pleasanton, California from October 2005 to October 2007, stated that "[i]f [a borrower] had a FICO and a pulse, they could get a loan" from Option One. CW 57 also the following:

> I caught blatant fraud, and the [account executive] would still fight for it. [The account executives and managers] would fight me because they didn't care. They knew they were going to sell it on the secondary market, and they didn't care because it wasn't their money. They were going to get paid regardless.... At Option One they didn't have a portfolio; they sold everything, so they didn't care.... [Option One] didn't have to worry about it, because once they're done with these crappy loans, they'd sell them off. They were the investors' problem.

*Id.* ¶ 246.

353.    The *Cambridge Place* suit survived a motion to dismiss, with the court holding that the allegations paint a "particularized and compelling portrait of a dramatic loosening of

underwriting standards on the part of the originators." *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, 10-2741, 2012 WL 5351233, *13 (Mass. Super. Ct. Sept. 28, 2012).

354.     Option One has also been the subject of state and federal investigations. On June 3, 2008, the Massachusetts Attorney General filed an action against Option One, and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. Complaint, *Commonwealth v. H&R Block, Inc.*, No. 08-2474 (Mass. Super. Ct. June 3, 2008).

355.     According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards ... and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." *Id.* ¶ 4.

356.     The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home." *Id.* ¶ 8. Option One also "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." *Id.* Option One's "origination policies employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id.* ¶ 1.

357.     On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction in the case, which prevented Option One from foreclosing on thousands of loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008).

358.     On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *Commonwealth v. Option One Mortgage Co.*, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

359.     On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million. Press Release, *H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions*, Massachusetts Attorney General (Aug. 9, 2011), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2011/option-one-settlement.html.

### 16.     OwnIt

360.     OwnIt Mortgage Solutions, Inc. ("OwnIt") was a California-based company that specialized in the origination of mortgages for individuals who earned less than $100,000 annually, and had less than $100,000 in personal assets. OwnIt originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

361.     Numerous lawsuits followed in the years after OwnIt's bankruptcy. These lawsuits repeatedly alleged systematic abandonment of OwnIt's underwriting guidelines and many included loan re-underwriting results demonstrating remarkably high breach rates. These complaints include *John Hancock Life Ins. Co. (USA) et al. v. Ally Financial Inc.et al.*, No. 12-cv-1841 (D. Minn. July 27, 2012) and *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012).

362.     Another lawsuit was filed in August 2011 by several AIG companies against Bank of America Corp., Merrill Lynch, Countrywide and others, alleging that the defendants therein had defrauded plaintiffs in connection with defendants' sale of RMBS. *See* Complaint, *American Int'l Group, Inc. et al. v. Bank of America Corp. et al.*, No. 652199/2011 (N.Y. Sup.

Ct. Aug. 8, 2011). In connection with drafting the allegations, the plaintiffs interviewed several

former OwnIt employees. Those former employees confirmed that OwnIt had abandoned its

underwriting guidelines. Those former employees reported the following:

- A former corporate underwriter at OwnIt stated that OwnIt was "'the worst example'" of a lender making risky loans that should never had been made in the first place. *Id.* ¶ 298.

- According to a former OwnIt senior underwriter from September 2004 through July 2006, OwnIt loan officers were falsely inflating incomes on loan applications, and even when she complained to managers that "'there's no way'" the borrower could be making the claimed income, the amount was accepted anyway. *Id.* ¶ 299.

- The former senior underwriter also observed "'excessive adjustments'" inflating appraisals at OwnIt. *Id.* ¶ 300.

- According to a former OwnIt loan funder, from December 2004 to December 2006, when she brought questionable incomes to the attention of her supervisors she was told to "'mind her own business'" and to fund the loans. *Id.* ¶ 299

- OwnIt's systematic disregard of its own underwriting standards is confirmed by independent government analyses of OwnIt's underwriting standards and the quality of its loans. Based on figures the OCC updated in 2010, OwnIt ranked among only 21 companies that "in various combinations occupy the Worst Ten slots in the Worst Ten metro areas." John C. Dugan, Comptroller of the Currency, *Appendix B: Activities of National Banks Related to Subprime Lending* (Apr. 8, 2010), *available at* http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-39.html.
-
  ### 17. Paul Financial

363. Paul Financial, LLC ("Paul Financial") originated or contributed a material

portion of the loans in the mortgage pools underlying the trusts.

364. Paul Financial has been the subject of numerous investigations and lawsuits

alleging that Paul Financial systematically abandoned its underwriting guidelines in the pursuit

of profits. These investigations and lawsuits uncovered ample evidence that mortgage loans

originated by Paul Financial breached the associated representations and warranties. Not only do

these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans.

365.    For example, according to an amended complaint filed in New York state court in *Royal Park Investments NA/SV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Nov. 7, 2012), a former Paul Financial Underwriting Assistant from 2004 through 2007 stated that "[a] lot of people were lying about their incomes." Because Paul Financial allowed borrowers to simply state their income without investigation, it ended up making loans to many borrows who could not afford the payments. Am. Complaint, *Royal Park Investments NA/SV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012, at ¶ 484 (N.Y. Sup. Ct. Nov. 7, 2013).

366.    Moreover, the same employee stated that often when borrowers failed to qualify for loans, Paul Financial switched them to a different loan program for approval. As with other lenders at the time, Paul Financial thus qualified borrowers for loans they could not afford. The amended complaint states that usually the change to a different loan program was to one where it was easier for the borrowers to submit false information on a loan application. *Id.* ¶ 489.

367.    According to the amended complaint, Paul Financial did not conduct the appropriate due diligence to assess whether the borrower's incomes were accurate. In addition, Paul Financial simply ignored egregious examples of false information on loan applications. The complaint details how a Paul Financial Post-Closing and Broker Service Representative, who worked for the company from October 2003 until June 2005, stated that he witnessed times where stated income applicants working with a mortgage broker were declined loans because of insufficient income. Yet after the mortgage broker heard from Paul Financial what the income

requirement was, the applications would come back with the higher stated amount that qualified the borrowers for the loan. Paul Financial approved these loans. This employee stated that 70% to 80% of the loans he witnessed were stated income loans and that income inflation was common. *Id*. ¶ 486.

368.    The same employee also stated that real estate appraisers working on Paul Financial loans typically appraised the property at the exact purchase price, which was a common lender tactic. The Paul Financial employee stated that Paul Financial often felt that the appraisals were inflated. *Id*. ¶ 488.

369.    According to the amended complaint, a different employee, a Paul Financial Broker Service Representative and Account Executive, who worked for Paul Financial from 2005 through 2007, confirmed that Paul Financial routinely accepted inflated reported incomes and allowed mortgage brokers to submit revised incomes for previously denied loans. *Id*. ¶ 487.

370.    Finally, the amended complaint alleges that Paul Financial simply lent money to nearly any borrower regardless of repayment ability. The complaint states that the former Paul Financial Broker Service Representative and Account Executive reported that "it was extremely rare to get loans declined" at Paul Financial. *Id*. ¶ 490.

### 18.    Residential Funding

371.    Residential Funding Co., LLC ("RFC") originated or contributed a material number of loans to the trusts.

372.    RFC's underwriting practices are implicated in two lawsuits filed by MBIA. MBIA provided monoline insurance, a form of credit enhancement that insured RMBS certificates in the event of default, for RMBS containing RFC-originated loans. In its suits, MBIA alleged misrepresentations regarding the loans underlying the RMBS that it insured. The

RMBS in these suits were issued in 2006 and 2007. *See* Complaint, *MBIA Ins. Corp. v. Ally Fin., Inc.*, No. 12-18889 (Minn. Dist. Ct. Sept. 17, 2012) ("MBIA v. Ally Compl."); First Am. Complaint, *MBIA Ins. Corp. v. Residential Funding Co.*, No. 603552/2008 (N.Y. Sup. Ct. Mar. 19, 2010) ("MBIA v. RFC Compl.").

373.    RFC sponsored RMBS at issue in those suits and originated or acquired many of the loans underlying RMBS at issue in those suits. *See* MBIA v. Ally Compl. ¶¶ 5, 22; MBIA v. RFC Compl. ¶ 2.

374.    After sustaining large losses due to loan defaults, MBIA conducted forensic analyses of several thousand loans underlying the RMBS sponsored by RFC. In *MBIA v. RFC*, MBIA reviewed 7,913 loans and found that 7,019 (88%) contained material misrepresentations. *Id.* ¶ 50; *see also* MBIA v. Ally Compl. ¶ 80. The material misrepresentations included, among other things, routine disregard of underwriting guidelines, debt-to-income ("DTI") and combined loan-to-value ratios ("CLTV") that exceeded the amounts allowed in the underwriting guidelines, and failure to verify employment as required by underwriting guidelines. *See* MBIA v. Ally Compl. ¶¶ 76-83; MBIA v. RFC Compl. ¶¶ 47-72.

375.    Representative examples of the misrepresentations MBIA uncovered include:

- On November 30, 2006, a loan with a principal balance of $140,000 was made to a borrower in Newton, Massachusetts on a property with an original appraisal value of $740,000 and a senior loan balance of $513,567. The property subject to the loan was a non-owner occupied investment property. The borrower stated his income to be $41,666 per month ($500,000 per year) as the owner of a Wine/Spirits store. Further, the borrower did not demonstrate any liquid assets. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2007 in connection with which the borrower claimed to have earned $0.00 for 2006. Further, the appraisal indicated the property failed to conform to the legal standards and the loan file lacked any letter form the local authority regarding rebuilding. RFC Underwriting Guidelines require verification of 6 months of reserves for the monthly Principle, Interest, Taxes and Insurance ("PITI") payments for stated income loans on non-owner occupied investment

properties yet there is no indication in the loan files that these reserves were identified or verified. Finally, RFC guidelines limit loans under the non-owner occupied loan program to $100,000, $40,000 less than was loaned.

- On March 16, 2007, a loan with a principal balance of $40,000 was made to a borrower in Bradenton, Florida on a property with an original appraisal value of $440,000 and a senior loan balance of $328,000. The borrower was retired and received a fixed income that was stated as $6,450 per month. The borrower's FICO credit score of 688 required the DTI for the loan not to exceed 45%, however, the borrower's DTI was 55.93%. Because the borrower received a fixed income, the borrower did not meet the residual income requirements for a higher DTI under RFC's Underwriting Guidelines. Further, the loan file lacks any evidence of 2 months of PITI reserves as required by RFC's Underwriting Guidelines.

- On July 24, 2006, a loan with a principal balance of $29,500 was made to a borrower in Flint, Michigan on a property with an original appraisal value of $57,497 and a senior loan balance of $24,676. The borrower stated income of $3,700 per month and had a FICO score of 650. The CLTV for the mortgage loan was 94.2%. Pursuant to RFC's Underwriting Guidelines, the borrower was required to have monthly income of $4,000 and the CLTV for the loan could not exceed 80%. Further, the loan file lacks evidence of a full appraisal for the property as well as evidence of 2 months of PITI reserves, both of which are required by RFC's Underwriting Guidelines.

- On November 12, 2006, a loan with a principal balance of $135,000.00 was made to a borrower in Scottsdale, Arizona on a property with an original appraisal value of $540,000.00 and a senior loan balance of $405,000.00. The borrower stated income of $11,000 per month as a sales manager at a concrete company, however, the borrower could only demonstrate assets of $11,491. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2008 in connection with which the borrower claimed to have actually earned $43,523 for 2006 and $20,401 for 2007. Additionally, the bank account used to verify the borrower's reserves is actually held in the name of the loan officer that issued the loan.

MBIA v. RFC Compl. ¶ 52.

### 19.    RBS/Greenwich Capital

376.    The Royal Bank of Scotland Group PLC ("RBS"), through its affiliate RBS Financial Products, Inc. (f/k/a Greenwich Capital Financial Products, Inc.), sponsored a significant number of the trusts.

377.    RBS's poor mortgage securitization practices have been the subject of government investigations, reports and significant RMBS investor lawsuits. The FCIC Report noted that Clayton acted as a due diligence provider for RBS's RMBS offerings. According to testimony provided to the FCIC, for the loans Clayton tested for RBS from at least January 1, 2006 through June 30, 2007, Clayton informed RBS that at least 17% of the loans it tested did not comply with the underwriting guidelines, did not have compensating factors otherwise meriting approval, and/or had defective appraisals. Notwithstanding its receipt of such notice, RBS then knowingly and deliberately waived well over half of those defective loans (53%) into their RMBS Offerings. *See* Clayton All Trending Report at 6, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

378.    In *FHFA v. RBS*, the FHFA performed a forensic analysis of sixty-eight RBS-sponsored securitizations and/or RBS-underwritten securitizations. Am. Complaint, *FHFA v. Royal Bank of Scotland Group PLC, et al.*, No. 11-cv-01383 (D. Conn. Feb. 1, 2012). The FHFA found that "at least 3.12 percent of the mortgage loans for each Securitization had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger." *Id.* ¶ 113. The FHFA also found that "the Prospectus Supplement for each Securitization was grossly inaccurate, understating the percentage of non-owner occupied properties by at least six percent, and for many Securitizations by ten percent or more." *Id.* ¶ 107.

379.    Additional forensic analyses of RBS securitizations have confirmed RBS's widespread securitization of breaching loans. *See, e.g.*, *Royal Park Investments SA/NV v. Royal Bank of Scotland Group PLC, et al.*, No. 653541/2013 (N.Y. Sup. Ct. Oct. 11, 2013) (forensic review demonstrated pervasive breaches of representations and warranties concerning compliance with underwriting guidelines, owner occupancy, LTV ratios and assignment of title).

### 20.     Wells Fargo

380.     Wells Fargo Bank, N.A., ("Wells Fargo") originated or contributed a material number of loans to the loan pools underlying the trusts.

