# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal Credit Union,
Members United Corporate Federal Credit Union,
Southwest Corporate Federal Credit Union, and
Constitution Corporate Federal Credit Union,

and

GRAEME W. BUSH, as Separate Trustee of NCUA
GUARANTEED NOTES TRUST 2010-R1, NCUA
GUARANTEED NOTES TRUST 2010-R2, NCUA
GUARANTEED NOTES TRUST 2010-R3, NCUA
GUARANTEED NOTES TRUST 2011-R1, NCUA
GUARANTEED NOTES TRUST 2011-R2, NCUA
GUARANTEED NOTES TRUST 2011-M1,

                              Plaintiffs,

              -against-

DEUTSCHE BANK NATIONAL TRUST CO.,

                              Defendant.

---------------------------------------------------------x

Case No. 14-cv-8919

Hon. Sidney H. Stein

**[Proposed] SECOND
AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

TABLE OF CONTENTS

I.     NATURE OF THE ACTION ...................................................................................... 1

II.    PARTIES ................................................................................................................... 6

       A.    Plaintiff NCUA Board as Liquidating Agent ................................................ 6

       B.    Plaintiff Separate Trustee .......................................................................... 10

       C.    Defendant .................................................................................................... 15

III.   JURISDICTION AND VENUE ............................................................................. 16

IV.    THE TRUSTS ........................................................................................................ 17

V.     DUTIES OF THE TRUSTEE UNDER THE CONTRACTS AND
       COMMON LAW ................................................................................................... 18

       A.    RMBS Trusts .............................................................................................. 18

             Figure 1 ...................................................................................................... 19

       B.    The Trustees' General Duties ..................................................................... 21

       C.    The Trustees' Duties Under the Pooling and Servicing
             Agreements ................................................................................................. 22

       D.    Duty Properly to Review the Mortgage Loans Conveyed to the
             Trust ............................................................................................................ 23

       E.    Duty to Provide Notice of Incomplete or Defective Mortgage
             Files and Enforce Repurchase Rights with Respect to Mortgage
             Files that Cannot be Cured ......................................................................... 26

       F.    Duty to Provide Notice of Document Defects and
             Representation and Warranty Breaches and to Enforce
             Repurchase Rights with Respect to Defective and Breaching
             Loans ........................................................................................................... 27

       G.    Duties under the Loan Transfer Agreements .............................................. 29

       H.    Duties Regarding the Servicers ................................................................... 31

       I.    The Trustee's Duties upon Knowledge of an Event of Default ................... 32

J. The Trustee's Duties and Obligations under the Common Law ............................ 33

**VI. DEFENDANT FAILED TO PROVIDE NOTICE OF AND ENFORCE REMEDIES RELATED TO MORTGAGE FILE DOCUMENT DEFECTS** ................................................................................................. 33

A. Defendant Failed to Provide Notice and Enforce Remedies Related to Incomplete of Defective Mortgage Loan Files ..................................... 33

B. Defendant Discovered or Knew the Mortgage Loan Files Were Incomplete ................................................................................................. 35

**VII. DEFENDANT DISCOVERED OR RECEIVED NOTICE THAT THE TRUSTS SUFFERED FROM WIDESPREAD BREACHES OF REPRESENTATIONS AND WARRANTIES AND SHOULD HAVE TAKEN APPROPRIATE ACTION** ............................................................ 37

A. General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards ..................................... 39

B. Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices ..................... 44

1. American Home ........................................................................... 45

2. Accredited Home Lenders, Inc. ................................................... 47

3. Ameriquest/Argent ...................................................................... 49

4. Countrywide ................................................................................ 56

5. Decision One ............................................................................... 63

6. First Franklin .............................................................................. 63

7. Fremont ....................................................................................... 68

8. GreenPoint ................................................................................... 71

9. Impac .......................................................................................... 75

10. IndyMac ...................................................................................... 77

11. Morgan Stanley Mortgage Capital .............................................. 82

12. National City ............................................................................... 86

13. New Century ...................................................................................88

14. Option One.....................................................................................97

15. Paul Financial..............................................................................101

16. Residential Funding .....................................................................103

17. RBS/Greenwich Capital................................................................105

18. Wells Fargo .................................................................................107

19. WMC Mortgage Corp....................................................................111

C. A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards ................................................115

1. The Trusts Suffered from High Delinquency and Default Rates....................................................................................115

2. The Trusts Suffered Huge Losses ..........................................117

D. The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines..........................117

E. Additional Evidence Shows That Defendant Knew of Systemic Problems That Necessarily Would Result in Breaching and Defective Loans in the Trusts ..............................................................118

1. Defendant's Affiliates Have Been Sued on Claims of Systematic, Widespread Shoddy Origination and Securitization Practices..........................................................118

2. Defendant Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers.......................................122

3. Global RMBS Repurchase Investigations and Settlements Alerted Defendant to Systematic, Widespread Breaches of Representations and Warranties .............................................................................123

4. Defendant Has Been Involved in Repurchase Litigation Against Many Warrantors.......................................................125

VIII. DEFENDANT FAILED TO ACT PRUDENTLY FOLLOWING EVENTS OF DEFAULT ...............................................................................127

A.      Defendant Breached the Governing Agreements and Its
        Common Law Obligations By Failing to Fulfill Its Duties After
        Defaults and Events of Default .......................................................................127

B.      Specific Servicer Misconduct .........................................................................130

C.      The Master Servicers and Servicers Defaulted on Their Duty to
        Notify the Trustee of Breaches of the Mortgage Loan
        Representations and Warranties ......................................................................140

D.      Defendant Knew That the Trusts Suffered from Widespread
        Master Servicer and/or Servicer Defaults ......................................................142

IX.   DEFENDANT HAD CONFLICTS OF INTEREST .................................................144

X.    THE "NO ACTION" CLAUSES DO NOT APPLY ................................................147

XI.   DEFENDANT IMPERMISSIBLY HAS SEIZED, AND WILL
      CONTINUE TO SEIZE CERTIFICATEHOLDERS' TRUST FUNDS
      TO DEFEND AGAINST SUITS BY TRUST-BENEFICIARY
      INVESTORS ..................................................................................................148

A.      The Parties Entered Binding Agreements Conveying Beneficial
        Ownership of the Trusts to Certificateholders ...............................................148

B.      Deutsche Bank's Limited Right to Indemnification from
        Certificateholders' Trust Funds Does Not Extend to Suits By
        Certificateholders ...........................................................................................150

C.      Deutsche Bank Is Not Entitled to Judgment-Shifting
        Indemnification ...............................................................................................153

D.      Claims in this Litigation, If Proven, Would Necessarily
        Establish Deutsche Bank's Negligence, and Deutsche Bank
        Therefore Cannot Meet Its Burden of Proving Entitlement to
        Indemnification ...............................................................................................154

E.      Any Indemnification From Trust Funds Would Be Limited to
        Reasonable Fees and Expenses, and Deutsche Bank Has Been
        Billing The Trusts without Adequate Disclosure to Prove Its
        Expenses and Fees Are Reasonable ................................................................155

XII.  CLAIMS FOR RELIEF ....................................................................................157

      COUNT ONE – BREACH OF CONTRACT ..................................................157

      COUNT TWO – NEGLIGENCE AND GROSS NEGLIGENCE ..................158

COUNT THREE – BREACH OF FIDUCIARY DUTY ..................................................159

COUNT FOUR – DECLARATORY JUDGMENT REGARDING
RIGHT TO INDEMNIFICATION FROM THE TRUST FUNDS ................................160

COUNT FIVE – BREACH OF CONTRACT REGARDING
UNLAWFUL WITHDRAWALS FROM TRUST FUNDS AND
DISGORGEMENT ......................................................................................................161

PRAYER FOR RELIEF ............................................................................................162

**XIII.  JURY DEMAND** ...........................................................................................163

The National Credit Union Administration Board ("NCUA Board"), acting in its capacity as liquidating agent for each of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union ("WesCorp"), Members United Corporate Federal Credit Union ("Members United"), Southwest Corporate Federal Credit Union ("Southwest"), and Constitution Corporate Federal Credit Union ("Constitution"), (collectively, the "CCUs"); and Graeme W. Bush, as Separate Trustee of NCUA Guaranteed Notes Trust 2010-R1 ("NCUA 2010-R1 Trust"); NCUA Guaranteed Notes Trust 2010-R2 ("NCUA 2010-R2 Trust"); NCUA Guaranteed Notes Trust 2010-R3 ("NCUA 2010-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R1 ("NCUA 2011-R1 Trust"); NCUA Guaranteed Notes Trust 2011-R2 ("NCUA 2011-R2 Trust"); and NCUA Guaranteed Notes Master Trust ("NCUA 2011-M1 Trust") (in such capacity, the "Separate Trustee," and together with the NCUA Board, "Plaintiffs") bring this Second Amended Complaint against Deutsche Bank National Trust Co. ("Deutsche Bank," "DBNTC," "Defendant," or "the trustee") and allege as follows:

## I.     NATURE OF THE ACTION

1.     Plaintiffs bring this action against Defendant to recover the damages they have suffered because of Defendant's violations of its contractual and common-law obligations.

2.     This action arises out of Defendant's role as trustees for 37 trusts identified on Exhibit A that issued residential mortgage-backed securities ("RMBS"). Each trust consists of hundreds of individual residential mortgage loans that were pooled together and securitized for sale to investors. Investors purchased certificates issued by the RMBS trusts that entitled the investors (or "certificateholders") to fixed principal and interest payments from the income stream generated as borrowers made monthly payments on the mortgage loans in the trusts.

3.     The CCUs purchased the certificates in the 37 trusts identified on Exhibit A at an

original face value of approximately $2.47 billion.

4.      The value of the certificates was dependent on the quality and performance of the mortgage loans in the trusts and swift correction of any problems with the loans. But, because of the structure of the securitizations, certificateholders do not have access to the mortgage loan files or the power to remedy or replace any defective loans. Instead, certificateholders must rely on the trustee to protect their interests.

5.      Defendant, as the trustee for the trusts, had contractual and common law duties to address and correct problems with the mortgage loans and to protect the trusts' and the certificateholders' interests. *See infra* Part V. The trustee for each trust typically has three primary duties. First, the trustee (whether itself or through a custodian or other agent) must take possession and acknowledge receipt of the mortgage files, review the documents in the mortgage files, identify any mortgage files that lack a complete chain of title or that have missing documents, and then certify that the mortgage files are complete and accurate. If the trustee identifies defects in the mortgage files, it must notify the appropriate parties and take steps to enforce the warrantor's obligation to cure, substitute, or repurchase any mortgage loans with defective mortgage files.

6.      Second, if the trustee discovers or receives notice of a breach of the representations and warranties ("R&Ws") concerning the mortgage loans, including but not limited to representations concerning the characteristics of the mortgage borrowers, the collateral for the mortgage loans, and assurances that the mortgage loans were originated in accordance with applicable underwriting criteria, the trustee must notify the appropriate parties and take steps to enforce the warrantor's obligation to cure, substitute, or repurchase the defective mortgage loans. If the trustee fails to exercise this duty, then the trusts and the certificateholders

2

will suffer losses that should instead be borne by the warrantor responsible for defective loans.

7.      Third, the trustee must act to protect the interests of the trust and the certificateholders when it becomes aware of events of default concerning the trust. Thus, when the trustee discovers a default, or is notified by other parties, such as servicers, of defaults, the trustee must act prudently to investigate those defaults, notify certificateholders of the defaults, and take appropriate action to address the defaults.

8.      Here, Defendant obtained discovery or notice that many of the mortgage files had material defects (*infra* Part VI), discovery or notice that many of the loans had material R&W breaches (*infra* Part VII), and knowledge of events of default (*infra* Part VIII), yet it failed to provide notice and enforce warrantor repurchase duties for such loans and otherwise to act as a prudent person in the management of its own property following events of default. If Defendant had fulfilled its obligations, a significant percentage of the mortgage loans in the trusts would have been repurchased, and subsequent losses on those loans averted.

9.      Moreover, an overwhelming number of events alerted Defendant to the fact that the trusts suffered from numerous problems including, among other things (1) Defendant's internal tracking and correspondence regarding loan-by loan problems, (2) notices from entities including monoline insurers identifying loans with R&W breaches; (3) information regarding specific breaching loans discovered by servicers; and (4) exceptions reports showing defects in loan and mortgage files for specific loans. This evidence was both in the possession of and known to Defendant, and not generally available to investors. Discovery in this action can be expected to show such evidence.

10.     The likelihood of such evidence existing in Deutsche Bank's files is supported at the pleading stage of this case by the overwhelming available evidence of systemic problems

with the trusts, separately or together and including but not limited to, (1) reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the warrantors' pervasive disregard of prudent securitization standards; (2) reports concerning the originators of loans in the trusts abandoning their underwriting standards and sponsors of the securitizations failing to follow prudent practices; (3) the high number of borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts; (4) the collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings; and (5) the numerous lawsuits brought by and against Defendant and its affiliates alleging the systematic abandonment of originator underwriting guidelines. Yet Defendant failed to take steps to preserve its rights or hold the warrantors accountable for the repurchase or substitution of defective mortgage loans in direct contravention of its obligations as trustee.

11.     Defendant also failed to address servicer and/or master servicer defaults and events of default. Defendant knew that the master servicers and servicers were ignoring many of their duties, including their duty to notify other parties, including Defendant as trustee, upon the master servicers' and servicers' discovery of breaches of the mortgage loan representations and warranties. Despite Defendant's knowledge of these ongoing defaults and events of default, Defendant failed to act prudently to protect the interests of the trusts and the certificateholders.

12.     Defendant's failures resulted in the trusts and certificateholders suffering losses rightfully borne by the warrantors and other parties. Had Defendant adequately performed its contractual and common law obligations, breaching loans would have been repurchased from the loan pools underlying the certificates. Defendant's improper conduct directly caused losses to certificateholders like the Plaintiffs.

13.     Defendant further acted under a significant conflict of interest and failed to act at least in part because protecting the best interests of the trusts and the certificateholders would have conflicted with Defendant's own interests. *See infra* Part IX. As a participant in many roles in the securitization process, Defendant was economically intertwined with the parties it was supposed to police. Further, Defendant had incentive to ignore other parties' misconduct in order to avoid drawing attention to its own. Indeed, Defendant entered a settlement with the Department of Justice in which Defendant admitted in January 2017 to securitizing many thousands of defective loans in its own RMBS operations. By enforcing repurchase of similarly defective loans as plaintiff trustee, Defendant would have compromised its own selfish interests as a defendant securities underwriter, warrantor, or originator, among other RMBS roles. But a trustee cannot prefer its own interests over those of the trust beneficiaries for whom it agreed by contract to serve as trustee.

14.     Defendant was required to exercise its rights and powers to protect the trusts. Once Defendant became aware of the various failures discussed in this complaint, Defendant was required to use the same degree of care and skill as a prudent person in the management of its own property. But Defendant did not do so. Instead of protecting the trusts and the certificateholders, Defendant sat by as the trusts wasted away.

15.     Defendant's failure to perform its duties has damaged Plaintiffs, which now bring this action against Defendant for breach of contract, acting and failing to act based on significant conflicts of interest, failure to perform ministerial duties with due care, and negligently and with gross negligence breaching its duties to Plaintiffs as trustee for many thousands of securitized mortgage loans.

16.     In addition, Plaintiffs seek declaratory relief regarding Defendant's unlawful use

5

of trust funds as indemnification in this case, an accounting of the legal fees and costs it has sought and/or received from the trusts in this case or any other brought by investors for breach of Defendant's duties, and disgorgement of any such trust funds. Deutsche Bank is impermissibly shifting the cost of its defense to its litigation adversaries, including Plaintiffs, by using trust funds, which are beneficially owned by investor beneficiaries including Plaintiffs, to finance its defense in this litigation. Deutsche Bank has diverted trust funds and intends to continue diverting trust funds that otherwise should flow and belong to investors, who are the beneficial owners of trust assets. *See infra* Part XI.

17.     Accordingly, Plaintiffs seek:  (a) declaratory relief, to prevent Deutsche Bank from further looting the trusts in this case to fund its defense in this or any other investor action, (b) declaratory relief, to clarify that Defendant is not entitled to draw any judgment obtained in this or any other investor action from Plaintiffs' trust funds, and (c) disgorgement, to return trust funds Deutsche Bank has already seized to pay for this or any other investor action alleging trustee misconduct, so that those funds can flow properly, though the waterfall payment structures as set out in the governing trust agreements, to beneficiaries including Plaintiffs. Plaintiffs thus seek to ensure that throughout this litigation, they are not bearing the financial burden (through reduced bond payments and diminished value of their certificates) of their adversary's defense, which is an ongoing harm to Plaintiffs that should be stopped.

## II.    PARTIES

### A.    Plaintiff NCUA Board as Liquidating Agent

18.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share

Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") to stabilize corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA Board manages the NCUA. *See* Federal Credit Union Act ("FCU Act"), 12 U.S.C. §§ 1751, 1752a(a). Pursuant to 12 U.S.C. § 1787(a) and (b)(2)(A), the NCUA Board, in specified circumstances and in a distinct capacity, may close an insured credit union and appoint itself the liquidating agent for such credit union. As liquidating agent for a failed credit union, the NCUA Board succeeds to all rights, titles, powers, and privileges of the credit union, its members, accountholders, officers, and directors.

19.     U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas.

20.     WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.

21.     Members United was a federally chartered corporate credit union with its offices and principal place of business in Warrenville, Illinois. Members United was created in mid-2006 by the merger of Empire and Mid-States Corporate Federal Credit Unions.

22.     Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas.

23.     Constitution was a federally chartered corporate credit union with its offices and principal place of business in Wallingford, Connecticut.

24.     As corporate credit unions, the CCUs provided investment and financial services to other credit unions.

25.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant its authority under the FCU Act, 12 U.S.C. § 1786(h). On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation pursuant to 12 U.S.C. § 1766(a) and 12 U.S.C. § 1787(a)(1)(A) and appointed itself liquidating agent. On September 24, 2010, the NCUA Board placed Members United, Southwest, and Constitution into conservatorship pursuant to the FCU Act. On October 31, 2010, the NCUA Board placed Members United, Southwest, and Constitution into involuntary liquidation, appointing itself liquidating agent.

26.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as liquidating agent has succeeded to all rights, titles, powers, and privileges of the CCUs and of any member, account holder, officer or director of the CCUs, with respect to the CCUs and their assets, including the right to bring the claims asserted in this action. As liquidating agent, the NCUA Board has all the powers of the members, directors, officers, and committees of the CCUs, and succeeds to all rights, titles, powers, and privileges of the CCUs. *See* 12 U.S.C. §1787(b)(2)(A). The NCUA Board may also sue on the CCUs' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2). In addition, the NCUA Board as liquidating agent may "exercise all powers and authorities specifically granted to conservators or liquidating agents, respectively, under this chapter and such incidental powers as shall be necessary to carry out such powers; and (ii) take any action authorized by this chapter, which the Board determines is in the best interests of the

credit union, its account holders, or the Board." *See* 12 U.S.C. §1787(b)(2)(J).

27.     The NCUA Board, as liquidating agent, brings this action in its own right for the following certificates: CUSIP 040104PY1 in Trust ARSI 2005-W4; CUSIP 040104SR3 in Trust ARSI 2006-W3; CUSIPs 05530PAD4 and 05530PAP7 in Trust BCAP 2007-AA1; CUSIP 05529DAA0 in Trust BCAPB 2007-AB1; CUSIP 320275AE0 in Trust FFML 2006-FF16; CUSIP 362631AD5 in Trust GSR 2006-OA1; CUSIPs 3622NAAB6 and 3622NAAG5 in Trust GSR 2007-OA1; CUSIPs 41162NAD9 and 41162NAH0 in Trust HVMLT 2006-14; CUSIP 41161MAE0 in Trust HVMLT 2006-5; CUSIP 41161GAE3 in Trust HVMLT 2006-8; CUSIPs 41161XAM8 and 41161XAN6 in Trust HVMLT 2006-9; CUSIPs 41165AAC6 and 41165AAD4 in Trust HVMLT 2007-5; CUSIP 45257BAE0 in Trust IMSA 2006-4; CUSIP 45071KCP7 in Trust IXIS 2005-HE4; CUSIP 61744CWJ1 in Trust MSAC 2005-HE7; CUSIP 617451EU9 in Trust MSAC 2006-HE2; CUSIP 61748BAC8 in Trust MSAC 2006-HE4; CUSIP 61753KAD8 in Trust MSAC 2007-HE5; CUSIP 61755EAD0 in Trust MSAC 2007-NC4; and CUSIP 81378EAB9 in Trust SABR 2007-BR4 (collectively, the "NCUA Certificates").[1]

---

[1] Some of the certificates for which the NCUA Board now brings direct claims were formerly held by NGN trusts that have since unwound pursuant to the procedure described *infra* at ¶ 32-33, meaning that NCUA as liquidating agent now holds those certificates.

Specifically, the following CUSIPs were formerly held by the NCUA Guaranteed Notes Trust 2010-R2 (the "NCUA 2010-R2 Trust"): CUSIP 617451EU9 in Trust MSAC 2006-HE2; and CUSIP 61748BAC8 in Trust MSAC 2006-HE4.

The following CUSIPs were formerly held by the NCUA Guaranteed Notes Trust 2011-R4 (the "NCUA 2011-R4 Trust"): CUSIP 040104SR3 in Trust ARSI 2006-W3; CUSIP 05530PAP7 in Trust BCAP 2007-AA1; CUSIP 05529DAA0 in Trust BCAPB 2007-AB1; CUSIP 362631AD5 in Trust GSR 2006-OA1; CUSIP 41161XAN6 in Trust HVMLT 2006-9; CUSIP 61753KAD8 in Trust MSAC 2007-HE5.

The following CUSIPs were formerly held by the NCUA Guaranteed Notes Trust 2011-R5 (the "NCUA 2011-R5 Trust"): CUSIP 05530PAD4 in Trust BCAP 2007-AA1; CUSIPs 3622NAAB6 and 3622NAAG5 in Trust GSR 2007-OA1; CUSIPs 41162NAD9 and 41162NAH0 in Trust HVMLT 2006-14; CUSIP 41161GAE3 in Trust HVMLT 2006-8; CUSIP 41165AAC6 in Trust HVMLT 2007-5; CUSIP 81378EAB9 in Trust SABR 2007-BR4.

B. **Plaintiff Separate Trustee**

28.     The Separate Trustee brings this action for the following certificates: CUSIPs

040104PC9 and 040104PD7 and 040104PE5 in Trust ARSI 2005-W3; CUSIPs  320275AD2 and

320275AF7 in Trust FFML 2006-FF16; CUSIP 39539GAC6 in Trust GPMF 2006-OH1; CUSIP

362290AC2 in Trust GSR 2007-AR1; CUSIP 44328BAE8 in Trust HASC 2006-HE2; CUSIP

40430FAD4 in Trust HASC 2007-HE1; CUSIPs 41161PKB8 and 41161PKC6 and 41161PKD4

and 41161PKG7 in Trust HVMLT 2004-11; CUSIPs 41161PGH0 and 41161PGK3 and

41161PGR8 in Trust HVMLT 2004-7; CUSIP 41161MAD2 in Trust HVMLT 2006-5; CUSIPs

41161UAD4 and 41161UAF9 in Trust HVMLT 2006-6; CUSIP 41162BAB9 in Trust HVMLT

2006-SB1; CUSIP 45254TTL8 in Trust IMSA 2006-1; CUSIP 45257BAC4 in Trust IMSA

2006-4; CUSIP 45257EAD6 in Trust IMSA 2006-5; CUSIPs 452559AB3 and 452559AD9 in

Trust IMSA 2007-1; CUSIPs 61744CWM4 and 61744CWN2 and 61744CWP7 in Trust MSAC

2005-HE7; CUSIP 617451EW5 in Trust MSAC 2006-HE2; CUSIP 61748BAE4 in Trust MSAC

2006-HE4; CUSIP 61750MAF2 in Trust MSAC 2006-HE7; CUSIPs 61750SAE2 and

61750SAF9 in Trust MSAC 2006-HE8; CUSIP 61752UAC9 in Trust MSHEL 2007-2; CUSIP

83611MHP6 in Trust SVHE 2005-B; and CUSIPs 83611MJG4 and 83611MJL3 and

83611MJM1 and 83611MJX7 in Trust SVHE 2005-OPT4 (collectively, the "NGN

Certificates"). Exhibit A lists the NGN Trusts into which each CUSIP has been resecuritized.

29.     In 2010, the NCUA and the NCUA Board as liquidating agent created the NCUA

_____

    The following CUSIPs were formerly held by the NCUA Guaranteed Notes Trust 2011-
R6 (the "NCUA 2011-R6 Trust"): CUSIP 41161MAE0 in Trust HVMLT 2006-5; CUSIP
41161XAM8 in Trust HVMLT 2006-9; CUSIP 41165AAD4 in Trust HVMLT 2007-5; CUSIP
45071KCP7 in Trust IXIS 2005-HE4; CUSIP 61755EAD0 in Trust MSAC 2007-NC4.

    The following CUSIP was formerly held by the NCUA Guaranteed Notes Trust 2011-M1
(the "NCUA 2011-M1 Trust"): CUSIP 320275AE0 in Trust FFML 2006-FF16.

Guaranteed Notes Program (the "NGN Program") as a means of liquidating the distressed investment securities from the five failed corporate credit unions (the "Legacy Assets"), thereby stabilizing funding for the credit union system. The Legacy Assets consist of over 2,000 investment securities, secured by approximately 1.6 million residential mortgages, as well as commercial mortgages and other securitized assets. The NCUA Board as liquidating agent transferred certain Legacy Assets, including many of the CCU's investment in the trusts at issue in this Second Amended Complaint, to the NGN Trusts. The NGN Trusts then issued approximately $28.3 billion of NGNs, backed by the cash flows from the Legacy Assets.

30.     Each NGN Trust created under the NGN Program issued Notes pursuant to an Offering Memorandum and three key agreements:  (i) NGN Indentures by and between the NGN Trusts, as Issuers, and The Bank of New York Mellon ("BNYM"), as Indenture Trustee; (ii) Trust Agreements by and among the NCUA Board in its Capacity as Liquidating Agent, as Seller, Wells Fargo Delaware Trust Company, N.A. ("Wells Fargo"), as Owner Trustee, and BNYM, as Certificate Registrar and the Certificate Paying Agent; and (iii) Guaranty Agreements by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NGN Trusts, as Issuer, and BNYM, as the Indenture Trustee. The NGN Indentures, NGN Trust Agreements, and NGN Guaranty Agreements are referred to collectively herein as the "NGN Agreements."[2]

31.     In short, the creation of the NGN Trusts involved the following steps:  (i) the NCUA Board in its Capacity as Liquidating Agent (as Sellers) transferred the NGN Certificates to the NGN Trusts (as Issuers) pursuant to the NGN Trust Agreements, and Wells Fargo (as

---

[2] The NGN Agreements are substantially similar. Representative examples of an NGN Indenture, NGN Trust Agreement, and NGN Guaranty Agreement from the NCUA 2011-R2 Trusts are attached hereto as Exhibits B, C, and D.

Owner Trustee) caused the Owner Trust Certificates (defined below) to be issued to the NCUA

Board as Liquidating Agent (as Sellers); (ii) the NGN Trusts (as Issuers) pledged the Certificates

and the other assets of the trust estates to BNYM (as Indenture Trustee) and caused the NGN

Notes to be issued pursuant to the NGN Indentures; (iii) BNYM (as Indenture Trustee) delivered

the Notes, or NGNs, to the Initial Purchasers for further sale to investors.

      32.      Under the NGN Trust Agreements, the NCUA Board as liquidating agent

transferred and assigned its rights, title, and interest to assert the claims at issue in this SAC

related to the NGN Certificates to the NGN Trusts. Exh. C, NGN Trust Agreement § 3.01.[3] In

exchange, the NCUA Board received "Owner Trust Certificates" that represent a beneficial

ownership interest in the NGN Trusts. *Id.* As the holder and beneficial owner of the Owner Trust

---

     [3] The NCUA Board notified investors that it was actively investigating and pursuing certain legal claims against securitizing entities under federal and state securities laws in connection with the securities underlying the NGNs and that any recovery on those claims would benefit the NCUA Board as Liquidating Agent for the CCUs (referred to as the "Sellers" under the NGN securitization agreements) exclusively. *See, e.g.*, Exh. E, NGN Trust 2011-R2 Offering Memorandum at 30-31("Since late 2009, the NCUA has been conducting a number of formal investigations relating to whether violations of laws or regulations have occurred in connection with the offer and sale of various asset-backed securities to various credit unions, including U.S. Central, WesCorp, Members United, Southwest and Constitution (each, a 'Corporate Credit Union' and collectively, the 'Corporate Credit Unions'). In connection with those investigations, the NCUA issued a number of subpoenas to various sponsors and underwriters seeking documentation with respect to specified asset-backed securities sold to the Corporate Credit Unions. These underwriters include some of the Initial Purchasers (as set forth on the cover page of this Memorandum), and certain of the Underlying Securities were the subject of one or more of these subpoenas. Beginning in September 2010, in connection with these investigations, the NCUA requested that various potential defendants, including potentially these Initial Purchasers, enter into separate tolling agreements to suspend for a period of time the running of any statutes of limitations that apply to potential claims, including claims under federal and state securities laws, with respect to specified asset-backed securities sold to the Corporate Credit Unions. It is not known at this time whether specific legal claims will be asserted by the NCUA in respect of the Underlying Securities, or whether litigation will ensue. Any damages or other amounts recovered by the NCUA in connection with any such claims will not be part of the Trust Estate and will not be used to make payments on the Offered Notes. Any such recoveries will benefit the Sellers exclusively."). The NCUA Board did not transfer those claims against "sponsors and underwriters" (*id.*) under federal and state securities laws to the NGN Trusts. The different claims at issue here against the trustee were not subject to that reservation.

Certificates, the NCUA Board as liquidating agent is entitled to payments from the NGN Trusts after the principal balance of the Notes issued by the various NGN Trusts has been reduced to zero; all accrued and unpaid interest on the Notes has been paid; all amounts owed to the Guarantor have been reimbursed; and the other parties to the NGN Agreements have been paid in full.