381.     The City of Memphis sued Wells Fargo in 2010 over its mortgage practices claiming violations of the Fair Housing Act. *See* Am. Complaint, *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-cv-2857 (W.D. Tenn. Apr. 7, 2010) ("Memphis Compl."). The complaint includes sworn declarations from former Wells Fargo employees describing Wells Fargo's abandonment of underwriting guidelines.

382.     Camille Thomas was a loan processor at Wells Fargo from January 2004 to January 2008. She handled the paperwork involved in the loan, including processing the file for review and approval by the underwriters. To do her job, she had to be familiar with Wells Fargo's underwriting guidelines. Ms. Thomas recounted how the bonus structure placed pressure on credit managers to make loans that should not have been made. She stated that managers manipulated LTV ratios by using inflated appraisals they knew were not accurate. She also knew that documents were falsified to inflate borrowers' incomes. When she complained, a branch manager told her, "we gotta do what we gotta do." Finally, she stated that borrowers were not informed that their loans were adjustable-rate mortgages with low "teaser rates," or about prepayment penalties, potential violations of lending laws, which would also be violations of the underwriting guidelines. Memphis Compl. Exh. 4.

383.     Doris Dancy was a credit manager at Wells Fargo from July 2007 to January 2008 in the Memphis area. She stated that the district manager put pressure on credit managers to convince people to apply for loans even if the person could not afford the loan or did not qualify for it. To her shock, many people with bad credit scores and high debt-to-income ratios were

approved for subprime loans. Ms. Dancy would shake her head in disbelief and ask herself, "how could that happen?" She knew that Wells Fargo violated its underwriting guidelines to make those loans. Although she never witnessed it herself, she heard also from other employees that some branch managers falsified information to get customers to qualify for subprime loans. She stated that a bonus system was used to pressure her to make loans she thought should not be made. Memphis Compl. Exh. 1.

384.    Michael Simpson was a credit and branch manager at Wells Fargo from 2002 to 2008 in the Memphis area. According to Mr. Simpson, Wells Fargo managers falsified the mileage on car loan applications so the loan would be approved. He also stated that Wells Fargo was "very aggressive" in mortgage lending. The culture was "completely results driven." According to Mr. Simpson, Wells Fargo employees did not tell customers about the fees and costs associated with closing a loan – again, potential violations of lending laws, and also violations of the underwriting guidelines. He also knew managers who falsified information in loan files, such as income documentation, to get loans approved. Mr. Simpson further confirmed that Wells Fargo's bonus system was "lucrative" for those employees generating the loans. Memphis Compl. Exh. 2.

385.    Mario Taylor was a Wells Fargo credit manager from June 2006 to February 2008 in the Memphis area. His job was to find potential borrowers and to get them to apply for loans. His manager pressured him to push loans on borrowers whether they were qualified for the loan or could pay back the loan. He was also told to mislead borrowers by only telling them the "teaser rate" without disclosing the rate was adjustable and by not telling them about the "fine print." One of his branch managers changed pay stubs and used white-out on documents to alter the borrower's income. Finally, Mr. Taylor confirmed that Wells Fargo employees were heavily

incentivized by the bonus structure to generate large volumes of loans. Memphis Compl. Exh. 3.

386.    Elizabeth Jacobson was a loan officer and sales manager at Wells Fargo from 1998 to December 2007 in the Maryland area. She described the financial incentives to sign borrowers up for loans. In two years, she made more than $1.2 million in sales commissions. She knew loan officers who would lie to potential borrowers about whether they could refinance their loan once the "teaser rate" period expired. Ms. Jacobson also knew loan officers who falsified loan applications to qualify them for loans they should not have been given. One loan officer would "cut and paste" the credit report of an approved borrower into other borrowers' applications. She reported this conduct to management but was not aware of any action taken to correct the problems. Memphis Compl. Exh. 7.

387.    The district court denied a motion to dismiss. *City of Memphis v. Wells Fargo Bank, N.A.*, 2011 WL 1706756 (W.D. Tenn. May 4, 2011). The case subsequently settled.

388.    The FCIC's investigation supports the affidavits of these former Wells Fargo employees. The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who worked as an underwriter and a quality assurance analyst from 2001 until 2007. According to Ms. Parmer, at least half the loans she flagged as fraudulent were approved. She also told the FCIC that "hundreds and hundreds and hundreds of fraud cases" within Wells Fargo were never referred to the Treasury Department's Financial Crimes Enforcement Network. FCIC Report at 162.

389.    In July 2011, the Federal Reserve Board issued a consent cease and desist order, and assessed an $85 million civil money penalty against Wells Fargo & Co. (parent company of Wells Fargo Bank, N.A.) and Wells Fargo Financial, Inc. At the time, this was the largest penalty assessed by the Board in a consumer-protection enforcement action. The order addressed

allegations that Wells Fargo had falsified income information in mortgage applications. These practices were allegedly fostered by Wells Fargo's incentive compensation and sales quota programs and the lack of adequate controls to manage the risks resulting from these programs. Press Release, Federal Reserve Board (July 20, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110720a.htm.

390.    There is widespread evidence of pervasive breaches of seller representations and warranties in Wells Fargo sponsored RMBS, including detailed allegations in securities cases against Wells Fargo, such as *In Re Wells Fargo Mortgage-Backed Certificates Litigation*, No. 09-cv-1376 (N.D. Cal.), which Wells Fargo agreed to settle for $125 million. This action and others have demonstrated systemic and pervasive deficiencies in Wells Fargo's underwriting practices, which led to inaccurate representations and warranties regarding LTV ratios and owner occupancy.

391.    Other RMBS lawsuits involving Wells Fargo sponsored trusts have revealed Wells Fargo's systemic securitization abuses. For example, in August 2012, the FDIC, as receiver for the now-defunct Alabama-based Colonial Bank ("Colonial"), sued Wells Fargo and twelve other large banks for misrepresentations in connection with the sale of residential mortgage-backed securities to Colonial. The complaint alleged that Wells Fargo made material misrepresentations in the offering documents regarding loan-to-value ratios, owner occupancy rates, compliance with appraisal standards, and loan issuance practices. *See Fed. Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortgage Fin. Corp., et al*., No. 12-cv- 6166 (S.D.N.Y. Aug. 10, 2012).

392.    In *Federal Home Loan Bank of Atlanta v. Countrywide Fin. Corp, et al.*, No. 11-cv-00489 (N.D. Georgia Feb. 17, 2011), the plaintiff performed a forensic review of 30

offerings, including at least one trust sponsored by Wells Fargo. The Federal Home Loan Bank of Atlanta found that in its sample of more than 21,000 loans "over 58% of the appraised property values in this sample were overstated by 5% or more." Moreover, the analysis revealed that although the offering documents for all 30 offerings represented that no loans had an LTV at origination over 100%, of the "more than 21,000 loans the Bank analyzed, over 2,490 had an AVM value (at the time of origination) that was less than the amount of the original mortgage (*i.e.*, an LTV over 100%)."

393.    In a similar action brought by the Federal Home Loan Bank of Indianapolis, *Federal Home Loan Bank Indianapolis v. Banc of America Mort. Sec., Inc., et al.*, No. 10-cv-01463 (S.D. Ind. Nov. 15, 2010), the bank conducted a forensic review of 32 offerings, including some Wells Fargo sponsored trusts. For four of those trusts, Wells Fargo represented that no loan in the pool had an LTV ratio over 100%, but the review revealed that 9.02%, 14.29%, 17.39%, and 8.33% of the loans respectively, had an LTV greater than 100%. The review also revealed that the owner occupancy percentages were understated.

### 21.    WMC Mortgage Corp.

394.    WMC Mortgage Corp. ("WMC") originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

395.    In 2004, when General Electric ("GE") purchased it from a private equity firm, WMC was the sixth-largest subprime lender in the country. WMC specialized in nonprime loans and jumbo loans of up to $1 million.

396.    On January 20, 2012, the Huffington Post reported that the FBI and the Department of Justice were investigating possible fraud at WMC.

397.    Another article published that same day on iwatchnews.org elaborated on the

investigation. According to the article, "the government is asking whether WMC used falsified paperwork, overstated borrowers' income and other tactics to push through questionable loans" with the probe focused on whether "senior managers condoned improper practices that enabled fraudulent loans to be sold to investors." The article reports as follows:

> The FBI's San Francisco office indicated that it has been looking into WMC's business practices for nearly two years, according to one of the people who has knowledge of the investigation. The bureau has examined individual WMC loan files and has begun contacting former employees about how the lender handled the sale of mortgages to investors, this person said.

Michael Hudson, *Feds investigating possible fraud at GE's former subprime unit*, iwatchnews.org, Jan. 20, 2012, *available at* http://www.publicintegrity.org/2012/01/20/7908/feds-investigating-possible-fraud-ge-s-former-subprime-unit.

398.    Another iwatchnews.org article was a lengthy report on GE's purchase of WMC and the practices of WMC's sales staff to push through loans at any cost. According to the article, several ex-employees claim that many WMC sales staff "embraced fraud as a tool for pushing through loans that borrowers couldn't afford" and that WMC ignored reports of loans supported by falsified documents and inflated incomes. The article continued:

> Dave Riedel, a former compliance manager at WMC, says sales reps intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors.
>
> One WMC official, Riedel claims, went so far as to declare:
> "Fraud pays."
> . . .
>
> [Riedel] supervised a quality-control team of a dozen or more people who watched over WMC's lending in a broad area of Southern California where salespeople were pushing subprime loans as well as "Alt-A" mortgages, another type of risky home loan.
>
> The team, Riedel says, found many examples of fraud committed by in-house staffers or the independent mortgage brokers who helped bring in customers to the lender. These included faking proofs of loan applicants' employment and faking verifications that

would-be home buyers had been faithfully paying rent for years rather than, say, living with their parents.

Some employees also fabricated borrowers' incomes by creating bogus W-2 tax forms, he says. Some, he says, did it old-school, cutting and pasting numbers from one photocopy to another. Others, he says, had software on their computers that allowed them to create W-2s from scratch.
. . .

While Dave Riedel was fighting battles inside WMC's California headquarters, Gail Roman was losing battles on the other side of the country.

Roman worked as a loan auditor at WMC's regional offices in Orangeburg, N.Y. She and other colleagues in quality control, she says, dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications.

It did little good. Management ignored their reports and approved the loans anyway, she says.

"They didn't want to hear what you found," Roman told iWatch News. "Even if you had enough documentation to show that there was fraud or questionable activity."

If GE made any progress against fraud at WMC, Roman says, she didn't notice it. Fraud was as bad at WMC in 2006 as it was when she started at the lender in 2004, she says.

"I didn't really see much of a change," Roman says.

Victor Argueta, the former risk analyst, says he didn't see much change either.

Meetings would be held. Executives from GE would agree fraud was a problem and something needed to be done. "But the next month it was business as usual," Argueta says.
. . .

Argueta says one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved.
"Bank statements, W-2s, you name it, pretty much anything that goes into a file," Argueta says. "Anything to make the loan look better than what was the real story."

In one instance, Argueta says, he sniffed out salespeople who were putting down fake jobs on borrowers' loan applications — even listing their own cell phone numbers so they could pose as the borrowers' supervisors and "confirm" that the borrowers were working at the made-up employers.

Management gave him a pat on the back for pointing out the problem, he says, but did nothing about the salespeople he accused of using devious methods to make borrowers appear gainfully employed.

Nightmare loans

Roman and Argueta weren't alone in their concerns, according to other ex-employees who spoke on the condition they remain anonymous, because they still work in banking and fear being blackballed within the industry.

"It was ugly," one former fraud investigator at WMC recalls. "I would have nightmares about some of the things I'd find in a file. I'd wake up in the middle of the night going, 'Oh my God, how did this happen?'"

A former manager who worked for WMC in California claims that company officials transferred and essentially demoted her after she complained about fraud, including the handiwork of a sales rep who used an X-Acto knife to create bogus documents, cutting numbers from one piece of paper and pasting them onto another, then running the mock-up through a photocopier.
. . .

By early 2006, Dave Riedel had begun to rebuild his career inside WMC.

He helped put together a presentation in May 2006 aimed at giving GE officials a sense of how serious WMC's fraud problems were. Riedel says an audit of soured loans that investors had asked WMC to repurchase indicated that 78 percent of them had been fraudulent; nearly four out of five of the loan applications backing these mortgages had contained misrepresentations about borrowers' incomes or employment.

Michael Hudson, *Fraud and folly: The untold story of General Electric's subprime debacle*,

iwatchnews.org, Jan. 6, 2012, *available at* http://www.publicintegrity.org/2012/01/06/7802/

fraud-and-folly-untold-story-general-electric-s-subprime-debacle.

399.   On the radio program This American Life, broadcast May 9, 2008, reporter Alex

Blumberg interviewed a WMC sales manager who made over a million dollars a year by making

loans to "people [who] didn't have a pot to piss in." Blumberg reported that the manager "didn't

worry about whether the loans were good. That's someone else's problem." *This American Life:*

*The Giant Pool of Money*, Chicago Public Radio (May 9, 2008), *available at*

http://www.thisamericanlife.org/radio-archives/episode/355/transcript.

400.     In June 2008, the Washington State Department of Financial Institutions filed a "Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees" against WMC and its owners. The Statement of Charges stemmed from an investigation that found WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on multiple loans, understated amounts of payments made to escrow companies, understated annual percentage rates by almost 5%, and committed numerous other violations of Washington State deceptive and unfair practices laws. In July 2009, WMC entered a consent order under which it agreed to pay fines, restitution and the costs of the investigation to settle the matter. *Available a*t http://www.dfi.wa.gov/CS%20Orders/C-07-557-09-CO02.pdf.