33.    Once the principal balance of the Notes issued by the any NGN Trust has been reduced to zero, all accrued and unpaid interest on the Notes has been paid, all amounts owed to the Guarantor have been reimbursed, any other parties to the NGN Agreements have been paid in full, and certain other conditions have been fulfilled, then the NGN Indenture is satisfied and discharged, permitting the NCUA Board as liquidating agent and Owner Trust Certificateholder to receive distribution of all remaining assets of the Trust Estate in accordance with written instructions provided to the Certificate Paying Agent. Exh. B, NGN Indenture Agreement § 3.01; Exh. C, NGN Trust Agreement § 8.01(a).[4]

34.    Under the NGN Guaranty Agreements, the NCUA in its capacity as an agency of the Executive Branch of the United States Government (in such capacity, the "Guarantor") provided a guarantee, backed by the full faith and credit of the United States, of the timely repayment of all principal and interest to the investors in the NGN Trusts. Exh. D, NGN Guaranty Agreement § 1.

35.    Under the NGN Indentures, BNYM was granted the right to take action against Defendant with respect to the NGN Certificates. Exh. B, NGN Indenture, Granting Clause (granting BNYM all right, title, and interest to "all present and future claims, demands, causes

---

[4] As holder of the Owner Trust Certificates, the NCUA Board as liquidating agent may also receive transfer of certificates from the NGN Trusts through an Early Termination, if applicable, or an Optional Purchase, if applicable. Exh. B, NGN Indenture Agreement §§ 2.16(a); 3.01(d).

and choses in action in respect of the [NGN Certificates]"); *see also id*. § 5.01(a)(i) ("The Indenture Trustee shall have the full power and authority to do all things not inconsistent with the provisions of this Indenture that it may deem advisable in order to enforce the provisions hereof or to take any action with respect to a default or an Event of Default hereunder, or to institute, appear in or defend any suit or other proceeding with respect hereto, or to protect the interests of the Noteholders and the Guarantor").[5]

36.    On August 29, 2018, BNYM, in its capacity as the Indenture Trustee of the NGN Trusts, transferred all legal title, claims, powers, rights, authorities, and duties of BNYM, including the claims at issue in this SAC to the Separate Trustee and appointed the Separate Trustee for purposes of exercising any and all of the Indenture Trustee's powers, rights and authorities and/or fulfilling any and all of the Indenture Trustee's duties under each applicable Indenture with respect to the claims at issue in this SAC, with any recoveries going to the NGN Trusts. Exh. F, Instrument of Appointment and Acceptance ("Separate Trustee Agreement"). The Separate Trustee is a citizen of Colorado and has standing to pursue these claims in his own name as duly appointed separate trustee of the NGN Trusts and holder of legal title, claims, powers, rights, authorities, and duties of BNYM, including the claims set forth herein.

37.    On August 23, 2018, CEDE & Co., as nominee of The Depository Trust Company, provided written consent to Plaintiffs to commence, prosecute, or continue litigation that CEDE & Co. is or may be entitled to take, for the at-issue certificates in trusts containing negating clauses, where CEDE is the nominal holder. For the NGN Certificates, CEDE & Co. provided the consent to BNYM or its designee; for the NCUA Certificates, to the NCUA Board, as liquidating agent. Exh. G.

---

[5] By contrast, Wells Fargo, as the Owner Trustee, has no such rights under the Trust Agreement. *See generally* Exh. C, NGN Trust Agreement.

C.     **Defendant**

38.    DBNTC or Deutsche Bank is a national banking association organized under the laws of the United States to carry out the business of a limited purpose trust company. DBNTC's main office is located in Los Angeles, California, and its principal place of trust administration is located in Santa Ana, California. DBNTC is a nondepository trust company regulated by the Office of the Comptroller of the Currency ("OCC"). As of December 31, 2013, DBNTC had assets valued at over $188 billion, making it the eighth largest nondepository trust company in the United States. As a nondepository trust company, DBNTC operates for profit, accepting and executing trusts, including the trusts at issue here.

39.    DBNTC is an indirect wholly owned subsidiary of Deutsche Bank AG ("DBAG"), which maintains its corporate headquarters in Frankfurt, Germany. Deutsche Bank Trust Corporation ("DBTC") is a wholly owned subsidiary of DBAG. DBNTC is a wholly owned subsidiary of Deutsche Bank Holdings, Inc. ("DBHI"), which is a wholly owned subsidiary of DBTC.

40.    DBNTC, together with its affiliates, is involved in many aspects of the private-label RMBS market. As of April 2014, DBNTC administered as trustee more than $1.15 trillion in original face value of non-agency RMBS issued between 2004 and 2008 (*i.e.*, private-label residential mortgage backed securities not guaranteed by an agency of the United States Government), with a total balance of $157.1 billion, representing nearly 21% of all non-agency RMBS during that period based on balances.

41.    Additionally, Deutsche Bank AG through its subsidiaries and affiliates, MortgageIT, Inc. and Chapel Funding LLC, originated tens of billions of dollars in loans leading up to the financial crisis.

**III.     JURISDICTION AND VENUE**

42.     This Court has subject matter jurisdiction pursuant to the following statutes:

(a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in

equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the

United States, and the United States district courts shall have original jurisdiction thereof,

without regard to the amount in controversy"; (b) 28 U.S.C. § 1345, which provides that "the

district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced

by the United States, or by any agency or officer thereof expressly authorized to sue by Act of

Congress"; (c) 15 U.S.C. § 1331, providing for "original jurisdiction of all civil actions arising

under the Constitution, laws, or treaties of the United States"; (d) 28 U.S.C. § 1332, because

there is compete diversity of citizenship of the parties and the amount in controversy, without

interest and costs, exceeds $75,000; (e) 15 U.S.C. § 1367, providing for "supplemental

jurisdiction over all other claims that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy;" and (f) 28 U.S.C. § 1348,

providing that a national banking association shall, for purposes of all actions by or against them

(except in other circumstances not applicable here but which would also provide for jurisdiction

in this Court), be deemed a citizen of the State in which it is respectively located.

43.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C.

§ 77v(a), and/or 28 U.S.C. § 1391(b)(1), because Defendant is a resident of and/or conducts

business in this District. This Court has personal jurisdiction over Defendant because it is a

resident of and/or conducts business in this District and under N.Y. C.P.L.R. 301, New York's

long-arm statute.  The claims relate to Defendant's role as trustee over trusts created under New

York law and/or administered at least in part in New York.  In addition, Defendant has filed

foreclosure cases on behalf of the trusts in New York and in the course of such proceedings either discovered or should have discovered multiple defaults and representation and warranty breaches.

## IV.    THE TRUSTS

44.    The trusts identified on Exhibit A are 37 New York common law trusts or Delaware statutory trusts created in connection with residential mortgage-backed securitizations between 2004 and 2008.

45.    The trusts have a high concentration of loans originated or contributed by the following lenders and their affiliates: American Home Mortgage Corp.; Accredited Home Lenders, Inc.; Argent Mortgage Co. LLC; Countrywide Home Loans, Inc.; Decision One Mortgage Company, LLC; Fremont Investment and Loan; GreenPoint Mortgage Funding, Inc.; Impac Funding Corporation; IndyMac Bank, F.S.B; National City Mortgage Co.; NC Capital Corp.; Option One Mortgage Corp.; Paul Financial, LLC; Residential Funding Co., LLC; First Franklin Financial Corp.; Wells Fargo Bank, N.A.; and WMC Mortgage Corp. (collectively, the "originators").

46.    A significant portion of the trusts were sponsored by the following sponsors and their affiliates: Ameriquest Mortgage Co.; Greenwich Capital Financial Products, Inc.; Impac Funding Corp.; Morgan Stanley Mortgage Capital, Inc. and Morgan Stanley Mortgage Capital Holdings, LLC; and Option One Mortgage Corp. (collectively, the "sponsors").

## V.    DUTIES OF THE TRUSTEE UNDER THE CONTRACTS AND COMMON LAW

### A.    RMBS Trusts

47.    RMBS certificates are debt instruments issued to investors by an issuing trust that holds one or more mortgage pools. The corpus of the trust – like the trusts at issue here – consists

almost exclusively of the underlying mortgage loans. Certificateholders receive a portion of the income stream generated by the trust as borrowers make payments on their mortgage loans.

48.    Because residential mortgage loans are the assets underlying the RMBS, the origination of mortgages starts the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting. The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.

49.    The securitization process begins with a sponsor who purchases loans in bulk from one or more originators. The sponsor transfers title of the loans to an entity called a depositor.

50.    The depositor transfers the loans to a trust called the issuing entity.

51.    The issuing entity then issues notes and/or certificates, providing certificateholders scheduled principal and interest payments derived from the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

52.    The depositor files required documents (such as registration statements and prospectuses) with the U.S. Securities and Exchange Commission ("SEC") so the certificates can be offered to the public.

53.    One or more underwriters then sell the notes or certificates to investors.

54.    Figure 1 (*infra*) depicts a typical securitization process.

**Figure 1**
***Illustration of the Securitization Process***

18



55.     The establishment and administration of each trust is governed by an agreement called a Pooling and Servicing Agreement ("PSA") and certain related agreements that the PSA references and incorporates (the "governing agreements"). All of the governing agreements are substantially similar, and impose the same duties on Defendant. *See* Exhibit H §§ I – XI. Accordingly, this SAC refers to the PSAs or the governing agreements when discussing the trustee's contractual obligations.

56.     Once the loans are deposited into a trust, borrowers begin making payments to the trust through a master servicer. The master servicer is ultimately responsible for servicing the loans, but may use a designee, typically called a servicer or sub-servicer, to perform some or all

of the mortgage servicing functions. The master servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties, and overseeing any sub-servicers.

57.     When the master servicer collects loan payments from borrowers, it then transfers those payments, less allowable deductions, to the trustee. The trustee uses the payments, less allowable fees and expenses, to make scheduled principal and interest payments to certificateholders. The trustee also delivers monthly remittance reports to certificateholders describing the performance of underlying loans and compliance with the governing agreements. The contents of those reports are specified in the governing agreements and in Item 1121 of SEC Regulation AB. *See* 17 C.F.R. § 229.1121. The servicer provides data to the trustee to include in these remittance report. Each trust is administered primarily by two entities – the trustee and master servicer, under the oversight of the trustee. The trustee owes certificateholders certain duties set forth in the governing agreements, as well as those duties imposed by the common law.

58.     The purpose of having a trustee in an RMBS securitization is to ensure there is at least one independent party to the governing agreements who, unlike the RMBS certificateholders, does not face collective action, informational, or other limitations, and as a result can protect the trusts and the interests of RMBS certificateholders. The governing agreements and the common law impose critical duties on trustees, and the trustees' adherence to those duties affects the value of the RMBS.

59.     Defendant earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.  Defendant also received significant benefits from the interest-free deposits maintained

in its accounts when the servicing payments were remitted to its accounts.  Defendant maintained

accounts for thousands of trusts and earned enormous sums from the aggregate balances on these

accounts.  The RMBS trustee engagements further deepened Defendant's business relationships

with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

**B.    The Trustee's General Duties**

60.    The terms of the governing agreements are substantially similar, if not identical,

and impose substantially the same, if not identical, duties and obligations on the trustee. *See* Exh.

H §§ I – XI. Further, upon information and belief, Defendant employed the same general set of

policies and procedures to oversee and manage the trusts regardless of any individual variations

contained within the governing agreements, and to monitor for mortgage loan defects.

61.    Most importantly, Defendant has an absolute duty under the governing

agreements and the common law to acquire and protect the trust corpus for the benefit of

certificateholders. "The Trustee hereby accepts its appointment as Custodian hereunder and . . .

declares that, in its capacity as Custodian, it holds and will hold such documents and the other

documents delivered to it constituting a Mortgage File, and that it holds or will hold all such

assets and such other assets included in the definition of 'Trust Fund' in trust for the exclusive

use and benefit of all present and future Certificateholders." PSA Section 2.02; *see also* Exhibit

H § II.[6]

**C.    The Trustee's Duties Under the Pooling and Servicing Agreements**

62.    The PSAs are contracts between, in addition to others, the depositor, the master

servicer or servicer, and the trustee, which govern the trusts that issued the certificates. The PSAs

---

[6] Each PSA is several hundred pages long. All cites herein to "PSA Section ___" are to
the PSA for the HarborView Mortgage Loan Trust 2006-6 ("HVMLT 2006-6") offering, which,
as alleged above, is substantially similar to the governing agreements for all of the trusts. A copy
of the complete HVMLT 2006-6 PSA is attached as Exhibit I.

for each of the trusts are substantially similar and memorialize the following events and

conditions:  (i) the transfer and conveyance of the mortgage loans from the depositor to the trust;

(ii) the trust's issuance of beneficial certificates of interests in the trust to raise the funds to pay

the depositor for the mortgage loans; and (iii) the terms of those certificates. *See* Exhibit H §§ I –

XI.

       63.     The PSAs also set forth Defendant's contractual duties and obligations, which are

substantially similar for each trust. *See* Exhibit H §§ I – XI. Specifically, each PSA requires

Defendant to oversee and enforce the depositors,' the custodians', the servicers', sponsors' and

the originators' obligations. In performing these contractual obligations, Defendant must act in

the best interests of and for the protection of the trusts and the certificateholders.

Certificateholders, unlike the trustee, have no direct contact with the other deal parties.

Moreover, under the PSAs, certificateholders do not have the right to compel the trustee to

enforce the warrantor's representations and warranties concerning the qualities of the loans,[7]

absent satisfaction of the collective action provisions that individual certificateholders frequently

cannot satisfy. Certificateholders must therefore rely on the Defendant to protect their interests.

    **D.**    **Duty Properly to Review the Mortgage Loans Conveyed to the Trust**

       64.     The trusts must take title to the mortgages conveyed to them for due consideration

for the RMBS properly to be backed by mortgage loans. The PSAs establish the conveyance

---

[7] The governing agreements specify the party that is responsible for repurchasing any
defective loan. Generally, they provide that, upon discovery and/or notice of a breach of a
representation and warranty with respect to a mortgage loan that materially and adversely affects
the interests of the certificateholders, the warrantor shall cure the breach or repurchase the
affected mortgage loan at its purchase price, which is equal to the then-outstanding amount due
on the mortgage loan. The warrantor is generally either the originator of the loans, the seller of
the loans, or the sponsor of the securitization. These roles are frequently undertaken by the same
or affiliated entities. For simplicity, this complaint uses "warrantor" to refer to the entity
responsible for the repurchase of any defective loans.

terms of the mortgage loans to the trust, and those terms are intended to ensure that the trustee,

on behalf of the trusts, takes full title to the mortgage loans. *See* Exhibit H § I – III.

65.     The first part of this conveyance involves the depositor assigning to the trustee,

among other things, its rights, title, and interest in the mortgage loans and the depositor's rights

under the transfer agreement whereby the depositor acquired the mortgage loans. PSA Section

2.01 ("Conveyance of the Mortgage Loans") provides in relevant part:

> The Depositor, concurrently with the execution and delivery hereof, does hereby
> transfer, assign, set over and otherwise convey to the Trustee without recourse for the
> benefit of the Certificateholders all the right, title and interest of the Depositor,
> including any security interest therein for the benefit of the Depositor, in and to (i) each
> Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-off
> Date Principal Balance, all interest due thereon after the Cut-off Date and all collections
> in respect of interest and principal due after the Cut-off Date; (ii) all the Depositor's
> right, title and interest in and to the Distribution Account and all amounts from time to
> time credited to and the proceeds of the Distribution Account; (iii) any real property that
> secured each such Mortgage Loan and that has been acquired by foreclosure or deed in
> lieu of foreclosure; (iv) the Depositor's interest in any insurance policies in respect of
> the Mortgage Loans; (v) all proceeds of any of the foregoing; and (vi) all other assets
> included or to be included in the Trust Fund. Such assignment includes all interest and
> principal due to the Depositor or the Master Servicer after the Cut-off Date with respect
> to the Mortgage Loans.

The other PSAs contain substantially similar provisions. *See* Exhibit H § I.

66.     Furthermore, the PSAs require Defendant, or its agents acting as custodians, to

acknowledge receipt of the mortgage loans on behalf of the trust and to acknowledge that all

mortgage pool assets—including the mortgage files and related documents and property—are

held by it as trustee. Significantly, Defendant, or its agents, must take physical possession of the

mortgage files, including the mortgage note and the mortgage, properly endorsed and assigned to

the trustee. As set forth in PSA Section 2.02:

> The Trustee hereby accepts its appointment as Custodian hereunder and . . . declares
> that, in its capacity as Custodian, it holds and will hold such documents and the other
> documents delivered to it constituting a Mortgage File, and that it holds or will hold all

such assets and such other assets included in the definition of 'Trust Fund' in trust for the exclusive use and benefit of all present and future Certificateholders.

The other PSAs contain substantially similar provisions. *See* Exhibit H §§ II, IV.

67.    Section 2.01 of the PSA also specifically sets forth the operative documents that must be contained in the mortgage file:

(i) the original Mortgage Note, endorsed either on its face or by allonge attached thereto in blank or in the following form: "Pay to the order of Deutsche Bank National Trust Company, as Trustee for HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2006-6, without recourse", or with respect to any lost mortgage note, an original Lost Note Affidavit stating that the original mortgage note was lost, misplaced or destroyed, together with a copy of the related Mortgage Note; *provided, however*, that such substitutions of Lost Note Affidavits for original Mortgage Notes may occur only with respect to Mortgage Loans the aggregate Cut-Off Date Principal Balance of which is less than or equal to 2% of the Cut-Off Date Aggregate Principal Balance;

(ii) except as provided below, for each Mortgage Loan that is not a MERS Mortgage Loan, the original Mortgage, and in the case of each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN for that Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, or if such Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment to MERS, in each case with evidence of recording thereon, and the original recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon or, if such Mortgage or power of attorney has been submitted for recording but has not been returned from the applicable public recording office, has been lost or is not otherwise available, a certified copy of such Mortgage or power of attorney, as the case may be, and that the original of such Mortgage has been forwarded to the public recording office, or, in the case of a Mortgage that has been lost, a copy thereof (certified as provided for under the laws of the appropriate jurisdiction) and a written Opinion of Counsel (delivered at the Seller's expense) acceptable to the Trustee and the Depositor that an original recorded Mortgage is not required to enforce the Trustee's interest in the Mortgage Loan;

(iii) the original or copy of each assumption, modification or substitution agreement, if any, relating to the Mortgage Loans, or, as to any assumption, modification or substitution agreement which cannot be delivered on or prior to the Closing Date because of a delay caused by the

public recording office where such assumption, modification or substitution agreement has been delivered for recordation, a photocopy of such assumption, modification or substitution agreement, pending delivery of the original thereof, together with an Officer's Certificate of the Seller certifying that the copy of such assumption, modification or substitution agreement delivered to the Trustee (or its custodian) on behalf of the Trust Fund is a true copy and that the original of such agreement has been forwarded to the public recording office;

(iv) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, an original Assignment of Mortgage, in form and substance acceptable for recording. The Mortgage shall be assigned to "Deutsche Bank National Trust Company, as Trustee for HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2006-6, without recourse;"

(v) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, an original copy of an intervening Assignment of Mortgage showing a complete chain of assignments, or, in the case of an intervening Assignment of Mortgage that has been lost, a written Opinion of Counsel (delivered at the Seller's expense) acceptable to the Trustee that such original intervening Assignment of Mortgage is not required to enforce the Trustee's interest in the Mortgage Loans;

(vi) the original Primary Insurance Policy, if any, or certificate, if any;

(vii) the original or certified copy of lender's title insurance policy; and

(viii) with respect to any Cooperative Loan, the Cooperative Loan Documents.

68.     Once the mortgage files are in Defendant's or its custodians' possession, Defendant, or the custodian on Defendant's behalf, is required to review each mortgage file within a certain period after the "closing date" of the securitization and deliver to various deal parties a certification that all documents required have been executed and received, noting any exceptions – *i.e.*, any missing or defective mortgage file documents. Thus, the trustee or its agent, the custodian, prepares and/or receives a report identifying specific mortgage file document defects in the loans in each trust. As set forth in PSA Section 2.02:

The Trustee further agrees, for the benefit of the Certificateholders, to review each Mortgage File delivered to it and to certify and deliver to the Depositor, the Seller and

25

each Rating Agency an interim certification in substantially the form attached hereto as Exhibit G-2, within 90 days after the Closing Date (or, with respect to any document delivered after the Startup Day, within 45 days of receipt and with respect to any Qualified Substitute Mortgage, within five Business Days after the assignment thereof) that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents required to be delivered to it pursuant to Section 2.01 of this Agreement are in its possession, (ii) such documents have been reviewed by it and have not been mutilated, damaged or torn and relate to such Mortgage Loan and (iii) based on its examination and only as to the foregoing, the information set forth in the Mortgage Loan Schedule that corresponds to items (i), (ii) and (iii) of the Mortgage Loan Schedule accurately reflects information set forth in the Mortgage File.

The other PSAs contain substantially similar provisions. *See* Exhibit H § III.

69.     Defendant breached these contractual obligations by: 1) failing to adequately review the mortgage loan files and certify their completeness; and 2) failing to properly oversee the custodian or its agents.

### E.     Duty to Provide Notice of Incomplete or Defective Mortgage Files and Enforce Repurchase Rights with Respect to Mortgage Files that Cannot be Cured

70.     If Defendant or the custodian identifies, discovers, or receives notice of any defect in a mortgage loan file (through its own review, through receipt of the exception report, or otherwise) for an underlying mortgage loan contained in a trust, Defendant must identify such defect and promptly provide notice to the relevant parties. As set forth in PSA Section 2.02:

If, in the process of reviewing the Mortgage Files and making or preparing, as the case may be, the certifications referred to above, the Trustee finds any document or documents constituting a part of a Mortgage File to be missing or not conforming to the requirements set forth herein, at the conclusion of its review the Trustee (or the applicable Custodian as its designated agent) shall promptly notify the Seller and the Depositor. . . .

71.     Once incomplete mortgage files or loans with defective transfer documentation are identified, the parties to the governing agreements must work to remedy these deficiencies, and the trustee is ultimately responsible for enforcing the warrantor's obligation to remedy any

26

deficiency or repurchase the defective loan (see Part F below). As set forth in PSA Section 2.03:

> [T]he Trustee shall promptly notify the Originator of such defect, missing document or breach and request that such Originator deliver such missing document or cure such defect or breach within 90 days from the date that the Seller was notified of such missing document, defect or breach, and if such Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce such Originator's obligation under the related Purchase Agreement and cause such Originator to repurchase that Mortgage Loan from the Trust Fund at the Repurchase Price (as defined in the related Purchase Agreement) on or prior to the Determination Date following the expiration of such 90 day period. . . .

The other PSAs contain substantially similar provisions. *See* Exhibit H § V. The trustee also has the right and duty to protect the trusts by ensuring all parties to the governing agreements (including the custodial agreement) comply with their respective obligations.

72.     The trustee's sole remedy to protect the trust from such defective loans is to enforce the obligation of the warrantor to repurchase such loans, as set forth in PSA Section 2.03.

73.     Defendant breached these contractual obligations by: 1) failing to provide notice of incomplete or defective mortgage files; and 2) failing to enforce repurchase rights with respect to mortgage files that could not be cured.

**F.     Duty to Provide Notice of Document Defects and Representation and Warranty Breaches and to Enforce Repurchase Rights with Respect to Defective and Breaching Loans**

74.     The quality of the mortgage loans to which the trusts purportedly receive title is also critical to an RMBS securitization. For that reason, the governing agreements contain "representations and warranties" by the warrantor attesting to the characteristics of the borrower and collateral for the mortgage loans conveyed to the trusts, and that the loans were made in accordance with applicable underwriting guidelines.

75.     As in instances of missing documents or where the transfer of the mortgage was

incomplete, the governing agreements also require the warrantor to cure, substitute, or

repurchase any mortgage loans that materially breach the warrantor's representations and

warranties concerning the quality of the mortgage loans conveyed to the trusts. Specifically, the

governing agreements require the trustee, among others, to provide notice of the breaches and

enforce the warrantor's repurchase obligations:

> (a) Upon its discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the related originator of any representation, warranty or covenant under the related Purchase Agreement in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify such Originator of such defect, missing document or breach and request that such Originator deliver such missing document or cure such defect or breach within 90 days from the date that the Seller was notified of such missing document, defect or breach, and if such Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce such Originator's obligation under the related Purchase Agreement and cause such Originator to repurchase that Mortgage Loan from the Trust Fund at the Repurchase Price (as defined in the related Purchase Agreement) on or prior to the Determination Date following the expiration of such 90 day period. . . .  (b) Upon discovery or receipt of written notice of the breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement or in Section 2.04 or Section 2.08 hereof in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders, the Trustee (or the applicable Custodian as its designated agent) shall promptly notify the Seller of such breach and request that the Seller cure such breach within 90 days from the date that the Seller was notified of such breach, and if the Seller does not cure such breach in all material respects during such period, the Trustee shall enforce the Seller's obligation under the Mortgage Loan Purchase Agreement and cause the Seller to repurchase that Mortgage Loan from the Trust Fund at the Purchase Price on or prior to the Determination Date following the expiration of such 90 day period (subject to Section 2.03(e) below).

PSA Section 2.03; *see also* Exhibit H § V. The trustee also has the right and duty to protect the

trusts by ensuring all parties to the governing agreements comply with their respective

obligations.

     76.    To protect the trusts and all certificateholders, the governing agreements require

Defendant to give prompt written notice to all parties to the governing agreements upon its

discovery or receipt of written notice of a breach of a representation or warranty made by the warrantor about the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the trusts regarding the breach.

77.    Defendant breached these contractual obligations by: 1) failing to provide notice of mortgage loans with document defects and/or representation and warranty breaches; 2) failing to enforce repurchase rights with respect to such mortgage loans; and 3) failing to ensure the warrantor abided by their contractual obligations.

### G.    Duties under the Loan Transfer Agreements

78.    Depending on the parties, there are several methods whereby the depositor acquires the loans for securitization. These include Mortgage Loan Purchase Agreements ("MLPAs"), Sale and Servicing Agreements ("SSAs"), Sale Agreements ("SAs"), and Assignment and Recognition Agreements (collectively, "loan transfer agreements"). These agreements are all substantially similar and govern the terms for transferring mortgage loans acquired for securitization from the originator to the depositor. These loan transfer agreements are generally between either the originator and the depositor, or the sponsor and the depositor.

79.    The warrantor's typical representations and warranties in the loan transfer agreements include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a loan-to-value ("LTV") ratio of more than 100%; (vi) each mortgaged

29

property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator. *See, e.g.*, MLPA Section 3.02.[8] *See also* Exhibit H § IX. To the extent mortgages breach the warrantor's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

80.     Under the loan transfer agreements, upon discovery or receipt of notice of any breach of the warrantor's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the trusts or the interests of the certificateholders therein, the warrantor is obligated to cure the breach in all material respects. MLPA Section 3.03.

81.     If a breach is not cured within a specified period, the warrantor is obligated either to substitute the defective loan with a loan of adequate credit quality, or to repurchase the defective loan.

82.     The repurchase provisions ensure that the trust need not continue to hold mortgage loans for which the warrantor breached its representations and warranties.

83.      Under the loan transfer agreements, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the trusts or the certificateholders' interests in the loans. The warrantor's cure, substitute, and repurchase obligations do not require any showing that the warrantor's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or require that the demanding party prove reliance on servicing and origination documents.

84.     Upon the sale of the mortgage loans to the trust, the rights under the loan transfer agreements, including the warrantor's representations and warranties concerning the mortgage

---

[8] All cites to "MLPA Section ___" are to the Mortgage Loan Purchase Agreement and related documents specific to the HarborView Mortgage Loan Trust 2006-6 ("HVMLT 2006-6") offering, which, as alleged above, is substantially similar to the transfer agreement for all of the trusts. A copy of the HVMLT 2006-6 MLPA is attached as Exhibit J.

loans, are generally assigned to the Defendant, as trustee, for the benefit of the trusts and all certificateholders, in accordance with the governing agreements.

85.     Defendant breached these contractual obligations by: 1) failing to enforce its contractual rights under the loan transfer agreements; 2) failing to enforce repurchase rights with respect to breaching and defective mortgage loans; and 3) failing to ensure the warrantor abided by their contractual obligations.

### H.     Duties Regarding the Servicers

86.     Each PSA requires the master servicer or servicer to prudently service the loans underlying the trusts.

87.     Section 3.01 of the PSA states:

> The Master Servicer shall supervise, monitor and oversee the obligation of the Servicers to service and administer their respective Mortgage Loans in accordance with the terms of the applicable Servicing Agreement and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing and administration. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with Accepted Master Servicing Practices. Furthermore, the Master Servicer shall oversee and consult with each Servicer as necessary from time-to-time to carry out the Master Servicer's obligations hereunder, shall receive, review and evaluate all reports, information and other data provided to the Master Servicer by each Servicer and shall cause each Servicer to perform and observe the covenants, obligations and conditions to be performed or observed by such Servicer under the applicable Servicing Agreement. . . .

The other PSAs contain substantially similar provisions. *See* Exhibit H § VII.

88.     Under the PSAs, Defendant, as trustee, has certain duties and obligations regarding monitoring the master servicers and/or servicers. In particular, the PSAs set forth Defendant's obligations upon occurrence of an "event of default" which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time. Section 7.01 of the PSAs identifies several types of failures by the servicer that may give rise to such an event. The other PSAs contain substantially similar provisions. *See* Exhibit H § VIII.

Such failures include a breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied after written notice of such failure shall have been given to the servicer by the trustee.

89.     Events of default can also be triggered by servicer downgrades or poor collateral performance.

90.     The remedies for uncured servicer events of default include, among other things, termination of the master servicers and/or servicers. *See* Exhibit H § VIII.

91.     Defendant breached these contractual obligations by failing to properly monitor the servicers and master servicers and determine whether events of default had occurred.

**I.     The Trustee's Duties upon Knowledge of an Event of Default**

92.     The PSAs impose additional obligations upon Defendant once it knows an event of default or a servicer event of termination has occurred. Within sixty to ninety days after a default has occurred, Defendant must provide written notice to all certificateholders about that event, unless the default has been cured or waived. As set forth in PSA Section 7.04(b):

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute an Event of Default of which a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Certificateholders notice of such occurrence unless such Event of Default shall have been waived or cured.

The other PSAs contain substantially similar provisions. *See* Exhibit H § VIII.