401.     WMC's lack of underwriting landed it fourth on the OCC's 2009 "Worst Ten of the Worst Ten" list.

### C.     A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards

402.     Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both a state and federal level, there are various other indications that the trust's loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties, including the following: 1) the trusts' high default and delinquency rates; and 2) the trusts' enormous cumulative losses. A summary of the trusts' default and delinquency rates and the trusts' cumulative losses is attached as Exhibit D. Defendant should have carefully investigated these issues, notified certificateholders of the issues, and taken action to address these issues.

### 1. The Trusts Suffered from High Delinquency and Default Rates

403. Residential mortgages are considered delinquent if no payment has been received for over 30 days after payment is due. Residential mortgages where no payment has been received for over 90 days (or three payment cycles) are considered to be in default.

404. By January 2009 at the latest, Defendant and its responsible officers witnessed a significant rise in reported default and delinquencies in the loan pools backing the trusts with many defaults and delinquencies occurring within months of the loans' origination. As many commentators have noted, such rapid and numerous defaults indicate loans that should not have been made. For example, a November 2008 Federal Reserve Board study attributed the general rise in defaults, in part, to "[d]eteriorating lending standards," and posited that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors." Christopher J. Mayer et al., *The Rise in Mortgage Defaults*, at 15-16 Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59.

405. By 2009 at the latest, these massive numbers of defaults and delinquencies should have alerted Defendant to carefully investigate whether the loans sold into the trusts complied with the responsible parties' representations and warranties and to take action to address any issues. Loan pools that were properly underwritten and containing loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquency.

406. These default and delinquency rates were communicated to Defendant monthly through the service reports and trustee remittance reports. By January 2009, 95 out of the 97 trusts were reporting default and delinquency rates of over 10%, with nearly half of all the trusts reporting delinquency rates of over 40%. The average default and delinquency rate of the trusts

126

by January 2009 was over 39%. By January 2010, this average was over 46%.

407.    Properly underwritten loans would have experienced far fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies even during an economic downturn.

### 2.    The Trusts Suffered Huge Losses

408.    Realized losses are the losses incurred regarding any liquidated mortgage loan or any mortgage loan charged off by the servicer. The realized losses equal the portion of the stated principal balance remaining unpaid after applying all net liquidation proceeds to the mortgage loan.

409.    By January 2009 at the latest, the trusts' extraordinary losses should have raised a red flag to Defendant to carefully investigate whether the mortgage loans sold to the trusts complied with the responsible parties' representations and warranties. In particular, large realized losses are indicative of severe deficiencies in the appraisal and valuation process. As an example, SVHE 2005-B trust was reporting cumulative losses in January 2009 of over $100 million, which equates to more than 20% of the trust's total original par value.

410.    By January 2009, the total combined cumulative losses for the trusts (with reported figures) exceeded $4.7 billion, with the trusts reporting an average loss of over $48 million. By January 2011, the total reported cumulative losses for the trusts were over $17.2 billion.

411.    The immense losses are strong evidence that the originators systematically disregarded the underwriting standards and that many mortgages in the pool were not written in adherence to the underwriting guidelines in breach of the representations and warranties.

**D.   The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines**

412.   RMBS are generally divided into slices or tranches, each of which represents a different level of risk. RMBS certificates denote the particular tranches of the security purchased by the investor.

413.   The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS. Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit rating agencies that assigned credit ratings to the RMBS in this case.

414.   The credit rating agencies use letter-grade rating systems as shown in Table 2 (*infra*).

**Table 2**
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---|---|---|---|
| Aaa | AAA | **Prime (Maximum Safety)** | **INVESTMENT GRADE** |
| Aa1 Aa2 Aa3 | AA+ AA AA- | **High Grade, High Quality** | |
| A1 A2 A3 | A+ A A- | **Upper Medium Grade** | |
| Baa1 Baa2 Baa3 | BBB+ BBB BBB- | **Medium Grade** | |
| Ba2 Ba3 | BB BB- | **Non-Investment Grade, or Speculative** | **SPECULATIVE GRADE** |
| B1 B2 B3 | B+ B B- | **Highly Speculative, or Substantial Risk** | |
| Caa2 Caa3 | CCC+ | **In Poor Standing** | |
| Ca | CCC CCC- | **Extremely Speculative** | |

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| C | - | **May be in Default** | |
| - | D | **Default** | |

415.    Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk." Moody's Investors Services, Inc., Moody's Rating Symbols & Definitions at 6 (August 2003), *available at* http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf. Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment on the obligation is extremely strong." Standard & Poor's, Ratings Definitions, *available at* https://www.globalcreditportal.com/ratingsdirect/renderArticle.do?articleId=1019442&SctArtId =147045&from=CM&nsl_code=LIME.

416.    In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because the primary market for RMBS is institutional investors, such as the CCUs, that were generally limited at the time to buying only securities with the highest credit ratings. *See*, *e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities rated below AA-).

417.    The vast majority of the certificates owned by the CCUs were initially rated triple-A at issuance. A triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations." *Understanding Standard & Poor's Rating Definitions*, June 3, 2009, at 14. By the end of 2008, 68 of 164 certificates—a staggering 41%— had been downgraded to junk status by at least one credit rating agency. By 2009, this figure had increased to over 90%. A complete list of the downgrades for the certificates is set forth in Exhibit E.

418.     The high initial credit ratings reflected the risk associated with properly originated and underwritten mortgage loans and were based on the credit risk characteristics the responsible parties represented and warranted to the credit rating agencies. Consequently, the total collapse in the credit ratings of the RMBS certificates the CCUs purchased, typically from triple-A to non-investment speculative grade, put Defendant on notice that it was required to carefully investigate whether the trusts contained defective loans, notify certificateholders of any defaults, and take appropriate action.

## VIII.   ADDITIONAL EVIDENCE SHOWS THAT DEFENDANT KNEW OF DEFAULTS

### A.     Defendant's Affiliates Have Been Sued on Claims of Systematic, Widespread Shoddy Origination Practices

419.     Defendant's parent corporation faced a lawsuit by the FHFA, as conservator for Fannie Mae and Freddie Mac. The suit, *Federal Housing Finance Agency v. Deutsche Bank AG, et al.*, No. 11-cv-06192 (S.D.N.Y.), was filed with similar suits against seventeen financial institutions concerning the packaging, marketing and sale of RMBS purchased by Freddie Mac and Fannie Mae from 2005 to 2007 from underwriters of RMBS like Deutsche Bank AG. Fifteen of the FHFA cases were concentrated for coordinated pretrial proceedings before Judge Denise Cote of the Southern District of New York, thus providing Deutsche Bank access to the discovery and pleadings in each of the cases. The complaint alleges that Deutsche Bank AG and its affiliates falsely stated that the underlying mortgage loans and properties complied with certain underwriting guidelines and standards and that the false statements and misleading omissions significantly overstated the ability of the borrowers to repay their mortgage loans and the value of collateralized property. Am. Complaint, *Federal Housing Finance Agency v. Deutsche Bank AG, et al.*, No. 11-cv-06192 (S.D.N.Y. June 13, 2011).

420.    The complaint stated that a loan level analysis of a sample of loans for each securitization in the Deutsche Bank AG action had revealed that statistics provided by Deutsche Bank AG and its affiliates were false and omitted material facts due to widespread falsification of borrowers' incomes and debts, inflated property values, and misrepresentations of other key characteristics of the mortgage loans. A forensic review of loans for various Deutsche Bank AG securitizations at issue in the FHFA case revealed pervasive failure to adhere to underwriting guidelines. For example, a forensic review of 1,273 loans from the ACE 2007-HE3 offering, for which Deutsche Bank AG subsidiaries served as both the sponsor and lead underwriter, revealed that "approximately 97 percent of the reviewed loans were not underwritten in accordance with the applicable guidelines or otherwise breached the representations contained in the transaction documents." *Id*. ¶ 113. The FHFA action claims that as a result of Deutsche Bank AG and its affiliates' misstatements and omissions of material fact, Fannie Mae and Freddie Mac suffered substantial losses as the value of their holdings significantly deteriorated.

421.    The complaint alleges that Deutsche Bank AG "knew or was reckless in not knowing, that it was falsely representing the underwriting process and the risk profiles of the mortgage loans." *Id*. ¶ 165. According to the complaint, Deutsche Bank AG knew, through its own due diligence and the findings of its outside consultants, that the representations in the registration statements were false. The Prospectus Supplements stated that, "as one of its 'quality control procedures', it re-underwrote sample pools of the loans it purchased from originators to ensure that those loans were originated in compliance with applicable underwriting guidelines." *Id*. ¶ 166. In an FCIC interview of Joseph Swartz, a former vice president of Deutsche Bank's due diligence department responsible for overseeing all of the bank's residential mortgage business, states that he employed a team of people who would "run through credit bureaus hour

after hour through hundreds and hundreds of loans… to see 'Is there anything about this credit, about the borrower that is alarming'?" *Id.* ¶ 167. This pre-review would have revealed significant deficiencies in the underwriting of loans designated for inclusion in securitizations and that loans failed to meet the specific criteria in the Registration Statements. *Id.* ¶ 168.

422.    The FHFA announced a $1.9 billion settlement with Deutsche Bank AG regarding the lawsuit on December 20, 2013.

423.    On April 4, 2014, a New York state court allowed HSBC Bank USA, as trustee for Ace Securities Corp., Home Equity Loan Trust, Series 2006-HE4, to proceed with a putback lawsuit against DB Structured Products, Inc. ("DBSP"), the securitization unit of Deutsche Bank AG, in connection with a $702 million RMBS offering. HSBC alleged that the loans underlying the securitization breached their associated representations and warranties. *Ace Securities Corp. v. DB Structured Products, Inc.*, 2014 WL 1384490 (N.Y. Sup. Ct. 2014).

424.    On October 17, 2013, the Nevada Attorney General announced that DBSP had agreed to pay $11.5 million to the State of Nevada to resolve an investigation into the bank's role in purchasing and securitizing subprime and Alt-A mortgage loans in Nevada. The nearly two-year investigation centered upon potential misrepresentations by lenders, including New Century and American Home, to Nevada consumers who took out subprime loans and Alt-A loans that were funded, bought, and securitized by DBSP between 2004 and 2007. *In the Matter of DB Structured Products, Inc.,* No. A-13-690144-B (Nev. Dist. Ct. Clark Cnty. Oct. 14, 2013).

### B.    Defendant Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers

425.    Monoline insurance is credit enhancement that involves purchasing insurance to cover losses from any defaults. Many RMBS trusts were insured by monoline insurers. The responsible parties made representations and warranties concerning the underwriting standards of

the loans in the governing agreements for the insured RMBS, and the governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible party and the other parties to the agreement, including the trustee.

426.    Monoline insurers have filed many complaints against responsible parties for representations and warranty breaches in connection with other RMBS trusts to which Defendant serves as trustee or an affiliate of Defendant served as sponsor. Prior to filing suit against the responsible parties, the monoline insurers often obtained and carried out forensic loan level reviews of the loans at issue.

427.    In *CIFG Assurance N. Am., Inc. v. GreenPoint Mortgage Funding, Inc.*, No. 653449/2012 (N.Y. Sup. Ct. Oct. 1, 2012), the monoline insurer CIFG sued GreenPoint Mortgage Funding, Inc. alleging that its review of loan files originated by the defendant revealed breaches in 82% of the loans reviewed. DBNTC acted as the trustee for the trust at issue in the litigation.

428.    In *Assured Guaranty Corp. v. DB Structured Products, Inc., et al.*, No. 651824/201 (N.Y. Sup. Ct. Oct. 25, 2010), the monoline insurer Assured sued DBSP, an affiliate of Defendant, alleging that its review of loan files securitized by the defendant revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that the defendant represented would be followed.

429.    Because of the monoline insurers' breach notices and lawsuits, Defendant knew that these same defective underwriting and securitization practices likely affected other trusts containing loans originated and securitized by these same originators and sponsors, and had an obligation to investigate the issue carefully for trusts committed to its care.

C.    **Global RMBS Repurchase Investigations and Settlements Alerted Defendant to Systematic, Widespread Breaches of Representations and Warranties**

430.    RMBS certificateholders have initiated numerous mortgage repurchase directions, compelling trustees to demand that responsible parties repurchase the mortgage loans due to breaches of representations and warranties. Defendant was trustee for many of the RMBS subject to these directions.

431.    For example, on December 16, 2011, several institutional mortgage investors in hundreds of RMBS trusts sponsored by J.P. Morgan or its affiliates issued written instructions to Defendant along with U.S. Bank, Wells Fargo, BNYM, and HSBC, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools backing the trusts and deficient loan servicing practices. The notices covered over $95 billion of RMBS sponsored by J.P. Morgan from 2005 to 2007.

432.    The investors sought the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the trusts; and securitized by the same investment banks and financial institutions that sponsored the trusts. J.P. Morgan offered to settle the claims for $4.5 billion less than two years later. DBNTC approved the settlement and an Article 77 proceeding is pending.

433.    On January 31, 2012, a group of major institutional mortgage investors in several dozen Morgan Stanley-sponsored RMBS trusts demanded that Defendant along with U.S. Bank and Wells Fargo, as trustees, investigate ineligible mortgages in the loan pools securing those trusts and deficient servicing of the loans. The notices covered more than $25 billion of RMBS issued by Morgan Stanley from 2005 to 2007.

434.    The investors sought the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the trusts; and

134

securitized by the same investment banks and financial institutions that sponsored the trusts.

435.    As trustee, Defendant has received many breach notices from institutional investors, indicating widespread and systemic violations of representations and warranties by the responsible parties. Defendant knew similar issues likely affected the other RMBS trusts committed to its care, and had an obligation to investigate that issue carefully.