93.     Section 8.01 of the PSAs further requires Defendant to exercise the rights and powers vested in it by the PSA using "the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." The other PSAs contain substantially similar provisions. *See* Exhibit H § VI.

94.     Defendant breached these contractual obligations by: 1) failing to provide notice

of defaults and events of default; 2) failing act as a prudent person in the management of its own property following defaults and events of default (including, without limitation, by failing to actively review loans for defects and breaches and enforcing repurchase obligations); and 3) failing to act with due care and without negligence prior to an Event of Default.

J.     **The Trustee's Duties and Obligations under the Common Law**

95.     The common law imposes duties upon the trustee to perform ministerial acts with due care, to act without conflicts of interest, to provide notice when appropriate, to act in good faith, and to refrain from negligent conduct. Defendant's negligence, gross negligence, willful misconduct, and failure to avoid conflicts resulted in damage to Plaintiffs.

96.     As set forth below, Defendant is liable to Plaintiffs under the common law, as well as under the PSAs, for failing to exercise the necessary degree of skill and care as trustee, and in failing to avoid conflicts of interest that caused it not to act for the benefit of certificateholders.

VI.     **DEFENDANT FAILED TO PROVIDE NOTICE OF AND ENFORCE REMEDIES RELATED TO MORTGAGE FILE DOCUMENT DEFECTS**

A.     **Defendant Failed to Provide Notice and Enforce Remedies Related to Incomplete of Defective Mortgage Loan Files**

97.     To ensure that the rights, title and interest in the mortgage loans were properly protected, the governing agreements imposed upon Defendant, or its agents, a duty to take physical possession of the mortgage files, ensure that the note and mortgage were endorsed and assigned, ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying those mortgage loans for which the mortgage files were incomplete. *See* Exhibit H §§ II, III. The trustee or its agent were further required to notify the warrantors and enforce their obligations to cure, repurchase, or substitute compliant loans for the

loans with incomplete or defective files. *See* Exhibit H § V.

98.     Defendant, however, failed to act with due care and systematically disregarded its contractual duties to provide notice or enforce its rights on behalf of certificateholders to ensure that mortgage loans lacking complete or non-defective mortgage files were repurchased from the mortgage pools underlying the Certificates. If Defendant had met its contractual and common law duties with respect to the non-compliant loans, Plaintiffs would not have incurred their very significant losses attributable to the default of many of the defective loans.

99.     The governing agreements require that Defendant, or its agent, take physical possession of the mortgage files and that the note and mortgage are endorsed and assigned to Defendant. *See* Exhibit H §§ I, II. Under the governing agreements, Defendant, or the custodian on its behalf, was required to review each of the loan files and to certify that the documentation for each loan was accurate and complete. *See* Exhibit H § II, IV.

100.    Upon information and belief, Defendant accepted incomplete files without requiring the warrantors to cure document defects or substitute or repurchase loans.

101.    Defendant's failure to take possession of the mortgage loan documents, to notify the warrantors of document defects, and its failure to demand correction of the defects identified on the exception reports caused damage to Plaintiffs.

102.    Certificateholders did not receive or have access to any loan or mortgage files that they could check to make certain that their contractual rights were being protected, nor did they have access to the exception reports for the trusts. Rather, investors were dependent upon Defendant to police the deal and protect their contractual and other legal rights.

103.    Defendant's failure to perform its duties (including notifying other deal parties and enforcing warrantors' obligations) to ensure that the trust received a complete, non-defective

set of mortgage loan documents was not a mere technicality, as explained by Georgetown Law School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010.  Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before S. Comm. on Banking, Housing, and Urban Affairs (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center).  Professor Levitin described the implications of the failure by a securitization trustee such as Defendant to ensure delivery of the documents in the mortgage loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever.  The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law.  If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.
> . . .
> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts.  This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

### B.    Defendant Discovered or Knew the Mortgage Loan Files Were Incomplete

104.    That the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the originator to the trust, or there was no duly executed assignment of the mortgage to the trust, or the original lender's title policy was missing, or that any other required mortgage file document was missing or defective, would have been obvious to a reasonably competent trustee performing its contractual duties with due care.

105.    The trustee or its agent reviewed these documents and prepared an exception report listing all of the missing or defective documents.  And where the trustee's agent prepared the report, the trustee was generally required to directly receive a copy.  Thus, the trustee and/or its agent obtained direct knowledge of mortgage file document defects.

106.    In addition, numerous reports, litigation, and investigations have revealed the widespread misconduct of servicers to the trusts at issue here to cover-up the systemic failure of depositors and sponsors to properly assign the underlying mortgage loans to issuing trusts, including through the use of robo-signers. *See, e.g.*, Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm; Wall Street and the Financial Crisis: Anatomy of a Financial Collapse (2011), *available at* http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attempt=2; *In re Citibank, N.A.*, Consent Order, No. AA-EC-11-13 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47c.pdf; *In re Ally Fin. Inc., Ally Bank & GMAC Mortgage, LLC*, Consent Order, No. 11-20-B-HC, No. 11-020-B-DEO (Apr. 13, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a3.pdf; *In re HSBC Bank USA, N.A.*, Consent Order, No. AA-EC-11-14 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47d.pdf; *In re OneWest Bank, FSB*, Consent Order, No. WN-11-011 (Apr. 13 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf; *In re JPMorgan Chase Bank*, Consent Order, No. AA-EC-11-15, (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf; *In re PNC Bank, N.A.*, Consent Order, No. AA-EC-11-17 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47i.pdf; *In re Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf.

107.    Despite the existence of uncured Events of Default, Defendant did not adequately address the defaults and Events of Default. If Defendant had exercised due care, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the warrantors and caused them to repurchase or substitute the affected loans. Defendant's failure to do so damaged Plaintiffs.

108.    If Defendant had performed its duties as trustees, it would have enforced the obligations of the warrantors and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses. And if Defendant had enforced these repurchase obligations, as they were required to do, the Certificates would have been more valuable.

109.    If Defendant had met its contractual, common law, statutory, and fiduciary duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required, and issue accurate certifications, it would have caused the warrantors to repurchase all loans where the master servicers, servicers, sponsors, depositors, and originators failed to deliver required documentation to the Defendant or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already suffered losses or would ultimately suffer losses.

## VII.    DEFENDANT DISCOVERED OR RECEIVED NOTICE THAT THE TRUSTS SUFFERED FROM WIDESPREAD BREACHES OF REPRESENTATIONS AND WARRANTIES AND SHOULD HAVE TAKEN APPROPRIATE ACTION

110.    The trusts' loan pools contained large numbers of loans that materially breached the warrantors' representations and warranties concerning the originators' compliance with underwriting guidelines, owner occupancy statistics, appraisal procedures, and other associated standards. Discovery will likely show that Defendant discovered and received notice of loan-by

loan and trust-by-trust evidence including but not limited to:  (1) Defendant's internal tracking and correspondence regarding loan-by loan problems; (2) notices from entities, including monoline insurers, identifying loans with representation and warranty breaches; (3) information regarding specific breaching loans discovered by servicers; and (4) missing critical documents in loan and mortgage files for specific loans. This evidence was in the possession of and known to Defendant but not generally available to investors.

111.    That Defendant discovered or received notice of such evidence is further supported by evidence of widespread problems with the loans in the trusts, including, among other things:  (A) general reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the sponsors' pervasive disregard of prudent securitization standards (¶¶ 112-126); (B) specific reports concerning the originators of loans in the trusts abandoning their underwriting standards and sponsors of the securitizations failing to follow prudent practices (¶¶ 127-365); (C) the high number of borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts (¶¶ 366-375); (D) the collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings (¶¶ 376-379); and (E) Deutsche Bank's settlement with the Department of Justice concerning its securitization of loans originated by systematic abandonment of loan originator underwriting guidelines, together with the numerous lawsuits brought against Defendant and its affiliates alleging the systematic abandonment of originator underwriting guidelines (¶¶ 380-409).

**A.    General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards**

112.    By 2009, government reports, public and private investigations, and media reports

had surfaced concerning the collapse of the RMBS market and revealed the potential for massive

problems in the trusts such that a reasonable and prudent trustee would have taken upon itself the

duty to carefully investigate these issues and to take action as necessary. These reports and

investigations identified the originators' pervasive abandonment of underwriting standards and

sponsors' disregard of prudent securitization standards as the cause of the crisis.

113.    For example, the Office of the Comptroller of the Currency (the "OCC"),

published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest

rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in

those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report the OCC emphasized

the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the
> borrower and market conditions that a borrower is highly likely to be able to repay the
> loan as promised—is a major determinant of subsequent loan performance. The quality of
> underwriting varies across lenders, a factor that is evident through comparisons of rates
> of delinquency, foreclosure, or other loan performance measures across loan originators.

114.    Despite the importance of sticking to underwriting standards, it was clear that

originators were not following them. Chairman of the Federal Reserve Board, Benjamin

Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs

Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly
> compromised. The best-known and most serious case is that of subprime mortgages,
> mortgages extended to borrowers with weaker credit histories. To a degree that increased
> over time, these mortgages were often poorly documented and extended with insufficient
> attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting
> can be linked to the incentives that the originate-to-distribute model, as implemented in
> this case, created for the originators. Notably, the incentive structures often tied
> originator revenue to loan volume, rather than to the quality of the loans being passed up
> the chain. Investors normally have the right to put loans that default quickly back to the
> originator, which should tend to apply some discipline to the underwriting process.
> However, in the recent episode, some originators had little capital at stake, reducing their
> exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of

Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the*

*President's Working Group on Financial Markets*, Apr. 10, 2008, *available at*

http://www.federalreserve.gov/newsevents/speech/bernanke20080410a.htm.

115.   In November 2010, the Congressional Oversight Panel, which was established as

part of the Emergency Economic Stabilization Act of 2008, issued a report entitled "Examining

the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation."

The report recounts widespread foreclosure abuses in connection with mortgages that have been

securitized and the numerous federal and state investigations that have detailed this problem. The

abuses identified in the report—including forged or back-dated mortgage assignments and "robo-

signing" of false affidavits used in foreclosure actions—arise from failures in the documentation

and transfer of mortgage loans from the originators to other entities in the securitization process,

and ultimately into the trusts. As the report explains, irregularities in the chain of title between

the originator and the trust can have significant legal consequences that damage the trusts and

certificateholders. Cong. Oversight Panel, *Examining the Consequences of Mortgage*

*Irregularities for Financial Stability and Foreclosure Mitigation*, Pub. L. No. 110-343 (2010)*,*

*available at* http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-

111JPRT61835.pdf.

116.   Other reports reached similar conclusions. The Permanent Subcommittee on

Investigations in the United States Senate ("PSI") issued a report detailing the causes of the

financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its

investigation:

Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

Staff of S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* 50 (Subcomm. Print 2011).

117.    The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and the subsequent collapse of the mortgage market and wider economy. *See* Fin. Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").

118.    The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

[I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crisis in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

119.    The FCIC Report also noted that during the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan, and noted "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. A default in the first few months of a mortgage, known as an early

payment default, is known in the mortgage industry as a significant indicator of pervasive

disregard for underwriting standards. Not surprisingly, the FCIC Report noted that mortgage

fraud "flourished in an environment of collapsing lending standards." *Id.*

> 120. In this lax lending environment, mortgage lenders went unchecked, originating

mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause
> massive losses to investors in mortgage securities. As early as September 2004,
> Countrywide executives recognized that many of the loans they were originating could
> result in "catastrophic consequences." Less than a year later, they noted that certain high-
> risk loans they were making could result not only in foreclosures but also in "financial
> and reputational catastrophe" for the firm. But they did not stop.

*Id.*

> 121. Lenders and borrowers took advantage of this climate, with borrowers willing to

take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened

underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low

that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard

for a borrower's ability to pay." *Id.* at xxiii.

> 122. The predominant RMBS securitization method involved an originate-to-distribute

("OTD") model where the originators of the loans do not hold the loans, but instead repackage

and securitize them. The OTD model created a situation where the origination of low quality

mortgages through poor underwriting thrived. The Financial Stability Oversight Council

("FSOC") found:

> In the originate-to-distribute model, originators receive significant compensation upfront
> without retaining a material ongoing economic interest in the performance of the loan.
> This reduces the economic incentive of originators and securitizers to evaluate the credit
> quality of the underlying loans carefully. Some research indicates that securitization was
> associated with lower quality loans in the financial crisis. For instance, one study found
> that subprime borrowers with credit scores just above a threshold commonly used by
> securitizers to determine which loans to purchase defaulted at significantly higher rates

42

than those with credit scores below the threshold. By lower underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

Fin. Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements (2011) ("FSOC Report") at 11 (footnote omitted).

123.    The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry. The FSOC Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans." *Id*. Similarly, the sponsors responsible for securitizing residential mortgages for trusts between 2004-2008 failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the represented quality and also failed to ensure that the purported mortgaged property's appraised value was accurate.

124.    As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

125.    Additionally, the evidence shows that sponsors, and the third party due diligence providers they hired, failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools. More importantly, when the sponsors and their due diligence firms identified high percentages of mortgage loans in their sample reviews as defective, the sponsors often "waived in" mortgage loans in the interest of preserving their business relationships and their own profits.

43

126.    In sum, reports regarding the disregard of underwriting standards and poor securitization practices became common by 2009. Even prior to 2009, Defendant had exclusive access to proprietary information and data demonstrating the systematic failure of underwriting standards that was not available to the public. If validated, those practices would have directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools underlying RMBS, resulting in steep losses. By at least 2009, it was apparent to trustees that the originators and sponsors involved in the securitization of the trusts had engaged in problematic practices such that a reasonable and prudent trustee would have taken upon itself the duty to carefully investigate these issues fully in connection with the trusts entrusted to its care.

**B.      Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices**

127.    The governing agreements for each of the trusts incorporated representations and warranties concerning title to the mortgage loans, the characteristics of the borrowers and the collateral for the mortgage loans, and the credit criteria and underwriting practices for the origination of loans.

128.    However, Defendant knew and/or had reason to suspect that those representations and warranties were false and should have taken action to address the problem concerning the defective mortgage loans in the trusts. Numerous investigations, lawsuits, and media reports have demonstrated that nearly all of the largest mortgage loan originators in the RMBS market between 2000 and 2008 systematically disregarded their stated underwriting guidelines while pursuing profit by recklessly originating loans without regard for the borrowers' ability to repay. In addition, investigations, lawsuits, and media reports have shown that the primary sponsors in the RMBS market ignored prudent securitization standards.

129.     The information below put Defendant on notice that the loans underlying the trusts did not comply with the representations and warranties in the governing agreements. As a result, Defendant should have followed up on those issues in the context of the trusts entrusted to its care, provided notice to certificateholders, and taken appropriate action to protect the trusts, including identifying the particular breaching loans in the trusts and enforcing repurchase.

### 1.     American Home

130.     American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated, aggregated, and serviced by its subsidiaries. It was the parent of American Home Mortgage Acceptance, Inc. and American Home Mortgage Holdings, Inc., which was the parent of American Home Mortgage Corp., a retail lender of mortgage loans. Collectively, these entities are referred to as "American Home." American Home originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

131.     American Home's lack of adherence to underwriting guidelines was detailed in a 165-page amended class action complaint filed in June 2008. *See* Am. Complaint, *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. June 4, 2008) ("American Home Am. Compl."). Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from over 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. *See generally* American Home Am. Compl.

132.     According to the American Home Am. Compl., former American Home

employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied without compensating factors. *See id*. ¶¶ 120-21.

133.    Witnesses reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud. *See id*.

134.    Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for exceptions. It was commonplace to overrule mortgage underwriters' objections to facilitate loan approval. *See id*. ¶ 123.

135.    A former American Home auditor confirmed that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id*. ¶ 124.

136.    The parties settled the litigation on January 14, 2010, for $37.25 million.

137.    Like other originators from this period, American Home's poor lending practices resulted in numerous other civil lawsuits. Those lawsuits contain firsthand accounts from former employees and allegations that reunderwriting revealed that many loans originated by American Home were found to be breaching the associated representations and warranties. *See, e.g.*, Complaint, *Royal Park Invs. SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012); First Consolidated and Am. Complaint, *New Jersey Carpenters Health Fund v. Structured Asset Mortgage Invs. II, et al.*, No. 08-cv-8093 (S.D.N.Y. May 15, 2009).

2.      **Accredited Home Lenders, Inc.**

138.    In October 2006, Accredited Home Lenders, Inc. ("Accredited") acquired a smaller sub-prime lender, Aames. Accredited and Aames originated or contributed a material portion of the loans to the trusts.

139.    A complaint filed by Allstate Insurance Company contains allegations based on confidential witness statements in which former Accredited employees confirm that Accredited blatantly disregarded its underwriting standards. *See* Compl., *Allstate Insurance Company v. Morgan Stanley*, No. 651840/2011 (N.Y. Sup Ct. July 5, 2011) ("Allstate Complaint").

140.    One confidential witness, who served as a corporate underwriter for Accredited in San Diego, California between May 2002 and November 2006, reported that "underwriters were consistently pressured by upper management to approve loans where there was no mitigating value except to get the loan on the books." Allstate Complaint at ¶ 125. That same former Accredited employee "explained that certain underwriters with problem loan ratios above 45% 'were favored [by upper-level management] because they produced more loans.'" *Id*.

141.    Another confidential witness, who served as a corporate underwriter at Accredited between August 2003 and February 2006 in Tampa, Florida reported that "[t]he problem with the whole system was the overrides. The overrides were rampant. . . . If the borrower breathed, he got the loan." *Id*. ¶ 126.

142.    Similarly, a former chief appraiser at Accredited between 2002 and June 2007 in San Diego, California explained that Accredited's misconduct extended to artificial inflation of property appraisal values. According to the former appraiser, "Accredited established a policy whereby sales managers had the authority to manipulate a professional appraiser's final opinion of market value by utilizing the values of properties that were not comparable to the property

serving as collateral for the loan . . . . '[a]s of June 2006, between 12% and 15% of [Accredited's] business was being done through management overrides.'" *Id*. ¶ 127.

143.    Additionally, the complaint in *Bayerische Landesbank v. Goldman Sachs Group, Inc.*, No. 653111/2012 (N.Y. Sup. Ct. Sept. 5, 2012) ("Bayerische Complaint") cited confidential sources formerly employed by Accredited.

144.    According to a former corporate underwriter at Accredited in San Diego, California and Austin, Texas from June 2000 through March 2007, "inflated income on stated income loans was a most common problem and it was not unusual to see housekeepers who claimed to make $8,000 per month or landscapers who claimed to make $10,000 or $12,000 per month." *Id*. ¶ 177.

145.    A former Accredited employee from 1998 until December 2006 in loan underwriting and sales explained that underwriters were "strongly encouraged to push loans through regardless of quality."  *Id*. ¶ 176.

146.    The Amended Class Action Complaint filed in *Public Employees' Retirement System of Mississippi v. Merrill Lynch*, No. 1:08-cv-10841-JSR-JLC (S.D.N.Y. July 6, 2010) cited the following based on additional information provided by confidential sources:

- According to CW16, the number of overrides grew so large that Accredited was forced to institute a system to track such overrides. The system included a box on the loan file that an underwriter needed to check if a higher-level manager approved the loan "as a business decision" over the recommendation of the underwriter.

- According to CW17, a Corporate Underwriter at Accredited between June 2000 and March 2007 in both the San Diego, California, and Austin, Texas, offices, 'At the end of the month, we were handed loan files and told to just sign them with no audit.'

*Id*. ¶¶ 158–59.

147.    Additionally, the Class Action Complaint filed in *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-cv-488 H (RBB) (S.D. Cal. Aug. 24, 2007) provides testimony by former Aames and Accredited employees, as follows:

- According to CW11, the Western Retail Operations Manager at Accredited from October 2006 until March 2007, "Accredited got very loosey goosey on credit. It was common to see four, five or six exceptions on a loan. . . . At Accredited, they actually pushed making the exceptions. . . ."

- Further, according to CW11, "I was frequently overridden on loans that I thought were pieces of crap. They wanted units and dollar volume and didn't care how they got there."

- CW12, a Senior Underwriter at Accredited from October 2006 through March 2007 in its Irvine office, reported that "[a]t Accredited, we were told to make exceptions on everything." According to CW12, it wasn't until February 2007 that Accredited finally tightened its lending guidelines. According to CW12, "it was too late by then."

*Id.* ¶¶ 83–88.

148.    The Court in *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-cv-488 H (RBB) (S.D. Cal. Jan. 4, 2008), sustained allegations that "[d]efendants' statements regarding Accredited's underwriting practices were allegedly false and misleading because defendants had caused Accredited to deviate from its publicly professed standards."

### 3.    Ameriquest/Argent

149.    ACC Capital Holdings ("ACC Capital"), based in Orange, California, was the nation's largest privately-owned subprime lender. Ameriquest Mortgage Company ("Ameriquest") was ACC Capital's retail mortgage lending unit. Argent Mortgage Company, LLC ("Argent") was ACC Capital's wholly-owned wholesale lending unit that made loans through independent brokers. On September 1, 2007, Citigroup purchased Argent from ACC Capital, and Ameriquest announced that it was shutting down lending operations.

150.     Argent originated or contributed a substantial portion of the loans in the mortgage pools underlying the trusts and Ameriquest sponsored some of the trusts.

151.     Argent appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report. Argent was ranked as the worst lender in Cleveland, Ohio, and Detroit, Michigan; the second worst in Las Vegas, Nevada, and Miami, Florida; the third worst in Denver, Colorado; the fourth worst in Stockton, California; the fifth worst in Bakersfield, California; the sixth worst in Riverside and Sacramento, California; and the eighth worst in Memphis, Tennessee.

152.     In the 2009 OCC Report, Argent was fourth in Las Vegas, Nevada; sixth in Fort Pierce-Port St. Lucie, Florida and Reno, Nevada; seventh in Bakersfield, California and Stockton-Lodi, California; eighth in Riverside-San Bernardino, California; ninth in Merced, California, Modesto, California and Fort Myers-Cape Coral, Florida; and tenth in Vallejo-Fairfield-Napa, California.

153.     According to a May 11, 2008, Cleveland Plain Dealer article titled *The Subprime House of Cards*, Jacquelyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, reported that "some Argent employees played fast and loose with the rules" and stated: "I personally saw some stuff I didn't agree with." Ms. Fishwick "saw [Argent] account managers remove documents from files and create documents by cutting and pasting them." Mark Gillispie, *The Subprime House of Cards*, The Plain Dealer, May 11, 2008, *available at* http://blog.cleveland.com/metro/2008/05/the_subprime_house_of_cards.html.

154.     According to a January 29, 2009, article in the Miami Herald, Orson Benn, a former vice president of Argent who was convicted and sentenced to prison for racketeering relating to mortgage fraud, spent three years during the height of the housing boom teaching

50

brokers "how to doctor credit reports, coached them to inflate [borrower] income on loan applications, and helped them invent phantom jobs for borrowers" so that loans could be approved. Jack Dolan *et al.*, *Home Loan Racket Flourished In Florida*, Miami Herald, Jan. 29, 2009, *available at* https://www.miamiherald.com/news/special-reports/borrowers-betrayed/article1931259.html.

155.    According to Mr. Benn himself, "the accuracy of loan applications was not a priority." *Id.* The article reports: "The simplest way for a bank to confirm someone's income is to call the employer. But in at least two dozen cases, the applications show bogus telephone numbers for work references." *Id.* The article notes that one Argent broker generated at least 100 loans worth $22 million in Miami and nearly all of them were based on false and misleading financial information. *See id.* For instance, "one borrower claimed to work for a company that didn't exist—and got a $170,000 loan. Another borrower claimed to work a job that didn't exist—and got enough money to buy four houses." *Id.* The Miami Herald obtained applications for 129 loans funded by Argent and found that "103 contained red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth." *Id.*

156.    The New York Times reported that Ameriquest refused to sign up for a tax verification service for verifying the reported taxes of borrowers as part of its underwriting process. Gretchen Mortgenson, *A Road Not Taken By Lenders*, N.Y. Times, Apr. 6, 2010, *available at* http://www.nytimes.com/2008/04/06/business/06gret.html.

157.    Richard Bowen, the former Business Chief Underwriter at Citibank, was involved in the due diligence process for Citibank's acquisition of Argent. In his April 7, 2010 appearance before the FCIC, Mr. Bowen testified that he advised against the acquisition because "we sampled loans that were originated by Argent, and we found large numbers that did not—that

were not underwritten according to the representations that were there." Hearing on Subprime

Lending and Securitization and Gov't Sponsored Enterprises Before the Fin. Crisis. Inquiry

Comm'n (Apr. 7, 2010) (testimony of Richard M. Bowen, III) ("Bowen Testimony") at 239.

158.    In a video released by the American News Project on May 11, 2009, reporters

Lagan Sebert and Mike Fritz interviewed several former employees of Argent and Ameriquest

regarding their lending practices. American News Project, *Fraud by Mortgage Companies Key*

*Cause of Foreclosures* (May 11, 2009), *available at*

http://www.youtube.com/watch?v=MFPi6mcNubo.

159.    Tamara Loatman-Clark, a former loan closer for Argent, stated "I mean you did

what you had to do and again if that meant manipulating documents so that you can get them out

so that they could conform, that's what you did…. [T]here were incentives to get as many done

as possible. So on a typical Thursday, I may have 15 or 20 files that I need to get funded

somehow and you know you need to work very hard to get 20 files funded. Whatever hit your

desk for the day is what you wanted to get out." *Id*.

160.    According to the video, "It was the Wall Street business that drove the frantic

pace. Even before proper papers were signed, Ameriquest was bundling the loans and passing

them on." Loatman-Clark said, "And so sometimes when they came back and you're talking

about, you know, names not properly on mortgage documents… you're talking about missing

documents, like internally the incentive was to do whatever you needed to do to get them out and

that sometimes meant that you manipulated documents to get them out." *Id*.

161.    The video report contained the following exchange:

Reporter: "So you are saying the goal was to make these loans and then get them off your
books as quick as possible?"

Loatman-Clark: "Exactly. That was the pressure."

Reporter: "But who were the people who were buying, who were like the most hungry for these loans?"

Loatman-Clark: "Bear Stearns… Citigroup was another one. Basically the ones that were/are hardest hit were the people who invested. And these were the people we were shuffling these documents out to by any means necessary."

*Id.*

162.    Omar Kahn, a former Ameriquest Loan Officer, also told the reporters, "Every closing we had was a bait and switch, because you could never get them to the table if you were honest." "There were instances where the borrower felt uncomfortable about signing the stated income letter, because they didn't want to lie, and the stated income letter would be filled out later on by the processing staff." *Id*.

163.    Another former Ameriquest Loan Officer named Tyson Russum said, "The entire system is built to do whatever you can to close as many loans at the highest fee amount as possible." *Id*.

164.    In testimony before the FCIC on Jan. 14, 2010, Illinois Attorney General Lisa Madigan explained that a multistate investigation of Ameriquest "revealed that the company engaged in the kinds of fraudulent practices that other predatory lenders subsequently emulated on a wide scale ... includ[ing]: inflating home appraisals." FCIC Report at 12.

165.    On June 23, 2011, the Cleveland Plain-Dealer reported that a Cleveland grand jury indicted nine former Argent employees for their suspected roles in approving fraudulent home loans. Mark Gillespie, *Former Employees of Subprime Mortgage Lender Indicted by Cuyahoga County Grand Jury*, The Plain Dealer, June 23, 2011, *available at* http://blog.cleveland.com/metro/2011/06/former_employees_of_subprime_m.html.

166.    The indictment alleged that Argent employees "helped coach mortgage brokers

about how to falsify loan documents so that they misstated the source or existence of down payments as well as borrower's income and assets." *Id*. The article noted that "[e]mployees at an Argent loan processing center in Illinois ultimately approved the loans knowing that the company's own lending rules had not been satisfied." *Id*. A spokesman for the prosecutor's office said that "Argent employees bent the rules to get loans approved in order to inflate their wages and bonuses." *Id*.

167.    Later, the Plain Dealer reported that additional criminal charges had been brought against one of the former Argent employees indicted in June—a woman named Angela Pasternak. Mark Gillespie, *Argent Mortgage Worker Gets Indicted Again in Suspected Mortgage Fraud Case*, The Plain Dealer, Nov. 15, 2011, *available at* http://blog.cleveland.com/metro/2011/11/argent_mortgage_worker_gets_in.html.

168.    According to the article, prosecutors said that Ms. Pasternak, "approved exceptions knowing that loan applications contained false income information and bogus credit scores." *Id*. The article also reported, "Plain Dealer investigations found numerous instances in which Argent approved mortgages that contained blatant misrepresentations of borrowers' income, assets and ability to pay." *Id*.

169.    According to another article, Steve Jernigan, a fraud investigator at Argent, said that when he sent an appraiser to check on a subdivision for which Argent had made loans, the address on the loans was clearly fictitious because the appraiser was standing in the middle of a cornfield. Michael W. Hudson, *Silencing the Whistle-blowers*, The Investigative Fund, May 10, 2010, *available at* https://www.theinvestigativefund.org/investigation/2010/05/10/silencing-whistle-blowers/.