**D.    Defendant Has Been Involved in Repurchase Litigation Against Many Responsible Parties**

436.    Defendant is also involved in many repurchase claims for other RMBS trusts that involved the same originators, sponsors, sellers, and servicers as the trusts. Based on its involvement in these repurchase actions, which alleged widespread, systematic breaches of representations and warranties, Defendant had an obligation to investigate that issue carefully for all trusts committed to its care and take action as appropriate.

437.    On August 26, 2009, Defendant – the trustee for ninety-nine trusts in which WaMu sold, sponsored and serviced loans – filed suit against the FDIC, WaMu's receiver, and others on behalf of the trusts and their investors in an effort to enforce the trusts' and certificateholders' rights. *See* Am. Complaint, *Deutsche Bank National Trust Co. v. FDIC, as receiver for Wash. Mut. Bank, et. al.*, No. 09-cv-01656 (D.D.C. Sept. 8, 2010) (the "WaMu Repurchase Litigation"). Defendant brought the lawsuit because the FDIC failed to respond to its proof of claim filed the preceding year. Defendant's complaint in the WaMu Repurchase Litigation details WaMu's systemic disregard of sound origination practices and pervasive sale of mortgage loans that failed to comply with representations and warranties between 2004 and 2008.

438.    Defendant's complaint cites the Senate Subcommittee findings, including that "WaMu selected and securitized loans that it had identified as likely to go delinquent, without

disclosing its analysis to investors who bought the securities." *Id*. ¶69. Defendant alleges that "[b]ased upon: (a) the pervasiveness of such practices by WaMu, as found by the Senate Subcommittee; and (b) the high proportion of WaMu's securitized mortgage loans that were sold to, or deposited in, the Trusts during the relevant time period, the Trustee has reason to believe that such practices affected mortgage loans sold to, or deposited in, the Trusts by WaMu and that, accordingly, many of the mortgage loans in the Trusts do not comply with the Representations and Warranties." *Id*. ¶74.

439.    The complaint filed in *Deutsche Bank National Trust Co. v. Barclays Bank PLC, et al.*, No. 651338/2013 (N.Y. Sup. Ct. Sept. 17, 2013), details how "an exhaustive forensic review of a sample of loan origination documents" was conducted that showed the mortgage loans Barclays sold to the trust failed to meet the standards described in Barclays' representations and warranties. Over 64% of the loans reviewed were determined to be in breach of those representations and warranties. *Id*. ¶3. Analysis of 2,221 mortgage loans revealed 539 loans with actual loan-to-value ratios exceeding 95%, and 365 loans with actual cumulative loan-to-value ratios exceeding 100% - far greater numbers than the reported ratios. *Id*. ¶56. The action pertains to an offering backed by loans originated primarily by New Century and Ameriquest (two of the originators of loans supporting the trusts at issue here). *Id*. ¶25.

440.    Moreover, a loan level review of loans originated by New Century and included in the HASC 2007-NC1 offering uncovered breaches in at least 2,725 loans – almost 60% of the loans in the trust. According to the complaint, this suggested a "high breach rate across the Trust's entire Mortgage Loan pool." Complaint, *Deutsche Bank National Trust Co. v. HSBC Bank USA*, No. 652001/2013 (N.Y. Sup. Ct. Nov. 12, 2013), ¶62.

441.    In another repurchase action against Decision One, Defendant claimed that Decision One breached so many representations and warranties materially and adversely affecting the value of the loans in a trust that over half of the loans conveyed into the trust were in material breach. *See* Complaint, *Deutsche Bank National Trust Co. v. Decision One*, No. 2013-L-005823 (Ill. Cir. Ct. May 31, 2013), ¶53.

442.    Defendant's involvement in numerous repurchase actions, particularly its knowledge of the forensic reviews conducted in connection with that litigation, shows that Defendant knew that such widespread, systemic breaches of representations and warranties likely affected all of the trusts committed to its care, and had an obligation to investigate that issue carefully and take action to protect the trusts.

## IX.    DEFENDANT FAILED TO PRUDENTLY ADDRESS MASTER SERVICER AND/OR SERVICER DEFAULTS

### A.    Defendant Breached the Governing Agreements and Its Common Law and Statutory Obligations By Failing to Fulfill Its Duties After Defaults and Events of Default Triggered By Master Servicer and Servicer Misconduct

443.    The master servicers and/or servicers failed to prudently service the mortgage loans underlying the trusts. The governing agreements require that the master servicers and/or servicers administer the mortgage loans for and on behalf of the certificateholders, and do so (consistent with the terms of the governing agreements): (i) in the same manner in which they service and administer similar mortgage loans for their own portfolios or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) to maximize the recoveries regarding such mortgage loans on a net present value basis; and (iii) without regard to the right of the master servicers and/or servicers to receive compensation or other fees for their services under the governing agreements, the obligation of the master servicers and/or servicers to make servicing

advances under the governing agreements, and the master servicers' and/or servicers' ownership, servicing or management for others of any other mortgage loans. The master servicers and servicers did not adhere to these requirements.

444.    The master servicers and/or servicers failed to meet their obligations by: (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) providing false or misleading information to borrowers; (v) failing to properly deliver loan documentation; and (vi) failing to maintain appropriate staffing, training and quality control systems.

445.    Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. In that process, because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers were put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the applicable parties or take action based on these breaches as required by the governing agreements.

446.    The master servicers and/or servicers failed to notify parties to the governing agreements upon the discovery of mortgages in violation of the representations and warranties; failed to enforce repurchase obligations; failed to properly respond to denial of mortgage insurance claims based on originator misrepresentations; failed to foreclose upon properties when appropriate under applicable law; and failed to conduct foreclosures in a lawful fashion.

447. Much of this conduct constituted Events of Default under the governing agreements. These failures have been confirmed by governmental investigations, published reports, and public and private litigation that have described the master servicers' and/or servicers' pervasive deviation from customary and lawful servicing practices.

448. Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any covenants or agreements under the governing agreements, after notice and lapse of time, constitutes a default.

449. These defaults ripened into Events of Default under the governing agreements for the trusts. Defendant had an obligation to provide notice of such defaults, which would have resulted in additional Events of Default, but it failed to do so.

450. Defendant breached the governing agreements, its duties, and violated the law after becoming aware of such breaches, defaults and/or Events of Default by failing to: provide notice of such breaches, defaults and/or Events of Default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or Events of Default.

451. Defendant failed to exercise the same skill and care as a prudent person in the same circumstances in enforcing its rights and powers under the governing agreements upon learning of the above breaches, defaults and/or Events of Default.

**B.     Specific Servicer Misconduct**

452. Most of the trusts' loans are or were serviced by the following servicers and their affiliates: Countrywide Home Loans Servicing LP and Countrywide Home Loans, Inc.; American Home Mortgage Servicing, Inc.; Wells Fargo Bank, N.A.; JPMorgan Chase Bank,

N.A.; Fremont Investment and Loan; GMAC Mortgage Corporation or Mortgage LLC; Saxon Mortgage Services, Inc.; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; Option One Mortgage Corp.; National City Mortgage Co. and Home Loan Services; Bank of America, N.A.; and CitiMortgage, Inc.

453.    After Countrywide was acquired by Bank of America in 2008, Countrywide Home Loans Servicing L.P. ("CHLS") was renamed BAC Home Loans Servicing LP ("BAC Servicing"). In July 2011, BAC Servicing was merged into Bank of America.

454.    In March 2008, prior to being acquired by Bank of America, Countrywide was ranked as the most common mortgage servicer in the United States and had a servicing portfolio with a balance of over $1.4 trillion. In September 2009, after its acquisition of Countrywide, Bank of America was the nation's most common mortgage servicer with a servicing portfolio of over $2.1 trillion.

455.    On October 6, 2008, the attorneys general in multiple states reached an $8.68 billion settlement with Countrywide Home Loans, Countrywide Financial Corporation and Full Spectrum Lending. The settlement allowed certain borrowers whose loans were serviced by Countrywide to obtain loan modifications valued at up to $3.4 billion worth of reduced interest payments and, for certain borrowers, reduction of their principal balances.

456.    On June 7, 2010, the Federal Trade Commission ("FTC") filed a civil enforcement action against Countrywide Home Loans, Inc. and BAC Servicing for "unlawful acts and practices in servicing mortgage loans." Complaint, *Federal Trade Commission v. Countrywide Home Loans, Inc. and BAC Home Loan Servicing, LP*, No. 10-cv-4193 (C.D. Cal. June 7, 2010). Countrywide Home Loans and BAC Servicing paid $108 million to settle.

457.    According to the FTC, when borrowers fell behind on their payments, Countrywide and BAC imposed several default-related services "by funneling the work through panoply of Countrywide subsidiaries." In its mortgage servicing operation, Countrywide/BAC followed a so-called "vertical integration strategy" to generate default-related fee income. Rather than obtain default-related services directly from third-party vendors and charge borrowers for the actual cost of these services, Countrywide/BAC formed subsidiaries to act as middlemen in the default services process. According to the FTC, these subsidiaries existed solely to generate revenues for Countrywide/BAC and did not operate at arms'-length with Countrywide/BAC. Countrywide/BAC and their subsidiaries – "[a]s a matter of practice" – added a substantial mark-up to their actual costs for the services and then charged the borrowers the marked-up fees. The inflated fees were both contrary to prudent servicing standards and violated the mortgage contracts, which limit fees chargeable to the borrower to actual costs of the services and as are reasonable and appropriate to protect the noteholder's interest in the property and rights under the security instrument.

458.    Countrywide/BAC similarly breached servicing standards and mortgage contracts when servicing loans for borrowers who sought to save their homes through a Chapter 13 bankruptcy. According to the FTC, Countrywide/BAC made various representations to those borrowers about their mortgage loans that were false or lacked a reasonable basis, and failed to disclose to borrowers during their bankruptcy case when fees and escrow shortages and deficiencies accrued on their loan. According to the FTC, "Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans. Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts." After the bankruptcy cases have closed and borrowers no longer have the

protection of the bankruptcy court, Countrywide/BAC collected those amounts, including through foreclosure actions.

459.    Following a 16-month investigation led by Iowa Attorney General Tom Miller, a coalition of 49 State Attorneys General, the Departments of Justice, Treasury and HUD (collectively, the "Coalition") reached a settlement with, among others, Bank of America. In its complaint, the Coalition reported its investigative findings.  The Coalition concluded that Bank of America committed unfair and deceptive practices including (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; and (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

460.    Wells Fargo also serviced many of the trusts. The Office of the Comptroller of the Currency ("OCC") issued a consent order dated April 13, 2011 finding, in part, that Wells Fargo as servicer filed in state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records. *In re Wells Fargo Bank, N.A.*, Consent Order, No. AA-EC-11-19 (Apr. 13, 2011).

461.    Wells Fargo stipulated to the consent order. *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf.

462.    The consent order required Wells Fargo to undertake a sweeping review of their foreclosure practices, including (i) instituting processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable legal requirements and OCC

supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, and applicable state and federal law.

463.     Additionally, the Coalition reached a settlement with Wells Fargo. The Coalition Complaint alleged that Wells Fargo committed unfair and deceptive practices including: (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; and (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

464.     Following a two week trial, on December 19, 2014, a jury verdict was rendered against Wells Fargo in the amount of $54.8 million resolving claims brought in the class action *Mazzei v. The Money Store*, No. 01-cv-05694 (S.D.N.Y. Jun. 22, 2001). The jury determined that Wells Fargo, and its subsidiaries charged improper and excessive fees for default-related services.  *See* Kurt Orzeck, *Wells Fargo Owes $55M in Mortgage Late Fee Suit, Jury Says*, Law360 (Dec. 19, 2014), *available at* http://www.law360.com/articles/606660/wells-fargo-owes-55m-in-mortgage-late-fee-suit-jury-says.

465.     Another entity that was the master servicer or servicer on a substantial number of the trusts was JPMorgan Chase Bank, N.A.

466.     The OCC issued a consent order dated April 13, 2011 finding that, in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, J.P. Morgan

143

filed with state and federal courts affidavits executed by its employees concerning the fees and

expenses chargeable to the borrower when, in many cases, the allegations were not based on

personal knowledge or review of the relevant books and records. *In re JPMorgan Chase Bank*,

Consent Order, No. AA-EC-11-15 (Apr. 13, 2011), *available at* http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47e.pdf.

467.    JPMorgan stipulated to the consent order. *Id.*

468.    The OCC ordered JPMorgan to undertake a sweeping review of its foreclosure

practices, including: (i) instituting processes to ensure that all fees, expenses, and other charges

imposed on the borrower are assessed in accordance with the terms of the underlying mortgage

and in compliance with all applicable legal requirements and OCC supervisory guidance, and (ii)

determining (a) whether a delinquent borrower's account was only charged fees and/or penalties

that were permissible under the terms of the borrower's loan documents, applicable state and

federal law, and were reasonable and customary; and (b) whether the frequency that fees were

assessed to any delinquent borrower's account was excessive under the terms of the borrower's

loan documents, and applicable state and federal law.

469.    Further, private litigation has brought to light that J.P. Morgan charged marked-up

and unnecessary servicing fees (including through the use of default-related service vendors) and

assessed them against borrowers' accounts for profits. *See, e.g.*, *Ellis v. J.P. Morgan Chase &*

*Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013).

470.    Additionally, JPMorgan entered into a settlement of claims brought by the

Coaltion that it committed unfair and deceptive practices including overcharging borrowers for

default related services. *See United States, et al., v. Bank of Am., et al.*, No. 12-cv-00361 (D.D.C.

Mar. 14, 2012).