170.    When Jernigan reviewed the loan files, he determined that the houses did not exist

and that each of the loan files contained the picture of the same house. *See id.* The article also reported that Argent had been ripped off by a con man named Robert Andrew Penn, who later admitted that he had appropriated victims' names and credit histories to obtain loans and buy properties for inflated prices around Indianapolis. *See id.* Although Argent was warned about the man in 2004, Jernigan said the company did not "conduct a serious investigation" into the fraud until mid-2006 when it learned the scheme was about to be made public by another duped lender. *Id.*

171.    The article stated that the reluctance to investigate fraud was deliberate because management did not want to "crimp loan sales." *Id.* The article quoted Kelly Dragna, a fraud investigator at Ameriquest who said, "You're like a dog on a leash. You're allowed to go as far as a company allows you to go." "At Ameriquest, we were on pretty short leash. We were there for show. We were there to show people that they had a lot of investigators on staff." *Id.*

172.    The article outlined the story of one fraud investigator's career at Ameriquest to demonstrate the extent to which Ameriquest turned a blind eye to fraud:

> Ed Parker signed on as Ameriquest's head of mortgage fraud investigation in early 2003, as the company was on the verge of becoming the nation's largest subprime lender. The first case he took on involved allegations that employees at the company's Grand Rapids, Mich., branch were pushing real-estate appraisers to inflate loan applicants' home values. Workers admitted to the scheme, Parker said, and the company shut down the branch and repurchased hundreds of loans from the investors who'd bought them.
>
> Parker saw the investigation as a success. He thought he'd helped set a precedent that fraud wouldn't be tolerated. But he discovered that his actions didn't endear him to many of his co-workers. One executive told him the sales force looked on him as "Darth Vader." On another occasion, when a suspicious loan file was brought up during a staff meeting, a senior executive said: "Don't give it to Ed. If you give it to him, that one file will multiply and become hundreds of files."
>
> Parker said higher-ups began pushing him to limit the scope of his inquiries and focus on smaller cases rather than big-impact ones like Grand Rapids. This message was driven home after Ameriquest learned that a TV reporter was digging into problems at a branch in Mission Valley, Calif. Two loans raised questions about whether branch employees

were falsifying not only borrowers' incomes but also their ages, so that the inflated incomes would seem plausible. One borrower was 67, but the loan application prepared in her name said she was 41. Another was 74, but the loan application indicated the borrower was 44. The company, Parker said, wanted to limit its exposure and portray the problem as a couple of isolated cases. The company had all of the branch's loan files boxed up and transported to the fraud investigation team in Orange County. Management sent word, however, that Parker's team shouldn't open the boxes. His investigators looked anyway. As they cracked open the files, they saw that falsified incomes and ages were a problem that went beyond two borrowers' loans. When senior managers discovered what the team was doing, Parker said, they weren't happy. "They said: 'Don't look anymore,'" he recalled. "They didn't want to know."

*Id.*

173.    In January 2010, Ameriquest and Argent agreed to pay $22 million to settle 29 class action lawsuits against them that had been consolidated in the Northern District of Illinois, alleging that Argent and Ameriquest inflated appraisal values and borrower income or asset statements and aggressively employed misleading marketing/sales techniques as part of a business strategy to force potential borrowers to close loans. *See In re Ameriquest Mortgage Co. Mortgage Lending Pracs. Litig.*, MDL No. 1715 (N.D. Ill.)

### 4.    Countrywide

174.    Countrywide Financial, Countrywide Home Loans, Inc., Countrywide Mortgage Funding, Inc. and Countrywide Home Loans Servicing LP ("Countrywide") was one of the largest originators of residential mortgages in the United States during the period leading up to the financial crisis. Countrywide originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

175.    In a television special titled, "*If You Had a Pulse, We Gave You a Loan*," Dateline NBC reported on March 27, 2009:

To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."

He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."

But it turned out to be no laughing matter for Partow. Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."
. . .
During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *If You Had a Pulse, We Gave You a Loan,* NBC Dateline (Mar. 22, 2009),

*available at* http://www.nbcnews.com/id/29827248/ns/dateline_nbc-

the_hansen_files_with_chris_hansen/t/if-you-had-pulse-we-gave-you-loan/.

176.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled

investors about the credit risks that Countrywide created with its mortgage origination business,

telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See* Complaint, *SEC v. Mozilo*, No. 09-cv-3994 (C.D. Cal. June 4, 2009). Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

177.    Internal Countrywide e-mails released in connection with the SEC lawsuit and publicly available show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

178.    Indeed, in a September 1, 2004 email, Mozilo voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."

179.    In 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract. In an e-mail sent on April 17, 2006, Mozilo asked,

"[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate." Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic] It's not only subordinated to the first, but the first is subprime. In addition, the [FICOs] are below 600, below 500 and some below 400 . . . . With real estate values coming down . . . the product will become increasingly worse. There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

180.    Countrywide sold a product called the "Pay Option ARM." This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."

181.    An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.

182.    Mozilo admitted in a September 26, 2006 email that Countrywide did not know how Pay Option ARM loans would perform and had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet." Yet such loans were securitized and passed on to unsuspecting investors such as the CCUs.

183.    With growing concern over the performance of Pay Option ARM loans, Mozilo advised in a November 3, 2007 email that he "d[id]n't want any more Pay Options originated for the Bank." In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans. Mozilo's concerns about Pay Option ARM loans expressed in

the same email were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."

184.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

185.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines." Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry.

186.    Aguilera confirmed in a June 12, 2006 email that internal reports months after an

initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.

187.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate. In a February 21, 2007 email, Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."

188.    John McMurray, a former Countrywide managing director, expressed his opinion in a September 7, 2007 e-mail that "the exception process has never worked properly."

189.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors. After reviewing many of the loans that went bad, Countrywide executive Russ Smith stated in an April 11, 2007 email that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."

190.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

191.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

192.    According to Zachary, Countrywide pressured employees to approve unqualified borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It

doesn't matter how you get there." NBC Nightly News, *Countrywide Whistleblower Reports*

*"Liar Loans,"* July 1, 2008. Zachary also stated that the practices were not the work of a few bad

apples, but rather: "It comes down, I think from the very top that you get a loan done at any

cost." *Id.*

193.    Zachary also told of a pattern of: 1) inflating home appraisals so buyers could

borrow enough to cover closing costs, but leaving the borrower owing more than the house was

truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into

riskier mortgages requiring little or no documentation, knowing they could not afford it; and

3) employees coaching borrowers to overstate their income to qualify for loans. *Id.*

194.    NBC News interviewed six other former Countrywide employees from different

parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and

practices. Some said that Countrywide employees falsified documents intended to verify

borrowers' debt and income to clear loans. NBC News quoted a former loan officer: "'I've seen

supervisors stand over employees' shoulders and watch them . . . change incomes and things like

that to make the loan work.'" *Id.*

195.     Countrywide's complete disregard for proper loan underwriting has spawned

numerous lawsuits. As part of these lawsuits, plaintiffs have performed forensic analyses and re-

underwritten entire loan files. Public disclosure of the staggering number of loans breaching the

associated representations and warranties discovered in these cases should have alerted the

trustee that Countrywide loans were highly likely to have breached the associated representations

and warranties.

### 5.    Decision One

196.    Decision One Mortgage Co., LLC and Decision One Mortgage Corp. ("Decision

One") was a major lender specializing in mortgage loans that are commonly referred to as Alt-A

lending options, and non-conforming or sub-prime loans. In 2006, Decision One ranked as the

14th largest subprime lender in the nation. Decision One originated or contributed a material

portion of the loans in the mortgage pools underlying the trusts.

197.    A 2011 complaint filed by Allstate Insurance Company contains allegations based

on confidential witness statements in which former Decision One employees "described

Decision One's lax attitude towards its own origination and underwriting standards and

explained that Decision One had been approving loans that should have never been issued."

Complaint, *Allstate Ins. Co. v. Morgan Stanley*, No. 651840/2011, ¶ 95 (N.Y. Sup. Ct. July 5,

2011). On March 15, 2013, the Court granted Morgan Stanley's Motion to Dismiss with respect

to a negligent misrepresentation claim, but denied the Motion in all other respects.

198.    According to testimony and documents submitted to the FCIC by a Clayton

executive, during 2006 and the first half of 2007, Clayton reviewed 911,039 loans issued by

originators, including Decision One, for securitization. Clayton determined over 10% of

Decision One's loans did not comply with its underwriting guidelines and had no compensating

factors. *See* Clayton All Trending Report at 10, available at http://fcic-

static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

199.    Decision One's reckless lending practices earned it a spot on the OCC's 2009

"Worst Ten in the Worst Ten" list.

### 6.    First Franklin

200.    First Franklin Financial Corporation ("First Franklin") originated or contributed a

material portion of the loans in the mortgage pools underlying the trusts.

201.    Starting in 2009, First Franklin was named in numerous lawsuits alleging that it

systematically abandoned its underwriting guidelines in the pursuit of profits. These lawsuits

contain ample evidence that mortgage loans originated by First Franklin breached the associated

representations and warranties. Not only do these lawsuits contain eye-witness accounts from

confidential witnesses and former employees of First Franklin, but many complaints also contain

detailed information based on forensic reviews of individual loans.

202. One of the earliest lawsuits naming First Franklin was filed on February 17,

2009. Complaint, *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. et

al.*, No. 09-cv-1392 (S.D.N.Y. Feb. 17, 2009). The complaint alleged that First Franklin

"systematically ignored, or abandoned their stated and pre-established underwriting and

appraisal standards." *Id.* at ¶ 11. The litigation was eventually settled.

203. First Franklin was also named in a 2010 class action suit that alleged it

systemically disregarded its underwriting guidelines when originating mortgages that were

subsequently securitized into RMBS. *See* Corrected Am. Compl. For Rescission and Damages,

*Federal Home Loan Bank of Chicago v. Banc of America Funding Corp et al.*, No. 10-ch-45003

(Ill. Cir. Ct. Apr. 8, 2011) ("FHLB Chicago Am. Compl.").

204. Statements from confidential witnesses in the FHLB Chicago Am. Complaint

represented that First Franklin originated mortgage loans in violation of its stated underwriting

standards.

205. According to one confidential witness who was an underwriter at a First Franklin

branch in Georgia from March 2004 to November 2007, account executives at First Franklin

were making "$100,000 a month in commissions," which was based on the number and dollar

amount of loans processed. Due to this incentive structure, account executives would often

pressure underwriters to approve loans that should not have been approved. The executives

would simply override the underwriter's decision so that, according to this confidential witness, "Nine out of ten times, the loan went through." *Id*. ¶¶ 387-88.

206.    That same confidential witness explained that First Franklin used contract appraisers who inflated property values. There "were homes with busted out windows and the meter boxes [] missing" that appraised for $300,000. He also knew that many fake W-2s had been attached to loan applications because the tax withholdings did not match the income. Further, he knew that mortgage brokers who referred loan applications to First Franklin were "whiting out or faxing over" the actual numbers and writing in new numbers so that the loans would work. *Id*. ¶¶ 400, 402.

207.    Another confidential witness was an underwriter and account executive at a First Franklin branch in Ohio from 2000 until 2007. Account executives were responsible for maintaining relationships with mortgage brokers that referred loan applications to the originating banks. This confidential witness stated that "account executives paid processors cash under the table to help them get loans closed," and went on to describe how one loan processor was caught manipulating the loan documents in order to close more loans. *Id*. ¶ 389.

208.    One confidential witness, who was an underwriter at a First Franklin branch in Washington from 2005 until November 2007, described how the systematic disregard for underwriting standards grew worse after First Franklin purchased OwnIt Mortgage and OwnIt employees began working with the confidential witness. She stated that OwnIt employees "were used to approving anything. They'd say, 'If we don't approve it, somebody else will. So why lose the money?'" This witness's manager was a former OwnIt employee who would often override her employees' decisions to decline loans in order to meet performance goals. The witness also noted that First Franklin employees manipulated applications so that they would be

approved. *Id*. ¶¶ 390, 406.

209.    The confidential witness who worked at the Ohio branch represented that there was enormous pressure from management to close loans at any cost. "[P]eople were working until 8 p.m. on Saturdays and Sundays" in order to close the loans, stated the witness. As a result, "a lot of loans slipped through. People were tired of being beat up. With the rush of loans, stuff could have been overlooked. Maybe the conditions didn't exactly meet the guidelines." During the last few days of the month, some employees would go to the branch manager "begging for exceptions to close their loans." *Id*. ¶ 395.

210.    Another confidential witness, who was, among other things, an account executive and underwriter at a First Franklin branch in Utah from 1996 until 2008, noted that account executives would often approach branch managers about overturning an underwriter's decision to reject a loan, and said that "some loans were approved that were not compliant with guidelines." *Id*. ¶ 396.

211.    That same confidential witness also encountered the "blatant fraud" first hand. She recalled a $500,000 loan application for a home that was supposed to be owner occupied even though the same borrower and purchased a $1,000,000 home in the same neighborhood a month earlier and also claimed that it would be owner occupied. Although the underwriter was successful in blocking that particular application, her manager was mad at her for catching it. Other similar loans were approved. *See id*. ¶ 404.

212.    When First Franklin began downsizing its mortgage operation in late 2007, it ordered all of its remaining underwriters to assist in loss mitigation. The confidential witness from the Utah branch was one of them. She reported that the loss mitigation group was tasked with reviewing the quality of a number of First Franklin's loans: she reported that among the

loans she reviewed, fifty percent were not compliant with First Franklin's guidelines, citing problems such as inflated appraisal values, insufficient employment verification, and disqualifying credit scores. *See id*. ¶ 398.

213.    According to another confidential witness, who was an underwriter at a First Franklin branch in Florida from 1999 until 2007, loan document manipulation at First Franklin grew to disconcerting levels. The witness stated that "a lot of fraudulent loans were going through. There was tons of fraud going on." *Id*. ¶ 401.

214.    FHLB's complaint survived the defendants' motion to dismiss, with the court stating "the Bank has provided evidentiary facts, such as testimony, AVM analysis of appraisal values, delinquency and foreclosure rates, and pleadings from other civil actions involving the defendants, which demonstrate the strength of the Bank's case" that the originators systematically disregarded their underwriting standards. Order, No. 10-45033 (Ill. Cir. Ct. Sept. 19, 2012).

215.    First Franklin has also been sued by Ambac Assurance Corporation, a company that provided monoline insurance, a form of credit enhancement for certain certificates in a RMBS. After paying hundreds of millions of dollars to certificateholders as a result of the many defaults and delinquencies on First Franklin-originated loans, Ambac reviewed 1,750 First Franklin loans. It found that 94% had material defects, including:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated appraisals; and

- Pervasive violations of the loan originator's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made

unreasonable claims as to their income, (ii) with debt-to-income and loan-to-value ratios above the allowed maximums, or (iii) with relationships to the applicable originator or other non-arm's-length relationships. Complaint, *Ambac Assurance Corp. v. First Franklin Fin. Corp.*, No. 651217/2012, at ¶¶ 82-83 (N.Y. Sup. Ct. April 16, 2012).

### 7.   Fremont

216.   Fremont Investment and Loan ("Fremont") originated or contributed a material

portion of the loans in the mortgage pools underlying the trusts.

217.   Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a

lender "'known for poor quality loans.'" Opening Statement of Sen. Carl Levin, Chairman, *Wall*

*Street and the Financial Crisis: The Role of High Risk Home Loans*, Hearing Before S.

Permanent Subcomm. on Investigations (Apr. 23, 2010). Senator Levin recounted how an analyst

with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs

RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, a subprime lender known for loans with high rates of delinquency. On January 24, 2007, an analyst wrote seeking advice from two senior analysts: "I have a Goldman deal with subprime Fremont collateral. Since Fremont collateral has been performing not so good, is there anything special I should be aware of?" One analyst responded: "No, we don't treat their collateral any differently." The other asked: "are the FICO scores current?" "Yup," came the reply. Then "You are good to go." In other words, the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry. In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages. By October, both companies began downgrading the CDO. Today all five AAA tranches have been downgraded to junk status.

*Id*.

218.   Fremont faced a lawsuit filed by Cambridge Place Investment, Inc., which is

mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.

Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.

Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*,

Myrtle Beach Sun-News, Aug. 15, 2010.

219.    On September 28, 2012, the court denied in principal part the defendants' Joint

Motion to Dismiss For Failure to State a Claim. *See Cambridge Place Inv. Mgmt. Inc. v. Morgan*

*Stanley & Co., Inc., et al.*, No. 10-2741 (Mass. Super. Ct.).

220.    On December 21, 2011, the FHFA filed an amended complaint against UBS

Americas, Inc., alleging securities laws violations concerning RMBS purchases made by Freddie

Mac and Fannie Mae. In the complaint, the FHFA alleged:

A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans. He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this." The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved. The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams. He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

*See* Second Am. Complaint, *FHFA v. UBS Americas, Inc.*, No. 11-cv-05201 (S.D.N.Y.) (Dec.

21, 2011). The court denied a motion to dismiss the complaint in May 2012. *See FHFA v. UBS*

*Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012). On July 25, 2013, the FHFA announced

that it had reached an agreement to settle the case for $885 million.

221.    Fremont's origination practices have also been addressed in numerous governmental investigations and reports. For example, the FCIC Report discusses that Moody's created an independent surveillance team in 2004 in order to monitor previously rated deals. The Moody's surveillance team saw a rise in early payment defaults in mortgages originated by Fremont in 2006, and downgraded several securities with underlying Fremont loans or put them on watch for future downgrades. Moody's chief credit officer stated that Moody's had never had to put on watch deals rated in the same calendar year. In 2007, Moody's downgraded 399 subprime mortgage-backed securities that had been issued in 2006 and put an additional 32 securities on watch. Moody's noted that about 60% of the securities affected contained mortgages from one of four originators, one of which was Fremont. FCIC Report at 221-222.

222.    According to the FCIC Report, when sponsors kicked loans out of securitization pools, some originators simply put those loans into new pools. Roger Ehrnman, Fremont's former regulatory compliance and risk manager, told the FCIC that Fremont had a policy of putting loans into subsequent pools until they were kicked out three times. FCIC Report at 168.

223.    Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee. *See* 2008 "Worst Ten in the Worst Ten" Report. In the 2009 "Worst Ten of the Worst Ten" Report, Fremont held the following positions: 2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th in Bakersfield, California and Merced, California. *See* 2009 "Worst Ten in the Worst Ten"

70

Report.

### 8.    GreenPoint

224.    GreenPoint Mortgage Funding, Inc. ("GreenPoint"), based in Novato, California,

was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One").

Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork

Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year

later on August 21, 2007. Capital One eventually liquidated GreenPoint in December 2008,

taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's

origination business. GreenPoint originated or contributed a material portion of the loans in the

mortgage pools underlying the trusts.

225.    When originating stated income loans, GreenPoint often inflated the borrowers'

income by as much as 5%. A September 12, 2008, article on Bloomberg reports on GreenPoint's

underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower
> than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay
> stubs or tax returns to document their earnings, were offered by lenders such as
> GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found
> it difficult to verify their salaries.
> . . .
> "To grow, the market had to embrace more borrowers, and the obvious way to do that
> was to move down the credit scale," said Guy Cecala, publisher of Inside Mortgage
> Finance. "Once the door was opened, it was abused."
> . . .
> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or
> more, and more than half increased the amount by more than 50 percent, according to a
> study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-
> based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*,

Bloomberg, Sept. 12, 2008.

226.     Syncora Guarantee, a monoline insurer, sued J.P. Morgan Securities, LLC, as successor to Bear Stearns & Co., Inc., in 2011 in connection with an RMBS underwritten by Bear Stearns and exclusively collateralized by GreenPoint-originated loans. After sustaining large losses due to the poor performance of GreenPoint loans, Syncora hired an independent consultant to "reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly selected without regard to payment status. Over 92% of the 1,431 loans contained misrepresentations, and over 85% of the randomly selected 400 loans contained misrepresentations. The misrepresentations uncovered included the following:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

*See* Complaint, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, No. 651566/2011 (N.Y. Sup. Ct. June 6, 2011). Syncora's lawsuit survived a combined motion to dismiss and motion for summary judgment. *See* Decision and Order, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, Doc. 50, No. 651566/2011 (N.Y. Sup. Ct. May 2, 2012).

227.     GreenPoint's own employees have corroborated the findings of Syncora. A confidential witness in *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage*

*Securities, Inc.*, stated that (1) GreenPoint employees faced intense pressure to close loans at any cost; (2) GreenPoint managers overrode employees' decisions to reject loans and approved loans based upon inflated incomes; (3) GreenPoint approved loans that contained exceptions for which there were no reasonable compensating factors; and (4) GreenPoint failed to adhere to sound underwriting guidelines. This confidential witness was a senior loan underwriter at GreenPoint from October 1997 through August 2007. *See* Complaint, *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortgage Secs., Inc.*, No. 49D051010PL045071 (Ind. Sup. Ct. Oct. 15, 2010) ("FHLB Indianapolis").

228.    According to that confidential witness, sales staff and managers at GreenPoint received bonuses based on the number of loans closed. As she said, "sales had tremendous authority" at GreenPoint, and "[t]hey were in business to make more money. They would try to find any way to close a loan." *Id.* ¶ 266.

229.    Between 2005 and 2007, the confidential witness said that stated income loans became increasingly popular and GreenPoint managers approved loans based upon inflated incomes she believed should not have been approved. She saw a lot of loans with stated "income that was more than could be justified by the borrower's employment." When she denied loans because she believed the income was inflated, sometimes the underwriting managers, operations managers, and the regional operations manager overrode her decisions. *Id.* ¶ 267.

230.    More often than not, the confidential witness believed that her managers overrode her denials due to the incentives they received based upon loan volume. As she said, "They were making the decision because they had to hit certain sales numbers." She knew of such targets because of comments made in operations meetings about the company needing to meet certain goals. *Id.* ¶ 268.

231.    In *Allstate Bank v. J.P. Morgan Chase, N.A.*, Allstate, an RMBS investor, sued J.P. Morgan, the RMBS underwriter, for misrepresentations in RMBS offering documents. Allstate's complaint relied on several confidential witnesses. One confidential witness, who was an underwriting analyst at GreenPoint from 2003 to 2007, stated that GreenPoint reviewed only 10% of the loans it originated for fraud. He thought this was a "mistake" because the fraud and misrepresentations uncovered in the 10% sample indicated that many more loans likely contained fraud. But the remaining 90% of the loans were not reviewed. Am. Complaint, *Allstate Bank v. J.P. Morgan Chase, N.A.*, No. 11-cv-1869, at ¶ 485 (S.D.N.Y. May 10, 2012).

232.    That confidential witness also stated that sales personnel ran GreenPoint, and senior management was comprised of people from sales who were incentivized to push the volume of mortgage loans, not adherence to the underwriting guidelines or due diligence. Managers' bonuses were tied to production volume, and they were not penalized if loans were later found to be fraudulent or if the borrower defaulted on the first payment. He stated that GreenPoint's management deliberately overlooked misrepresentations from mortgage loan brokers, particularly if the broker brought in a high volume of loans. Problem brokers were rarely suspended, and even when they were, there was never a review of the loans they originated that were already in the pipeline. *Id*. ¶ 486.

233.    Another confidential witness was a Wholesale Account Manager at GreenPoint from 2004 to 2006. That confidential witness stated that GreenPoint employees understood that if a mortgage loan could eventually be sold to Wall Street, GreenPoint was to approve and fund the mortgage loan. The majority of the loan products originated in the confidential witness's office were stated income and asset loans and pay-option ARMs. Despite the risk inherent in these products, the sales force "never learned of negative loan performance" and their

compensation was not tied to loan performance. *Id*. ¶ 487.

234.    Another confidential witness was an Underwriting Supervisor at GreenPoint from 2005 to 2006 who supervised five Underwriters and three Conditions Specialists. That confidential witness stated that GreenPoint management authorized exceptions to loan underwriting guidelines to approve applications, even when there were no compensating factors justifying the exceptions. The confidential witness knew that management overrode decisions to refuse funding in locations known for fraud and property flipping, even when evidence of fraud was found. According to the confidential witness, "if the borrower is breathing and could sign loan documents, they could get a loan" from GreenPoint. *Id*. ¶ 488.

235.    Allstate's complaint also alleged that many of GreenPoint's loans were granted by the over 18,000 brokers approved to transact with GreenPoint – a large enough number that GreenPoint could exercise no realistic degree of control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. *Id*. ¶ 490.

236.    GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; and 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California.

### 9.    Impac

237.    Impac Funding Corp. and Impac Mortgage Holdings, Inc. ("Impac") is a mortgage company that acquires, purchases, and sells mortgage loans. It is a California

corporation headquartered in Irvine, California. Impac originated or contributed a material portion of the loans in the mortgage pools underlying the trusts and sponsored many of the trusts.

238.    Massachusetts Mutual Life Ins. Co. ("Mass Mutual"), an RMBS investor like the CCUs, sued Impac regarding RMBS that Impac sponsored. Mass Mutual conducted a forensic analysis of loans underlying an RMBS it had purchased. The analysis revealed that 48% of the loans tested had appraisals inflated by 10% or more, and 34% of the loans tested had LTVs that were 10 or more points more than represented. Additionally, 15.45% of the loans that had been represented to be owner occupied were determined not to be owner occupied. *See* Complaint, *Massachusetts Mut. Life Ins. Co. v. Impac Funding Corp.*, No. 11-cv-30127, at ¶¶ 87-88, 95 (D. Mass. May 6, 2011).

239.    As conservator for Fannie Mae and Freddie Mac, the Federal Housing Finance Agency ("FHFA") sued Bear Stearns for alleged material misstatements and omissions in certain RMBS offering documents concerning RMBS purchased by Fannie Mae and Freddie Mac. *See* Am. Complaint, *FHFA v. JP Morgan*, No. 11-cv-6188 (S.D.N.Y. June 13, 2012).

240.    In connection with this lawsuit, the FHFA conducted a forensic review of loans backing an RMBS that contained a significant number of loans from Impac. This review consisted of an analysis of the loan origination file for each loan, including the documents submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as the borrower's motor vehicle registration documentation with pertinent information indicating a borrower's assets or residence, and other information that was available at the time of the loan application, as well as the borrower's filings in bankruptcy proceedings and other sources of information. *Id.* ¶ 362.

241.    The FHFA reviewed 535 loan files from the group of loans. Impac originated

13.56% of the loans in that group. The FHFA's review revealed that 98% of the loans (523 out of 535) were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents. Of the 523 loans that did not comply with the underwriting guidelines, none had sufficient compensating factors to warrant an exception. *Id.* ¶¶ 359, 367.

242.     Of the 535 loans reviewed, 89 loans (or 25.2 percent) revealed an incorrect calculation of the borrower's debts which, when corrected, caused the debt-to-income ratio to exceed the applicable underwriting guidelines for the product type. *Id.* ¶ 386.

### 10.     IndyMac

243.     By 2007, IndyMac Bank, F.S.B. ("IndyMac") was the largest savings and loan association in the Los Angeles area and the seventh largest mortgage originator in the United States. IndyMac originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

244.     On July 11, 2008, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac's parent, IndyMac Bancorp, Inc., filed for bankruptcy on July 31, 2008.

245.     IndyMac has been the subject of numerous investigations and lawsuits alleging that IndyMac systematically abandoned its underwriting guidelines in pursuing profits. These investigations and lawsuits contain ample evidence that mortgage loans originated by IndyMac breached the associated representations and warranties. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. These lawsuits, investigations, and reports, in conjunction with the poor performance of the underlying

loans and the public information concerning wide-spread issues among all originators was more than sufficient to provide Defendant with notice that large numbers of loans originated by IndyMac, including loans in the trusts, breached the associated representations and warranties.

246.    For example, in June 2008, the Center for Responsible Lending ("CRL") published a report entitled IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending (June 30, 2008) ("CRL Report"), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/indymac_what_went_wrong.pdf. The CRL Report detailed the results of CRL's investigation into IndyMac's lending practices. CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac. The CRL Report summarized the results of its investigation:

> IndyMac's story offers a body of evidence that discredits the notion that the mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll the purchase of bigger homes or investment properties. CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

247.    CRL reported that its investigation "uncovered substantial evidence that [IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id*. at 2.

248.    The CRL Report stated that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id*.

249.    The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees."

*Id*. at 3.

250.     Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id*. at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id*. at 3.

251.     The CRL also found the following evidence: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it."

The refrain from managers, Miller recalls, was simple: "Find a way to make this work." *Id*. at 9 (footnote omitted).

252.     Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated: "I would reject a loan and the insanity would begin . . . . It would go to upper management and the next thing you know it's going to closing." *Id.* at 1, 3. Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

253.     Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona

during the same time period, told the CRL that IndyMac management would override his

decision to reject loans about 50% of the time. *See id*. at 9. According to Montilla:

> "I would tell them: 'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says. "There were some loans that were just blatantly overstated. . . . Some of these loans are very questionable. They're not going to perform."

*Id*. at 10.

254.    Montilla and another IndyMac mortgage underwriter told the CRL that borrowers

did not know their stated incomes were being inflated as part of the application process. *See id*.

at 14.

255.    On March 4, 2009, the Office of the Inspector General of the United States

Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled

"Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG

Report") reporting the results of Treasury OIG's review of the failure of IndyMac. The IndyMac

OIG Report portrays IndyMac as a company determined to originate as many loans as possible,

as quickly as possible, without regard for the quality of the loans, the creditworthiness of the

borrowers, or the value of the underlying loan pool.

256.    According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's

failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing

Alt-A loans on a large scale." IndyMac OIG Report at 2. The report found, "IndyMac often made

loans without verification of the borrower's income or assets, and to borrowers with poor credit

histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as

well." *Id*.

257.    IndyMac "encouraged the use of nontraditional loans," engaged in "unsound

underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as

many loans as possible and sell them in the secondary market." *Id*. at 11, 21. The IndyMac OIG

Report reviewed a sampling of loans in default and found "little, if any, review of borrower

qualifications, including income, assets, and employment." *Id*. at 11.

258.    IndyMac was not concerned by the poor quality of the loans or the fact that

borrowers simply "could not afford to make their payments" because, "as long as it was able to

sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id*. at 2-3.

259.    IndyMac's "risk from its loan products. . .was not sufficiently offset by other

underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id*. at 31.

260.    Unprepared for the downturn in the mortgage market and the sharp decrease in

demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it

could not sell in the secondary market." *Id*. at 3. This proved to be a weight it could not bear, and

IndyMac ultimately failed. *See id*.

261.    On July 2, 2010, the FDIC sued certain former officers of IndyMac's

Homebuilder Division, alleging that IndyMac disregarded its underwriting practices, among

other things, and approved loans to borrowers who were not creditworthy or for projects with

insufficient collateral. *See FDIC v. Van Dellen*, No. 10-cv-04915 (C.D. Cal. July 2, 2010). The

case was tried in late 2012, and the jury entered a verdict in favor of the FDIC.

262.    IndyMac currently faces or has faced additional litigation alleging disregard of

underwriting standards that adversely affected the value of the purchased RMBS. *See, e.g.*, *In re

IndyMac Mortgage-Backed Sec. Litig*., No. 09-cv-4583 (S.D.N.Y. May 14, 2009); *Federal Home

Loan Bank of Boston v. Ally Financial, Inc., et al*., No. 11-cv-10952 (D. Mass. May 26, 2011);

*Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No.

652607/2012 (N.Y. Sup. Ct. July 27, 2012).

263.    IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities. As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's "Worst Ten in the Worst Ten" Report. IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009.