471.     In 2010, the Federal Reserve, the OCC, the Federal Deposit Insurance

Corporation, and the Office of Thrift Supervision conducted on-site reviews of foreclosure

processing at fourteen federally regulated mortgage servicers. The servicers included Ally

Bank/GMAC, HSBC, Citibank (affiliated entity to CitiMortgage – a servicer for the trusts),

JPMorgan Chase, OneWest (which had acquired IndyMac, a common servicer for the trusts, in

or about March 2009), PNC (which had acquired National City, another servicer for the trusts),

and Wells Fargo. These entities together served as servicer or master servicer on a huge

percentage of the trusts.

472.     In April 2011, the investigating agencies issued a report titled "Interagency

Review of Foreclosure Policies and Practices." *Available at* http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47a.pdf.

473.     The report found "critical weaknesses in each of the servicers' foreclosure

governance processes, foreclosure document preparation processes, and oversight and

monitoring of third-party vendors, including foreclosure attorneys." Based on the deficiencies

identified in the report, the investigating agencies initiated enforcement actions against each of

the servicers subject to the report.

474.     Specifically, the report found that the foreclosure governance processes were

underdeveloped and insufficient and that weaknesses included: (i) lack of sufficient audit trails to

show how information set out in servicer affidavits (including the amount of fees and penalties

charged) was linked to servicers' internal records; (ii) failure to ensure accurate foreclosure

documentation, including documentation pertaining to the fees assessed; and (iii) lack of

sufficient oversight of default management service providers.

475.     Additionally, the OTS issued a consent order dated April 13, 2011 finding that OneWest failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

476.     OneWest stipulated to the OTS's findings. *In re OneWest Bank, FSB*, Consent Order, No. 18129 (Apr. 13, 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf.

477.     In addition, the consent order detailed OneWest's practice of charging excessive fees. The consent order required OneWest to enact a compliance program to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage. The order also required OneWest to review whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the loan documents and were otherwise reasonable and customary. Further, OneWest is required to review whether the frequency that fees were assessed to borrowers' accounts was excessive. Finally, OneWest was required to remediate all injury to borrowers by reimbursing or otherwise appropriately remediating borrowers for impermissible of excessive penalties, fees, or expenses.

478.     As mentioned above, in February 2012, forty-nine state attorneys general and the federal government announced a historic joint $25 billion state-federal settlement with the country's five largest mortgage servicers and their affiliates for misconduct related to their origination and servicing of residential mortgages: (i) Residential Capital, LLC, Ally Financial, Inc., and GMAC Mortgage, LLC; (ii) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (iii) Citigroup

Inc., Citibank, N.A., and CitiMortgage, Inc.; (iv) J.P. Morgan Chase & Company and J.P.

Morgan Chase Bank, N.A.; and (v) Wells Fargo & Company and Wells Fargo Bank, N.A. The

complaint alleged these servicers had engaged in wrongful conduct related to foreclosures,

including failing to properly identify the foreclosing party, preparing, executing, notarizing or

presenting false and misleading documents, engaging in robo signing, and "charging excessive or

improper fees for default-related services." *See United States, et al. v. Bank of America, et al.*,

No. 12-cv-0361 (D.D.C. April 4, 2012). These entities served as master servicer and servicer for

the vast majority of the trusts.

479.   On December 20, 2010, New Jersey Administrative Director of the Courts issued

an administrative order requiring 24 loan servicers and RMBS trustees to file certifications

demonstrating there were no irregularities in handling their foreclosure proceedings. The order

was directed at, among others, HSBC, PNC (and its servicer National City), and Wachovia, all

master servicers or servicers to the trusts. *Available at*

http://www.judiciary.state.nj.us/notices/2010/n101220b.pdf.

480.   Also on December 20, 2010, the New Jersey Superior Court Chancery Division

issued an order in *In the Matter of Residential Mortgage Foreclosure Pleading and Document

Irregularities*, Docket No. F-59553-10 (N.J. Sup. Ct.), directing six mortgage loan lenders and

servicers implicated in residential mortgage loan foreclosure irregularities to show cause why the

processing of their uncontested residential foreclosure filings should not be suspended. Wells

Fargo, JPMorgan Chase, Citibank, Bank of America/BAC, OneWest FSB (f/k/a IndyMac), and

GMAC were recipients of this show cause order. *Available at*

https://www.judiciary.state.nj.us/notices/2010/n101220c.pdf.

481.    In December 2013, the Consumer Financial Protection Bureau, authorities in 49

states, and the District of Columbia filed a proposed court order requiring the country's largest

nonbank mortgage-loan servicer, Ocwen, and its subsidiary, Ocwen Loan Servicing, to provide

$2 billion in first-lien principal reduction to underwater borrowers to compensate for years of

systemic misconduct at every stage of the mortgage-servicing process. The consent order also

covered two companies previously purchased by Ocwen, Litton and Homeward Residential

Holdings LLC (previously known as American Home Mortgage Servicing, Inc.). These entities

served as master servicer or servicer to some of the trusts. *See*

http://www.consumerfinance.gov/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-

billion-in-relief-to-homeowners-for-servicing-wrongs/.

482.    According to the complaint, Ocwen violated state law in several ways, including

failing to timely and accurately apply payments made by borrowers and failing to maintain

accurate account statements; charging borrowers unauthorized fees for default-related services;

and providing false or misleading information in response to consumer complaints.

483.    According to Bloomberg, the Texas Attorney General has stated that American

Home falsely claimed that borrowers did not make payments so as to justify late fees and also

refused to accept payments, forcing the borrower to incur late charges. *See* David McLaughlin,

*Wilbur Ross's American Home Mortgage Faces Servicing Lawsuits*, Bloomberg (Oct. 28, 2010),

*available at* http://www.bloomberg.com/news/2010-10-28/wilbur-ross-s-american-home-sued-

by-homeowner-texas-for-mortgage-practice.html.

484.    On February 18, 2014, *The New York Times* reported that "[s]hoddy paperwork,

erroneous fees and wrongful evictions—the same abuses that dogged the nation's largest banks

and led to [the National Mortgage Settlement]—are now cropping up among the specialty firms

[such as Ocwen], according to dozens of foreclosure lawsuits and interviews with borrowers, federal and state regulators and housing lawyers." Jessica Silver-Greenberg & Michael Corkery, *Loan Complaints by Homeowners Rise Once More*, N.Y. Times (Feb. 18, 2014), *available at* http://dealbook.nytimes.com/2014/02/18/loan-complaints-by-homeowners-rise-once-more/.

485.    In October 2012, Ocwen and Green Tree Servicing LLC ("Green Tree") won a joint bid in the United States Bankruptcy Court of the Southern District of New York for GMAC's mortgage servicing platform. GMAC was a common master servicer and servicer to the trusts.

486.    A May 2014 report on servicer mortgage practices found that Green Tree's servicing practices were inadequate in light of the 2012 National Mortgage Settlement's improved servicing standards requirements. Evan Weinberger, *$25B Mortgage Deal Monitor Says Banks Improved Practices*, Law360.com, May 14, 2014, *available at* http://www.law360.com/articles/537724/25b-mortgage-deal-monitor-says-banks-improved-practices.

487.    The report used twenty-nine metrics, including errors in foreclosure sales, adherence to late fee guidelines and pre-foreclosure initiation notifications, to determine whether national servicing standards have improved. Office of Mortgage Settlement Oversight, Compliance in Progress: A Report from the Monitor of the National Mortgage Settlement (May 14, 2014), *available at* https://www.jasmithmonitoring.com/omso/wp-content/uploads/sites/4/2014/05/compliance-report-interactive-.pdf.

488.    Green Tree's servicing of the GMAC servicing platform fell short of the requirements for eight of these metrics.  *Id.* at 9. The report ultimately concluded that Green Tree "has much implementation work to do."  *Id.* at 2.

489.    Saxon was another trust servicer. In April 2012, the Federal Reserve released a

Consent Order against Morgan Stanley to address patterns of misconduct and negligence in

residential mortgage loan servicing and foreclosure processing at Saxon. The consent order

required Morgan Stanley to retain an independent consultant to review Saxon's foreclosure

proceedings. *In re Morgan Stanley*, Consent Order, No. 12-015-B-HC (Apr. 2, 2012), *available

at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20120403a1.pdf.

490.    Option One has also been the subject of state and federal investigations. On June

3, 2008, the Massachusetts Attorney General filed an action against Option One, and its past and

present parent companies, for unfair and deceptive origination and servicing of mortgage loans.

Complaint, *Commonwealth v. H&R Block, Inc.*, No. 08-2474 (Mass. Super. Ct. June 3, 2008).

491.    On November 24, 2008, the Superior Court of Massachusetts granted a

preliminary injunction in the case, which prevented Option One from foreclosing on thousands

of loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, 2008 WL

5970550 (Mass. Super. Ct. Nov. 24, 2008).

492.    On October 29, 2009, the Appeals Court of Massachusetts affirmed the

preliminary injunction. *Commonwealth v. Option One Mortgage Co.*, 2009 WL 3460373 (Mass.

App. Ct. Oct. 29, 2009).

493.    Another servicer to the trusts, Fremont Investment and Loan, agreed to pay

Massachusetts $10 million to settle a lawsuit brought based on, among other things, Fremont's

misconduct in servicing loans. *Massachusetts v. Fremont Investment & Loan*, No. 07-4374-

BLS1 (June 9, 2009), *available at* http://www.mass.gov/ago/docs/press/2009/2009-06-09-

fremont-consent-judgment.pdf. Fremont collapsed and went into bankruptcy in 2008.

494.    Another original servicer, Greenpoint Mortgage Funding, Inc., was shuttered by

Capital One in 2007 amid escalating problems with its origination and servicing activities.

**C.    The Master Servicers and Servicers Defaulted on Their Duty to Notify the Trustee of Breaches of the Mortgage Loan Representations and Warranties**

495.    Under the governing agreements and prudent servicing standards, master servicers and servicers are generally required to notify the trustee, among others, upon discovery of a breach of representations and warranties with respect to a mortgage loan that materially and adversely affects the loan or the interests of the certificateholders in the loans.

496.    For example, the SAST 2007-2 PSA states:

> Upon discovery by any of the parties hereto of a breach of a representation or warranty made by the Seller in respect of the Mortgage Loans that (i) materially and adversely affects the interests of the Certificateholders in any such Mortgage Loan or (ii) is set forth in subsections (B) or (C) of Exhibit B to the Sales Agreement between the Depositor and SFM, the party discovering such breach shall give prompt notice thereof to the other parties.

PSA Section 2.3. The governing agreements for the other trusts similarly require such notification. *See* Exhibit F § V. The servicer is a party to the SAST 2007-2 PSA and thus required to provide notice of any breaches.

497.    The PSA Section 7.1 states:

> "Event of Default," wherever used herein, means any one of the following events: . . .
> (ii) [F]ailure by the Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in this Agreement, which failure materially affects the rights of Certificateholders, which failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Servicer by the Trustee. . . .

498.    In the course of their duties, the master servicer and servicers to the trusts became aware of the overwhelming and widespread problems with the underlying mortgage loans due to the shoddy origination and underwriting practices detailed above.

499.     Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. Because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers must have been put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the trustee or take action based on these breaches.

500.     In addition, in the course of fulfilling its duties to service the loans, and particularly when required to foreclose on certain mortgage loans when appropriate, the master servicers and servicers also became aware of breaches of representations and warranties but failed to notify the trustee.

501.     These breaches materially affected the mortgage loans and the interests of the certificateholders as the breaches made it far more likely that the loans would underperform.

502.     Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any covenants or agreements under the governing agreements, including the duty to notify the trustee of breaches of representations and warranties, after notice and lapse of time, constitutes an event of default.

**D.     Defendant Knew That the Trusts Suffered from Widespread Master Servicer and/or Servicer Defaults**

503.     Defendant, as trustee, knew of the servicing misconduct alleged, which has been the subject of high profile government investigations and private and public lawsuits. In the aftermath of the financial crisis, servicing abuse has also received widespread attention in the media. Thus, Defendant knew of the breaches, defaults, and events of default alleged herein.

504.     As described above, Defendant and its responsible officers should have carefully investigated the widespread breaches of representations and warranties reported in the media,

governmental investigations, private litigation and the servicing reports and monthly remittance reports and taken appropriate action.

505.    In 2010, the Federal Reserve, the OCC, the FDIC, and the Office of Thrift Supervision conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers.

506.    In April 2011, the investigating agencies issued a report titled "Interagency Review of Foreclosure Policies and Practices." The report found, among other things, that the servicers failed to evaluate "compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements." Based on the deficiencies identified in the report, the investigating agencies initiated enforcement actions against each of the servicers subject to the report. *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

507.    Ally/GMAC, Bank of America, Citibank, JP Morgan Chase, HSBC, OneWest, PNC, and Wells Fargo were all subjects of the investigation. These entities and their affiliates and acquired companies (including IndyMac, Countrywide and National City) acted as master servicer and servicer to the overwhelming majority of the trusts.

508.    Defendant knew of this investigation and the servicer events of default.

509.    In addition, in October 2010, Defendant sent a memorandum to the servicers of mortgage loans in RMBS trusts for which Defendant served as trustee. The memorandum specifically mentions media reports of servicer misconduct and demands notification from servicers regarding various problems.

510.    Thus, Defendant knew that servicers failed to implement proper quality control, audit and compliance standards and thus failed to adhere to the notification requirements in the

governing agreements.

511.   This failure by the master servicer and servicers to prudently service the loans, notify Defendant of defective loans, and other associated problems constituted events of default, yet rather than adhere to its statutory and contractual obligations upon such a default, Defendant ignored the master servicer and servicer misconduct.

512.   Defendant and its responsible officers also received servicing reports and monthly remittance reports that revealed widespread modifications, large losses and write-downs, and poor loan quality. Through these reports, Defendant, based on its roles in the RMBS, knew that there were widespread breaches of representations and warranties that the master servicers and servicers had discovered but failed to give the required notification.