### 11.    Morgan Stanley Mortgage Capital

264.    Morgan Stanley Mortgage Capital, Inc. ("MSMC"), now known as Morgan Stanley Mortgage Capital Holdings, LLC ("MSCH"), did not originate residential mortgages itself. Rather it purchased closed, first-lien and subordinate-lien residential mortgage loans for securitization or for its own investment from other lenders. MSMC acquired residential mortgage loans through bulk purchases and through purchases of single loans through its conduit loan purchase program.

265.    MSMC and MSCH contributed loans to the mortgage pools underlying the trusts and sponsored a significant number of the trusts.

266.    MSMC has been the subject of numerous investigations and lawsuits alleging that MSMC systematically abandoned originator underwriting guidelines in pursuing profits. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. These lawsuits in conjunction with the poor performance of the underlying loans and the public information concerning wide-spread issues among all originators was more than sufficient to provide Defendant with notice that large numbers of loans contributed by MSMC, including loans in the trusts, breached the associated representations and warranties.

267.     On June 24, 2010, the Attorney General of the State of Massachusetts entered into

an Assurance of Discontinuance with "Morgan Stanley & Co. Incorporated together with its

affiliates involved in the mortgage financing and securitization business" concerning its practices

of buying and securitizing loans, primarily from New Century Financial Corp. and its

subsidiaries. Press Release, *Morgan Stanley to Pay $102 Million for Role in Massachusets*

*Subprime Mortgage Meltdown Under Settlement with AG Coakley's Office*, Attorney General of

Massachusetts, (June 24, 2010) *available at* http://www.mass.gov/ago/news-and-updates/press-

releases/2010/attorney-general-martha-coakley-reaches-102.html. The Attorney General found:

- As part of its process for "purchasing and securitizing subprime loans, [Morgan Stanley] engaged in a number of reviews of the quality of the originators' lending practices and loans. These included, inter alia, determining whether the subprime loans were originated in accordance with the originators' underwriting guidelines and assessing compliance with applicable laws ('credit and compliance diligence'), and examining property values ('valuation diligence'). These reviews increasingly demonstrated shortcomings in some of New Century's lending practices and problems with a large number of individual subprime loans."

- Based on an internal analysis run by Morgan Stanley, New Century qualified borrowers based on a teaser interest rate, but when the fully indexed rate was taken into consideration, 45% of the borrowers in Massachusetts would not have qualified for the loan.

- Morgan Stanley hired the underwriting firm Clayton to analyze a sample of loans to be purchased to determine whether they were originated in accordance with underwriting guidelines. Although Clayton's analysis showed that New Century increasingly stretched "underwriting guidelines to encompass or approve loans not written in accordance with the guidelines," Morgan Stanley continued to buy such loans under pressure from New Century to avoid losing New Century's business to another loan buyer.

- During the period from 2006-2007, only 9% of those loans that were granted pursuant to exceptions had adequate compensating factors to offset the exception. Further, Morgan Stanley waived exceptions on a large number of loans Clayton found to be generated in violation of guidelines without adequate compensating factors.

- Although Morgan Stanley had a stated policy not to purchase or securitize loans with a combined LTV ratio of greater than 100%, the reality was about a third of

the loans securitized by Morgan Stanley in 2006-2007 had a CLTV greater than 100%.

- Morgan Stanley determined that New Century did not adequately evaluate the borrower's income on "stated income" loans.

- Despite Morgan Stanley's awareness of problems at New Century, it continued to fund, purchase, and securitize New Century loans.

268.   Under the Assurance of Discontinuance, Morgan Stanley agreed to institute procedures to ensure that loans it securitized conformed to underwriting guidelines and to pay $102 million to settle the charges against it. *Id.*

269.   In September 2011, MSCH entered into a similar Assurance of Discontinuance with the Attorney General of the State of Nevada following an investigation into the origination practices of originators (primarily New Century) who originated loans that MSCH purchased and sold via securitizations, including whether the originators misrepresented interest rates to borrowers, inflated appraisals, and failed to disclose payment shock to borrowers following expiration of the initial teaser interest rate. Under the agreement, Morgan Stanley agreed to provide relief to consumers valued between $21 million and $40 million and to institute a process to review loans purchased for securitization to ensure compliance with the law. *Available at* media.lasvegassun.com/media/pdfs/blogs/documents/2011/09/27/morgandoc092711.pdf.

270.   MSMC/MSCH has also been the subject of numerous civil lawsuits alleging it did not adequately conduct due diligence on loans it purchased and securitized.

271.   For instance, in *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, LLC*, No. 5140 (Del. Chanc. Jan. 29, 2010), a servicer of loans sued MSCH (as successor in interest to MSMC) on several contract and fraud theories regarding the plaintiff's purchase of the servicing rights to thousands of loans from MSCH. The complaint alleged that plaintiff paid a premium for the right to service the loans, because MSCH had represented that

they were "agency" loans, or loans originated under Fannie Mae and/or Freddie Mac guidelines. The complaint alleged that the loans experienced high rates of delinquency. According to the complaint, a representative of Morgan Stanley admitted the loans had not been screened at Morgan Stanley's internal due diligence facility and were of poorer quality than originally represented. Fannie Mae and Freddie Mac made repurchase requests regarding the loans. After initially honoring the repurchase requests, MSCH eventually stopped doing so notwithstanding its contractual obligations. The complaint alleged that the plaintiff reviewed the loans and found numerous fields in the mortgage loan schedules that were inaccurate.

272.     In *FHFA v. Morgan Stanley, et al.*, No. 11-cv-06739 (S.D.N.Y. Sep. 2, 2011), the FHFA, as conservator of Fannie Mae and Freddie Mac, sued Morgan Stanley & Co., Inc., several of its subsidiaries, including Morgan Stanley Mortgage Capital Holdings LLC d/b/a Morgan Stanley Mortgage Capital, Inc., and others alleging that the defendants falsely represented that the mortgages collateralizing certain RMBS sold to Fannie Mae and Freddie Mac "complied with certain underwriting guidelines and standards, and presented a false picture of the characteristics and riskiness of those loans." FHFA alleged that its analysis of a sampling of the loans revealed that a statistically significant rate of owner occupancy and LTV ratios were false. The case was settled in 2014 for $1.25b. Press Release, *FHFA Announces $1.25 Billion Settlement with Morgan Stanley* (Feb. 7, 2014) *available at* http://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Announces-$1-25-Billion-Settlement-With-Morgan-Stanley.aspx.

273.     Likewise, in *MBIA Ins. Co. v. Morgan Stanley, et al.*, No. 29951/2010 (N.Y. Sup. Ct. Dec. 6, 2010), the monoline insurer MBIA sued Morgan Stanley, Morgan Stanley Mortgage Capital Holdings, LLC, and Saxon Mortgage Services, Inc., alleging that its review of loan files

securitized by the defendants revealed breaches of representations and warranties including an

extraordinarily high incidence of material deviations from the underwriting standards that

defendants represented would be followed. The parties settled the case in December 2011.

274.    According to the FCIC Report, Morgan Stanley devoted minimal resources to due

diligence on the loans it securitized. For instance, the head of due diligence was based not in

New York but rather in Boca Raton, Florida, and he had, at any one time, only two to five

individuals reporting to him directly—and they were actually employees of a personnel

consultant, Equinox. FCIC Report at 168.

275.    According to the report, internal Clayton documents show that a startlingly high

percentage of loans reviewed by Clayton for Morgan Stanley were defective, but were

nonetheless included by Morgan Stanley in loan pools. According to Clayton's data 37% (or

23,154) of the 62,940 loans it reviewed for Morgan Stanley failed to conform to Morgan

Stanley's stated underwriting standards. Of the 37% of loans identified by Clayton as non-

compliant, Morgan Stanley "waived in" 56% (or 20% of the total pool).

### 12.    National City

276.    National City Mortgage Co. was a division of National City Bank which was a

wholly owned subsidiary of National City Corporation. Collectively these entities are referred to

as "National City." National City originated or contributed a material number of loans the

mortgage pools underlying the trusts.

277.    In 2008, investors brought a securities fraud class action lawsuit against National

City alleging that National City misrepresented the quality of its mortgage loans. *See* Am. Class

Action Complaint, *In Re National City Corp. Sec., Derivative & ERISA Litig.*, No. 08-nc-70004

(N.D. Ohio June 13, 2008). On August 8, 2011, it was announced that the case had settled for

$168 million.

278.     National City faced another class action lawsuit in 2010 alleging, among other things, that National City did not adhere to its underwriting standards. *See* Second Am. Class Action Complaint, *Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd. and Argent Classic Convertible Arbitrage Fund L.P. v. National City Corp.*, No. 08-nc-70016 (N.D. Ohio Feb. 19, 2010). On November 30, 2010, the case settled for $22.5 million.

279.     Evidence of misconduct on the part of National City employees can also be found in the complaint filed in *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012). For example, in October 2011, in Providence, Rhode Island, National City Loan Officer Juan Hernandez pled guilty to participating in a fraudulent lending scheme. Hernandez pled guilty to fraudulently obtaining loans from National City and other lenders by using "straw purchasers" and providing false information to qualify borrowers for loans they would not have otherwise qualified for. From October 2006 through August 2007, Hernandez prepared false loan applications for phony borrowers containing falsified borrower incomes and debts, and misrepresenting that the properties would be owner occupied when they were not. *Id.* ¶ 361.

280.     Hernandez was joined in the fraud by Miguel Valerio, a National City Loan Processor. Valerio also pled guilty to the fraudulent scheme in December 2011. *Id.* ¶ 362.

281.     Similarly, in the Cleveland, Ohio area, in February 2011, at least two National City employees were indicted for lending fraud, along with 15 other co-conspirators. Loren Segal and Krystal Hill, both National City employees, were indicted for assisting in a fraudulent lending scheme that spanned from March 2005 through November 2007. The scheme included using straw purchasers, inflated appraisals, falsified borrower incomes, fake bank statements,

and false verifications of borrowers' funds. Both Segal and Hill pled guilty to participating in the scheme. *Id.* ¶ 363.

282.     National City's systemic failure to follow its underwriting guidelines and evaluate its borrowers' true repayment abilities, and the fraudulent loans that followed, required the parent company, National City Corporation, to take a charge of $4.2 billion in the first quarter of 2008 for its defective loans. Moreover, National City's abject failure to follow its underwriting guidelines led to the SEC investigating National City's underwriting standards in 2008. In addition, in mid-2008, National City Corporation entered into a confidential agreement with the OCC, "effectively putting the bank on probation," according to a Wall Street Journal article published on June 6, 2008. Damian Paletta *et al.*, *National City is Under Scrutiny*, Wall Street Journal, June 6, 2008, *available at* http://online.wsj.com/articles/SB121271764588650947.

### 13.     New Century

283.     New Century Mortgage Corporation and NC Capital Corporation were subsidiaries of New Century Financial Corp. (collectively "New Century"). New Century was founded in 1995 in Irvine, California, and grew to be one of the nation's largest subprime lenders—originating $60 billion in loans in 2006 alone. New Century originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

284.     New Century failed amid revelations that its books contained numerous accounting errors, government investigations and a liquidity crisis when its Wall Street backers pulled the financial plug on loan funding. The circumstances leading to its collapse tell the story of a company that was far more concerned with originating mortgages to fuel the securitization machine than in the quality of those mortgages.

285.     A June 2, 2008 article in the Columbus Dispatch summarized New Century's

reputation in the industry:

> The California-based mortgage company catered to the riskiest borrowers, even those with credit scores as low as 500. Its brokers cut deals by asking few questions and reviewing even fewer documents, investigators say.
>
> Homeowners struggling to pay their existing mortgages signed up for what they believed to be redemption: a new loan. They were unaware of the warnings from lending and legal experts that New Century loaned money with a devil-may-care-attitude.
>
> New Century typified the book-'em-at-any-cost mentality that fueled the national mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, Columbus Dispatch, June 2, 2008, at 1A.

286.    The article continued:

> Lending experts and consumer advocates say New Century was the poster child for the subprime tsunami – a company that relaxed lending standards so much that even borrowers with fresh bankruptcies and foreclosures could get a mortgage.

*Id.*

287.    New Century's foreclosure rates reflected its inattention to underwriting standards. Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report in every housing market highlighted. Incredibly, New Century appeared in the top five in every market—1st in Las Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton, California; 3rd in Bakersfield, California and Detroit, Michigan; and 5th in Miami, Florida and Memphis, Tennessee.

288.    When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, New Century rose to the top three in every one of the ten worst markets, holding 1st place in Reno, Nevada; Bakersfield, California; Riverside-San Bernardino, California; and Fort Myers-Cape Coral, Florida; 2nd place in Modesto, California; Las Vegas, Nevada; Merced, California; Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida; and Vallejo-

Fairfield-Napa, California.

289.     The U.S. Bankruptcy Court for the District of Delaware presiding over New

Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and

all accounting and financial statement irregularities, errors and misstatements" in connection

with New Century's practices and procedures. The Examiner engaged a law firm, forensic

accountants, and financial advisors to assist in his investigation and reporting. Final Report of

Michael J. Missal, *In re: New Century TRS Holdings, Inc.*, No. 07-bk-10416 (D. Del. Feb. 29,

2008) (the "Examiner's Report") *available at*

http://www.klgates.com/files/upload/Final_Report_New_Century.PDF.

290.     The Examiner concluded that New Century "engaged in a number of significant

improper and imprudent practices related to its loan originations, operations, accounting and

financial reporting processes." Examiner's Report at 2. The Examiner summarized the findings:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.' Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." *Id*. at 3.

- "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id*.

- "More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as 'liars' loans' because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that 'we are unable to actually determine the borrowers' ability to afford a loan.'" *Id*.

- "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies." *Id*. at 3-4.

- "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality. Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market." *Id*. at 4.

- "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages. New Century was not able to survive and investor suffered mammoth losses." *Id*.

291.    Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" *i.e.*, a rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id*. at 61-62.

292.    From 2003 to 2006, New Century peddled riskier and riskier products, yet failed to employ underwriting safeguards that might have mitigated the inherent risk associated with such products. For instance, from March 2003 to June 2005, the percentage of interest-only loans New Century originated leapt from 0% to 38.49%. And from 2004 to 2005, the percentage of interest-only adjustable-rate loans rose from 19.3% to 29.6% of the total volume of New Century's originations and purchases. New Century qualified borrowers based on their ability to

91

pay the initial interest rate rather than the interest plus principal amortization, which was added after the first several years. *Id*. at 57, 125-26.

293.    Likewise, from 2004 through 2006, New Century increasingly sold "stated income" loans—with such loans representing at least 42% of New Century's total loan volume. "Stated income" loans involve no documentation regarding a borrower's income; instead, the loan is made based on the borrower's statement as to the amount of his or her income. Stated income loans are often referred to in the industry as "liars' loans," because of the ease with which unscrupulous borrowers or mortgage brokers can overstate income. *Id*. at 58. New Century actively discouraged its employees from even seeking to verify whether a prospective borrower's stated income was reasonable. *Id*. at 127 n.314.

294.    The Examiner identified several "red flags" that indicated the poor quality of New Century's loans and that New Century was not adhering to its underwriting guidelines. Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all of which "suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines." *Id*. at 109.

295.    The Examiner found:

New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004. For example, in April 2004, New Century's Chief Credit Officer reported that 'the QA [quality assurance] results [pertaining to the loan origination processes] are still at unacceptable levels' and that 'Investor Rejects [kickouts] are at an incline as well.' Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that 'we have so many issues pertaining to quality and process!'"

*Id*. at 110.

296.    In 2005, New Century began internal audits of its loan origination and production

processes. An audit of the Sacramento wholesale fulfillment center revealed several "high risk" problems, including that 45% of the loans reviewed had improper RESPA disclosures, 42% did not have approval stipulations fully satisfied, 39% had noted exceptions regarding the calculation or verification of income, and 23% had appraisal exceptions or problems. *See id*. at 152.

297.    Further adding to the problem was that exceptions were frequently granted to underwriting guidelines, but "New Century had no formal exceptions policy." *Id*. at 174.

298.    With no policy in place, granting exceptions was arbitrary. Despite upper management's awareness of the tremendous problems regarding loan quality, the Examiner concluded that "New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." *Id*. at 111.

299.    The Examiner reported:

New Century's loan originations grew at an enormous rate from 2000 through 2006, becoming the second largest subprime lender by the end of 2004 and remaining one of the largest in 2005. The Production Department was highly motivated and effective in originating such loans and apparently resisted changes that might have limited loan production volume. While both the Quality Assurance and Internal Audit Departments identified loan quality problems, and kick-out and EPD rates confirmed many of these problems, the Production Department devoted its resources to generating high volumes of loans, with relatively little attention to loan quality.

*Id*. at 113.

300.    New Century consistently prioritized the origination of new loans over virtually all other concerns, including loan quality. Despite after-the-fact assertions by some company spokespeople that such disregard was anomalous, New Century leaders articulated priorities demonstrating that the disregard was systematic. For example, Patrick Flanagan, who until 2006 was New Century's Head of Loan Production and Secondary Marketing, "emphasized

maintaining New Century's loan production even when field audits revealed loan quality problems." *Id*. at 89. Even after Flanagan left the company, New Century's prioritization of volume, rather than quality, continued.

301.    The Examiner noted that New Century's Quality Assurance Department would run audit reports after loans were funded to determine if the loan file evidenced compliance with New Century's underwriting guidelines. "The Quality Assurance audit results tended to identify the same sorts of problems as identified in the kickout reports, such as faulty appraisals, undocumented exceptions to underwriting guidelines and missing documentation from loan files." Despite this, "since such post-funding audits did not directly affect profitability, some in Management discounted their importance." *Id*. at 137.

302.    The Examiner's Report contained pages of findings that management ignored the loan quality issue and resisted efforts to implement strategies that would improve the quality of loans. For instance, the Examiner reported that management had determined a way to identify underwriters whose actions led to a high number of defective loans in October 2005, but failed to implement the effort until much later. *See id*. at 169 n.337.

303.    The Examiner's Report found that loan quality trends "worsened dramatically" at New Century in 2006 and early 2007. Although New Century belatedly tried to improve loan quality late in 2006, it was "too little too late" and even as late as December 2006, "the same sorts of problems, including defective appraisals and missing documentation continued to be the main reasons for investors kicking out increasing quantities of New Century loans." *Id*. at 157-58.

304.    The Examiner concluded, "New Century knew from multiple data sources that its loan quality was problematic, starting no later than 2004. Yet . . . the Board of Directors and

Senior Management before 2006 took few steps to address the troubling loan quality trends." *Id.*

at 175.

305.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at

New Century, who worked for the company from 1997 through December 2007, corroborated

the Examiner's findings in her testimony before the FCIC. She testified that at New Century, risk

managers were often viewed as a roadblock rather than a resource and that:

> Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . . Many of the sales managers and account executives lacked any real estate or mortgage experience. They were missing the depth of experience necessary to make an informed lending decision. These same sales mangers [sic] had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. Some of the best sales managers had underwriting backgrounds and were more closely aligned with risk management and better at understanding potential problems, but this was the exception and not the rule.

Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the

Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice

President of Corporate Risk, New Century).

306.    She also testified to systematic problems in the appraisal process:

> In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value," fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id*.

307.    Ms. Lindsay noted that at the end, New Century's approach to lending lacked

"common sense"—that the business became "volume driven and automated" with a broker being

able to get a loan pre-approved in "12 seconds or less." *Id*.

308.    The FCIC found that New Century "ignored early warnings that its own loan

quality was deteriorating and stripped power from two risk-control departments that had noted the evidence." FCIC Report at 157. The FCIC reported that New Century's Quality Assurance staff "had found severe underwriting errors," while New Century's Internal Audit department "identified numerous deficiencies in loan files," with seven out of nine reviews of the company's loan production department resulting in "'unsatisfactory'" ratings. *Id.* Instead of making efforts designed to bring the company into compliance with its underwriting guidelines, New Century's management directed that the negative results be removed from the company's loan performance tracking system, that the Quality Assurance department be dissolved, and that the Internal Audit department's budget be cut. *Id.*

309.    In December 2009, the SEC filed a complaint charging three former New Century executives with securities fraud. *See SEC v. Morrice, et al.*, No. 09-cv-01426 (C.D. Cal. Dec. 7, 2009). The SEC's complaint alleges that the New Century executives misled investors as to the deterioration of New Century's loan portfolio, including dramatic increases in early default rates and loan repurchases/repurchase requests. On July 30, 2010, the SEC announced it had accepted offers to settle the case, subject to court approval, with defendants agreeing to (1) pay over $1.5 million in disgorgement and civil penalties; (2) be permanently enjoined from further securities law violations; and (3) a five-year ban on serving as an officer or director of a public company.

310.    The Attorney General for the Commonwealth of Massachusetts also investigated New Century's faulty origination practices with the following findings:

- New Century unlawfully qualified borrowers for adjustable rate mortgages by using "teaser" rates instead of using the "fully indexed rates" as required by law. Assurance of Discontinuance at 13, *In re: Morgan Stanley & Co. Incorporated*, No. 10-2538 (Mass. Super. Ct. June 24, 2010), *available at* http://www.mass.gov/ago/docs/press/2010/2010-06-24-ms-settlement-attachment3.pdf.

- New Century engaged in "sloppy underwriting for many loans and stretching of

underwriting guidelines to encompass or approve loans not written in accordance with the guidelines." *Id*. at 9.

- New Century successfully pressured Morgan Stanley into buying loans which both parties knew did not comply with the underwriting guidelines. *Id*. at 10.

- "31% of the New Century loans on properties checked via BPOs . . . and securitized by Morgan Stanley in 2006 and 2007 had []LTV ratios . . . that were greater than 100%." *Id*. at 13.

- "As early as October 2005, Morgan Stanley's diligence team determined . . . that the stated income on a number of New Century loans was unreasonable. In early 2006, a Morgan Stanley employee commented that stated income credit was not adequately evaluated by New Century. . . . On average, the stated income of these borrowers was approximately 42% higher than the income of fully documented borrowers." *Id*. at 13-14.

311. Private litigation has also illustrated the fact that New Century failed to comply with its stated underwriting guidelines. In *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., Inc.*, No. 10-2741 (Mass. Super. Ct. July 9, 2010), confidential witnesses stated that: the company abandoned underwriting guidelines to approve more loans; employees were told to do whatever they had to in order to increase volume; and loans that were not initially approved by underwriters were often later approved by superiors.

### 14.   Option One

312. Option One Mortgage Corp. ("Option One") was a national mortgage lender formerly owned by H&R Block, Inc., until its assets were sold to American Home Mortgage Servicing, Inc. in April 2008. Option One originated or contributed a material portion of the loans in the mortgage pools underlying the trusts and also sponsored one trust.

313. In November 2008, the OCC issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations. Option One was ranked as the sixth-worst mortgage originator by number of foreclosures in the

worst-affected metropolitan areas.

314.    Reflecting the terrible quality of its loans, Option One has since been named as a

defendant in a wave of lawsuits alleging that it engaged in a pattern of fraudulent and otherwise

improper lending practices. Cambridge Place, a RMBS investor, sued Morgan Stanley and other

Wall Street banks alleging violations of the Massachusetts Securities Act arising from the Wall

Street banks' offers and sales of RMBS. Cambridge Place's complaint relied on several

confidential witnesses. These former employees with first-hand knowledge confirmed that

Option One violated its stated standards for underwriting and appraisals. *See* Am. Complaint,

*Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Super. Oct. 14,

2011).

315.    For example, a former underwriter at Option One in Atlanta, Georgia from 2005

to 2006, referred to as CW 52, said that if an underwriter denied a loan and an account executive

complained, the loan was escalated to the branch manager, who then got in touch with the

underwriter. With account executives, "the biggest screamer and shaker of trees gets the most

fruit." For a "top-producing" account executive, any red flags that may have been present in the

loan file being considered would be "overlooked" and the loan file would invariably be pushed

through successfully. CW 52 estimated that at least 50% of the total loan volume in Option

One's Atlanta branch was approved in this manner. CW 52 also stated that a loan applicant could

tell "a straight up lie" about his or her income, but the false information would be overlooked

and the loan would be approved, despite CW 52's initial rejection of the application. *Id*. ¶ 242.

316.    Similarly, CW 53, an underwriter at Option One's Marietta, Georgia office in

2005, reported that Option One approved stated income loans "knowing good and well that those

people did not make that much money in the position they were in." Likewise, CW 54, an

underwriter for Option One in Hawaii from November 2004 to January 2006, stated that "the overwhelming majority of stated income loans were crafted," meaning that the borrowers were not making "anywhere near" what they claimed. However, CW 54 stated that he felt pressured to push loans through because every loan generated income and because, "[i]f you applied any level of rational thought, you were frowned upon." *Id*. ¶ 243.

317.    Former employees also revealed that falsified mortgage appraisals were another ubiquitous facet of Option One's questionable origination practices. With respect to artificially inflated appraisals, CW 52 stated that "[o]f course [loan appraisers] inflated values" and that if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file. Similarly, CW 55 stated that the appraisals "were all bad." He considered the appraisals borderline fraudulent, not merely incompetent, but was unable to prevent loans based on the flawed appraisals. He explained, "Our job is supposed to be stopping bad loans, but no one stopped them." When CW 55 objected to loans because of flawed appraisals, the loan officer would complain to the branch manager, who would complain to the Appraisals Department at headquarters in Irvine, California, and on up the chain until someone high enough in the Underwriting and Sales Department would ultimately approve the loan. *Id*. ¶ 244.

318.    Option One was motivated to violate its underwriting and appraisal standards in order to increase the volume of loans it could sell to Wall Street banks to be securitized. CW 56, an Assistant Vice President of Option One from 2005 to 2007, worked in the Correspondent Lending department, which purchased loans from small mortgage companies. CW 56 stated that Option One purchased loans that raised concerns under the stated guidelines and that when he raised such concerns he was essentially told, "Shut up. Wall Street will buy it: don't worry about

it." *Id*. ¶ 245.

319.    Similarly, CW 57, who was an underwriter at Option One in Pleasanton, California from October 2005 to October 2007, stated that "[i]f [a borrower] had a FICO and a pulse, they could get a loan" from Option One. CW 57 also the following:

> I caught blatant fraud, and the [account executive] would still fight for it. [The account executives and managers] would fight me because they didn't care. They knew they were going to sell it on the secondary market, and they didn't care because it wasn't their money. They were going to get paid regardless.... At Option One they didn't have a portfolio; they sold everything, so they didn't care.... [Option One] didn't have to worry about it, because once they're done with these crappy loans, they'd sell them off. They were the investors' problem.

*Id*. ¶ 246.

320.    The *Cambridge Place* suit survived a motion to dismiss, with the court holding that the allegations paint a "particularized and compelling portrait of a dramatic loosening of underwriting standards on the part of the originators." *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, 10-2741, 2012 WL 5351233, *13 (Mass. Super. Ct. Sept. 28, 2012).

321.    Option One has also been the subject of state and federal investigations. On June 3, 2008, the Massachusetts Attorney General filed an action against Option One, and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. Complaint, *Commonwealth v. H&R Block, Inc.*, No. 08-2474 (Mass. Super. Ct. June 3, 2008).

322.    According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards ... and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." *Id*. ¶ 4.

323.    The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home." *Id*. ¶ 8. Option One also "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." *Id*. Option One's "origination policies employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id*. ¶ 1.

324.    On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction in the case, which prevented Option One from foreclosing on thousands of loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008).

325.    On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *Commonwealth v. Option One Mortgage Co.*, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

326.    On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million. Press Release, *H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions*, Massachusetts Attorney General (Aug. 9, 2011), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2011/option-one-settlement.html.

### 15.    Paul Financial

327.    Paul Financial, LLC ("Paul Financial") originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

328.    Paul Financial has been the subject of numerous investigations and lawsuits alleging that Paul Financial systematically abandoned its underwriting guidelines in the pursuit

of profits. These investigations and lawsuits uncovered ample evidence that mortgage loans originated by Paul Financial breached the associated representations and warranties. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans.

329.    For example, according to an amended complaint filed in New York state court in *Royal Park Investments NA/SV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Nov. 7, 2012), a former Paul Financial Underwriting Assistant from 2004 through 2007 stated that "[a] lot of people were lying about their incomes." Because Paul Financial allowed borrowers to simply state their income without investigation, it ended up making loans to many borrows who could not afford the payments. Am. Complaint, *Royal Park Investments NA/SV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012, at ¶ 484 (N.Y. Sup. Ct. Nov. 7, 2013).

330.    Moreover, the same employee stated that often when borrowers failed to qualify for loans, Paul Financial switched them to a different loan program for approval. As with other lenders at the time, Paul Financial thus qualified borrowers for loans they could not afford. The amended complaint states that usually the change to a different loan program was to one where it was easier for the borrowers to submit false information on a loan application. *Id*. ¶ 489.

331.    According to the amended complaint, Paul Financial did not conduct the appropriate due diligence to assess whether the borrower's incomes were accurate. In addition, Paul Financial simply ignored egregious examples of false information on loan applications. The complaint details how a Paul Financial Post-Closing and Broker Service Representative, who worked for the company from October 2003 until June 2005, stated that he witnessed times

where stated income applicants working with a mortgage broker were declined loans because of insufficient income. Yet after the mortgage broker heard from Paul Financial what the income requirement was, the applications would come back with the higher stated amount that qualified the borrowers for the loan. Paul Financial approved these loans. This employee stated that 70% to 80% of the loans he witnessed were stated income loans and that income inflation was common. *Id*. ¶ 486.

332.    The same employee also stated that real estate appraisers working on Paul Financial loans typically appraised the property at the exact purchase price, which was a common lender tactic. The Paul Financial employee stated that Paul Financial often felt that the appraisals were inflated. *Id*. ¶ 488.

333.    According to the amended complaint, a different employee, a Paul Financial Broker Service Representative and Account Executive, who worked for Paul Financial from 2005 through 2007, confirmed that Paul Financial routinely accepted inflated reported incomes and allowed mortgage brokers to submit revised incomes for previously denied loans. *Id*. ¶ 487.

334.    Finally, the amended complaint alleges that Paul Financial simply lent money to nearly any borrower regardless of repayment ability. The complaint states that the former Paul Financial Broker Service Representative and Account Executive reported that "it was extremely rare to get loans declined" at Paul Financial. *Id*. ¶ 490.