513.   This failure by the master servicer and servicers to notify the Defendant of defective loans and other associated problems constituted an event of default, yet rather than adhere to its statutory and contractual obligations upon such a default, Defendant ignored the master servicer and servicer misconduct.

514.   Defendant breached the governing agreements, its duties, and applicable law after becoming aware of all of the foregoing breaches, defaults, and/or Events of Default by failing to do the following: provide notice of such breaches, defaults, and/or Events of Default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or Events of Default.

515.   Defendant failed to exercise the same skill and care as a prudent person would exercise in the same circumstances in enforcing its rights and powers under the governing agreements.

X.   **DEFENDANT FAILED TO ENSURE LOAN FILES WERE PROPERLY CONVEYED TO THE TRUSTS AND FAILED TO REMEDY ANY DEFECTS**

A.   **Defendant Failed to Take Possession of Complete Mortgage Loan Files**

516.   The governing agreements purported to transfer title to the mortgage loans to the trusts for the benefit of certificateholders. To ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed to the trusts, the governing agreements imposed upon Defendant, or its agents, a duty to ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying those mortgage loans for which the mortgage files were incomplete. *See* Exhibit F §§ II, III. The sponsors or depositors were required to substitute compliant loans for the loans with incomplete files or repurchase the loans. *See* Exhibit F § V, Defendant, however, systematically disregarded its contractual and fiduciary duties to enforce its rights on behalf of certificateholders to ensure that mortgage loans lacking complete mortgage files were removed from the mortgage pools underlying the Certificates. If Defendant had met its contractual, fiduciary, common law, and statutory duties with respect to the non-compliant loans, Plaintiffs would not have incurred their very significant losses attributable to the default of many of the defective loans. And if Plaintiffs had been aware of these Events of Default or defaults they would not have continued to invest in RMBS throughout 2005-2007.

517.   The governing agreements require that Defendant, or its agent, take physical possession of the mortgage files and that the note and mortgage are endorsed and assigned to Defendant. *See* Exhibit F §§ I, II. Under the governing agreements, Defendant was required to review each of the loan files and to certify that the documentation for each loan was accurate and complete. *See* Exhibit F § II, IV.

518.   Defendant had a duty, under the governing agreements, to review the mortgage

files and create an exception report identifying mortgage loans with incomplete mortgage files. Those loans had to be cured, repurchased, or substituted by the responsible parties. *Id*.

519.    Upon information and belief, Defendant accepted incomplete files without requiring the responsible parties to cure document defects or substitute or repurchase loans.

520.    Defendant's failure to take possession of the key mortgage loan documents, its failure to ensure proper review of the mortgage files for missing documents or irregularities, and its failure to demand correction of irregularities caused damage to Plaintiffs.

521.    A reasonably prudent trustee who had fulfilled its obligations would have noticed these failures in mortgage loan documentation. Upon information and belief, Defendant breached its statutory, common law, and contractual obligations by failing to identify these obvious defects and require correction by the responsible parties, and were negligent in failing to do so. Defendant also negligently misrepresented to Plaintiffs that it had done so when it had superior knowledge, a duty to inform, and Plaintiffs had no other way of discovering the truth.

522.    By certifying that it had received documentation that, upon information and belief, it had not received, Defendant breached its obligations to the detriment of certificateholders, including Plaintiffs.

523.    Defendant failed to act prudently or with due care when it failed to ensure proper review of the required documentation, prepared inaccurate certifications, failed to notify the responsible parties about missing required documentation, failed to require action to remedy the inadequate documentation, failed to properly supervise and review custodian conduct, and failed to notify certificateholders of the inadequate documentation and failure to repurchase, substitute, or cure.

524.    Defendant has failed to exercise due care and to act prudently throughout the life

of the trusts. Had Defendant met its contractual, common law, and statutory duties to require delivery of mortgage loan files, review the files, give notice, and issue fully accurate and complete certifications, loans with defective or incomplete files would have been cured, repurchased, or substituted. Because those loans were not cured, repurchased, or substituted, many went into default and caused losses to certificateholders.

525.     Certificateholders did not receive or have access to any loan or mortgage files that they could check to make certain that their contractual rights were being protected.  Rather, such investors were dependent upon Defendant to police the deal and protect their contractual and other legal rights.

526.     Defendant's failure to take physical possession of the key mortgage loan documents, and its failure to review the mortgage files for missing documents or irregularities and then assure that identified irregularities were corrected, was not a mere technicality, as explained by Georgetown Law School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010.  Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before S. Comm. on Banking, Housing, and Urban Affairs (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center).  Professor Levitin described the implications of the failure by a securitization trustee such as Defendant to take physical possession of the key documents in the loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever.  The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law.  If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.
> . . .
> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts.  This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee.

If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

. . .

If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgage-backed securities. In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate). Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors.

### B.    Defendant Knew That the Loan Files Were Incomplete

527.    That the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the originator to Defendant, or there was no duly executed assignment of the mortgage to Defendant, or the original lender's title policy was missing would have been obvious to a reasonably competent trustee performing its contractual duties with due care.

528.    Numerous reports, litigation, and investigations have revealed the widespread misconduct of servicers to the trusts at issue here to cover-up the systemic failure of depositors and sponsors to properly assign the underlying mortgage loans to issuing trusts, including through the use of robo-signers. *See, e.g.*, Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm; Wall Street and the Financial Crisis: Anatomy of a Financial Collapse (2011), *available at* http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attempt=2; *In re Citibank, N.A.*, Consent Order, No. AA-EC-11-13 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47c.pdf; *In re Ally Fin. Inc., Ally Bank & GMAC Mortgage, LLC*, Consent Order, No. 11-20-B-HC, No. 11-020-B-DEO

(Apr. 13, 2011), *available at*

http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a3.pdf; *In re HSBC*

*Bank USA, N.A.*, Consent Order, No. AA-EC-11-14 (Apr. 13, 2011), *available at*

http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47d.pdf; *In re OneWest*

*Bank, FSB*, Consent Order, No. WN-11-011 (Apr. 13 2011), *available at*

http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf; *In re JPMorgan Chase Bank*,

Consent Order, No. AA-EC-11-15, (Apr. 13, 2011), *available at* http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47e.pdf; *In re PNC Bank, N.A.*, Consent Order, No.

AA-EC-11-17 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-

releases/2011/nr-occ-2011-47i.pdf; *In re Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19

(Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-

2011-47k.pdf.

### C.  The Document Delivery Failures Were Events of Default

529.     Events of Default occurred shortly after the final exception reports were delivered

for each of the trusts under multiple provisions of the governing agreements.

530.     First, many of the governing agreements provide that that an Event of Default

occurs if the depositor fails to perform its obligations under the governing agreements and such

breach is not remedied within a specified number of days of notice of the breach. *See*  Exhibit F

§§ VII. The depositor had an obligation to deliver complete mortgage loan files but failed to do

so. For each trust, notice of the depositor's breach was provided by the trustee, or custodian

acting on the trustee's behalf, when it delivered the final certification and exception report.

Within a period of time after such notice, the breaches ripened into Events of Default and the

Defendant had a duty to exercise due care to protect certificateholders' interests. *See*  Exhibit F

§§ V, VI. Defendant should have caused the responsible parties to repurchase the affected loans and reviewed defaulted loans to determine whether they should be put-back to the responsible party.

531.     Second, all of the governing agreements require that the servicer's or master servicer's failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period of notice by Defendant of such breach. *See* Exhibit F § VIII. When borrowers defaulted and the servicers or master servicers were required to commence foreclosures they allegedly fabricated the documents necessary to foreclose rather than cause the sponsor, depositor, or originator to repurchase or substitute the affected loan. Defendant was aware of this fact as they were aware of the contents of the document exception reports and that properties with exceptions had defaulted and not repurchased or substitute.  However, Defendant did not provide notice as it was required to do. Having failed to provide the required notice, Defendant had an obligation to act prudently to address all defaults.

532.     Despite the existence of uncured Events of Default, Defendant did not adequately address the defaults and Events of Default. If Defendant had exercised due care, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the responsible parties and caused them to repurchase or substitute the affected loans. Defendant's failure to do so damaged Plaintiffs.

533.     If Defendant had performed its duties as trustees, it would have enforced the obligations of the responsible parties and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses. And if Defendant had enforced these repurchase or substitution obligations, as they were required to do, the Certificates would have been more valuable.

534.    If Defendant had met its contractual, common law, statutory, and fiduciary duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required, and issue accurate certifications, it would have caused the responsible parties to substitute or repurchase all loans where the master servicers, servicers, sponsors, depositors, and originators failed to deliver required documentation to the Defendant or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default.

535.    Defendant did not exercise due care when it learned of defaults and Events of Default. When Defendant provided its final exception reports to the sponsors, depositors, and master servicers (or servicers) indicating that mortgage files were missing required documents, it should have acted to require the responsible parties to repurchase or replace the non-compliant loans. At a minimum, Defendant should have notified certificateholders that the mortgage files were incomplete and the responsible parties did not repurchase or substitute the loans. Such failure to notify constituted negligent misrepresentation because Defendant had unique and special knowledge where Plaintiffs had no information and Defendant had a duty to notify Plaintiffs.

## XI.    DEFENDANT FAILED TO SATISFY ITS PRE-AND POST-DEFAULT DUTIES AND BREACHED THE GOVERNING AGREEMENTS

536.    As the trustee for the trusts, Defendant owes Plaintiffs and the other certificateholders certain contractual and fiduciary duties, and other common law obligations, as well as duties under the TIA and the Streit Act. Among these duties are those set forth in governing agreements, which were incorporated by reference into the certificates Defendant signed, and under applicable state and federal laws.

537.    Defendant breached its contractual, fiduciary, common law, and statutory duties

in at least four different ways.

538.     First, the governing agreements purported to transfer title to the mortgage loans to the trusts for the benefit of certificateholders. To ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed to Defendant, the governing agreements imposed on Defendant a duty to ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying those mortgage loans for which the mortgage files were incomplete. The responsible party was required to substitute the loans with incomplete files with compliant loans or repurchase the loans. Defendant, however, systematically disregarded its contractual and fiduciary duties to enforce its rights on behalf of certificateholders to ensure that mortgage loans lacking complete mortgage files were removed from the mortgage pools underlying the Certificates.

539.     Defendant breached its contractual and fiduciary duties under the governing agreements, its common law duties, and its obligation under the TIA and the Streit Act by failing to take physical possession of many of the operative documents for the mortgage loans in the trusts. If Defendant had met its contractual, fiduciary, and statutory duties with respect to the non-compliant loans, which now constitute the overwhelming majority of the defaulted loans, Plaintiffs would not have incurred their very significant losses.

540.     These breaches constituted defaults and Events of Default under the governing agreements, and all parties to the governing agreements (but not certificateholders) received notice of the defaults in the form of Defendant's document exception reports. Defendant was required to provide notice of these defaults to certificateholders, among others. It did not. If it had, the responsible parties would have been forced to repurchase or replace many of the loans that ultimately caused Plaintiffs' losses. And if Plaintiffs had been aware of these Events of

Default or defaults they would not have continued to invest in RMBS throughout 2005-2007.

541.     Defendant did not exercise due care or with good faith when it learned of defaults and Events of Default. When Defendant provided its final exception reports to the sponsors, depositors, and master servicers (or servicers) indicating that mortgage files were missing required documents, it should have acted to require the responsible party to repurchase or replace the non-compliant loans. At a minimum, Defendant should have notified certificateholders that the mortgage files were incomplete and the responsible party did not repurchase or substitute the loans.

542.     Defendant acted with gross negligence and negligence when it failed to ensure the proper documentation of the mortgage loans. Further, by not notifying certificateholders, Defendant negligently misrepresented the circumstances surrounding the trusts in a situation where it had unique and special knowledge that the Plaintiffs did not have.

543.     Second, Defendant is obligated to provide notice of defaults under the governing agreements. Defendant violated this requirement by failing to give notice of repeated breaches by the master servicers or servicers designated under the governing agreements or of systemic breaches by the sponsors, originators, or affiliates that served as the depositors. For example, the master servicers or servicers routinely failed to provide notice of the sponsors' or originators' numerous breaches of representation and warranty provisions in the governing agreements and loan purchase agreements that the mortgage loans had been underwritten in accordance with applicable underwriting guidelines. If adequate notice of such breaches had been provided, the responsible party would have been required to repurchase the mortgage loans that did not comply with the applicable underwriting guidelines and which ultimately caused Plaintiffs' losses.

544.     Defendant was aware of these Events of Default but failed to provide notice, and

to act with due care and good faith. Defendant also knowingly and negligently failed to act upon these Events of Default and negligently misrepresented these circumstances to Plaintiffs even though it had special and unique knowledge that Plaintiffs did not have.

545.    Third, when the Defendant performed servicing related functions with respect to the trusts, it had a duty to provide accurate certifications and remittance reports as required under the governing agreements and applicable federal law. Defendant negligently failed to do so. If it had accurately reported the facts regarding its knowledge of defective mortgage loans, the responsible party would have been forced to repurchase the non-compliant loans that have caused Plaintiffs losses. Accurate certifications also could have prevented subsequent mortgage loan securitizations from including large numbers of defective and non-compliant loans.

546.    Fourth, having notice of the master servicers' and servicers' numerous defaults and Events of Default under the governing agreements and breaches of representations and warranties by the responsible party, Defendant failed to exercise due care to ensure that certificateholders' interests were adequately protected. If Defendant had exercised due care and acted in good faith, it would have issued repurchase demands years ago and, if necessary, commenced repurchase litigation forcing the responsible party to repurchase defective loans.

547.    When Defendant learned that the master servicers or servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the governing agreements and that master servicers and servicers engaged in widespread misconduct constituting events of default under the governing agreements, Defendant should have (i) taken steps to require the responsible party to repurchase the loans; and (ii) notified certificateholders of the master servicers' or servicers' defaults and the breaches of representation and warranty provisions.