### 16.    Residential Funding

335.    Residential Funding Co., LLC ("RFC") originated or contributed a material number of loans to the trusts.

336.    RFC's underwriting practices are implicated in two lawsuits filed by MBIA. MBIA provided monoline insurance, a form of credit enhancement that insured RMBS

certificates in the event of default, for RMBS containing RFC-originated loans. In its suits, MBIA alleged misrepresentations regarding the loans underlying the RMBS that it insured. The RMBS in these suits were issued in 2006 and 2007. *See* Complaint, *MBIA Ins. Corp. v. Ally Fin., Inc.*, No. 12-18889 (Minn. Dist. Ct. Sept. 17, 2012) ("MBIA v. Ally Compl."); First Am. Complaint, *MBIA Ins. Corp. v. Residential Funding Co.*, No. 603552/2008 (N.Y. Sup. Ct. Mar. 19, 2010) ("MBIA v. RFC Compl.").

337.   RFC sponsored RMBS at issue in those suits and originated or acquired many of the loans underlying RMBS at issue in those suits. *See* MBIA v. Ally Compl. ¶¶ 5, 22; MBIA v. RFC Compl. ¶ 2.

338.   After sustaining large losses due to loan defaults, MBIA conducted forensic analyses of several thousand loans underlying the RMBS sponsored by RFC. In *MBIA v. RFC*, MBIA reviewed 7,913 loans and found that 7,019 (88%) contained material misrepresentations. *Id.* ¶ 50; *see also* MBIA v. Ally Compl. ¶ 80. The material misrepresentations included, among other things, routine disregard of underwriting guidelines, debt-to-income ("DTI") and combined loan-to-value ratios ("CLTV") that exceeded the amounts allowed in the underwriting guidelines, and failure to verify employment as required by underwriting guidelines. *See* MBIA v. Ally Compl. ¶¶ 76-83; MBIA v. RFC Compl. ¶¶ 47-72.

339.   Representative examples of the misrepresentations MBIA uncovered include:

- On November 30, 2006, a loan with a principal balance of $140,000 was made to a borrower in Newton, Massachusetts on a property with an original appraisal value of $740,000 and a senior loan balance of $513,567. The property subject to the loan was a non-owner occupied investment property. The borrower stated his income to be $41,666 per month ($500,000 per year) as the owner of a Wine/Spirits store. Further, the borrower did not demonstrate any liquid assets. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2007 in connection with which the borrower claimed to have earned $0.00 for 2006. Further, the appraisal indicated the property failed to

conform to the legal standards and the loan file lacked any letter form the local authority regarding rebuilding. RFC Underwriting Guidelines require verification of 6 months of reserves for the monthly Principle, Interest, Taxes and Insurance ("PITI") payments for stated income loans on non-owner occupied investment properties yet there is no indication in the loan files that these reserves were identified or verified. Finally, RFC guidelines limit loans under the non-owner occupied loan program to $100,000, $40,000 less than was loaned.

- On March 16, 2007, a loan with a principal balance of $40,000 was made to a borrower in Bradenton, Florida on a property with an original appraisal value of $440,000 and a senior loan balance of $328,000. The borrower was retired and received a fixed income that was stated as $6,450 per month. The borrower's FICO credit score of 688 required the DTI for the loan not to exceed 45%, however, the borrower's DTI was 55.93%. Because the borrower received a fixed income, the borrower did not meet the residual income requirements for a higher DTI under RFC's Underwriting Guidelines. Further, the loan file lacks any evidence of 2 months of PITI reserves as required by RFC's Underwriting Guidelines.

- On July 24, 2006, a loan with a principal balance of $29,500 was made to a borrower in Flint, Michigan on a property with an original appraisal value of $57,497 and a senior loan balance of $24,676. The borrower stated income of $3,700 per month and had a FICO score of 650. The CLTV for the mortgage loan was 94.2%. Pursuant to RFC's Underwriting Guidelines, the borrower was required to have monthly income of $4,000 and the CLTV for the loan could not exceed 80%. Further, the loan file lacks evidence of a full appraisal for the property as well as evidence of 2 months of PITI reserves, both of which are required by RFC's Underwriting Guidelines.

- On November 12, 2006, a loan with a principal balance of $135,000.00 was made to a borrower in Scottsdale, Arizona on a property with an original appraisal value of $540,000.00 and a senior loan balance of $405,000.00. The borrower stated income of $11,000 per month as a sales manager at a concrete company, however, the borrower could only demonstrate assets of $11,491. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2008 in connection with which the borrower claimed to have actually earned $43,523 for 2006 and $20,401 for 2007. Additionally, the bank account used to verify the borrower's reserves is actually held in the name of the loan officer that issued the loan.

MBIA v. RFC Compl. ¶ 52.

### 17.  RBS/Greenwich Capital

340.   The Royal Bank of Scotland Group PLC ("RBS"), through its affiliate RBS

Financial Products, Inc. (f/k/a Greenwich Capital Financial Products, Inc.), sponsored a significant number of the trusts.

341.    RBS's poor mortgage securitization practices have been the subject of government investigations, reports and significant RMBS investor lawsuits. The FCIC Report noted that Clayton acted as a due diligence provider for RBS's RMBS offerings. According to testimony provided to the FCIC, for the loans Clayton tested for RBS from at least January 1, 2006 through June 30, 2007, Clayton informed RBS that at least 17% of the loans it tested did not comply with the underwriting guidelines, did not have compensating factors otherwise meriting approval, and/or had defective appraisals. Notwithstanding its receipt of such notice, RBS then knowingly and deliberately waived well over half of those defective loans (53%) into their RMBS Offerings. *See* Clayton All Trending Report at 6, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

342.    In *FHFA v. RBS*, the FHFA performed a forensic analysis of sixty-eight RBS-sponsored securitizations and/or RBS-underwritten securitizations. Am. Complaint, *FHFA v. Royal Bank of Scotland Group PLC, et al.*, No. 11-cv-01383 (D. Conn. Feb. 1, 2012). The FHFA found that "at least 3.12 percent of the mortgage loans for each Securitization had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger." *Id*. ¶ 113. The FHFA also found that "the Prospectus Supplement for each Securitization was grossly inaccurate, understating the percentage of non-owner occupied properties by at least six percent, and for many Securitizations by ten percent or more." *Id*. ¶ 107.

343.    Additional forensic analyses of RBS securitizations have confirmed RBS's widespread securitization of breaching loans. *See, e.g.*, *Royal Park Investments SA/NV v. Royal Bank of Scotland Group PLC, et al.*, No. 653541/2013 (N.Y. Sup. Ct. Oct. 11, 2013) (forensic

review demonstrated pervasive breaches of representations and warranties concerning compliance with underwriting guidelines, owner occupancy, LTV ratios and assignment of title).

### 18.    Wells Fargo

344.    Wells Fargo Bank, N.A., ("Wells Fargo") originated or contributed a material number of loans to the loan pools underlying the trusts.

345.    The City of Memphis sued Wells Fargo in 2010 over its mortgage practices claiming violations of the Fair Housing Act. *See* Am. Complaint, *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-cv-2857 (W.D. Tenn. Apr. 7, 2010) ("Memphis Compl."). The complaint includes sworn declarations from former Wells Fargo employees describing Wells Fargo's abandonment of underwriting guidelines.

346.    Camille Thomas was a loan processor at Wells Fargo from January 2004 to January 2008. She handled the paperwork involved in the loan, including processing the file for review and approval by the underwriters. To do her job, she had to be familiar with Wells Fargo's underwriting guidelines. Ms. Thomas recounted how the bonus structure placed pressure on credit managers to make loans that should not have been made. She stated that managers manipulated LTV ratios by using inflated appraisals they knew were not accurate. She also knew that documents were falsified to inflate borrowers' incomes. When she complained, a branch manager told her, "we gotta do what we gotta do." Finally, she stated that borrowers were not informed that their loans were adjustable-rate mortgages with low "teaser rates," or about prepayment penalties, potential violations of lending laws, which would also be violations of the underwriting guidelines. Memphis Compl. Exh. 4.

347.    Doris Dancy was a credit manager at Wells Fargo from July 2007 to January 2008 in the Memphis area. She stated that the district manager put pressure on credit managers to

convince people to apply for loans even if the person could not afford the loan or did not qualify for it. To her shock, many people with bad credit scores and high debt-to-income ratios were approved for subprime loans. Ms. Dancy would shake her head in disbelief and ask herself, "how could that happen?" She knew that Wells Fargo violated its underwriting guidelines to make those loans. Although she never witnessed it herself, she heard also from other employees that some branch managers falsified information to get customers to qualify for subprime loans. She stated that a bonus system was used to pressure her to make loans she thought should not be made. Memphis Compl. Exh. 1.

348.    Michael Simpson was a credit and branch manager at Wells Fargo from 2002 to 2008 in the Memphis area. According to Mr. Simpson, Wells Fargo managers falsified the mileage on car loan applications so the loan would be approved. He also stated that Wells Fargo was "very aggressive" in mortgage lending. The culture was "completely results driven." According to Mr. Simpson, Wells Fargo employees did not tell customers about the fees and costs associated with closing a loan – again, potential violations of lending laws, and also violations of the underwriting guidelines. He also knew managers who falsified information in loan files, such as income documentation, to get loans approved. Mr. Simpson further confirmed that Wells Fargo's bonus system was "lucrative" for those employees generating the loans. Memphis Compl. Exh. 2.

349.    Mario Taylor was a Wells Fargo credit manager from June 2006 to February 2008 in the Memphis area. His job was to find potential borrowers and to get them to apply for loans. His manager pressured him to push loans on borrowers whether they were qualified for the loan or could pay back the loan. He was also told to mislead borrowers by only telling them the "teaser rate" without disclosing the rate was adjustable and by not telling them about the "fine

print." One of his branch managers changed pay stubs and used white-out on documents to alter the borrower's income. Finally, Mr. Taylor confirmed that Wells Fargo employees were heavily incentivized by the bonus structure to generate large volumes of loans. Memphis Compl. Exh. 3.

350.    Elizabeth Jacobson was a loan officer and sales manager at Wells Fargo from 1998 to December 2007 in the Maryland area. She described the financial incentives to sign borrowers up for loans. In two years, she made more than $1.2 million in sales commissions. She knew loan officers who would lie to potential borrowers about whether they could refinance their loan once the "teaser rate" period expired. Ms. Jacobson also knew loan officers who falsified loan applications to qualify them for loans they should not have been given. One loan officer would "cut and paste" the credit report of an approved borrower into other borrowers' applications. She reported this conduct to management but was not aware of any action taken to correct the problems. Memphis Compl. Exh. 7.

351.    The district court denied a motion to dismiss. *City of Memphis v. Wells Fargo Bank, N.A.*, 2011 WL 1706756 (W.D. Tenn. May 4, 2011). The case subsequently settled.

352.    The FCIC's investigation supports the affidavits of these former Wells Fargo employees. The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who worked as an underwriter and a quality assurance analyst from 2001 until 2007. According to Ms. Parmer, at least half the loans she flagged as fraudulent were approved. She also told the FCIC that "hundreds and hundreds and hundreds of fraud cases" within Wells Fargo were never referred to the Treasury Department's Financial Crimes Enforcement Network. FCIC Report at 162.

353.    In July 2011, the Federal Reserve Board issued a consent cease and desist order, and assessed an $85 million civil money penalty against Wells Fargo & Co. (parent company of

Wells Fargo Bank, N.A.) and Wells Fargo Financial, Inc. At the time, this was the largest penalty assessed by the Board in a consumer-protection enforcement action. The order addressed allegations that Wells Fargo had falsified income information in mortgage applications. These practices were allegedly fostered by Wells Fargo's incentive compensation and sales quota programs and the lack of adequate controls to manage the risks resulting from these programs. Press Release, Federal Reserve Board (July 20, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110720a.htm.

354.    There is widespread evidence of pervasive breaches of seller representations and warranties in Wells Fargo sponsored RMBS, including detailed allegations in securities cases against Wells Fargo, such as *In Re Wells Fargo Mortgage-Backed Certificates Litigation*, No. 09-cv-1376 (N.D. Cal.), which Wells Fargo agreed to settle for $125 million. This action and others have demonstrated systemic and pervasive deficiencies in Wells Fargo's underwriting practices, which led to inaccurate representations and warranties regarding LTV ratios and owner occupancy.

355.    Other RMBS lawsuits involving Wells Fargo sponsored trusts have revealed Wells Fargo's systemic securitization abuses. For example, in August 2012, the FDIC, as receiver for the now-defunct Alabama-based Colonial Bank ("Colonial"), sued Wells Fargo and twelve other large banks for misrepresentations in connection with the sale of residential mortgage-backed securities to Colonial. The complaint alleged that Wells Fargo made material misrepresentations in the offering documents regarding loan-to-value ratios, owner occupancy rates, compliance with appraisal standards, and loan issuance practices. *See Fed. Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortgage Fin. Corp., et al.*, No. 12-cv- 6166 (S.D.N.Y. Aug. 10, 2012).

356.    In *Federal Home Loan Bank of Atlanta v. Countrywide Fin. Corp, et al.*, No. 11-cv-00489 (N.D. Georgia Feb. 17, 2011), the plaintiff performed a forensic review of 30 offerings, including at least one trust sponsored by Wells Fargo. The Federal Home Loan Bank of Atlanta found that in its sample of more than 21,000 loans "over 58% of the appraised property values in this sample were overstated by 5% or more." Moreover, the analysis revealed that although the offering documents for all 30 offerings represented that no loans had an LTV at origination over 100%, of the "more than 21,000 loans the Bank analyzed, over 2,490 had an AVM value (at the time of origination) that was less than the amount of the original mortgage (*i.e.*, an LTV over 100%)."

357.    In a similar action brought by the Federal Home Loan Bank of Indianapolis, *Federal Home Loan Bank Indianapolis v. Banc of America Mort. Sec., Inc., et al.*, No. 10-cv-01463 (S.D. Ind. Nov. 15, 2010), the bank conducted a forensic review of 32 offerings, including some Wells Fargo sponsored trusts. For four of those trusts, Wells Fargo represented that no loan in the pool had an LTV ratio over 100%, but the review revealed that 9.02%, 14.29%, 17.39%, and 8.33% of the loans respectively, had an LTV greater than 100%. The review also revealed that the owner occupancy percentages were understated.

### 19.    WMC Mortgage Corp.

358.    WMC Mortgage Corp. ("WMC") originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

359.    In 2004, when General Electric ("GE") purchased it from a private equity firm, WMC was the sixth-largest subprime lender in the country. WMC specialized in nonprime loans and jumbo loans of up to $1 million.

360.    On January 20, 2012, the Huffington Post reported that the FBI and the

Department of Justice were investigating possible fraud at WMC.

361.    Another article published that same day on iwatchnews.org elaborated on the investigation. According to the article, "the government is asking whether WMC used falsified paperwork, overstated borrowers' income and other tactics to push through questionable loans" with the probe focused on whether "senior managers condoned improper practices that enabled fraudulent loans to be sold to investors." The article reports as follows:

> The FBI's San Francisco office indicated that it has been looking into WMC's business practices for nearly two years, according to one of the people who has knowledge of the investigation. The bureau has examined individual WMC loan files and has begun contacting former employees about how the lender handled the sale of mortgages to investors, this person said.

Michael Hudson, *Feds investigating possible fraud at GE's former subprime unit*, iwatchnews.org, Jan. 20, 2012, *available at* http://www.publicintegrity.org/2012/01/20/7908/ feds-investigating-possible-fraud-ge-s-former-subprime-unit.

362.    Another iwatchnews.org article was a lengthy report on GE's purchase of WMC and the practices of WMC's sales staff to push through loans at any cost. According to the article, several ex-employees claim that many WMC sales staff "embraced fraud as a tool for pushing through loans that borrowers couldn't afford" and that WMC ignored reports of loans supported by falsified documents and inflated incomes. The article continued:

> Dave Riedel, a former compliance manager at WMC, says sales reps intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors.
>
> One WMC official, Riedel claims, went so far as to declare:
> "Fraud pays."
> . . .
>
> [Riedel] supervised a quality-control team of a dozen or more people who watched over WMC's lending in a broad area of Southern California where salespeople were pushing subprime loans as well as "Alt-A" mortgages, another type of risky home loan.

The team, Riedel says, found many examples of fraud committed by in-house staffers or the independent mortgage brokers who helped bring in customers to the lender. These included faking proofs of loan applicants' employment and faking verifications that would-be home buyers had been faithfully paying rent for years rather than, say, living with their parents.

Some employees also fabricated borrowers' incomes by creating bogus W-2 tax forms, he says. Some, he says, did it old-school, cutting and pasting numbers from one photocopy to another. Others, he says, had software on their computers that allowed them to create W-2s from scratch.

. . .

While Dave Riedel was fighting battles inside WMC's California headquarters, Gail Roman was losing battles on the other side of the country.

Roman worked as a loan auditor at WMC's regional offices in Orangeburg, N.Y. She and other colleagues in quality control, she says, dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications.

It did little good. Management ignored their reports and approved the loans anyway, she says.

"They didn't want to hear what you found," Roman told iWatch News. "Even if you had enough documentation to show that there was fraud or questionable activity."

If GE made any progress against fraud at WMC, Roman says, she didn't notice it. Fraud was as bad at WMC in 2006 as it was when she started at the lender in 2004, she says.

"I didn't really see much of a change," Roman says.

Victor Argueta, the former risk analyst, says he didn't see much change either.

Meetings would be held. Executives from GE would agree fraud was a problem and something needed to be done. "But the next month it was business as usual," Argueta says.

. . .

Argueta says one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved.

"Bank statements, W-2s, you name it, pretty much anything that goes into a file," Argueta says. "Anything to make the loan look better than what was the real story."

In one instance, Argueta says, he sniffed out salespeople who were putting down fake jobs on borrowers' loan applications — even listing their own cell phone numbers so they

could pose as the borrowers' supervisors and "confirm" that the borrowers were working at the made-up employers.

Management gave him a pat on the back for pointing out the problem, he says, but did nothing about the salespeople he accused of using devious methods to make borrowers appear gainfully employed.

Nightmare loans

Roman and Argueta weren't alone in their concerns, according to other ex-employees who spoke on the condition they remain anonymous, because they still work in banking and fear being blackballed within the industry.

"It was ugly," one former fraud investigator at WMC recalls. "I would have nightmares about some of the things I'd find in a file. I'd wake up in the middle of the night going, 'Oh my God, how did this happen?'"

A former manager who worked for WMC in California claims that company officials transferred and essentially demoted her after she complained about fraud, including the handiwork of a sales rep who used an X-Acto knife to create bogus documents, cutting numbers from one piece of paper and pasting them onto another, then running the mock-up through a photocopier.

. . .

By early 2006, Dave Riedel had begun to rebuild his career inside WMC.

He helped put together a presentation in May 2006 aimed at giving GE officials a sense of how serious WMC's fraud problems were. Riedel says an audit of soured loans that investors had asked WMC to repurchase indicated that 78 percent of them had been fraudulent; nearly four out of five of the loan applications backing these mortgages had contained misrepresentations about borrowers' incomes or employment.

Michael Hudson, *Fraud and folly: The untold story of General Electric's subprime debacle*, iwatchnews.org, Jan. 6, 2012, *available at* http://www.publicintegrity.org/2012/01/06/7802/ fraud-and-folly-untold-story-general-electric-s-subprime-debacle.

363.    On the radio program This American Life, broadcast May 9, 2008, reporter Alex Blumberg interviewed a WMC sales manager who made over a million dollars a year by making loans to "people [who] didn't have a pot to piss in." Blumberg reported that the manager "didn't worry about whether the loans were good. That's someone else's problem." *This American Life:*

*The Giant Pool of Money*, Chicago Public Radio (May 9, 2008), *available at*
http://www.thisamericanlife.org/radio-archives/episode/355/transcript.

364.     In June 2008, the Washington State Department of Financial Institutions filed a
"Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit
From Industry, Impose Fine, Order Restitution and Collect Investigation Fees" against WMC
and its owners. The Statement of Charges stemmed from an investigation that found WMC had
originated loans with unlicensed or unregistered mortgage brokers, understated amounts of
finance charges on multiple loans, understated amounts of payments made to escrow companies,
understated annual percentage rates by almost 5%, and committed numerous other violations of
Washington State deceptive and unfair practices laws. In July 2009, WMC entered a consent
order under which it agreed to pay fines, restitution and the costs of the investigation to settle the
matter.

365.     WMC's lack of underwriting landed it fourth on the OCC's 2009 "Worst Ten of
the Worst Ten" list.

### C.     A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards

366.     Apart from the multiple, highly-publicized RMBS lawsuits and the numerous
government investigations on both a state and federal level, there were various other indications
that the trusts' loan pools included large numbers of mortgage loans that materially breached the
warrantor's representations and warranties, including the following: 1) the trusts' high default
and delinquency rates; and 2) the trusts' enormous cumulative losses. A summary of the trusts'
default and delinquency rates and the trusts' cumulative losses is attached as Exhibit K.

### 1.   The Trusts Suffered from High Delinquency and Default Rates

367.   Residential mortgages are considered delinquent if no payment has been received for over 30 days after payment is due. Residential mortgages where no payment has been received for over 90 days (or three payment cycles) are considered to be in default.

368.   By January 2009 at the latest, Defendant and its responsible officers witnessed a significant rise in reported default and delinquencies in the loan pools backing the trusts with many defaults and delinquencies occurring within months of the loans' origination. As many commentators have noted, such rapid and numerous defaults indicate loans that should not have been made. For example, a November 2008 Federal Reserve Board study attributed the general rise in defaults, in part, to "[d]eteriorating lending standards," and posited that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors." Christopher J. Mayer et al., *The Rise in Mortgage Defaults*, at 15-16 Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59.

369.   By 2009 at the latest, these massive numbers of defaults and delinquencies, including early payment defaults which automatically breach representations and warranties, put Defendant on notice that the loans sold into the trusts did not comply with the warrantors' representations and warranties and Defendant should have taken action to address any issues. Loan pools that were properly underwritten and containing loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquency.

370.   These default and delinquency rates were communicated to Defendant monthly through the service reports and trustee remittance reports. By January 2009, all 37 trusts were reporting default and delinquency rates of over 10%, with over half of all the trusts reporting

delinquency rates of over 40%. The average default and delinquency rate of the trusts by January 2009 was over 42%. By January 2010, this average was almost 50%.

371.    Properly underwritten loans would have experienced far fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies even during an economic downturn.

### 2.    The Trusts Suffered Huge Losses

372.    Realized losses are the losses incurred regarding any liquidated mortgage loan or any mortgage loan charged off by the servicer. The realized losses equal the portion of the stated principal balance remaining unpaid after applying all net liquidation proceeds to the mortgage loan.

373.    By January 2009 at the latest, the trusts' extraordinary losses should have raised a red flag to Defendant that the mortgage loans sold to the trusts did not comply with the warrantors' representations and warranties. In particular, large realized losses are indicative of severe deficiencies in the appraisal and valuation process. As an example, SVHE 2005-B trust was reporting cumulative losses in January 2009 of over $100 million, which equates to more than 20% of the trust's total original par value.

374.    By January 2009, the total combined cumulative losses for the trusts (with reported figures) exceeded $2.3 billion, with the trusts reporting an average loss of over $64 million. By January 2011, the total reported cumulative losses for the trusts were over $8.5 billion.

375.    The immense losses are strong evidence that the originators systematically disregarded the underwriting standards and that many mortgages in the pool were not written in adherence to the underwriting guidelines in breach of the representations and warranties.

**D.     The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines**

376.     RMBS are generally divided into slices or tranches, each of which represents a different level of risk. RMBS certificates denote the particular tranches of the security purchased by the investor.

377.     The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.

378.     The vast majority of the certificates owned by the CCUs were rated triple-A at issuance. A triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations." *Understanding Standard & Poor's Rating Definitions*, June 3, 2009, at 14. By the end of 2008, 35 of 64 certificates—a staggering 55%— had been downgraded to junk status by at least one credit rating agency. By the end of 2009, this figure had increased to over 94%. A complete list of the downgrades for the certificates is set forth in Exhibit L.

379.     The high initial credit ratings reflected the risk associated with properly originated and underwritten mortgage loans and were based on the credit risk characteristics the warrantors represented and warranted to the credit rating agencies. Consequently, the total collapse in the credit ratings of the RMBS certificates the CCUs purchased, typically from triple-A to non-investment speculative grade, put Defendant on notice that it was required to notify certificateholders of any defaults and take appropriate action.

**E.     Additional Evidence Shows That Defendant Knew of Systemic Problems That Necessarily Would Result in Breaching and Defective Loans in the Trusts**

**1.     Defendant's Affiliates Have Been Sued on Claims of Systematic, Widespread Shoddy Origination and Securitization Practices**

380.     Deutsche Bank AG reached a $7.2 billion settlement with the Department of

Justice in which "Deutsche Bank admits making false representations and omitting material information from disclosures to investors about the loans included in RMBS securities sold by the Bank." DOJ Release, *Deutsche Bank Agrees to Pay $7.2 Billion for Misleading Investors in its Sale of Residential Mortgage-Backed Securities; Deutsche Bank's Conduct Contributed to the 2008 Financial Crisis* (Jan. 17, 2017), *available at* https://www.justice.gov/opa/pr/deutsche-bank-agrees-pay-72-billion-misleading-investors-its-sale-residential-mortgage-backed (providing settlement agreement and statement of facts).

381.    "As part of the settlement, Deutsche Bank agreed to a detailed Statement of Facts," which "describes how Deutsche Bank knowingly made false and misleading representations to investors about the characteristics of the mortgage loans it securitized in RMBS worth billions of dollars issued by the bank between 2006 and 2007." *Id.*

382.    The settlement agreement was between DOJ and the Trustee's parent company, "Deutsche Bank AG, as well as its current and former subsidiaries and affiliates."  Settlement Agreement at 1, https://www.justice.gov/opa/press-release/file/928096/download. Accordingly, Defendant here was made a party to that settlement with DOJ, together with all of Defendant's affiliates and Defendant's parent company.

383.    Deutsche Bank intentionally misrepresented that the loans in the RMBS "were originated generally in accordance with mortgage loan originators' underwriting guidelines," "the value of the properties securing the loans, "the significant number of borrowers [who] had second liens on their properties," the accuracy of FICO scores, and "the true risk of losses of its RMBS." Statement of Facts at 2-3, https://www.justice.gov/opa/press-release/file/927271/download.

384.    Many of the loans involved in the securitizations at issue in the DOJ settlement

were purchased from originators listed above in this SAC. *Id.* at 4. The Statement of Facts details internal knowledge by Deutsche Bank that the loans were not of the quality represented. *Id.* at 10-23.

385.    In addition, Defendant's parent corporation faced a lawsuit by the FHFA, as conservator for Fannie Mae and Freddie Mac. The suit, *Federal Housing Finance Agency v. Deutsche Bank AG, et al.*, No. 11-cv-06192 (S.D.N.Y.), was filed with similar suits against seventeen financial institutions concerning the packaging, marketing and sale of RMBS purchased by Freddie Mac and Fannie Mae from 2005 to 2007 from underwriters of RMBS like Deutsche Bank AG. Fifteen of the FHFA cases were concentrated for coordinated pretrial proceedings before Judge Denise Cote of the Southern District of New York, thus providing Deutsche Bank access to the discovery and pleadings in each of the cases. The complaint alleges that Deutsche Bank AG and its affiliates falsely stated that the underlying mortgage loans and properties complied with certain underwriting guidelines and standards and that the false statements and misleading omissions significantly overstated the ability of the borrowers to repay their mortgage loans and the value of collateralized property. Am. Complaint, *Federal Housing Finance Agency v. Deutsche Bank AG, et al.*, No. 11-cv-06192 (S.D.N.Y. June 13, 2011).

386.    The complaint stated that a loan level analysis of a sample of loans for each securitization in the Deutsche Bank AG action had revealed that statistics provided by Deutsche Bank AG and its affiliates were false and omitted material facts due to widespread falsification of borrowers' incomes and debts, inflated property values, and misrepresentations of other key characteristics of the mortgage loans. A forensic review of loans for various Deutsche Bank AG securitizations at issue in the FHFA case revealed pervasive failure to adhere to underwriting

guidelines. For example, a forensic review of 1,273 loans from the ACE 2007-HE3 offering, for which Deutsche Bank AG subsidiaries served as both the sponsor and lead underwriter, revealed that "approximately 97 percent of the reviewed loans were not underwritten in accordance with the applicable guidelines or otherwise breached the representations contained in the transaction documents." *Id*. ¶ 113. The FHFA action claims that as a result of Deutsche Bank AG and its affiliates' misstatements and omissions of material fact, Fannie Mae and Freddie Mac suffered substantial losses as the value of their holdings significantly deteriorated.

387.    The complaint alleges that Deutsche Bank AG "knew or was reckless in not knowing, that it was falsely representing the underwriting process and the risk profiles of the mortgage loans." *Id*. ¶ 165. According to the complaint, Deutsche Bank AG knew, through its own due diligence and the findings of its outside consultants, that the representations in the registration statements were false. The Prospectus Supplements stated that, "as one of its 'quality control procedures', it re-underwrote sample pools of the loans it purchased from originators to ensure that those loans were originated in compliance with applicable underwriting guidelines." *Id*. ¶ 166. In an FCIC interview of Joseph Swartz, a former vice president of Deutsche Bank's due diligence department responsible for overseeing all of the bank's residential mortgage business, states that he employed a team of people who would "run through credit bureaus hour after hour through hundreds and hundreds of loans… to see 'Is there anything about this credit, about the borrower that is alarming'?" *Id*. ¶ 167. This pre-review would have revealed significant deficiencies in the underwriting of loans designated for inclusion in securitizations and that loans failed to meet the specific criteria in the Registration Statements. *Id*. ¶ 168.

388.    The FHFA announced a $1.9 billion settlement with Deutsche Bank AG regarding the lawsuit on December 20, 2013.

389.     On April 4, 2014, a New York state court allowed HSBC Bank USA, as trustee for Ace Securities Corp., Home Equity Loan Trust, Series 2006-HE4, to proceed with a putback lawsuit against DB Structured Products, Inc. ("DBSP"), the securitization unit of Deutsche Bank AG, in connection with a $702 million RMBS offering. HSBC alleged that the loans underlying the securitization breached their associated representations and warranties. *Ace Securities Corp. v. DB Structured Products, Inc.*, 2014 WL 1384490 (N.Y. Sup. Ct. 2014).