548.     Yet Defendant failed to give notice of defaults that occurred when the responsible party breached representation and warranty provisions providing that all loans met applicable loan origination guidelines. In reality, during the 2004–2007 time period, the responsible parties regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

549.     Defendant knew that the responsible parties regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before certificateholders.

550.     Many facts should have caused Defendant to conduct careful investigations into the trusts and take appropriate action, including the following: 1) the trusts' high default rates and poor performance; 2) breaches of representations and warranties made by the responsible parties; 3) servicer defaults and events of default; 4) incomplete transfer of the mortgage loans; and 5) the failure by sponsors, sellers, originators, issuers, and itself to fulfill the duties and obligations set forth in the governing agreements. Unlike certificateholders, Defendant had the ability under the governing agreements to carefully investigate these issues. Nonetheless, Defendant failed to perform its duties as trustee to provide notice of such failures and to protect the trusts and certificateholders.

551.     By at least 2009, Defendant, based on its access to public information as well as information unavailable to the public, know of the breaches of representations and warranties and had a duty to carefully investigate circumstances suggesting that the trusts routinely contained loans that materially breached the responsible parties' representations and warranties, which adversely affected the value of those mortgage loans and the trusts' and certificateholders' interests in those mortgage loans and take appropriate action to address those defaults

552.    Defendant also knew of failures on the part of the servicers to observe or perform in material respects its covenants or agreements in the governing agreements, including the servicers' and/or master servicers' failure to do the following: (i) give notice to the other parties of responsible party breaches of representations and warranties upon discovery thereof and enforce the responsible parties' repurchase obligations; and (ii) observe or perform the covenants or agreements contained in the governing documents. These breaches by the servicers constituted Events of Default as defined by the governing agreements. Defendant knew these servicers' breaches were material.

553.    Defendant breached its contractual, fiduciary and legal duties under governing agreements, the common law, and the TIA and the Streit Act by failing to do the following: (i) carefully and prudently investigate breaches involving the loans in the trusts committed to its care; (ii) notify certificateholders of breaches; and (iii) take appropriate action to enforce the responsible parties' repurchase of the defective mortgage loans.

554.    These defaults and/or Events of Default occurred and remained uncured for the requisite period. Thus, under the governing agreements, Defendant was obligated to exercise the rights and powers vested in it by the governing agreements, and to use the same care and skill as prudent persons would exercise or use under the circumstances in the conduct of their own affairs. A prudent person would have taken action to protect the trusts and certificateholders from the known responsible party breaches of representations and warranties by exercising all of its rights under the governing agreements to enforce the responsible parties' repurchase obligations, including conducting a timely, careful and prudent investigation to determine all of the materially breaching mortgage loans and suing the responsible parties for specific performance to compel their repurchase of those loans.

555.    A prudent person would have taken appropriate steps to ensure all mortgage loan documentation was completely and accurately transferred to the trusts.

556.    A prudent person also would have ensured that Defendant was receiving notification of breaches of representations and warranties from servicers and master servicers and enforced the responsible parties' obligations with respect to breaching mortgage loans.

557.    In addition to its statutory duty to exercise due care upon learning of a default, Defendant had a similar duty under the governing agreements to exercise due care upon an Event of Default. Events of Default occurred under each of the governing agreements, but Defendant failed to take the required actions to protect the rights of the trusts. Defendant was aware that the master servicers, servicers, depositors, and sponsors failed to provide notice of representation and warranty violations that occurred in the trusts and engaged in other misconduct in contravention of the governing agreements. Defendant, however, did not provide notice of such defaults as it was required to do. Because these defaults would have seasoned into Events of Default if notice had been provided, Defendant had the duty to act prudently to enforce repurchase provisions once it learned of such defaults.

558.    Events of Default occurred under each of the governing agreements, but Defendant failed to take the required actions to protect the trusts. Although certain Events of Default require formal notice and an opportunity to cure, the trustee cannot escape their duty of care by failing to provide the required notice. Defendant was aware that the master servicers, servicers, depositors, sponsors, and the trustees themselves, failed to provide notice of the responsible parties' representation and warranty violations. Defendant, however, did not provide notice of such defaults as it was required to do. Because these defaults would have seasoned into Events of Default if notice had been provided, the Defendant had the duty to act prudently to

enforce repurchase provisions once it learned of such defaults.

559.    Despite the existence of uncured Events of Default, Defendant did not adequately address the defaults and Events of Default. If Defendant had exercised due care, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the responsible parties and caused them to repurchase or substitute the affected loans.  Defendant's failure to do so damaged Plaintiffs.

560.    If Defendant had performed its duties as trustee, it would have enforced the obligations of the responsible parties and caused them to buy back, or replace with non-defective loans, the loans that ultimately defaulted and caused Plaintiffs' losses. And if Defendant had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have been more valuable.

561.    If Defendant had met its contractual, statutory, and fiduciary duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required, and issue accurate certifications, it would have caused the responsible party to substitute or repurchase all loans where the servicers, sponsors, depositors, and originators failed to deliver required documentation to the trustee or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default.

562.    Defendant's failure to meet its contractual and fiduciary duties and duties under the TIA, the Streit Act, and the common law once it became aware of defaults relating to the numerous representation and warranty breaches by the responsible parties further caused harm. If Defendant had provided notice of defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the responsible parties to

repurchase loans as they were required to do and would have taken action against master servicers and servicers for misconduct.

563. Defendant and its responsible officers knew of the responsible parties breaches of representations and warranties and also knew of the numerous defaults and Events of Default. Defendant was aware (or would have been aware if it had carried out its duties) of these problems.

564. Defendant had an obligation under the law and the governing agreements to provide notice regarding defaults and Events of Default.

565. Defendant further had a duty to impart correct and accurate information to certificateholders. Because of its status as trustee, Defendant had special knowledge about the accuracy of the certifications, the breaches of representations and warranties, and the servicer misconduct. Defendant negligently breached its duties to Plaintiffs in its conduct and negligently misrepresented information to Plaintiffs.

566. Plaintiffs did not have the knowledge that the Defendant had and could not obtain that information. Plaintiffs were thus dependent on Defendant to accurately impart information and conduct itself in accordance with its fiduciary and contractual duties and other common law and statutory duties.

567. Defendant further had a duty to act with due care, in good faith, and with undivided loyalty, all of which it breached by failing to protect the trusts and certificateholders and failing to take action against the responsible parties. Every trustee—including Defendant— has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors. This duty is non-waivable and arises independently of the governing agreements. Every trustee also has a non-waivable duty to exercise due care in the performance of ministerial

acts required to be undertaken in the course of the administration of the trust. Under the common law, Defendant can not contract around all responsibility for its negligence and failure to act.

568.    Further, in contravention of its statutory, contractual, and common law duties, Defendant failed to adequately protect the trusts before and after certain trust sponsors and originators filed for bankruptcy or otherwise became insolvent. Defendant failed to adequately and comprehensively pursue relief against relevant parties and failed to provide adequate notice of relevant defaults and "events of default."

569.    Defendant also breached its contractual, statutory, and common law duties by failing to properly oversee repurchase litigation initiated by monoline insurers. In particular, Defendant failed to ensure that the interests of the trusts and certificateholders were adequately protected and failed to ensure that recoveries adequately benefited the trusts as a whole. Defendant also failed to utilize those suits and the associated reunderwriting results, tolling agreements, and repurchase demands to protect the trusts and certificateholders.

570.    Defendant was guilty of acting with negligence, gross negligence, and willful misconduct in failing to adhere to its contractual, fiduciary, common law, and statutory obligations. Defendant negligently, and with willful misconduct, disregarded its duties to protect the trusts and the certificateholders and its duty to provide accurate information to Plaintiffs.

571.    Defendant's breaches of its contractual, statutory, and fiduciary duties has caused Plaintiffs immense damages.

572.    Many, if not all of, the repurchase or substitution claims described above may have lapsed due to Defendant's inaction.

## XII.   THE "NO ACTION" CLAUSES DO NOT APPLY

573.    The "no action" clauses in the governing agreements do not apply to this lawsuit because the claims are brought against Defendant as trustee, not against a third party. The PSAs expressly permit suits against the trustee, stating that no provision of the agreements "shall be construed to relieve the trustee . . . from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct."

574.    Additionally, under the TIA and New York law, "no action" clauses do not apply to an action against the trustee, as here, for its own wrongdoing. Defendant is not being asked to sue as trustee to enforce rights and obligations under the governing agreements. Rather, this action asserts claims against Defendant for breaching its statutory and contractual obligations.

575.    Because this is not an action, suit or proceeding that Defendant is capable of bringing in its own name as trustee under the governing agreements, the "no action" clauses do not apply.

576.    Compliance with the "no action" clauses' pre-suit requirements also would have been futile. The no action clauses (if they applied) would require Plaintiffs to demand that Defendant initiate proceedings against itself and to indemnify Defendant for its own liability to the trusts, an absurd result that the parties did not intend. *See Cruden v. Bank of New York*, 957 F. 2d 961, 968 (2d Cir. 1992).

## XII.   CLAIMS FOR RELIEF

### <u>COUNT ONE – BREACH OF CONTRACT</u>

577.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

578.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to

recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 02660YAN2 in Trust AHM 2006-2, CUSIP 026935AD8 in Trust AHMA 2007-3, CUSIP 040104PY1 in Trust ARSI 2005-W4, CUSIP 41161PXB4 in Trust HVMLT 2005-14, CUSIP 45257BAE0 in Trust IMSA 2006-4, CUSIP 45667SAP2 in Trust INDX 2006-AR35, CUSIP 45661FAC5 in Trust INDYL 2006-L2, and CUSIP 61744CWJ1 in Trust MSAC 2005-HE7.

579.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of and for the benefit of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust; NCUA 2010-R2 Trust; NCUA 2010-R3 Trust; NCUA 2011-R1 Trust; NCUA 2011-R2 Trust; NCUA 2011-R3 Trust; NCUA 2011-R4 Trust; NCUA 2011-R5 Trust; NCUA 2011-R6 Trust; and NCUA 2011-M1 Trust.

580.    The PSAs are valid and binding contracts entered into between Defendant, each trust, the sponsors, the master servicers, the servicers, and depositors.

581.    The PSAs provide, among other things, the terms under which Defendant acts as trustee for the trusts.

582.    As current holders of certificates issued by each trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee.

583.    Defendant breached several obligations that it undertook on behalf of Plaintiffs as certificateholder including, without limitation, to:

> (a)    take physical possession of the operative documents for the mortgage loans in the trusts;

(b)     identify all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports;

(c)     make accurate representations in final certifications and exception reports;

(d)     render accurate reports under Regulation AB;

(e)     protect the interests of the beneficiaries of the trusts;

(f)     take steps to cause the responsible party to repurchase loans lacking adequate documentation;

(g)     investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the responsible parties' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(h)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.01 of the PSAs, or similar sections, relating to repeated failures by the master servicer or servicer to require the repurchase or substitution of mortgage loans by the responsible party (1) under Section 2.03, or similar sections, where such loans breached representations and warranties, and (2) under Sections 2.01 and 2.02, or similar sections, where such loans were lacking proper documentation;

(i)     enforce the repurchase obligations of the responsible party.

584.    The specific provisions breached by Defendant are further detailed herein and in the Exhibits hereto.[9]

585.    Defendant's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their certificates and diminished their value.

586.    Plaintiffs have performed their obligations under the PSAs.

587.    Defendant is liable to Plaintiffs for the losses they suffered as a direct result of Defendant's failure to perform its contractual obligations under the PSAs.

---

[9] Full copies of each of the PSAs are publically available on the SEC EDGAR website. Due to the amount and length of the agreements, only the relevant portions have been attached hereto. Plaintiffs incorporate the full PSAs and governing agreement herein by reference.

## COUNT TWO – BREACH OF FIDUCIARY DUTY

588.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

589.     NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 02660YAN2 in Trust AHM 2006-2, CUSIP 026935AD8 in Trust AHMA 2007-3, CUSIP 040104PY1 in Trust ARSI 2005-W4, CUSIP 41161PXB4 in Trust HVMLT 2005-14, CUSIP 45257BAE0 in Trust IMSA 2006-4, CUSIP 45667SAP2 in Trust INDX 2006-AR35, CUSIP 45661FAC5 in Trust INDYL 2006-L2, and CUSIP 61744CWJ1 in Trust MSAC 2005-HE7.

590.     NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of and for the benefit of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

591.     As set forth in detail above, Defendant owed certificateholders, including Plaintiffs, a fiduciary duty to act in good faith, and with due care and undivided loyalty when

performing the obligations set forth in the PSAs, and to exercise all powers under the PSAs

prudently once an Event of Default occurred or payments to Certificateholders became impaired.

These obligations included, without limitation, duties to:

> (a)  take physical possession of the operative documents for the mortgage loans in the trusts;

> (b)  identify all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports;

> (c)  make accurate representations in the final certifications and exceptions reports;

> (d)  render accurate reports under Regulation AB;

> (e)  protect the interests of the beneficiaries of the trusts;

> (f)  take steps to cause the responsible party to repurchase loans lacking adequate documentation;

> (g)  investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the responsible parties' widespread practice of including in securitization trusts loans which breached such representations and warranties;

> (h)  make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.01 of the PSAs, or similar sections, relating to repeated failures by the master servicer or servicer to require the repurchase or substitution of mortgage loans by responsible parties (1) under Section 2.03, or similar sections, where such loans breached representations and warranties, and (2) under Sections 2.01 and 2.02, or similar sections, where such loans were lacking proper documentation;

> (i)  enforce the repurchase obligations of the responsible party.