390.     On October 17, 2013, the Nevada Attorney General announced that DBSP had agreed to pay $11.5 million to the State of Nevada to resolve an investigation into the bank's role in purchasing and securitizing subprime and Alt-A mortgage loans in Nevada. The nearly two-year investigation centered upon potential misrepresentations by lenders, including New Century and American Home, to Nevada consumers who took out subprime loans and Alt-A loans that were funded, bought, and securitized by DBSP between 2004 and 2007. *In the Matter of DB Structured Products, Inc.,* No. A-13-690144-B (Nev. Dist. Ct. Clark Cnty. Oct. 14, 2013).

### 2.     Defendant Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers

391.     Monoline insurance is credit enhancement that involves purchasing insurance to cover losses from any defaults. Many RMBS trusts were insured by monoline insurers. The warrantors made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS, and the governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the warrantor and the other parties to the agreement, including the trustee.

392.     Monoline insurers have filed many complaints against warrantors for representations and warranty breaches in connection with other RMBS trusts to which Defendant

serves as trustee or an affiliate of Defendant served as sponsor. Prior to filing suit against the warrantors, the monoline insurers often obtained and carried out forensic loan level reviews of the loans at issue.

393.    In *CIFG Assurance N. Am., Inc. v. GreenPoint Mortgage Funding, Inc.*, No. 653449/2012 (N.Y. Sup. Ct. Oct. 1, 2012), the monoline insurer CIFG sued GreenPoint Mortgage Funding, Inc. alleging that its review of loan files originated by the defendant revealed breaches in 82% of the loans reviewed. DBNTC acted as the trustee for the trust at issue in the litigation.

394.    In *Assured Guaranty Corp. v. DB Structured Products, Inc., et al.*, No. 651824/201 (N.Y. Sup. Ct. Oct. 25, 2010), the monoline insurer Assured sued DBSP, an affiliate of Defendant, alleging that its review of loan files securitized by the defendant revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that the defendant represented would be followed.

395.    Because of the monoline insurers' breach notices and lawsuits, Defendant knew that these same defective underwriting and securitization practices affected other trusts containing loans originated and securitized by these same originators and sponsors. Furthermore, discovery will likely demonstrate that monoline insurers and private mortgage insurers provided loan-by-loan breach notices for certain trusts in this action.

> **3.      Global RMBS Repurchase Investigations and Settlements Alerted Defendant to Systematic, Widespread Breaches of Representations and Warranties**

396.    RMBS certificateholders have initiated numerous mortgage repurchase directions, compelling trustees to demand that warrantors repurchase the mortgage loans due to breaches of representations and warranties. Defendant was trustee for many of the RMBS subject to these

directions.

397.    For example, on December 16, 2011, several institutional mortgage investors in hundreds of RMBS trusts sponsored by J.P. Morgan or its affiliates issued written instructions to Defendant along with U.S. Bank, Wells Fargo, BNYM, and HSBC, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools backing the trusts and deficient loan servicing practices. The notices covered over $95 billion of RMBS sponsored by J.P. Morgan from 2005 to 2007.

398.    The investors sought the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the trusts; and securitized by the same investment banks and financial institutions that sponsored the trusts. J.P. Morgan offered to settle the claims for $4.5 billion less than two years later. DBNTC approved the settlement and an Article 77 proceeding is pending.

399.    On January 31, 2012, a group of major institutional mortgage investors in several dozen Morgan Stanley-sponsored RMBS trusts demanded that Defendant along with U.S. Bank and Wells Fargo, as trustees, investigate ineligible mortgages in the loan pools securing those trusts and deficient servicing of the loans. The notices covered more than $25 billion of RMBS issued by Morgan Stanley from 2005 to 2007.

400.    The investors sought the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the trusts; and securitized by the same investment banks and financial institutions that sponsored the trusts.

401.    As trustee, Defendant has received many breach notices from institutional investors, indicating widespread and systemic violations of representations and warranties by the warrantors. Defendant knew similar issues likely affected the other RMBS trusts committed to its

care, and had an obligation to investigate that issue carefully.

402.    Upon information and belief from publicly available reports filed pursuant to Securities and Exchange Commission Rule 15Ga-1, Defendant has made at least 9,900 repurchase demands across the at-issue trusts between the first quarter of 2009 and the second quarter of 2018, further demonstrating Defendant's knowledge of widespread loan-by-loan breaches of representations and warranties.

### 4.    Defendant Has Been Involved in Repurchase Litigation Against Many Warrantors

403.    Defendant is also involved in many repurchase claims for other RMBS trusts that involved the same originators, sponsors, sellers, and servicers as the trusts. In many instances, these actions were initiated by certificateholders who provided notices of breaching loans to the Defendant on a loan-by-loan basis and then directed the Defendant to bring suit. Based on its involvement in these repurchase actions, which alleged widespread, systematic breaches of representations and warranties, Defendant had an obligation to investigate that issue carefully for all trusts committed to its care and take action as appropriate.

404.    On August 26, 2009, Defendant – the trustee for ninety-nine trusts in which WaMu sold, sponsored and serviced loans – filed suit against the FDIC, WaMu's receiver, and others on behalf of the trusts and their investors in an effort to enforce the trusts' and certificateholders' rights. *See* Am. Complaint, *Deutsche Bank National Trust Co. v. FDIC, as receiver for Wash. Mut. Bank, et. al.*, No. 09-cv-01656 (D.D.C. Sept. 8, 2010) (the "WaMu Repurchase Litigation"). Defendant brought the lawsuit because the FDIC failed to respond to its proof of claim filed the preceding year. Defendant's complaint in the WaMu Repurchase Litigation details WaMu's systemic disregard of sound origination practices and pervasive sale of mortgage loans that failed to comply with representations and warranties between 2004 and

2008.

405.     Defendant's complaint cites the Senate Subcommittee findings, including that "WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities." *Id*. ¶ 69. Defendant alleges that "[b]ased upon: (a) the pervasiveness of such practices by WaMu, as found by the Senate Subcommittee; and (b) the high proportion of WaMu's securitized mortgage loans that were sold to, or deposited in, the Trusts during the relevant time period, the Trustee has reason to believe that such practices affected mortgage loans sold to, or deposited in, the Trusts by WaMu and that, accordingly, many of the mortgage loans in the Trusts do not comply with the Representations and Warranties." *Id*. ¶ 74.

406.     The complaint filed in *Deutsche Bank National Trust Co. v. Barclays Bank PLC, et al.*, No. 651338/2013 (N.Y. Sup. Ct. Sept. 17, 2013), details how "an exhaustive forensic review of a sample of loan origination documents" was conducted that showed the mortgage loans Barclays sold to the trust failed to meet the standards described in Barclays' representations and warranties. Over 64% of the loans reviewed were determined to be in breach of those representations and warranties. *Id*. ¶ 3. Analysis of 2,221 mortgage loans revealed 539 loans with actual loan-to-value ratios exceeding 95%, and 365 loans with actual cumulative loan-to-value ratios exceeding 100% - far greater numbers than the reported ratios. *Id*. ¶ 56. The action pertains to an offering backed by loans originated primarily by New Century and Ameriquest. *Id*. ¶ 25.

407.     Moreover, a loan level review of loans originated by New Century and included in the HASC 2007-NC1 offering uncovered breaches in at least 2,725 loans – almost 60% of the loans in the trust. According to the complaint, this suggested a "high breach rate across the

Trust's entire Mortgage Loan pool." Complaint, *Deutsche Bank National Trust Co. v. HSBC Bank USA*, No. 652001/2013 (N.Y. Sup. Ct. Nov. 12, 2013), ¶ 62.

408.   In another repurchase action against Decision One, Defendant claimed that Decision One breached so many representations and warranties materially and adversely affecting the value of the loans in a trust that over half of the loans conveyed into the trust were in material breach. *See* Complaint, *Deutsche Bank National Trust Co. v. Decision One*, No. 2013-L-005823 (Ill. Cir. Ct. May 31, 2013), ¶ 53.

409.   Defendant's involvement in numerous repurchase actions, particularly its knowledge of the forensic reviews conducted in connection with that litigation, shows that Defendant was on notice of the fact that such widespread, systemic breaches of representations and warranties likely affected all of the trusts committed to its care, and had an obligation to investigate that issue carefully and take action to protect the trusts.

## VIII.   DEFENDANT FAILED TO ACT PRUDENTLY FOLLOWING EVENTS OF DEFAULT

### A.   Defendant Breached the Governing Agreements and Its Common Law Obligations By Failing to Fulfill Its Duties After Defaults and Events of Default

410.   The master servicers and/or servicers failed to prudently service the mortgage loans underlying the trusts. The governing agreements require that the master servicers and/or servicers administer the mortgage loans for and on behalf of the certificateholders, and do so (consistent with the terms of the governing agreements):  (i) in the same manner in which they service and administer similar mortgage loans for their own portfolios or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) to maximize the recoveries regarding such mortgage loans on a net present value basis; and (iii) without regard to the right of the master

servicers and/or servicers to receive compensation or other fees for their services under the governing agreements, the obligation of the master servicers and/or servicers to make servicing advances under the governing agreements, and the master servicers' and/or servicers' ownership, servicing or management for others of any other mortgage loans. The master servicers and servicers did not adhere to these requirements.

411.     The master servicers and/or servicers failed to meet their obligations by: (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) providing false or misleading information to borrowers; (v) failing to properly deliver loan documentation; and (vi) failing to maintain appropriate staffing, training and quality control systems.

412.     Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. In that process, because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers were put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the applicable parties or take action based on these breaches as required by the governing agreements.

413.     In addition, in the course of fulfilling their duties to service the loans, and particularly when required to foreclose on certain mortgage loans when appropriate, the master servicers and servicers also became aware of breaches of representations and warranties but failed to notify the trustee.

414.    The master servicers and/or servicers failed to notify parties to the governing agreements upon the discovery of mortgages in violation of the representations and warranties; failed to enforce repurchase obligations; failed to properly respond to denial of mortgage insurance claims based on originator misrepresentations; failed to foreclose upon properties when appropriate under applicable law; and failed to conduct foreclosures in a lawful fashion.

415.    Much of this conduct constituted Events of Default under the governing agreements. These failures have been confirmed by governmental investigations, published reports, and public and private litigation that have described the master servicers' and/or servicers' pervasive deviation from customary and lawful servicing practices.

416.    Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any covenants or agreements under the governing agreements, after notice and lapse of time, constitutes a default.

417.    These defaults ripened into Events of Default under the governing agreements for the trusts. Defendant had an obligation to provide notice of such defaults, which would have resulted in additional Events of Default, but it failed to do so.

418.    Defendant breached the governing agreements, its duties, and violated the law after becoming aware of such breaches, defaults and/or Events of Default by failing to:  provide notice of such breaches, defaults and/or Events of Default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or Events of Default.

419.    Defendant failed to exercise the same skill and care as a prudent person in the same circumstances in enforcing its rights and powers under the governing agreements upon

learning of the above breaches, defaults and/or Events of Default.

### B.    Specific Servicer Misconduct

420.    Many of the trusts' loans are or were serviced by the following servicers and their affiliates: Countrywide Home Loans Servicing LP; American Home Mortgage Servicing, Inc.; Wells Fargo Bank, N.A.; JPMorgan Chase Bank, N.A.; GMAC Mortgage Corporation or Mortgage LLC; Saxon Mortgage Services, Inc.; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; Option One Mortgage Corp.; National City Mortgage Co. and Home Loan Services;; and CitiMortgage, Inc.

421.    After Countrywide was acquired by Bank of America in 2008, Countrywide Home Loans Servicing L.P. ("CHLS") was renamed BAC Home Loans Servicing LP ("BAC Servicing"). In July 2011, BAC Servicing was merged into Bank of America.

422.    In March 2008, prior to being acquired by Bank of America, Countrywide was ranked as the most common mortgage servicer in the United States and had a servicing portfolio with a balance of over $1.4 trillion. In September 2009, after its acquisition of Countrywide, Bank of America was the nation's most common mortgage servicer with a servicing portfolio of over $2.1 trillion.

423.    On October 6, 2008, the attorneys general in multiple states reached an $8.68 billion settlement with Countrywide Home Loans, Countrywide Financial Corporation and Full Spectrum Lending. The settlement allowed certain borrowers whose loans were serviced by Countrywide to obtain loan modifications valued at up to $3.4 billion worth of reduced interest payments and, for certain borrowers, reduction of their principal balances.

424.    On June 7, 2010, the Federal Trade Commission ("FTC") filed a civil

enforcement action against Countrywide Home Loans, Inc. and BAC Servicing for "unlawful acts and practices in servicing mortgage loans." Complaint, *Federal Trade Commission v. Countrywide Home Loans, Inc. and BAC Home Loan Servicing, LP*, No. 10-cv-4193 (C.D. Cal. June 7, 2010). Countrywide Home Loans and BAC Servicing paid $108 million to settle.

425.     According to the FTC, when borrowers fell behind on their payments, Countrywide and BAC imposed several default-related services "by funneling the work through panoply of Countrywide subsidiaries." In its mortgage servicing operation, Countrywide/BAC followed a so-called "vertical integration strategy" to generate default-related fee income. Rather than obtain default-related services directly from third-party vendors and charge borrowers for the actual cost of these services, Countrywide/BAC formed subsidiaries to act as middlemen in the default services process. According to the FTC, these subsidiaries existed solely to generate revenues for Countrywide/BAC and did not operate at arms'-length with Countrywide/BAC. Countrywide/BAC and their subsidiaries – "[a]s a matter of practice" – added a substantial mark-up to their actual costs for the services and then charged the borrowers the marked-up fees. The inflated fees were both contrary to prudent servicing standards and violated the mortgage contracts, which limit fees chargeable to the borrower to actual costs of the services and as are reasonable and appropriate to protect the noteholder's interest in the property and rights under the security instrument.

426.     Countrywide/BAC similarly breached servicing standards and mortgage contracts when servicing loans for borrowers who sought to save their homes through a Chapter 13 bankruptcy. According to the FTC, Countrywide/BAC made various representations to those borrowers about their mortgage loans that were false or lacked a reasonable basis, and failed to disclose to borrowers during their bankruptcy case when fees and escrow shortages and

deficiencies accrued on their loan. According to the FTC, "Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans. Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts." After the bankruptcy cases have closed and borrowers no longer have the protection of the bankruptcy court, Countrywide/BAC collected those amounts, including through foreclosure actions.

427.    Following a 16-month investigation led by Iowa Attorney General Tom Miller, a coalition of 49 State Attorneys General, the Departments of Justice, Treasury and HUD (collectively, the "Coalition") reached a settlement with, among others, Bank of America. In its complaint, the Coalition reported its investigative findings.  The Coalition concluded that Bank of America committed unfair and deceptive practices including (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; and (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

428.    Wells Fargo also serviced many of the trusts. The Office of the Comptroller of the Currency ("OCC") issued a consent order dated April 13, 2011 finding, in part, that Wells Fargo as servicer filed in state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records. *In re Wells Fargo Bank, N.A.*, Consent Order, No. AA-EC-11-19 (Apr. 13, 2011).

429.    Wells Fargo stipulated to the consent order. *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf.

430.    The consent order required Wells Fargo to undertake a sweeping review of their foreclosure practices, including (i) instituting processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable legal requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, and applicable state and federal law.

431.    Additionally, the Coalition reached a settlement with Wells Fargo. The Coalition Complaint alleged that Wells Fargo committed unfair and deceptive practices including: (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; and (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

432.    Following a two week trial, on December 19, 2014, a jury verdict was rendered against Wells Fargo in the amount of $54.8 million resolving claims brought in the class action *Mazzei v. The Money Store*, No. 01-cv-05694 (S.D.N.Y. Jun. 22, 2001). The jury determined that Wells Fargo, and its subsidiaries charged improper and excessive fees for default-related services.  *See* Kurt Orzeck, *Wells Fargo Owes $55M in Mortgage Late Fee Suit, Jury Says*, Law360 (Dec. 19, 2014), *available at* http://www.law360.com/articles/606660/wells-fargo-owes-55m-in-mortgage-late-fee-suit-jury-says.

133

433.    Another entity that was the master servicer or servicer on a substantial number of the trusts was JPMorgan Chase Bank, N.A.

434.    The OCC issued a consent order dated April 13, 2011 finding that, in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, J.P. Morgan filed with state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records. *In re JPMorgan Chase Bank*, Consent Order, No. AA-EC-11-15 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

435.    JPMorgan stipulated to the consent order. *Id*.

436.    The OCC ordered JPMorgan to undertake a sweeping review of its foreclosure practices, including: (i) instituting processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable legal requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, and applicable state and federal law.

437.    Further, private litigation has brought to light that J.P. Morgan charged marked-up and unnecessary servicing fees (including through the use of default-related service vendors) and assessed them against borrowers' accounts for profits. *See, e.g.*, *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013).

134

438.     Additionally, JPMorgan entered into a settlement of claims brought by the

Coaltion that it committed unfair and deceptive practices including overcharging borrowers for

default related services. *See United States, et al., v. Bank of Am., et al.*, No. 12-cv-00361 (D.D.C.

Mar. 14, 2012).

439.     In 2010, the Federal Reserve, the OCC, the Federal Deposit Insurance

Corporation, and the Office of Thrift Supervision conducted on-site reviews of foreclosure

processing at fourteen federally regulated mortgage servicers. The servicers included Ally

Bank/GMAC, HSBC, Citibank (affiliated entity to CitiMortgage – a servicer for the trusts),

JPMorgan Chase, OneWest (which had acquired IndyMac, a common servicer for the trusts, in

or about March 2009), PNC (which had acquired National City, another servicer for the trusts),

and Wells Fargo. These entities together served as servicer or master servicer for many of the

trusts.

440.     In April 2011, the investigating agencies issued a report titled "Interagency

Review of Foreclosure Policies and Practices." *Available at* http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47a.pdf.

441.     The report found "critical weaknesses in each of the servicers' foreclosure

governance processes, foreclosure document preparation processes, and oversight and

monitoring of third-party vendors, including foreclosure attorneys." Based on the deficiencies

identified in the report, the investigating agencies initiated enforcement actions against each of

the servicers subject to the report.

442.     Specifically, the report found that the foreclosure governance processes were

underdeveloped and insufficient and that weaknesses included: (i) lack of sufficient audit trails to

show how information set out in servicer affidavits (including the amount of fees and penalties

charged) was linked to servicers' internal records; (ii) failure to ensure accurate foreclosure documentation, including documentation pertaining to the fees assessed; and (iii) lack of sufficient oversight of default management service providers.

443.    Additionally, the OTS issued a consent order dated April 13, 2011 finding that OneWest failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

444.    OneWest stipulated to the OTS's findings. *In re OneWest Bank, FSB*, Consent Order, No. 18129 (Apr. 13, 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf.

445.    In addition, the consent order detailed OneWest's practice of charging excessive fees. The consent order required OneWest to enact a compliance program to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage. The order also required OneWest to review whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the loan documents and were otherwise reasonable and customary. Further, OneWest is required to review whether the frequency that fees were assessed to borrowers' accounts was excessive. Finally, OneWest was required to remediate all injury to borrowers by reimbursing or otherwise appropriately remediating borrowers for impermissible of excessive penalties, fees, or expenses.

446.    As mentioned above, in February 2012, forty-nine state attorneys general and the federal government announced a historic joint $25 billion state-federal settlement with the country's five largest mortgage servicers and their affiliates for misconduct related to their origination and servicing of residential mortgages: (i) Residential Capital, LLC, Ally Financial,

Inc., and GMAC Mortgage, LLC; (ii) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (iii) Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.; (iv) J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A.; and (v) Wells Fargo & Company and Wells Fargo Bank, N.A. The complaint alleged these servicers had engaged in wrongful conduct related to foreclosures, including failing to properly identify the foreclosing party, preparing, executing, notarizing or presenting false and misleading documents, engaging in robo signing, and "charging excessive or improper fees for default-related services." *See United States, et al. v. Bank of America, et al.*, No. 12-cv-0361 (D.D.C. April 4, 2012). These entities served as master servicer and servicer for many of the trusts.

447.    On December 20, 2010, New Jersey Administrative Director of the Courts issued an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating there were no irregularities in handling their foreclosure proceedings. The order was directed at, among others, HSBC, PNC (and its servicer National City), and Wachovia, all master servicers or servicers to the trusts. *Available at* http://www.judiciary.state.nj.us/notices/2010/n101220b.pdf.

448.    Also on December 20, 2010, the New Jersey Superior Court Chancery Division issued an order in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No. F-59553-10 (N.J. Sup. Ct.), directing six mortgage loan lenders and servicers implicated in residential mortgage loan foreclosure irregularities to show cause why the processing of their uncontested residential foreclosure filings should not be suspended. Wells Fargo, JPMorgan Chase, Citibank, Bank of America/BAC, OneWest FSB (f/k/a IndyMac), and

GMAC were recipients of this show cause order. *Available at*

https://www.judiciary.state.nj.us/notices/2010/n101220c.pdf.

449.    In December 2013, the Consumer Financial Protection Bureau, authorities in 49

states, and the District of Columbia filed a proposed court order requiring the country's largest

nonbank mortgage-loan servicer, Ocwen, and its subsidiary, Ocwen Loan Servicing, to provide

$2 billion in first-lien principal reduction to underwater borrowers to compensate for years of

systemic misconduct at every stage of the mortgage-servicing process. The consent order also

covered two companies previously purchased by Ocwen, Litton and Homeward Residential

Holdings LLC (previously known as American Home Mortgage Servicing, Inc.). These entities

served as master servicer or servicer to some of the trusts. *See*

http://www.consumerfinance.gov/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-

billion-in-relief-to-homeowners-for-servicing-wrongs/.

450.    According to the complaint, Ocwen violated state law in several ways, including

failing to timely and accurately apply payments made by borrowers and failing to maintain

accurate account statements; charging borrowers unauthorized fees for default-related services;

and providing false or misleading information in response to consumer complaints.

451.    According to Bloomberg, the Texas Attorney General has stated that American

Home falsely claimed that borrowers did not make payments so as to justify late fees and also

refused to accept payments, forcing the borrower to incur late charges. *See* David McLaughlin,

*Wilbur Ross's American Home Mortgage Faces Servicing Lawsuits*, Bloomberg (Oct. 28, 2010),

*available at* http://www.bloomberg.com/news/2010-10-28/wilbur-ross-s-american-home-sued-

by-homeowner-texas-for-mortgage-practice.html.

452.    On February 18, 2014, *The New York Times* reported that "[s]hoddy paperwork,

erroneous fees and wrongful evictions—the same abuses that dogged the nation's largest banks and led to [the National Mortgage Settlement]—are now cropping up among the specialty firms [such as Ocwen], according to dozens of foreclosure lawsuits and interviews with borrowers, federal and state regulators and housing lawyers." Jessica Silver-Greenberg & Michael Corkery, *Loan Complaints by Homeowners Rise Once More*, N.Y. Times (Feb. 18, 2014), *available at* http://dealbook.nytimes.com/2014/02/18/loan-complaints-by-homeowners-rise-once-more/.

453.    In October 2012, Ocwen and Green Tree Servicing LLC ("Green Tree") won a joint bid in the United States Bankruptcy Court of the Southern District of New York for GMAC's mortgage servicing platform. GMAC was a common master servicer and servicer to the trusts.

454.    A May 2014 report on servicer mortgage practices found that Green Tree's servicing practices were inadequate in light of the 2012 National Mortgage Settlement's improved servicing standards requirements. Evan Weinberger, *$25B Mortgage Deal Monitor Says Banks Improved Practices*, Law360.com, May 14, 2014, *available at* http://www.law360.com/articles/537724/25b-mortgage-deal-monitor-says-banks-improved-practices.

455.    The report used twenty-nine metrics, including errors in foreclosure sales, adherence to late fee guidelines and pre-foreclosure initiation notifications, to determine whether national servicing standards have improved. Office of Mortgage Settlement Oversight, Compliance in Progress: A Report from the Monitor of the National Mortgage Settlement (May 14, 2014), *available at* https://www.jasmithmonitoring.com/omso/wp-content/uploads/sites/4/2014/05/compliance-report-interactive-.pdf.

456.    Green Tree's servicing of the GMAC servicing platform fell short of the

139

requirements for eight of these metrics. *Id.* at 9. The report ultimately concluded that Green Tree "has much implementation work to do." *Id.* at 2.

457.    Saxon was another trust servicer. In April 2012, the Federal Reserve released a Consent Order against Morgan Stanley to address patterns of misconduct and negligence in residential mortgage loan servicing and foreclosure processing at Saxon. The consent order required Morgan Stanley to retain an independent consultant to review Saxon's foreclosure proceedings. *In re Morgan Stanley*, Consent Order, No. 12-015-B-HC (Apr. 2, 2012), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20120403a1.pdf.

458.    Option One has also been the subject of state and federal investigations. On June 3, 2008, the Massachusetts Attorney General filed an action against Option One, and its past and present parent companies, for unfair and deceptive origination and servicing of mortgage loans. Complaint, *Commonwealth v. H&R Block, Inc.*, No. 08-2474 (Mass. Super. Ct. June 3, 2008).

459.    On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction in the case, which prevented Option One from foreclosing on thousands of loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008).

460.    On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *Commonwealth v. Option One Mortgage Co.*, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

461.    Another original servicer, Greenpoint Mortgage Funding, Inc., was shuttered by Capital One in 2007 amid escalating problems with its origination and servicing activities.

**C.    The Master Servicers and Servicers Defaulted on Their Duty to Notify the Trustee of Breaches of the Mortgage Loan Representations and Warranties**

462.    Under the governing agreements, master servicers and servicers typically are

required to notify the trustee, among others, upon discovery of a breach of representations and warranties with respect to a mortgage loan that materially and adversely affects the loan or the interests of the certificateholders in the loans. *See* Exhibit H § V.

463.    In the course of their duties, the master servicer and servicers to the trusts became aware of the overwhelming and widespread problems with the underlying mortgage loans due to the shoddy origination and underwriting practices detailed above.

464.    Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. Because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers must have been put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the trustee or take action based on these breaches.

465.    In addition, in the course of fulfilling its duties to service the loans, and particularly when required to foreclose on certain mortgage loans when appropriate, the master servicers and servicers also became aware of breaches of representations and warranties but failed to notify the trustee.

466.    These breaches materially affected the mortgage loans and the interests of the certificateholders as the breaches made it far more likely that the loans would underperform.

467.    Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any covenants or agreements under the governing agreements, including the duty to notify the trustee of breaches of representations and warranties, after notice and lapse of time, constitutes an event of default.

468.    The PSA Section 7.01 lists, as one of several events each considered an "Event of

Default," the following:

> (ii) [F]ailure by the Master Servicer duly to observe or perform, in any material respect, any other covenants, obligations or agreements of the Master Servicer as set forth in this Agreement, which failure continues unremedied for a period of 60 days, in each case after the date (A) on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee or to the Master Servicer and the Trustee by Holders of Certificates evidencing at least 25% of the Voting Rights or (B) on which a Servicing Officer of the Master Servicer has actual knowledge of such failure. . . .

469.    As alleged above, in the course of their duties, the master servicer and servicers to the trusts became aware of widespread problems with the underlying mortgage loans and failed to abide by their covenants.

**D.    Defendant Knew That the Trusts Suffered from Widespread Master Servicer and/or Servicer Defaults**

470.    Defendant, as trustee, knew of the servicing misconduct (and Events of Default) alleged, which has been the subject of high profile government investigations and private and public lawsuits. In the aftermath of the financial crisis, servicing abuse has also received widespread attention in the media. Thus, Defendant knew of the breaches, defaults, and events of default alleged herein.

471.    In 2010, the Federal Reserve, the OCC, the FDIC, and the Office of Thrift Supervision conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers.

472.    In April 2011, the investigating agencies issued a report titled "Interagency Review of Foreclosure Policies and Practices." The report found, among other things, that the servicers failed to evaluate "compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements." Based on the deficiencies identified in the report, the investigating agencies initiated enforcement actions

against each of the servicers subject to the report. *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

473.    Ally/GMAC, Bank of America, Citibank, JP Morgan Chase, HSBC, OneWest, PNC, and Wells Fargo were all subjects of the investigation. These entities and their affiliates and acquired companies (including IndyMac, Countrywide and National City) acted as master servicer and servicer to many of the trusts.

474.    Defendant knew of this investigation and the servicer events of default.

475.    In addition, in October 2010, Defendant sent a memorandum to the servicers of mortgage loans in RMBS trusts for which Defendant served as trustee. The memorandum specifically mentions media reports of servicer misconduct and demands notification from servicers regarding various problems.

476.    Thus, Defendant knew that servicers failed to implement proper quality control, audit and compliance standards and thus failed to adhere to the notification requirements in the governing agreements.

477.    This failure by the master servicer and servicers to prudently service the loans, notify Defendant of defective loans, and other associated problems constituted events of default, yet rather than adhere to its contractual obligations upon such a default, Defendant ignored the master servicer and servicer misconduct.

478.    Defendant and its responsible officers also received servicing reports and monthly remittance reports that revealed widespread modifications, large losses and write-downs, and poor loan quality. Through these reports, Defendant, based on its roles in the RMBS, knew that there were widespread breaches of representations and warranties that the master servicers and servicers had discovered but failed to give the required notification.

479.     This failure by the master servicer and servicers to notify the Defendant of defective loans and other associated problems constituted an Event of Default, yet rather than adhere to its contractual obligations upon such a default, Defendant ignored the master servicer and servicer misconduct.

480.     Defendant breached the governing agreements, its duties, and applicable law after becoming aware of all of the foregoing breaches, defaults, and/or Events of Default by failing to do the following:  provide notice of such breaches, defaults, and/or Events of Default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or Events of Default.

## IX.    DEFENDANT HAD CONFLICTS OF INTEREST

481.     Defendant failed and unreasonably refused to take action to protect the trusts and certificateholders against warrantor breaches and servicer violations because it would have revealed that Defendant was engaged in the same misconduct in its roles for other RMBS trusts.

482.     Many of the same banks or their affiliate entities that act as originators, sponsors, and servicers to the trusts were parties to trusts that included loans originated by Defendant. Accordingly, because Defendant itself faced enormous repurchase liability for loans sold in breach of representations and warranties, including loans in RMBS trusts sponsored by the same sponsors of the trusts, or trusts where the warrantors at issue here acted as trustee or servicer, Defendant was disincentivized to take any action to protect the trusts because it would benefit from similarly lenient treatment from other trustees.