592.   As set forth in detail above, Defendant breached its fiduciary obligations by

failing to perform these obligations and by failing to exercise due care and avoid conflicts of

interest.

593.   The violations by Defendant of its fiduciary obligations impaired

certificateholders' ability to fully collect the principal and interest due on their certificates and caused losses in the value of Plaintiffs' certificates.

### COUNT THREE – NEGLIGENCE AND GROSS NEGLIGENCE

594.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

595.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 02660YAN2 in Trust AHM 2006-2, CUSIP 026935AD8 in Trust AHMA 2007-3, CUSIP 040104PY1 in Trust ARSI 2005-W4, CUSIP 41161PXB4 in Trust HVMLT 2005-14, CUSIP 45257BAE0 in Trust IMSA 2006-4, CUSIP 45667SAP2 in Trust INDX 2006-AR35, CUSIP 45661FAC5 in Trust INDYL 2006-L2, and CUSIP 61744CWJ1 in Trust MSAC 2005-HE7.

596.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of and for the benefit of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

597.     As set forth in detail above, Defendant owed the certificateholders, including

Plaintiffs, duties under the PSAs and as trustee for trusts to act in good faith, with undivided

loyalty, and with due care when performing its contractual obligations under the PSAs. As

described above, Defendant performed or failed to perform its responsibilities in a grossly

inadequate and negligent manner. Defendant participated in willful misconduct in its

administration of the trusts.

598.     Defendant's negligence and gross negligence impaired certificateholders' ability

to fully collect the principal and interest due on their certificates and caused losses in the value of

Plaintiffs' certificates.

## COUNT FOUR – NEGLIGENT MISREPRESENTATION

599.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding

paragraphs above as if fully set forth herein.

600.     NCUA Board, as liquidating agent for each of the CCUs, brings this count to

recover damages arising at any time related to the following RMBS that were not re-securitized

in the NGN Program: CUSIP 02660YAN2 in Trust AHM 2006-2, CUSIP 026935AD8 in Trust

AHMA 2007-3, CUSIP 040104PY1 in Trust ARSI 2005-W4, CUSIP 41161PXB4 in Trust

HVMLT 2005-14, CUSIP 45257BAE0 in Trust IMSA 2006-4, CUSIP 45667SAP2 in Trust

INDX 2006-AR35, CUSIP 45661FAC5 in Trust INDYL 2006-L2, and CUSIP 61744CWJ1 in

Trust MSAC 2005-HE7.

601.     NCUA Board, as liquidating agent for each of the CCUs, and as holder of the

NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements,

acting on behalf of and for the benefit of the NGN Trusts, brings this count to recover damages

on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after

October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010;

NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust

for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or

after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011;

NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for

claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after

May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

602.    This is a claim for negligent misrepresentation against Defendant. As Defendant

served in its capacity as trustee for thousands of trusts sponsored by the sponsors or including

loans originated by the originators from 2004–2007, it had unique and special knowledge about

the mortgage loans in the trusts and the mortgage files for those loans. In particular, Defendant

had unique and special knowledge regarding: (i) whether the master servicer or servicers had

failed to perform its duties under the PSA; (ii) whether the operative documents for the mortgage

loans had been transferred to the trustee, and the trusts' interests perfected, for the benefit of

certificateholders in the trusts; (iii) whether the mortgage files contained missing, defective, or

incomplete information; (iv) whether the improperly documented loans were identified on the

final exception report and whether the irregularities remained uncorrected; and (v) whether the

statements in the various certifications provided by Defendant and described herein were

accurate.

603.    Because Plaintiffs could not evaluate the mortgage files for the mortgage loans

underlying the certificates and because Plaintiffs could not examine whether those files

contained complete and accurate documentation for the mortgage loans, they were heavily reliant

on Defendant's unique and special knowledge regarding the mortgage loans and the mortgage

files when determining whether or not to make each investment in the certificates, and whether or not to demand that Defendant exercise its powers under the PSAs to require the other parties to the PSAs to satisfy their obligations, including to repurchase or substitute the defective loans. Plaintiffs were entirely reliant on Defendant to provide accurate information regarding the loans and mortgage files with respect to these matters.

604.    Plaintiffs necessarily relied on Defendant's unique and special knowledge regarding the mortgage loans and mortgage files for those loans in the trusts. Defendant's status as the trustee for the trusts, coupled with its unique and special knowledge about the underlying loans and the mortgage files, created a special relationship of trust, confidence, and dependence between Defendant and Plaintiffs.

605.    Defendant, in the exercise of due care, should have been aware that Plaintiffs relied on its unique and special expertise and experience and depended upon Defendant for accurate and truthful information. Defendant also knew that the facts regarding the mortgage loans and the mortgage files were exclusively within its knowledge.

606.    Based on its expertise, superior knowledge, and relationship with Plaintiffs, Defendant owed a duty to Plaintiffs to provide complete, accurate, and timely information regarding the mortgage loans and mortgage files for the certificates. Defendant negligently breached its duty to provide such information to Plaintiffs.

607.    Defendant's negligent misrepresentations impaired certificateholders' ability to fully collect the principal and interest due on their certificates and caused losses in the value of Plaintiffs' certificates.

## COUNT FIVE – BREACH OF THE COVENANT OF GOOD FAITH

608.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

609.     NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 02660YAN2 in Trust AHM 2006-2, CUSIP 026935AD8 in Trust AHMA 2007-3, CUSIP 040104PY1 in Trust ARSI 2005-W4, CUSIP 41161PXB4 in Trust HVMLT 2005-14, CUSIP 45257BAE0 in Trust IMSA 2006-4, CUSIP 45667SAP2 in Trust INDX 2006-AR35, CUSIP 45661FAC5 in Trust INDYL 2006-L2, and CUSIP 61744CWJ1 in Trust MSAC 2005-HE7.

610.     NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of and for the benefit of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

611.     As all relevant times, Defendant owed Plaintiffs, as express, intended third party beneficiaries under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that

required Defendant to ensure that it did not, by act or omission, injure the rights of the Plaintiffs

to receive the benefits and protections provided for under the PSAs.

612.    By the conduct described above, Defendant breached its duty of good faith and

fair dealing under the PSAs.

613.    Defendant's breaches are material.

614.    As a result of these breaches, Plaintiffs have suffered damages and will continue

to suffer damages in an amount to be proven at trial.

## COUNT SIX – VIOLATION OF THE STREIT ACT

615.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding

paragraphs as if fully set forth herein.

616.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to

recover damages arising at any time related to: CUSIP 02660YAN2 in Trust AHM 2006-2,

CUSIP 026935AD8 in Trust AHMA 2007-3, CUSIP 040104PY1 in Trust ARSI 2005-W4,

CUSIP 41161PXB4 in Trust HVMLT 2005-14, CUSIP 45257BAE0 in Trust IMSA 2006-4,

CUSIP 45667SAP2 in Trust INDX 2006-AR35, CUSIP 45661FAC5 in Trust INDYL 2006-L2,

and CUSIP 61744CWJ1 in Trust MSAC 2005-HE7.

617.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the

NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements,

acting on behalf of the NGN Trusts, brings this count to recover damages on behalf of and for

the benefit of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after

October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010;

NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust

for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or

after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011;

NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for

claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after

May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

618.    The Streit Act was enacted to provide for the proper administration of mortgage

trusts and requires that the trustee exercise due care in performing its obligations. N.Y. Real

Prop. Law § 124.

619.    Plaintiffs, as certificateholders and beneficiaries of the trusts were entitled to the

protections afforded under the Streit Act.

620.    The certificates are "mortgage investments" subject to the Streit Act. N.Y. Real

Prop. Law § 125(1).

621.    The PSAs that established the trusts are "indentures," and Defendant is a "trustee"

under the Streit Act. N.Y. Real Prop. Law § 125(3).

622.    As described above, Defendant violated the Streit Act by failing to discharge its

pre-default duties.

623.    Following an event of default, the Streit Act provides that the trustee must

exercise the same degree of skill and care in the performance of its duties as a prudent man

would under the same circumstances. N.Y. Real Prop. Law § 126(1).

624.    In addition, Section 124 of the Streit Act imposes a duty upon the trustee to

discharge its duties under the applicable indenture with due care in order to ensure the orderly

administration of the trust and protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124.

625.    As set forth above, Defendant failed to exercise its rights under the PSAs after

becoming aware of numerous defaults, failed to carefully review the mortgage files, failed to

identify and rectify defaults by other parties, failed to notify certificateholders and other parties

of deficiencies, failed to take steps to address those deficiencies, and, most importantly, failed to

protect the best interests of certificateholders particularly through the enforcement of the

repurchase, cure, or substitution of defective loans.

626.     Defendant is liable to Plaintiffs for damages incurred as a result of its violations

of the Streit Act in an amount to be determined at trial.

### COUNT SEVEN – VIOLATION OF THE TRUST INDENTURE ACT OF 1939

627.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding

paragraphs as if fully set forth herein.

628.     NCUA Board, as liquidating agent for each of the CCUs, brings this count to

recover damages arising at any time related to the following RMBS that were not re-securitized

in the NGN Program: CUSIP 02660YAN2 in Trust AHM 2006-2, CUSIP 026935AD8 in Trust

AHMA 2007-3, CUSIP 040104PY1 in Trust ARSI 2005-W4, CUSIP 41161PXB4 in Trust

HVMLT 2005-14, CUSIP 45257BAE0 in Trust IMSA 2006-4, CUSIP 45667SAP2 in Trust

INDX 2006-AR35, CUSIP 45661FAC5 in Trust INDYL 2006-L2, and CUSIP 61744CWJ1 in

Trust MSAC 2005-HE7.

629.     NCUA Board, as liquidating agent for each of the CCUs, brings this count to

recover damages related to: any CUSIP resecuritized in NCUA 2010-R1 Trust for claims arising

prior to October 27, 2010; any CUSIP resecuritized in NCUA 2010-R2 Trust for claims arising

prior to November 17, 2010; any CUSIP resecuritized in NCUA 2010-R3 Trust for claims

arising prior to December 9, 2010; any CUSIP resecuritized in NCUA 2011-R1 Trust for claims

arising prior to January 27, 2011; any CUSIP resecuritized in NCUA 2011-R2 Trust for claims

arising prior to February 11, 2011; any CUSIP resecuritized in NCUA 2011-R3 Trust for claims

arising prior to March 1, 2011; any CUSIP resecuritized in NCUA 2011-R4 Trust for claims arising prior to March 31, 2011; any CUSIP resecuritized in NCUA 2011-R5 Trust for claims arising prior to April 14, 2011; any CUSIP resecuritized in NCUA 2011-R6 Trust for claims arising prior to May 5, 2011; and any CUSIP resecuritized in NCUA 2011-M1 Trust for claims arising prior to June 16, 2011.

630.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture Agreements, acting on behalf of and for the benefit of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

631.    Congress enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.

632.    Each of the PSAs is an "indenture," and Defendant is an "indenture trustee," within the meaning of the TIA. 15 U.S.C. § 77ccc(7), (10). As noted above, each of the PSAs and indentures is substantially similar and imposes substantially the same duties on Defendant in its capacity as trustee. Moreover, the TIA applies to and is deemed to be incorporated into each

of the PSAs and the related trusts. 15 U.S.C. § 77ddd(a)(1).

633.    Defendant violated the TIA in at least four ways. First, TIA Section 315(a) provides that, prior to default (as that term is defined in the indenture), the trustee is liable for any duties specifically set out in the indenture. 15 U.S.C. § 77ooo(a)(1). As set forth above, Defendant failed to comply with a number of duties set out in the indentures, including its duty to carefully review the mortgage files, to notify certificateholders and other parties of deficiencies, to take steps to address those deficiencies, and, most importantly, to enforce the substitution or repurchase of defective loans.

634.    Second, TIA Section 315(b) provides that the indenture trustee notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). As set forth above, Defendant failed to carefully investigate serious known issues with the loans in the trust, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

635.    Third, in case of default (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c). Here, as set forth above, Defendant did nothing after learning of numerous serious issues related to material breaches of representations and warranties and servicer defaults and events of default. A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans. In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute

and deliver mortgage file documents.

636.    Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b). Defendant has impaired the ability of the trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which Defendant failed to take action to correct. In addition, Defendant has impaired the ability of the trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

637.    These breaches materially and adversely affected the interests of the certificateholders because they resulted in the trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties and originators.

638.    Defendant is liable to Plaintiffs for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    An award of all appropriate damages and/or equitable relief in favor of Plaintiffs against Defendant for breaches of its common law and statutory duties in an amount to be determined at trial, including any applicable pre- or post-judgment interest thereon;

B.    Awarding Plaintiffs all reasonable costs and expenses incurred in this action, including attorney's fees, expert fees, and any other properly taxable costs and expenses; and

C.    Any other relief that the Court deems just and proper.

## XIV.  JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues properly triable.

Dated: March 5, 2015

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal
Credit Union, Members United Corporate
Federal Credit Union, Southwest Corporate
Federal Credit Union, and Constitution
Corporate Federal Credit Union, and on behalf
of and for the benefit of the NGN Trusts (as
defined above)

By:    George A. Zelcs
George A. Zelcs
John A. Libra
Max C. Gibbons
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
mgibbons@koreintillery.com
mdavies@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

David C. Frederick
Wan J. Kim
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dfrederick@khhte.com
wkim@khhte.com
grapawy@khhte.com

*Attorneys for the National Credit Union
Administration Board*

David H. Wollmuth
William A. Maher
Steven S. Fitzgerald
Ryan A. Kane
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com

*Attorneys for the National Credit Union
Administration Board*

Of Counsel:
Michael J. McKenna, General Counsel
John K. Ianno, Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314
johni@ncua.gov
mikem@ncua.gov