483.     Defendant knew that these entities, acting as sponsor, trustee or servicer, were

aware of trusts with massive number of loans with breaches of representations and warranties where Defendant was the warrantor.

484.    Defendant also failed to take appropriate action due to it, and its affiliates, economic intertwinement with the parties it was supposed to police. Defendant's highly profitable securitization business was dependent upon the good graces of originators, servicers, and sponsors. Strictly enforcing repurchase obligations would have harmed important business relationships and cut off the supply of mortgage loans to Defendant's securitization arm.

485.    Defendant thus turned a blind eye to breaches of R&Ws in the hopes that counterparties would later return a favor. Defendant benefited from its decision not to act with regard to mortgage file deficiencies, R&W breaches, and events of default, and was economically beholden to sellers and servicers because Defendant faced repurchase liability for the sale and securitization of its own loans if Defendant took action against them. Defendant refused to act against sellers and servicers because doing so would have exposed Defendant's own misconduct as an originator, warrantor, seller, or servicer for other RMBS trusts in which these same entities served as either trustee or servicer. Further, this conflict was exacerbated by Defendant's ongoing business relationships with the originators, warrantors, sellers, servicers and related companies," the servicers' payment of Defendant's trustee fees, and Defendant's economic disincentive to declare EODs.

486.    Defendant's ongoing conflicts of interest are made further clear from a $7.2 billion settlement with the Department of Justice in which "Deutsche Bank admits making false representations and omitting material information from disclosures to investors about the loans included in RMBS securities sold by the Bank." DOJ Release, *Deutsche Bank Agrees to Pay $7.2 Billion for Misleading Investors in its Sale of Residential Mortgage-Backed Securities;*

*Deutsche Bank's Conduct Contributed to the 2008 Financial Crisis* (Jan. 17, 2017), *available at* https://www.justice.gov/opa/pr/deutsche-bank-agrees-pay-72-billion-misleading-investors-its-sale-residential-mortgage-backed (providing settlement agreement and statement of facts).

487.    "As part of the settlement, Deutsche Bank agreed to a detailed Statement of Facts," which "describes how Deutsche Bank knowingly made false and misleading representations to investors about the characteristics of the mortgage loans it securitized in RMBS worth billions of dollars issued by the bank between 2006 and 2007." *Id.* The settlement agreement was between DOJ and the Trustee's parent company, "Deutsche Bank AG, as well as its current and former subsidiaries and affiliates" which necessarily include Defendant here. Settlement Agreement at 1, https://www.justice.gov/opa/press-release/file/928096/download.

488.    Deutsche Bank intentionally misrepresented that the loans in the RMBS "were originated generally in accordance with mortgage loan originators' underwriting guidelines," "the value of the properties securing the loans, "the significant number of borrowers [who] had second liens on their properties," the accuracy of FICO scores, and "the true risk of losses of its RMBS." Statement of Facts at 2-3, https://www.justice.gov/opa/press-release/file/927271/download.

489.    Many of the loans involved in the securitizations at issue in the DOJ settlement were purchased from originators listed above in this SAC. *Id.* at 4. The Statement of Facts details internal knowledge by Deutsche Bank that the loans were not of the quality represented. *Id.* at 10-23.

490.    Defendant failed and unreasonably refused to take action to protect the trusts and certificateholders against warrantor breaches and servicer violations because doing so would have required the Defendant to take legal and policy positions contrary to its own

interests. In order to fulfill its obligation to enforce the repurchase of breaching loans in a

non-negligent manner, Defendant would have had to advocate for an expansive

interpretation of the repurchase obligation. Such an interpretation would conflict with

positions Defendant sought to take in defending its own poor origination practices.

## X.    THE "NO ACTION" CLAUSES DO NOT APPLY

491.    The "no action" clauses in the governing agreements do not apply to this lawsuit

because the claims are brought against Defendant as trustee, not against a third party. The PSAs

expressly permit suits against the trustee, stating that no provision of the agreements "shall be

construed to relieve the trustee . . . from liability for its own negligent action, its own negligent

failure to act, or its own willful misconduct."

492.    Additionally, under New York law, "no action" clauses do not apply to an action

against the trustee, as here, for its own wrongdoing. Defendant is not being asked to sue as

trustee to enforce rights and obligations under the governing agreements. Rather, this action

asserts claims against Defendant for breaching its contractual obligations.

493.    Because this is not an action, suit or proceeding that Defendant is capable of

bringing in its own name as trustee under the governing agreements, the "no action" clauses do

not apply.

494.    Compliance with the "no action" clauses' pre-suit requirements also would have

been futile. The no action clauses (if they applied) would require Plaintiffs to demand that

Defendant initiate proceedings against itself and to indemnify Defendant for its own liability to

the trusts, an absurd result that the parties did not intend. *See Cruden v. Bank of New York*, 957

F. 2d 961, 968 (2d Cir. 1992).

XI.   **DEFENDANT IMPERMISSIBLY HAS SEIZED, AND WILL CONTINUE TO SEIZE CERTIFICATEHOLDERS' TRUST FUNDS TO DEFEND AGAINST SUITS BY TRUST-BENEFICIARY INVESTORS**

A.    **The Parties Entered Binding Agreements Conveying Beneficial Ownership of the Trusts to Certificateholders**

495.    The trusts are created under common law and pursuant to the terms of the PSA for each trust. As such, the trusts are non-juridical entities that cannot own property, enter contracts, or sue or be sued. Legal title to trust assets rests with the trustee, Deutsche Bank, and equitable title to those assets rests with the trusts' beneficiaries, including Plaintiffs.

496.    Certificateholders obtain a beneficial interest in the trusts via the certificates. The PSA provides that:  "Through this Agreement, the Depositor intends to cause the issuance and sale of the HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2006-6 (the 'Certificates') representing in the aggregate *the entire beneficial ownership of the Trust Fund*…." Exh. I at 6, HVMLT 2006-6 PSA Prelim. Statement (emphasis added).

497.    These certificates are binding contracts between the certificateholders and Deutsche Bank, as trustee. The certificates, in turn, incorporate the terms of the trusts' governing PSAs and mutually bind certificateholders and Deutsche Bank to the terms thereof.

498.    The PSAs were drafted with the final aim of selling certificates to investors. Indeed, without the sale of certificates to investors, the PSAs would have no purpose or function. Accordingly, the trustee and other parties to the PSAs drafted the certificates and attached them to each PSA as a Form of Certificate for each tranche to be sold from the RMBS trust then being created.

499.    As set forth in a typical Form of Certificate relevant here:

> The Trust was created pursuant to a Pooling and Servicing Agreement dated as of June 1, 2006 (the 'Agreement') among the Depositor . . . the Seller . . . master servicer . . . and Deutsche Bank National Trust Company, as trustee . . . . This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Exh. I at 144, HVMLT 2006-6 PSA, Exhibit A, Form of Senior Certificate at A-3. The relevant language for each publicly available form of certificate is excerpted in Exhibit H § XI.

500.    The CCUs, whose interests Plaintiffs assumed, entered into these binding contracts with Deutsche Bank and the other parties to the PSAs between 2004 and 2007, on the Trade Date(s) shown in Exhibit A.

501.    Certificateholders and the trustee therefore mutually agreed to and accepted "the terms, provisions and conditions of the [Pooling and Servicing] Agreement" — becoming first parties to these contracts — upon acceptance of the certificates. The contracts are governed by New York law, *e.g.*, Exh. I, HVMLT 2006-6 PSA § 12.04, with the exception of two trusts (HVMLT 2004-7 and 2004-11), which are governed by Delaware law.

502.    The contracts between certificateholders and the Defendant trustee are subject to the firmly established American Rule against fee-shifting indemnities, and the rule that fee-shifting between litigation adversaries or first parties to contracts requires unmistakably clear contractual language to that effect. *See Hooper Assocs. v. AGS Computers, Inc.*, 74 N.Y. 2d 487 (1989). There is no clear (let alone unmistakably clear) contractual language authorizing Deutsche Bank to shift its litigation expenses to its adversaries, which are first-parties to the contractual arrangement.

503.    At the time certificateholders were presented with contractual terms in the certificates and fully incorporated PSAs, the certificates and the PSAs had already been drafted by others, including Deutsche Bank, and were presented to investors (including Plaintiffs'

predecessors) as contracts of adhesion. Plaintiffs or their predecessors did not participate in the

drafting process.

### B. Deutsche Bank's Limited Right to Indemnification from Certificateholders' Trust Funds Does Not Extend to Suits By Certificateholders

504.    The PSAs incorporated by reference in the investor certificates allow Deutsche

Bank to draw indemnification from the trust funds in limited circumstances.

**SECTION 8.05   Trustee's and Securities Administrator's Fees and Expenses**

[T]he Trustee and the Securities Administrator will be entitled to recover from the Distribution Account . . . all reasonable out-of-pocket expenses, disbursements and advances and the expenses of the Trustee . . . including without limitation, in connection with . . . any Event of Default, any breach of this Agreement or any claim or legal action (including any pending or threatened claim or legal action) incurred or made by the Trustee . . . in the performance of its duties or the administration of the trusts hereunder (including, but not limited to, the performance of its duties under Section 2.03 hereof) except any such expense, disbursement or advance as may arise from its negligence or intentional misconduct . . . .

Exhibit I, HVMLT 2006-6 PSA. The relevant PSA language for each trust is excerpted in

Exhibit H § X. PSA § 2.03 referenced in this provision is the same provision that requires the

trustee to provide notice and enforce repurchase of loans with material mortgage file defects or

R&W breaches. *See supra* ¶¶ 70-77.

505.    The "Distribution Account" from which this indemnity is drawn is part of the

"Trust Fund," — "the entire beneficial ownership" of which belongs to certificateholders. Exh. I,

HVMLT 2006-6 PSA § 1.01 (definition of "Trust Fund"); prelim. statement. This Distribution

Account and the larger Trust Fund is a non-juridical entity, functioning essentially as a bank

account, with legal title to the corresponding assets held by the trustee and equitable title to those

assets held by the beneficiary certificateholders.[9] Accordingly, the true indemnitors and the only cognizable entities that bear a burden when the Distribution Account or Trust Funds are depleted, are the beneficial owners of those funds, namely, the certificateholders, including Plaintiffs. In short, when Trust Funds are used to pay trustee defense costs, trust beneficiaries effectively pay the cost and bear the burden.

506.    That trust beneficiaries bear the cost of Deutsche Bank's unlawful withdrawals of trust funds for its litigation defense is also reflected in the distribution structure or payment "waterfall" detailed in the PSAs. "On each Distribution Date and after making any withdrawals from the Distribution Account pursuant to Section 4.03(a), the Securities Administrator, as Paying Agent, shall withdraw funds on deposit in the Distribution Account *to the extent of Available Funds* for each Loan Group for such Distribution Date and, based on the Distribution Date Statement provided by the Securities Administrator, make the following disbursements and transfers as set forth below: [listing priority of payments to certificateholders]." *Id.* § 5.01(a) (emphasis added). Thus, to the extent the Trustee receives funds from the Distribution Account for its legal expenses, "the extent of Available Funds" for certificateholders is directly reduced. Practically, then, the indemnitors under PSA § 8.05 again are the certificateholder beneficiaries that would otherwise receive the funds Deutsche Bank withdraws for its own indemnification.

507.    Certificateholders, which are parties to certificates and fully incorporated PSAs, are therefore the first-party indemnitors in under the applicable PSA provisions, and Deutsche Bank is the first-party indemnitee under the same provision. Indeed, if certificateholders are not

---

[9] As shown in Exhibit H § X, many of the relevant indemnification provisions provide for indemnification from the Trust Fund rather than the Distribution Account.  *E.g.*, BCAP 2007-AA1 Trust Agreement § 8.06. Whether drawn from the "Trust Fund" or the "Distribution Account," the indemnification comes from the functional equivalent of a bank account that is beneficially owned by investor beneficiaries.

treated as the first-party indemnitors, then *no one* would be, as there is no other real, legally cognizable entity or party who could be said to provide the indemnity drawn from the "Trust Fund" or "Distribution Account."

508.    Nothing in the PSAs' indemnity provisions clearly or unmistakably demonstrates the parties' intent for certificateholders to indemnify the trustee in suits brought by certificateholders against the trustee. Such indemnitor-indemnitee suits are not explicitly referenced. Nor are such suits covered by implication, as there are myriad third-party claims that would not involve fee shifting (*i.e.*, claims by third-parties to the indemnity provision that would not be providing the indemnification as a legal or practical matter) for which Deutsche Bank arguably could draw indemnification from the certificateholders' Distribution Account or Trust Funds.

509.    For example, in its role as enforcer of warrantors' repurchase obligations (*see, e.g.*, PSA § 2.03(a)), Deutsche Bank was required to incur legal costs including the costs of pursuing repurchase litigation if necessary. To ensure that this critical remedy did not go unenforced, the trustee could seek indemnification from the certificateholders' Distribution Account or Trust Funds to cover such costs, if they were not otherwise indemnified by another source.[10]

510.    RMBS trustees also faced suits *by* third parties (*i.e.*, parties not providing the indemnity) in the course of performing their trustee duties and arguably are allowed to use

---

[10] The governing agreements typically required the warrantor ultimately to bear the costs of repurchase litigation. For example, HVMLT 2006-9 PSA § 1.01 defines the "Purchase Price" at which the warrantor must buyback defective or breaching loans from the trust explicitly to include "in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03 hereof, expenses reasonably incurred or to be incurred by the Trustee in respect of the breach or defect giving rise to the purchase obligation." Under such provisions, to the extent the trustee initially drew indemnification from the trusts for enforcement, it was required to recover any such indemnification from the warrantor, either directly or as part of the repurchase price.

certificateholder trust funds for indemnification in such suits. For example, trustees were named as parties in foreclosure actions and faced numerous counterclaims in that capacity.[11] RMBS trustees also owned properties after foreclosing and faced liability from municipalities for harm caused by failure to maintain or control these trust-owned properties.[12] On information and belief, such trustees have taken the position that they are entitled to indemnification from trust funds for such third-party suits.

511.    Thus, to the extent § 8.05 arguably allows the trustee to draw indemnification from certificateholders' funds for certain third-party or non-indemnitor suits, it cannot be construed to cover first-party claims between investor certificateholders and the trustee. Nothing in § 8.05 would be rendered superfluous by construing § 8.05 as limited to such claims. On the other hand, certificateholder-beneficiaries will be economically disincentivized from vindicating their rights against Deutsche Bank when it breaches its trustee duties if § 8.05 were construed to apply to suits brought by certificateholders against the trustee, contrary to the American Rule and the policies favoring open access to the courts that underlie the New York Court of Appeal's decision in *Hooper*.

## C.    Deutsche Bank Is Not Entitled to Judgment-Shifting Indemnification

512.    Deutsche Bank's assertion that it is entitled to indemnity from certificateholders' Trust Funds raises the startling possibility that it will seek to force certificateholders, including Plaintiffs, to bear not only the cost of their adversary's fees, win or lose, but also any *judgment* or settlement secured in this case or any other case by investors against their trustee. To the

---

[11] *See, e.g.*, *U.S. Bank Nat. Ass'n v. Sorrentino*, 118 A.3d 607, 610 (2015); *U.S. Bank Nat. Ass'n v. Capparelli*, 2014 WL 2807648, at *1 (S.D. Fla. June 20, 2014).

[12] *See, e.g.*, Jessica Garrison & Angel Jennings, "Second Bank Is Sued Over Blight," L.A. Times (7/17/12), *available at* http://articles.latimes.com/2012/jul/17/local/la-me-us-bank-slumlord-20120717.

extent certificateholders must forego distributions from their Trust Funds to fund any recovery they obtain through proving Deutsche Bank's breach, they would be forced, absurdly, to pay their own recovery, while Deutsche Bank would pay nothing.

513.     Such a reading would be commercially unreasonable. Deutsche Bank would have incentives to breach its contractual obligations to certificateholders because certificateholders would have no recourse:  if investors sued and prevailed, they would recover only at the cost of depleting their own Trust Funds, diminishing payments on their investment. Certificateholders would therefore have no meaningful, enforceable rights under the contracts, rendering them illusory. Any construction that would authorize *judgment* shifting from a losing litigant to its successful adversary must be avoided pursuant to well-settled rules against absurd constructions.

**D.     Claims in this Litigation, If Proven, Would Necessarily Establish Deutsche Bank's Negligence, and Deutsche Bank Therefore Cannot Meet Its Burden of Proving Entitlement to Indemnification**

514.     As noted, Deutsche Bank is not entitled to indemnification under *Hooper* for its fees, costs, and expenses incurred in this suit because of settled rules against fee-shifting between adversaries, regardless which party prevails or the culpability of a party's conduct.

515.     But, even if *Hooper* were deemed not to apply — *Hooper* does apply — then indemnification nevertheless would be impermissible because in all events the PSAs expressly preclude indemnification for fees, expenses, and liability incurred as a result of "negligence or intentional misconduct." *See* Exh. I, HVMLT 2006-6 PSA § 8.05. The relevant PSA provisions for each trust are excerpted in Exhibit H § X. (Many PSAs also preclude indemnification for "willful misfeasance, bad faith, or negligence in the performance of any of the Trustee's duties under this Agreement." *E.g.*, BCAP 2007-AA1 Trust Agreement § 8.06). Notably, the plain terms of the PSAs subject Deutsche Bank to liability in suits brought by any party based on

simple negligence, including negligence in carrying out its contractual duties.

516.     In this suit, Plaintiffs allege that Deutsche Bank negligently failed to address mortgage loan document deficiencies and breaches of representations and warranties with respect to the loans, and that it failed to act reasonably following events of default, as required under the PSAs. Plaintiffs also allege that Deutsche Bank impermissibly acted under an ongoing conflict of interest and failed to carry out its ministerial duties with due care. Other investor suits against Deutsche Bank have plausibly alleged similar misconduct and have survived motions to dismiss.

517.     These allegations, detailed and supported throughout this complaint, reveal negligent, grossly negligent, willful, intentional, and/or bad faith misconduct, for which Deutsche Bank now seeks indemnification at the expense of the very certificateholders harmed by that misconduct.

518.     At a minimum, unless and until Deutsche Bank both (1) proves that *Hooper* does not apply (which Deutsche Bank cannot prove) *and* (2) successfully defends against these allegations, it cannot claim that the liability, fees, and expenses are indemnifiable. As the party seeking indemnification, Deutsche Bank bears the burden of proof and would ordinarily be able to obtain indemnification from its adversary only through a motion and order at the end of a case. Here, Deutsche Bank has access to investor-beneficiaries' Trust Funds only because of its unique role as trustee, but it should not be able to abuse that access by taking its adversaries' funds for indemnification without meeting the ordinary burden of proof.

**E.     Any Indemnification From Trust Funds Would Be Limited to Reasonable Fees and Expenses, and Deutsche Bank Has Been Billing The Trusts without Adequate Disclosure to Prove Its Expenses and Fees Are Reasonable**

519.     Deutsche Bank has failed to provide certificateholders with adequate disclosure of

the funds it has been withdrawing, presumably on a monthly basis and starting some years ago. In failing to disclose its improper use of trust funds, Deutsche Bank has been acting in its own interest, to the detriment of certificateholders, rather than acting for the benefit of certificateholders as required.

520.    Further, Deutsche Bank's lack of transparency, like the practice of raiding the trusts in the first place, directly violates some of the PSAs,[13] and, in any event makes clear that Deutsche Bank has not met its burden of proving entitlement to indemnification. Where Deutsche Bank may seek indemnification for attorneys' fees (under circumstances not at issue here), indemnification for such fees and expenses is limited only to "reasonable" amounts. *E.g.*, Ex. H § X, BCAP 2007-AA1 Trust Agreement § 8.06.

521.    The distribution statements do not, however, reveal the amount of indemnification taken from the Trust Fund or identify the general purpose of any money that was taken (such as the matter giving rise to the expense) or the party receiving the expenses and fees in the first instance.

522.    Plaintiffs therefore seek an order requiring Deutsche Bank to disclose the amounts it has billed with sufficient detail to ascertain the reasonableness of its indemnification withdrawals from the trusts to date (if it is entitled to any indemnification at all), and disgorgement of any amounts it cannot establish are reasonable. Plaintiffs will also seek this

---

[13] For example, under PSA § 5.04(a) for HVMLT 2006-9, Deutsche Bank is obligated to disclose to investors the amounts it seizes from the trusts for indemnification on monthly distribution statements: "On each Distribution Date, the Trustee shall make available to each Certificateholder … a statement based, as applicable, on loan-level information obtained from the Servicer (the 'Distribution Date Statement') as to the distributions to be made or made, as applicable, on such Distribution Date…. The Distribution Date Statement shall include the following information, in each case, with respect to such Distribution Date: … (ix) for each Loan Group, *the amount of fees, expenses or indemnification amounts paid by the Trust Fund with an identification of the general purpose of such amounts and the party receiving such amounts*."

information in the normal course of discovery.

## XII.   CLAIMS FOR RELIEF

### <u>COUNT ONE – BREACH OF CONTRACT</u>

523.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

524.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the NCUA Certificates.

525.    The Separate Trustee brings this count to recover damages arising at any time relating to the NGN Certificates.

526.    The PSAs are valid and binding contracts entered into between Defendant, each trust, the sponsors, the master servicers, the servicers, and depositors.

527.    The PSAs provide, among other things, the terms under which Defendant acts as trustee for the trusts.

528.    As current holders of certificates issued by each trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee. Further, the certificates and the PSAs they incorporate are to be construed as one contract between the certificateholders and the trustee.

529.    Defendant breached several obligations that it undertook on behalf of Plaintiffs as certificateholder including, without limitation, to perform or cause to be performed through its agents or custodians:

> (a)    take physical possession of the operative documents for the mortgage loans in the trusts;
>
> (b)    identify all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports;

     (c)     make accurate representations in final certifications and exception reports;

     (d)     render accurate reports under Regulation AB;

     (e)     protect the interests of the beneficiaries of the trusts;

     (f)     provide notice of material defects and enforce warrantor duties to repurchase loans lacking adequate documentation pursuant to PSA § 2 or similar sections;

     (g)     provide notice of material breaches of warrantor representations and warranties relating to the mortgage loans upon its discovery or receipt of notice of such breaches pursuant to PSA § 2 or similar sections;

     (h)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default under PSA § 7 or similar sections;

     (i)     enforce the repurchase obligations of the warrantors.

530.    The specific provisions breached by Defendant are further detailed herein and in the Exhibits hereto.[14]

531.    Defendant's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their certificates and diminished their value.

532.    Plaintiffs have performed their obligations under the PSAs.

533.    Defendant is liable to Plaintiffs for the losses they suffered as a direct result of Defendant's failure to perform its contractual obligations under the PSAs.

## COUNT TWO – NEGLIGENCE AND GROSS NEGLIGENCE

534.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

535.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to

---

[14] Full executed copies of each of the PSAs is solely in possession of the trustee and will be requested in discovery. Copies of those agreements, without signature pages but otherwise presumed to be true and accurate, are publically available on the SEC EDGAR website. Due to the number and length of the agreements, only the relevant portions have been attached hereto. Plaintiffs incorporate the full PSAs and governing agreement herein by reference.

recover damages arising at any time related to the NCUA Certificates.

536.    The Separate Trustee brings this count to recover damages arising at any time relating to the NGN Certificates.

537.    As set forth in detail above, Defendant owed the certificateholders, including Plaintiffs, extracontractual duties under the PSAs and as trustee for the trusts to perform its duties and administer the trusts without negligence.

538.    Defendant negligently and with gross negligence failed to avoid conflicts of interest and thus failed to protect the interests of the certificateholders.

539.    Defendant negligently and with gross negligence failed to perform with due care its ministerial duties as trustee, including (1) acting in good faith; (2) providing notice to certificateholders when appropriate, including when using trust funds for indemnification of the Defendant, when Defendant was informed of or otherwise discovered representation and warranty breaches, and when warrantors failed to repurchase breaching loans; and (3) acting with undivided loyalty to certificateholders.

540.    Defendant's negligence and gross negligence damaged Plaintiffs, impaired Plaintiffs' ability to fully collect the principal and interest due on their certificates and caused losses in the value of Plaintiffs' certificates.

## COUNT THREE – BREACH OF FIDUCIARY DUTY

541.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

542.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the NCUA Certificates.

543.    The Separate Trustee brings this count to recover damages arising at any time

relating to the NGN Certificates.

544.    As set forth in detail above, Defendant owed Certificateholders, including Plaintiffs, a fiduciary duty following Events of Default to act in good faith, with due care and undivided loyalty, and without conflicts of interest, when performing the obligations set forth in the PSAs, and, in addition, to exercise all powers under the PSAs prudently once an Event of Default occurred.

545.    As set forth in detail above, Defendant breached its post-Events of Default fiduciary obligations by failing to perform these obligations and by failing to avoid conflicts of interest and act with undivided loyalty.

546.    The violations by Defendant of its post-Events of Default fiduciary obligations impaired Certificateholders' ability to fully collect the principal and interest due on their certificates and caused losses in the value of Plaintiffs' certificates.

## COUNT FOUR – DECLARATORY JUDGMENT REGARDING RIGHT TO INDEMNIFICATION FROM THE TRUST FUNDS

547.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

548.    A valid and justiciable controversy exists between Plaintiffs and Deutsche Bank regarding Deutsche Bank's unlawful withdrawal of investor trust funds to fund its litigation defense of this and any similar suits brought by other investors, or to pay any judgment or settlement.

549.    Because investors, which are beneficial owners of all trust funds and assets, are the indemnitors that would bear their adversary's defense costs and are first parties to the certificates pursuant to *Hooper*, Deutsche Bank may not use trust funds to pay its litigation costs or to fund any judgment in this or any similar suit brought by different investors.

160

550.    Plaintiffs therefore seek a declaration that Deutsche Bank is not permitted indemnification from the trusts for any loss, liability, expense (including attorney fees), or judgment associated with this case or any other case brought by an investor against Deutsche Bank for breach of its trustee duties.

551.    Plaintiffs likewise seek a declaration that Deutsche Bank must disclose the amount of indemnification it has billed each trust for this litigation and for any other litigation brought by an investor against Deutsche Bank for breach of its trustee duties.

552.    As a fallback, even if *Hooper* were deemed not to apply — *Hooper* does apply — then Deutsche Bank still would not be entitled to indemnification from the trusts for any loss, liability, expense, or judgment because the PSA carve-out precluding such indemnification for negligent, grossly negligent or willful conduct would apply. Plaintiffs therefore further contend, in the alternative, that Deutsche Bank is not entitled to advancement of legal fees from the trusts or indemnification from the trusts unless and until it has proven its entitlement to such relief.

553.    The requested declaratory judgment will serve a useful purpose in clarifying and settling the legal issue regarding the parties' relative burdens in this case and the stakes in this litigation.  The requested declaratory judgment will also serve a useful purpose in removing Deutsche Bank's distorted litigation incentives, which are presently based on an assumption of limitless litigation resources paid for by its adversaries.

### COUNT FIVE – BREACH OF CONTRACT REGARDING UNLAWFUL WITHDRAWALS FROM TRUST FUNDS AND DISGORGEMENT

554.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

555.    As set forth in detail above, the certificates and fully incorporated PSAs are enforceable contracts between the parties.

556.    These agreements do not permit Deutsche Bank to draw indemnification from the trusts for any purpose associated with this case or any other case brought by an investor against Deutsche Bank for breach of its trustee duties. And in all events the PSAs do not permit Deutsche Bank to draw such indemnification before it has met its burden of proving entitlement to indemnification, including proving the reasonableness of the amounts withdrawn.

557.    Deutsche Bank has breached these agreements by drawing indemnification from the Trust Funds for purposes associated with this case and other cases brought by investors against Deutsche Bank for breach of its trustee duties and without meeting its burden of proving entitlement to indemnification, including proving the reasonableness of the amounts withdrawn. Deutsche Bank's breaches deprived Plaintiffs of consideration and have caused Plaintiffs to suffer damages in the amount of all legal charges, fees, and expenses of any kind billed to the trusts to-date in relation to this case or any other case brought by an investor against Deutsche Bank for breach of its trustee duties.

558.    Deutsche Bank is liable to Plaintiffs for damages caused by its breach of contract and should be ordered to disgorge all funds impermissibly seized from the trusts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    An award of all appropriate damages and/or equitable relief in favor of Plaintiffs against Defendant for breaches of its common law duties in an amount to be determined at trial, including any applicable pre- or post-judgment interest thereon;

B.    Compelling Deutsche Bank to provide an accounting of the legal fees and costs it has sought and/or received from the trusts associated with this case or any other case brought by an investor against Deutsche Bank for breach of its trustee duties;

C.      Providing declaratory relief in favor of Plaintiffs and pursuant to *Hooper* to establish that Deutsche Bank is prohibited from using Trust Funds as indemnification for any purpose associated with this case or any other case brought by an investor against Deutsche Bank for breach of its trustee duties;

D.      Disgorging any Trust Funds Deutsche Bank has improperly taken from the Trusts associated with this case or any other case brought by an investor against Deutsche Bank for breach of its trustee duties;

E.      Awarding Plaintiffs all reasonable costs and expenses incurred in this action, including attorney's fees, expert fees, and any other properly taxable costs and expenses; and

F.      Any other relief that the Court deems just and proper.

## XIII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues properly triable.

Dated: October 5, 2018

David C. Frederick
Scott K. Attaway
Matthew M. Duffy
Frederick G. Hall
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dfrederick@kelloghansen.com
sattaway@kelloghansen.com
mduffy@kelloghansen.com
fhall@kelloghansen.com

David H. Wollmuth
William A. Maher
Steven S. Fitzgerald
Ryan A. Kane
WOLLMUTH MAHER & DEUTSCH
LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com

Of Counsel:
Michael J. McKenna, General Counsel
Alan R. Burch, Associate General
Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314
mmckenna@ncua.gov
aburch@ncua.gov

By:  *George A. Zelcs*

George A. Zelcs
John A. Libra
Max C. Gibbons
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
mgibbons@koreintillery.com
mdavies@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

*Attorneys for the National Credit Union
Administration Board as liquidating agent
and Graeme W. Bush as Separate Trustee*